1
SCOTT + SCOTT LLP
Arthur L. Shingler III (181719)
2
600 B Street, Suite 1500
San Diego, CA  92101
3
Tel.: 619/233-4565
Fax: 619/233-0508
4

5
SCOTT + SCOTT LLP
David R. Scott
6
108 Norwich Avenue
P.O. Box 192
7
Colchester, CT 06415
Tel.: 860/537-5537
Fax.: 860/537-4432
8

9
*Counsel for Plaintiff Charles R. King*

10

11
**UNITED STATES DISTRICT COURT**

12
**NORTHERN DISTRICT OF CALIFORNIA**

13

14
CHARLES R. KING, Derivatively on Behalf of Nominal Defendant, VERIFONE HOLDINGS, INC.,

15
                    Plaintiff,

16
          vs.

17

18
DOUGLAS G. BERGERON, JAMES C. CASTLE, LESLIE G. DENEND, ALEX W. (PETE) HART, ROBERT B. HENSKE, EITAN RAFF, CHARLES R. RINEHART, COLLIN E. ROCHE, CRAIG A. BONDY, and BARRY ZWARENSTEIN,

19

20

21
                    Defendants,

22
          -and-

23
VERIFONE HOLDINGS, INC.,

24
                    NOMINAL DEFENDANT.

25

26

27

28

Case No. C 07-cv-06347-MHP

**DECLARATION OF ARTHUR L. SHINGLER III IN SUPPORT OF PLAINTIFF CHARLES R. KING'S MOTION TO CONSOLIDATE RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT LEAD PLAINTIFF AND LEAD COUNSEL**

Judge:  The Hon. Marilyn H. Patel

Courtroom: 15

**Hearing Date:  April 28, 2008**

**Hearing Time:  2:00 p.m.**

DECLARATION OF ARTHUR L. SHINGLER III IN SUPPORT OF PLAINTIFF CHARLES R. KING'S MOTION TO CONSOLIDATE RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT LEAD PLAINTIFF AND LEAD COUNSEL

| | |
|---|---|
| ARTHUR HILBORN, Derivatively on Behalf of Nominal Defendant, VERIFONE HOLDINGS, INC., | Case No. C 08-cv-01132-PVT |
|        Plaintiff, | |
|     vs. | |
| DOUGLAS G. BERGERON, JESSE ADAMS, ISAAC ANGEL, WILLIAM ATKINSON, CRAIG A. BONDY, JAMES C. CASTLE, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, CHARLES R. RINEHART, COLLIN E. ROCHE, ELMORE WALLER, and BARRY ZWARENSTEIN, | |
|        Defendants, | |
|   -and- | |
| VERIFONE HOLDINGS, INC., | |
|        NOMINAL DEFENDANT. | |
| ARUNBHAI PATEL, Derivatively on Behalf of Nominal Defendant, VERIFONE HOLDINGS, INC., | Case No. C 08-cv-01133-HRL |
|        Plaintiff, | |
|     vs. | |
| DOUGLAS G. BERGERON, JESSE ADAMS, ISAAC ANGEL, WILLIAM ATKINSON, CRAIG A. BONDY, JAMES C. CASTLE, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, CHARLES R. RINEHART, COLLIN E. ROCHE, ELMORE WALLER, and BARRY ZWARENSTEIN, | |
|        Defendants, | |
|   -and- | |
| VERIFONE HOLDINGS, INC., | |
|        NOMINAL DEFENDANT. | |

DECLARATION OF ARTHUR L. SHINGLER III IN SUPPORT OF PLAINTIFF CHARLES R. KING'S MOTION TO CONSOLIDATE RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT LEAD PLAINTIFF AND LEAD COUNSEL

MARY LEMMOND and WANDELL
EVERETT, Derivatively on Behalf of
VERIFONE HOLDINGS, INC.,

   Plaintiff,

  vs.

DOUGLAS G. BERGERON, BARRY
ZWARENSTEIN, JESSE ADAMS,
ISAAC ANGEL, ELMORE WALLER,
COLLIN E. ROCHE, JAMES C. CASTLE,
LESLIE G. DENEND, ALEX W. HART,
ROBERT B. HENSKE, CHARLES R.
RINEHART, EITAN RAFF, WILLIAM G.
ATKINSON, CRAIG A. BONDY, GTCR
GOLDER RAUNER, LLC, and DOES 1-
25, inclusive,

   Defendants,

  -and-

VERIFONE HOLDINGS, INC., a
Delaware Corporation

   NOMINAL DEFENDANT.

Case No. C 08-cv-01301-RS

I, Arthur L. Shingler III, declare as follows:

  1.  I am an attorney duly licensed by the State of California and a Partner with the law firm of Scott + Scott LLP, counsel for Plaintiff Charles R. King ("Plaintiff") in the above-captioned action. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

  2.  I provide this declaration in support of Plaintiff Charles R. King's Motion To Consolidated Related Derivative Shareholder Actions and Appoint Lead Plaintiff and Lead Counsel (the "Motion).

  3.  Attached as Exhibit 1 is a true and correct copy of a complaint captioned *Hilborn v. Bergeron, et al.*, Case No. C 08-1132 PVT filed on February 26, 2008 and assigned to the Honorable Patricia V. Trumbell.

DECLARATION OF ARTHUR L. SHINGLER III IN SUPPORT OF PLAINTIFF CHARLES R. KING'S MOTION TO CONSOLIDATE
RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT LEAD PLAINTIFF AND LEAD COUNSEL

4.    Attached as Exhibit 2 is a true and correct copy of a complaint captioned *Patel v. Bergeron, et al.*, Case No. C 08-1133 HRL filed on February 26, 2008 and assigned to the Honorable Howard R. Lloyd.

5.    Attached as Exhibit 3 is a true and correct copy of a complaint captioned *Lemmond, et al. v. VeriFone Holdings, Inc., et al.*, Case No. C 08-1301-RT filed on March 5, 2008 and assigned to the Honorable Richard Seeborg.

6.    Attached as Exhibit 4 is a true and correct copy of the resume of Scott + Scott, LLP.

7.    Scott + Scott secured important settlements in a number of shareholder derivative actions, including Lattice Semiconductor Corporation in *In re Lattice Semiconductor Corp. Deriv. Litig.*, Case No. C 043327CV (Cir. Ct. Oregon).  This settlement was significant not only in monetary terms, but also in the reforms that the recovery initiated, including termination of the then CEO, termination and adoption of significant changes to the company's auditing, insider trading, executive compensation and other internal practices.  Scott + Scott was similarly instrumental in negotiating critical changes to Lattice's Board independence, selection and accountability.

8.    Scott + Scott was also responsible for negotiating the shareholder derivative settlement in the 9th Circuit in *Knowles et al v. Yuen et al*, Case No. 2:02-cv-8440 (C.D. Ca.), which was a derivative action brought on behalf of Gemstar TV Guide Incorporated.  In that settlement, Scott + Scott worked diligently and cooperatively with the Securities and Exchange Commission to successfully stop severance payments to executives under principles of equity and applicable provisions of the Sarbanes-Oxley Act.  Ultimately, substantial reforms to Gemstar's corporate governance were affected through the settlement that Scott + Scott negotiated on the shareholder's behalf, including a reconstituted board with increased size, mandated independence for two-thirds of the board as a whole and creation of a Lead Independent Director.

9.    Scott + Scott possesses a substantial amount of complex litigation experience nationwide, actively prosecuting and litigating complex securities fraud class actions, employee retirement cases under the Employee Retirement Income Security Act, antitrust cases, consumer

DECLARATION OF ARTHUR L. SHINGLER III IN SUPPORT OF PLAINTIFF CHARLES R. KING'S MOTION TO CONSOLIDATE RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT LEAD PLAINTIFF AND LEAD COUNSEL

1  rights matters, and human rights litigation.  To date, Scott + Scott has recovered hundreds of

2  millions of dollars in settlements and awards for injured shareholders and consumers.

3        I declare, under penalty of perjury, that the foregoing is true and correct to the best of my

4  knowledge and that the declaration was executed on March 18, 2008 at San Diego, California.

5

6                                          /s/ Arthur L. Shingler III
                                         ARTHUR L. SHINGLER III
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on March 18, 2008, I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF system that will send notification of such a filing to the email addresses

4   denoted on the attached Electronic Mail Notice List for Case No. 3:07-cv-06140-MHP, and I hereby

5   certify that I have mailed the foregoing document via the United States Postal Service to the non-

6   CM/ECF participants indicated on the attached Manual Notice Lists for Case No. 5:08-cv-01133-

7   HRL and Case No. 5:08-cv-01132-PVT and 5:08-cv-01301-RS.

8          I certify under penalty of perjury under the laws of the United States of America that the

9   forgoing is true and correct. Executed on March 18, 2008.

10

11

12

13                                                              /s/Arthur L. Shingler III
                                                          ARTHUR L. SHINGLER III

14

15                                          SCOTT + SCOTT LLP
                                            600 B Street, Suite 1500
16                                          San Diego, CA 92101
                                            Tel.: (619) 233-4565
17                                          Fax: (619) 233-0508

18

19

20

21

22

23

24

25

26

27

28
                                                                                              - 4 -
DECLARATION OF ARTHUR L. SHINGLER III IN SUPPORT OF PLAINTIFF CHARLES R. KING'S MOTION TO CONSOLIDATE
RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT LEAD PLAINTIFF AND LEAD COUNSEL

1

**MANUAL NOTICE LIST**

2   Francis A. Bottini, Jr.                          Eran Rubinstein
    Derek J. Wilson                                  Susan Boltz Rubinstein
3   JOHNSON BOTTINI, LLP                             11 Grace Avenue
    655 West Broadway, Suite 1400                    Suite 306
4   San Diego, CA 92101                              Great Neck, NY 11021

5   Nichole Browning                                 James H. Miller
    L. Timothy Fisher                                Eric L. Zagar
6   SCHIFFRIN BARROWAY TOPAZ &                       SCHRIFFRIN BARROWAY TOPAZ &
    KESSLER LLP                                      KESSLER,LLP
7   2125 Oak Grove Road                              280 King of Prussia Road
    Sutie 120                                        Radnor, PA 19087
8   Walnut Creek, CA 94598

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
DECLARATION OF ARTHUR L. SHINGLER III IN SUPPORT OF PLAINTIFF CHARLES R. KING'S MOTION TO CONSOLIDATE
RELATED SHAREHOLDER DERIVATIVE ACTIONS AND APPOINT LEAD PLAINTIFF AND LEAD COUNSEL

EXHIBIT 1

1  SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
   Alan R. Plutzik, Of Counsel (Bar No. 077785)
2  L. Timothy Fisher, Of Counsel (Bar No. 191626)
   Nichole Browning (Bar No. 251937)
3  2125 Oak Grove Road, Suite 120
   Walnut Creek, CA 94598
4  Telephone: (925) 945-0770
   Facsimile: (925) 945-8792
5  -and-

6  Eric L. Zagar
   James H. Miller
7  280 King of Prussia Road
   Radnor, PA 19087
8  Telephone: (610) 667-7706
   Facsimile: (610) 667-7056
9  Attorneys for Plaintiff

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13  ARTHUR HILBORN, Derivatively on Behalf of
    Nominal Defendant, VERIFONE HOLDINGS,
14  INC.,

15                Plaintiff,                      Case No.:   C08   01132
                                                                         PVT
16       v.

17  DOUGLAS G. BERGERON, JESSE ADAMS,            VERIFIED SHAREHOLDER
    ISAAC ANGEL, WILLIAM ATKINSON,              DERIVATIVE COMPLAINT
18  CRAIG A. BONDY, JAMES C. CASTLE,
    LESLIE G. DENEND, ALEX W. HART,
19  ROBERT B. HENSKE, CHARLES R.
    RINEHART, COLLIN E. ROCHE, ELMORE
20  WALLER, and BARRY ZWARENSTEIN,

21                Defendants,

22       and

23  VERIFONE HOLDINGS, INC.,

24                Nominal Defendant.

25

26       **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

27       Plaintiff, by the undersigned attorneys, submits this Verified Shareholder Derivative

28  Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought for the benefit of nominal defendant VeriFone Holdings, Inc. ("VeriFone" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2.    In contravention of their fiduciary duties, the defendants failed to ensure the effectiveness of the Company's internal controls. Despite these known failures, defendants caused the Company to disseminate to the public false and misleading statements that materially overstated VeriFone's financial results by failing to properly value inventory and cost of net revenue. In further violation of their fiduciary duties, certain defendants, based on their knowledge of material non-public information regarding the Company, sold 8,879,613 shares of VeriFone stock, garnering over *$332 million* in proceeds for their own personal benefit.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

4.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

5.    Plaintiff Arthur Hilborn ("Plaintiff") is a shareholder of nominal defendant VeriFone, was a shareholder of VeriFone at the time of the wrongdoing alleged herein, and has

- 2 -

1    been a shareholder of VeriFone continuously since that time. Plaintiff is a citizen of the State of

2    Washington.

3        6.    Nominal defendant VeriFone is a corporation incorporated under the laws of the

4    State of Delaware, and maintains its principal executive offices at 2099 Gateway Place Suite 600,

5    San Jose, CA 95110. According to its public filings, VeriFone provides expertise, solutions, and

6    services that add value to the point of sale with merchant-operated, consumer-facing, and self-

7    service payment systems for the financial, retail, hospitality, petroleum, government, and

8    healthcare vertical markets.

9        7.    Defendant Douglas G. Bergeron ("Bergeron") is, and was at all times relevant

10    hereto, the Chief Executive Officer ("CEO") and Chairman of the Board ("Chairman") of

11    VeriFone. Bergeron has served as the CEO and Chairman of VeriFone since July 2001. At times

12    relevant hereto, Bergeron sold more than 1.4 million shares of VeriFone common stock for

13    proceeds in excess of $56.5 million based upon the knowledge that the Company had materially

14    overstated its inventory levels and materially understated its cost of net revenues, thereby

15    materially overstating its net income. Notably, defendant Bergeron sold 43,300 shares of VeriFone

16    common stock for proceeds in excess of $1.9 million on November 26, 2007, only 8 calendar days

17    before the Company announced on December 3, 2007 that it would be restating its financial results

18    for the first three fiscal quarters of fiscal 2007, and delaying the release of its financial results for

19    the fiscal quarter ended October 31, 2007. Prior to assuming his roles as Chairman and CEO of

20    VeriFone, Bergeron served as the President and CEO of Geac Computer Corporation ("Geac")

21    from April 1999 to October 2000 alongside defendant Adams, who served as a division president

22    and Senior Vice President of Geac from July 1999 through December 2000. Upon information and

23    belief, Bergeron is a citizen of the State of California.

24        8.    Defendant Jesse Adams ("Adams") is, and was at all times relevant hereto, the Vice

25    Chairman of the Board ("Vice Chairman") of VeriFone. Adams has served as the Vice Chairman

26    of VeriFone since November 2006. Prior to serving as VeriFone's Vice Chairman, Adams served

27    as the Company's Executive Vice President ("EVP") of North American Sales from July 2001 until

28    October 2006. At times relevant hereto, Adams sold more than 129,000 shares of VeriFone stock

- 3 -

1    for proceeds in excess of $4.6 million based upon the knowledge that the Company had materially

2    overstated its inventory levels and materially understated its cost of net revenues, thereby

3    materially overstating its net income. Prior to beginning his service at VeriFone, Adams served as

4    a division president and Senior Vice President of Geac from July 1999 through December 2000

5    alongside defendant Bergeron, who served as the President and CEO of Geac from April 1999 to

6    October 2000. Upon information and belief, Adams is a citizen of the State of California.

7         9.    Defendant Isaac Angel ("Angel") is, and was at all times relevant hereto,

8    VeriFone's EVP of Global Operations. Angel has served as the Company's EVP of Global

9    Operations since November 2006. At times relevant hereto, Angel sold approximately 135,000

10    shares of VeriFone stock for proceeds of nearly $5.2 million based upon the knowledge that the

11    Company had materially overstated its inventory levels and materially understated its cost of net

12    revenues, thereby materially overstating its net income. Upon information and belief, Angel is a

13    citizen of Israel.

14         10.    Defendant William Atkinson ("Atkinson") was at times relevant hereto VeriFone's

15    EVP of Payment Systems. Atkinson served as the Company's EVP of Payment Systems from

16    November 2006 to July 2007, and served the Company in other capacities prior to this position. At

17    times relevant hereto, Atkinson sold approximately 117,000 shares of VeriFone stock for proceeds

18    in excess of $4.4 million based upon the knowledge that the Company had materially overstated its

19    inventory levels and materially understated its cost of net revenues, thereby materially overstating

20    its net income. Upon information and belief, Atkinson is a citizen of the State of California.

21         11.    Defendant Craig A. Bondy ("Bondy") was at times relevant hereto a director of

22    VeriFone. Bondy served as a director of VeriFone from July 2002 until his resignation on October

23    1, 2007. During the relevant period, defendants Bondy and Roche were affiliated with GTCR

24    Golder Rauner, L.L.C. ("GTCR"). At times relevant hereto, Bondy, through GTCR, sold

25    approximately 6.8 million shares of VeriFone stock for proceeds in excess of $251 million based

26    upon the knowledge that the Company had materially overstated its inventory levels and materially

27    understated its cost of net revenues, thereby materially overstating its net income. Upon

28    information and belief, Bondy is a citizen of the State of Illinois.

- 4 -

1        12.    Defendant James C. Castle ("Castle") is, and was at all times relevant hereto, a

2    director of VeriFone. Castle has served as a director of VeriFone since January 2005. At all times

3    relevant hereto, Castle served as a member of the Audit Committee of the Board ("Audit

4    Committee"). At times relevant hereto, Castle sold approximately 4,500 shares of VeriFone stock

5    for proceeds in excess of $176,000 based upon the knowledge that the Company had materially

6    overstated its inventory levels and materially understated its cost of net revenues, thereby

7    materially overstating its net income. Upon information and belief, Castle is a citizen of the State

8    of California.

9        13.    Defendant Leslie G. Denend ("Denend") is, and was at all times relevant hereto, a

10   director of VeriFone. Denend has served as a director of VeriFone since January 2005. At all

11   times relevant hereto, Denend served as a member of the Audit Committee and the Compensation

12   Committee of the Board (the "Compensation Committee"). Upon information and belief, Denend

13   is a citizen of the State of California.

14       14.    Defendant Alex W. Hart ("Hart") is, and was at all times relevant hereto, a director

15   of VeriFone. Hart has served as a director of VeriFone since July 2006. Upon information and

16   belief, Hart is a citizen of the State of California.

17       15.    Defendant Robert B. Henske ("Henske") is, and was at all times relevant hereto, a

18   director of VeriFone. Henske has served as a director of VeriFone since January 2005. At all

19   times relevant hereto, Henske has served as a member and chairman of the Audit Committee, and

20   as a member of the Compensation Committee. Upon information and belief, Henske is a citizen of

21   the State of California.

22       16.    Defendant Charles R. Rinehart ("Rinehart") is, and was at all times relevant hereto,

23   a director of VeriFone. Rinehart has served as a director of VeriFone since May 2006. At all times

24   relevant hereto, Rinehart has served as a member of the Audit Committee. Upon information and

25   belief, Rinehart is a citizen of the State of California.

26       17.    Defendant Collin E. Roche ("Roche") is, and was at all times relevant hereto, a

27   director of VeriFone. Roche has served as a director of VeriFone since July 2002. At all times

28   relevant hereto, Roche has served as a member of the Compensation Committee. During the

- 5 -

1    relevant period, defendants Roche and Bondy were affiliated with GTCR. At times relevant

2    hereto, Roche, through GTCR, sold approximately 6.8 million shares of VeriFone stock for

3    proceeds in excess of $251 million based upon the knowledge that the Company had materially

4    overstated its inventory levels and materially understated its cost of net revenues, thereby

5    materially overstating its net income. Upon information and belief, Roche is a citizen of the State

6    of Illinois.

7        18.    Defendant Elmore Waller ("Waller") is, and was at all times relevant hereto,

8    VeriFone's EVP of Integrated Solutions. Waller has served as the Company's EVP of Integrated

9    Solutions since December 2004. At times relevant hereto, Waller sold approximately 90,000

10   shares of VeriFone stock for proceeds in excess of $3.5 million based upon the knowledge that the

11   Company had materially overstated its inventory levels and materially understated its cost of net

12   revenues, thereby materially overstating its net income. Upon information and belief, Waller is a

13   citizen of the State of Florida.

14       19.    Defendant Barry Zwarenstein ("Zwarenstein") is, and was at all times relevant

15   hereto, VeriFone's EVP and Chief Financial Officer ("CFO"). Zwarenstein has served as the

16   Company's CFO since June 2004, and as EVP since November 2006. Previously, Zwarenstein

17   served the Company in various other capacities. At times relevant hereto, Zwarenstein sold more

18   than 161,000 shares of VeriFone stock for proceeds in excess of $6.2 million based upon the

19   knowledge that the Company had materially overstated its inventory levels and materially

20   understated its cost of net revenues, thereby materially overstating its net income. Upon

21   information and belief, Zwarenstein is a citizen of the State of California.

22       20.    Collectively, defendants Castle, Denend, Henske, and Rinehart may be referred to

23   herein as the "Audit Committee Defendants." Collectively, defendants Denend, Henske, and

24   Roche may be referred to herein as the "Compensation Committee Defendants." Collectively,

25   defendants Bergeron, Bondy, Castle, Denend, Hart, Henske, Rinehart, and Roche may be referred

26   to herein as the "Director Defendants." Collectively, defendants Adams, Angel, Atkinson,

27   Bergeron, Waller, and Zwarenstein may be referred to herein as the "Officer Defendants."

28

1    Together, the Director Defendants and Officer Defendants may be referred to herein as the

2    "Individual Defendants," and together with VeriFone, "Defendants."

3    ### DUTIES OF THE INDIVIDUAL DEFENDANTS

4        21.    By reason of their positions as officers and/or directors of the Company and because

5    of their ability to control the business and corporate affairs of the Company, the Individual

6    Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust,

7    loyalty, and due care, and were and are required to use their utmost ability to control and manage

8    the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

9    required to act in furtherance of the best interests of the Company and its shareholders so as to

10   benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each

11   director and officer of the Company owes to the Company and its shareholders the fiduciary duty

12   to exercise good faith and diligence in the administration of the affairs of the Company and in the

13   use and preservation of its property and assets, and the highest obligations of fair dealing.

14       22.    To discharge their duties, the officers and directors of the Company were required to

15   exercise reasonable and prudent supervision over the management, policies, practices and controls

16   of the Company.  By virtue of such duties, the officers and directors of the Company were required

17   to, among other things:

18       a.    Exercise good faith to ensure that the affairs of the Company were
19              conducted in an efficient, business-like manner so as to make it possible to
                provide the highest quality performance of its business;

20       b.    Exercise good faith to ensure that the Company was operated in a diligent,
21              honest and prudent manner and complied with the Company's by-laws and
                all applicable federal and state laws, rules, regulations and requirements,
22              including acting only within the scope of its legal authority;

23       c.    Exercise good faith to ensure that the Company's financial statements were
                prepared in accordance with Generally Accepted Accounting Principles
24              ("GAAP");

25       d.    Exercise good faith in supervising the preparation and filing of all financial
                statements and other financial information required by law, including
26              periodic financial statements and reports filed with the Securities and
                Exchange Commission ("SEC"), and in examining and evaluating the
27              financial statements and other information concerning the financial affairs of
                the Company;

28

1        e.    When placed on notice of improper or imprudent conduct by the Company
    and/or its employees, exercise good faith in taking action to correct the
2        misconduct and prevent its recurrence; and

3        f.    Act in furtherance of the best interests of the Company and its shareholders
    so as to benefit all shareholders equally and not in furtherance of their
4        personal interest or benefit.

5       23.    The Individual Defendants, particularly the Audit Committee Defendants Castle,

6  Denend, Henske, and Rinehart, were responsible for maintaining and establishing adequate internal

7  accounting controls for the Company and to ensure that the Company's financial statements were

8  based on accurate financial information. According to GAAP and SEC rules, to accomplish the

9  objectives of accurately recording, processing, summarizing, and reporting financial data, a

10  corporation must establish an internal accounting control structure. Among other things, the

11  Individual Defendants were required to:

    a.    Make and keep books, records, and accounts, which, in reasonable detail,
12        accurately and fairly reflect the transactions and dispositions of the assets of
    the issuer; and
13

    b.    Devise and maintain a system of internal accounting controls sufficient to
14        provide reasonable assurances that –

15        i.    transactions are executed in accordance with management's general
    or specific authorization; and
16

    ii.    transactions are recorded as necessary to permit preparation of
17        financial statements in conformity with [GAAP].

18       24.    VeriFone's Audit Committee Charter provides that the Audit Committee shall,

19  among other things:

20        a.    meet to review and discuss the quarterly financial statements, including
    reviewing the Company's specific disclosures under "Management's
21        Discussion and Analysis of Financial Condition and Results of Operations,"
    with management and the independent auditors prior to the filing of the
22        Company's Quarterly Report on Form 10-Q. Also, the Committee shall
    discuss the results of the quarterly review and any other matters required to
23        be communicated to the Committee by the independent auditors under
    generally accepted auditing standards;
24

    b.    review and discuss the type and presentation of information to be included in
25        earnings press releases, as well as financial information and earnings
    guidance provided to analysts and rating agencies; and
26

    c.    discuss with management, the internal auditors, and the independent auditors
27        the adequacy and effectiveness of internal control over financial reporting,
    including any significant deficiencies or material weaknesses identified by
28        management of the Company in connection with its required quarterly

certifications under Section 302 of the Sarbanes-Oxley Act which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting. In addition, the Committee shall discuss with management, the internal auditors, and the independent auditors any significant changes in internal control over financial reporting that are disclosed, or considered for disclosures, in the Company's periodic filings with the SEC.

25.    According to the Audit Committee Charter:

The Committee's review of the Company's financial statements and disclosures shall include: (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles, and major issues as to the adequacy of the company's internal controls and any specific remedial actions adopted in light of material control deficiencies; (ii) discussions with management and the independent auditors regarding significant financial reporting issues and judgments made in connection with the preparation of the financial statements and the reasonableness of those judgments, including analyses of the effects of alternative GAAP methods on the financial statements; (iii) consideration of the effect of regulatory accounting initiatives, as well as off-balance sheet structures on the financial statements; (iv) consideration of the judgment of both management and the independent auditors about the quality, not just the acceptability of accounting principles; and (v) the clarity of the disclosures in the financial statements. Also, the Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under professional standards.

26.    VeriFone's Compensation Committee charter provides that the Compensation Committee is responsible for, among other things:

a.    Reviewing and approving corporate goals and objectives relevant to the compensation of VeriFone's Chief Executive Officer ("CEO"), evaluating the CEO's performance in light of those goals and objectives and, either as a committee or together with the other independent directors (as directed by the Board), determining and approving the CEO's compensation level based on this evaluation;

b.    Making recommendations to the Board with respect to non-CEO compensation, incentive-compensation plans and equity-based plans, including the VeriFone Bonus Plan and the 2006 Equity Incentive Plan, overseeing the activities of the individuals responsible for administering these plans, and discharging any responsibilities imposed on the Compensation Committee by any of these plans; and

c.    In consultation with management, overseeing regulatory compliance with respect to compensation matters, including overseeing VeriFone's policies on structuring compensation programs to preserve tax deductibility, and, as and when required, establishing performance goals and certifying that

- 9 -

1    performance goals have been attained for purposes of Section 162(m) of the
     Internal Revenue Code.

2

3                              **FACTUAL ALLEGATIONS**

4                     *The Company's False and Misleading Statements*

5        27.        Between March 9, 2007 and December 3, 2007, the Individual Defendants knew

6    that the Company's internal financial controls were ineffective.    The Company's ineffective

7    internal controls, and the Individual Defendants' failure to ensure their effectiveness, resulted in

8    the Company materially overstating its financial results by failing to properly value its inventory

9    and cost of net revenue.

10       28.        During this time period, the Individual Defendants knowingly caused the Company

11   to make a series of false and misleading statements concerning the Company's financial condition,

12   materially misrepresenting that the Company's financial condition was better than it actually was.

13   Furthermore, VeriFone, through the Individual Defendants, made a series of false and misleading

14   statements concerning the condition of the Company's internal controls, materially misrepresenting

15   that the Company maintained sound internal controls and was able to regulate its business in

16   accordance with applicable laws and regulations.    As a result of these materially false and

17   misleading statements, the Individual Defendants falsely inflated the Company's stock price, even

18   though the Individual Defendants knew that the information provided to the investing public was

19   untruthful, and knew that their conduct was harmful to the Company.

20       29.        Defendants Bergeron, Castle, Denend, Hart, Henske, Rinehart, and Roche, as a

21   result of their access to internal VeriFone documents and reports, conversations and discussions

22   with other officers, directors, and employees of VeriFone, and attendance at executive,

23   management, and Board meetings, and especially defendants Castle, Denend, Henske, and

24   Rinehart, as Audit Committee Defendants responsible for meeting with management and the

25   Company's independent auditors to discuss the Company's quarterly financial statements, knew

26   that the statements discussed herein were materially false and misleading at the time that they were

27   filed with the SEC and disseminated to the investing public.

28

                                        - 10 -

1    30.    On December 18, 2006, the Company filed with the United States Securities and

2    Exchange Commission ("SEC") its annual report on Form 10-K for the fiscal year ended October

3    31, 2006 (the "2006 10-K").

4    31.    According to the 2006 10-K, the Company reviews the adequacy of its inventories

5    valuation on a quarterly basis:

> The valuation of inventories requires us to determine obsolete or excess inventory
> and inventory that is not of saleable quality. The determination of obsolete or excess
> inventories requires us to estimate the future demand for our products within
> specific time horizons, generally twelve months to eighteen months. If our demand
> forecast for specific products is greater than actual demand and we fail to reduce
> manufacturing output accordingly, we could be required to record additional
> inventories write-offs, which would have a negative impact on our gross profit
> percentage.
>
> We review the adequacy of our inventories valuation on a quarterly basis. For
> production inventory, our methodology involves matching our on-hand and on-order
> inventories with our sales estimate over the next twelve and eighteen months. We
> then evaluate the inventory found to be in excess of the twelve-month demand
> estimate and take appropriate write-downs to reflect the risk of obsolescence. For
> on-hand and on-order inventory in excess of eighteen month requirements we
> generally record a 100% reserve. This methodology is significantly affected by our
> sales estimate. If actual demand were to be substantially lower than estimated,
> additional inventories write-downs for excess or obsolete inventories may be
> required.

16    32.    On March 9, 2007, the Company filed with the SEC its quarterly report for the fiscal

17    quarter ended January 31, 2007 (the "1Q07 10-Q"). In the 1Q07 10-Q, the Company stated that the

18    Company had inventories assets valued at approximately $130,815,000 at the end of the fiscal

19    quarter, and that the Company had incurred costs of net revenue equal to approximately

20    $135,246,000 in the fiscal quarter. For the same fiscal quarter, the Company reported net income

21    of -$984,000, and earnings per diluted share of -$0.01.

22    33.    Also in the 1Q07 10-Q, the review of which the Audit Committee was responsible

23    for prior to filing with the SEC, the Company stated that VeriFone's disclosure controls and

24    procedures were effective, and that there had been no changes in the Company's internal control

25    over financial reporting for the quarter ended January 31, 2007:

> With the participation of our Chief Executive Officer and Chief Financial Officer,
> management has carried out an evaluation of the effectiveness of our disclosure
> controls and procedures (as defined in Rule 13a-15(e) and 15d-15(f) under the
> Securities Exchange Act of 1934). Based upon that evaluation, our Chief Executive

- 11 -

1      Officer and Chief Financial Officer concluded that our disclosure controls and
2      procedures were effective as of the end of the period covered by this report.

                                    * * *

3      There have been no other changes in our internal control over financial reporting
4      that have materially affected, or are reasonably likely to materially affect, our
   internal control over financial reporting for the quarter ended January 31, 2007.

5        34.    On May 31, 2007, the Company filed with the SEC its quarterly report for the fiscal

6   quarter ended April 30, 2007 (the "2Q07 10-Q"). In the 2Q07 10-Q, the Company stated that the

7   Company had inventories assets valued at approximately $125,390,000 at the end of the fiscal

8   quarter, and that the Company had incurred costs of net revenue equal to approximately

9   $127,013,000 in the fiscal quarter, and $262,259,000 for the six months ended April 30, 2007. For

10  the fiscal quarter and six months ended April 30, 2007, the Company reported net income of

11  $4,859,000 and $3875,000, respectively, and earnings per diluted share of $0.06 and $0.05,

12  respectively.

13       35.    Also in the 2Q07 10-Q, the review of which the Audit Committee was responsible

14  for prior to filing with the SEC, the Company stated that VeriFone's disclosure controls and

15  procedures were effective, and that there had been no changes in the Company's internal control

16  over financial reporting for the quarter ended April 30, 2007:

17     With the participation of our Chief Executive Officer and Chief Financial Officer,
18     management has carried out an evaluation of the effectiveness of our disclosure
   controls and procedures (as defined in Rule 13a-15(e) and 15d-15(f) under the
   Securities Exchange Act of 1934). Based upon that evaluation, our Chief Executive
19     Officer and Chief Financial Officer concluded that our disclosure controls and
   procedures were effective as of the end of the period covered by this report.
20
                                      * * *

21     No change in our internal control over financial reporting (as defined in Rule 13a-
   15(f) under the Securities and Exchange Act of 1934) occurred during the second
22     quarter of our fiscal year ended April 30, 2007 that has materially affected, or is
   reasonably likely to affect, our internal control over financial reporting.
23
24       36.    On September 7, 2007, the Company filed with the SEC its quarterly report for the

  fiscal quarter ended July 31, 2007 (the "3Q07 10-Q"). In the 3Q07 10-Q, the Company stated that
25
  the Company had inventories assets valued at approximately $145,398,000 at the end of the fiscal
26
  quarter, and that the Company had incurred costs of net revenue equal to approximately
27
  $129,934,000 in the fiscal quarter, and $392,193,000 for the nine months ended July 31, 2007. For
28

                                    - 12 -

1    the fiscal quarter and nine months ended July 31, 2007, the Company reported net income of

2    $13,439,000 and $17,314,000, respectively, and earnings per diluted share of $0.16 and $0.20,

3    respectively.

4        37.    Also in the 3Q07 10-Q, the review of which the Audit Committee was responsible

5    for prior to filing with the SEC, the Company stated that VeriFone's disclosure controls and

6    procedures were effective, and that there had been no changes in the Company's internal control

7    over financial reporting for the quarter ended July 31, 2007:

> With the participation of our Chief Executive Officer and Chief Financial Officer,
> management has carried out an evaluation of the effectiveness of our disclosure
> controls and procedures (as defined in Rule 13a-15(e) and 15d-15(f) under the
> Securities Exchange Act of 1934). Based upon that evaluation, our Chief Executive
> Officer and Chief Financial Officer concluded that our disclosure controls and
> procedures were effective as of the end of the period covered by this report.

* * *

> No change in our internal control over financial reporting (as defined in Rule 13a-
> 15(f) under the Securities and Exchange Act of 1934) occurred during the third
> quarter of our fiscal year ended July 31, 2007 that has materially affected, or is
> reasonably likely to affect, our internal control over financial reporting.

38.    The foregoing statements were false and misleading when made because the

Individual Defendants failed to disclose that the Company's net income for the first, second, and

third fiscal quarters of 2007 was materially overstated because the Company materially overstated

reported inventories and materially understated cost of net revenues during those quarters. The

Company reported that its first, second, and third quarter reported inventories were overstated by

$7.7 million, $16.5 million, and $30.02 million, respectively. As a result, the Company's reported

pre-tax income was overstated by $8.9 million, $7.0 million, and $13.8 million for the first, second,

and third quarters, respectively.

### *The Company Admits to its False and Misleading Statements*

39.    On December 3, 2007, the Company filed with the SEC a Form 8-K (the "8-K") in

which it announced that it "will restate its previously issued unaudited interim consolidated

financial statements for the three months ended January 31, 2007, the three and six months ended

April 30, 2007 and the three and nine months ended July 31, 2007."

- 13 -

1      40.     In the 8-K, the Company further disclosed that the financial statements for the

2   quarters ended January 31, 2007, April 30, 2007, and July 31, 2007 should not be relied upon

3   because the Company improperly and materially overstated in-transit inventory and allocation of

4   manufacturing and distribution overhead to inventory, each of which caused the Company's costs

5   of net revenues to be improperly and materially understated, and the Company's net income to be

6   improperly and materially inflated. The Company further noted that it would delay the release of

7   full financial results for the three months ended October 31, 2007 pending completion of the

8   restatements.

9         On December 2, 2007, following a review by and on the recommendation of
management, the Company concluded that its unaudited interim consolidated

10      financial statements for the three months ended January 31, 2007, the three and six
months ended April 30, 2007 and the three and nine months ended July 31, 2007

11      should no longer be relied upon, principally due to errors in accounting related to
the valuation of in-transit inventory and allocation of manufacturing and distribution

12      overhead to inventory, each of which affects the Company's reported costs of net
revenues. The restatements are anticipated to correct errors that overstated

13      previously reported inventories in material amounts as of January 31, 2007,
April 30, 2007 and July 31, 2007, and understated cost of net revenues in material

14      amounts for the three month periods ended January 31, 2007, April 30, 2007, and
July 31, 2007. Accordingly, investors are cautioned not to rely on the Company's

15      historical financial statements and earnings press releases and similar
communications for the periods ended January 31, 2007, April 30, 2007, and

16      July 31, 2007.

17      Based on its review to date, the Company's management currently anticipates that
the restatement will result in reductions to previously reported inventories of

18      approximately $7.7 million, $16.5 million and $30.2 million as of January 31, 2007,
April 30, 2007 and July 31, 2007, respectively, and reductions to previously

19      reported pre-tax income of approximately $8.9 million, $7.0 million and
$13.8 million for the three month periods ended January 31, 2007, April 30, 2007

20      and July 31, 2007, respectively. The Company is currently evaluating the
anticipated effect of the restatement on after-tax income for those periods.

21

22      These estimates include corrections of other unrelated errors detected in the course
of the Company's review to date, are based on currently available information and

23      are subject to change during the course of the Company's restatement process.
While the Company is not currently aware of other accounting errors requiring

24      adjustment to any prior period financial statements, there can be no assurances that
the Company or its independent registered public accounting firm will not find

25      additional accounting errors requiring further adjustments in those or earlier periods.

26      Also on December 2, 2007, the Company's management and the Audit Committee
of its Board of Directors determined that the Company would delay the release of

27      full fourth quarter 2007 financial results that were scheduled to be released on
December 6, 2007, pending completion of the assessment of these errors and the

28      restatements.

- 14 -

The Company concluded that a restatement of its interim unaudited financial statements is required as a result of an internal review of in-transit inventory balances conducted in preparation for the Company's fiscal 2007 audit. Upon completion of its assessment of these errors, the Company intends to file amended Quarterly Reports on Form 10-Q for the periods described above that will restate the previously issued financial statements included therein. The Company currently estimates that it will file these amended quarterly reports, together with its Annual Report on Form 10-K for the fiscal year ended October 31, 2007, in January 2008. However, the Company cannot be certain how much time will ultimately be required for it to complete the restatement process.

Although the Company's management is still evaluating the implications of the restatements described above on its internal control over financial reporting, when the Company files its Annual Report on Form 10-K for the year ended October 31, 2007 and amends the previously filed quarterly reports to effect the restatements, management expects the Company to report one or more material weaknesses in the Company's internal control over financial reporting.

The Company's management and the Audit Committee have discussed the matters disclosed in this Current Report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.

41.    The following table depicts the financial figures that will have to be restated, and the amount of such restatement, as a result of the Company's inadequate accounting and revenue recognition controls and procedures:

| Quarter | Previously Stated Inventories¹ | Amount of Reduction | % of Reduction | Previously Stated Pre-Tax Income | Amount of Reduction | % of Reduction |
|---------|------------------------------|--------------------|---------------|----------------------------------|--------------------|---------------|
| 1Q07 | $130,815 | $7,700 | 5.89% | $2,867 | $8,900 | 310.43% |
| 2Q07 | $125,390 | $16,500 | 13.16% | $9,351 | $7,000 | 74.86% |
| 3Q07 | $145,398 | $30,200 | 20.77% | $24,762 | $13,800 | 55.73% |

42.    On December 31, 2007, the Company filed with the SEC a Form NT 10-K in which it announced that its financial statements for the quarters ended January 31, 2007, April 30, 2007, and July 31, 2007 should not be relied upon due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects the Company's costs of net revenues.  Accordingly, the Company announced that it would be unable to file its Annual Report on Form 10-K for the year ended October 31, 2007 in a timely manner.

VeriFone Holdings, Inc. ("VeriFone") is unable to file its Annual Report on Form 10-K for the year ended October 31, 2007 in a timely manner without unreasonable effort and expense in light of the circumstances described below.

---

¹ All dollar figures are in thousands unless otherwise stated.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
1064379.1

On December 3, 2007, VeriFone announced that following a review by and on the recommendation of management, it has concluded that its unaudited interim consolidated financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007, and the three and nine months ended July 31, 2007, should no longer be relied upon, principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues. The restatements are anticipated to correct errors that overstated previously reported inventories in material amounts as of January 31, 2007, April 30, 2007, and July 31, 2007, and understated cost of net revenues in material amounts for the three month periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly, investors are cautioned not to rely on VeriFone's historical financial statements and earnings press releases and similar communications for the periods ended January 31, 2007, April 30, 2007, and July 31, 2007. These restatements are also anticipated to correct other errors that may be detected in the course of VeriFone's review.

VeriFone concluded that a restatement of its interim unaudited financial statements is required as a result of an internal review of in-transit inventory balances conducted in preparation for VeriFone's fiscal 2007 audit.

VeriFone's management and the Audit Committee of its Board of Directors have determined to delay the filing of VeriFone's Annual Report on Form 10-K for the fiscal year ended October 31, 2007 pending completion of the assessment of the errors and the restatements described above. Upon completion of its assessment of these errors, VeriFone intends to file amended Quarterly Reports on Form 10-Q for the periods described above that will restate the previously issued financial statements included therein, following which time VeriFone expects to complete and file its Annual Report on Form 10-K for the fiscal year ended October 31, 2007.

### *Individual Defendants' Stock Sales Based Upon Material Non-Public Information*

43.    From March 9, 2007 – the day the 1Q07 10-Q was filed with the SEC – until November 30, 2007 – the last trading day of the Company's common stock before the Company announced that its prior financial statements could not be relied upon – the Company's common stock climbed from $37.01 per share to $48.03, an increase of more than 29%. The Company's common stock peaked in 2007 at $49.43 per share on October 31, 2007.

44.    This dramatic gain was caused as a direct result of the Individual Defendants' failure to recognize and correct the Company's internal control failures, and the deliberate overstatement of the Company's financial performance in the Company's Form 10-Qs.

45.    In breach of both their fiduciary duty of good faith and loyalty, the Individual Defendants willfully ignored the obvious and pervasive problems with VeriFone's accounting and

- 16 -

1    internal control practices and procedures and failed to make a good faith effort to correct the

2    problems or prevent their recurrence.

3        46.    The material non-public information discussed above was well known among

4    VeriFone insiders, including the Individual Defendants, who comprise the entire executive corps of

5    the Company and its entire Board, and was discussed formally and informally during VeriFone

6    Board and committee meetings, management meetings, and other meetings attended by the

7    Individual Defendants.

8        47.    In contravention of their fiduciary duties of good faith and loyalty, defendants

9    Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein, with the

10    knowledge that the Company's financial statements were false and materially misstated, sold more

11    than *$332 million worth* of Company stock in order to line their own pockets, and the pockets of

12    their affiliates.

13        48.    From March 1, 2007 until November 26, 2007, defendants Adams, Angel, Atkinson,

14    Bergeron, Bondy, Castle, Roche, Waller and Zwarenstein, based on their knowledge of material

15    non-public information regarding the Company, sold a total of 8,879,613 shares of VeriFone stock,

16    garnering total proceeds of over $332 million, as follows:[2]

17

18

| Name | Date of First Sale | Date of Last Sale | Total Shares Sold | Proceeds[3] |
|---|---|---|---|---|
| Adams | 3/1/07 | 9/24/07 | 129,478 | $4,690,583 |
| Angel | 3/13/07 | 11/13/07 | 135,000 | $5,198,721 |
| Atkinson | 3/1/07 | 9/26/07 | 117,000 | $4,457,464 |
| Bergeron | 3/15/07 | 11/26/07 | 1,441,735 | $56,523,631 |
| Bondy | 6/25/07 | 9/13/07 | 6,800,000[4] | $251,208,000 |
| Castle | 9/14/07 | 9/14/07 | 4,500 | $176,404 |
| Roche | 6/25/07 | 9/13/07 | 6,800,000 | $251,208,000 |
| Waller | 6/13/07 | 11/26/07 | 90,000 | $3,530,605 |

[2] Each of the stock sales conducted by defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein are demonstrated in Exhibit A hereto.

[3] Proceeds are rounded to the nearest whole dollar.

[4] During the relevant period, Bondy and Roche were affiliated with GTCR. Bondy and Roche both used material inside information concerning the financial condition of the Company to cause GTCR to sell 6,800,000 shares of Company common stock for proceeds in excess of $251 million. These shares and proceeds were not counted twice in calculating to total values in the table above.

- 17 -

| Name | Date of First Sale | Date of Last Sale | Total Shares Sold | Proceeds |
|------|--------------------|--------------------|---------------------|----------|
| Zwarenstein | 3/15/07 | 11/13/07 | 161,900 | $6,228,286 |
| **TOTAL** | **3/1/07** | **11/26/07** | **8,879,613** | **$332,013,694** |

49.     At the time that the stock sales referenced in the above paragraph were made, defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein each knew that the Company's financial statements were false and materially overstated, and that the Company's stock price was materially inflated as a result thereof.

50.     The stock sales described in paragraph 48 were not part of any normal or regular pattern or practice of such sales by the Individual Defendants, but rather were unusual in that the Individual Defendants sold large amounts of VeriFone stock prior to revealing the truth about the Company's internal control problems and materially overstated financial statements.

51.     Specifically, defendants Adams, Angel, Atkinson, Bergeron, Bondy, Roche, Waller, and Zwarenstein each sold significant portions of their VeriFone holdings between March 1, 2007 and November 26, 2007, as demonstrated by the following table:

| Name | Percentage of Holdings Sold |
|------|------------------------------|
| Adams | 72.00% |
| Angel | 57.42% |
| Atkinson | 45.14% |
| Bergeron | 40.61% |
| Bondy & Roche (through GTCR) | 41.32% |
| Waller | 67.75% |
| Zwarenstein | 41.54% |
| **TOTAL** | **41.85%** |

52.     Lastly, in order to present the appearance of propriety, many of the transactions in paragraph 48 above were conducted pursuant to Rule 10b5-1 Plans under the Securities Exchange Act. However, defendants Adams, Bergeron, and Zwarenstein, who conducted certain of these transactions pursuant to purportedly proper 10b5-1 Plans, entered into these plans when they were in possession of material non-public information, thereby rendering the plans invalid. Bergeron and Zwarenstein conducted their stock sales pursuant to 10b5-1 Plans that were entered into on

1    December 10, 2006, more than one month after the beginning of 1Q07, which was the subject of

2    the first false and misleading statement, as alleged herein at paragraphs 32 and 33. Adams

3    conducted his stock sales pursuant to a 10b5-1 Plan that was entered into on January 3, 2007,

4    approximately two months after the beginning of 1Q07, which was the subject of the first false and

5    misleading statement, as alleged herein at paragraphs 32 and 33.

6    ### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

7        53.    Plaintiff brings this action derivatively in the right and for the benefit of VeriFone to

8    redress breaches of fiduciary duty and unjust enrichment of the Individual Defendants.

9        54.    Plaintiff will adequately and fairly represent the interests of VeriFone and its

10   shareholders in enforcing and prosecuting its rights.

11       55.    Plaintiff is an owner of VeriFone common stock and was an owner of VeriFone

12   common stock at all times relevant to the Individual Defendants' wrongful course of conduct

13   alleged herein.

14       56.    At the time that this action was commenced, the VeriFone Board consisted of eight

15   directors: defendants Bergeron, Castle, Denend, Hart, Henske, Rinehart, and Roche, and non-

16   defendant Eitan Raff.

17

18       57.    As a result of the facts set forth herein, Plaintiff has not made any demand on the

19   VeriFone Board to institute this action against the Individual Defendants. Such demand would be a

20   futile and useless act with respect to the following director defendants because they are incapable

21   of making an independent and disinterested decision to institute and vigorously prosecute this

22   action for the following reasons:

23       a.    Defendants Bergeron, Castle, and Roche, because all three of them face a
             substantial likelihood of being held liable for breaching their fiduciary duties

24           of loyalty and good faith for engaging in illegal insider trading of VeriFone
             securities, as alleged herein, and therefore they are incapable of

25           disinterestedly and independently considering a demand to commence and
             vigorously prosecute this action;

26       b.    Defendants Castle, Denend, Henske, and Rinehart, because each of them

27           knew of the Company's ongoing improper accounting and revenue
             recognition practices, yet still permitted the Company to portray to the

28           investing public the Company's false and misleading financial condition
             despite their heightened fiduciary obligations as members of the Audit

- 19 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
1064379.1

1    Committee, and therefore are incapable of disinterestedly and independently
considering a demand to commence and vigorously prosecute this action;

2

c.    Defendants Bergeron, Castle, Denend, Hart, Henske, Rinehart, and Roche,
3    because all seven of them knew of the Company's ongoing improper
accounting and revenue recognition practices, and thus face a substantial
4    likelihood of being held liable for breaching their fiduciary duties, and
therefore are incapable of disinterestedly and independently considering a
5    demand to commence and vigorously prosecute this action;

6    d.    Defendants Denend, Henske, and Roche, because each of them knew of the
Company's ongoing improper accounting and revenue recognition practices,
7    yet, as members of the Compensation Committee, still permitted defendants
Adams, Bergeron, and Zwarenstein to enter into 10b5-1 Plans in order to
8    present the appearance of propriety when defendants Adams, Bergeron, and
Zwarenstein conducted the transactions referred to in paragraph 48 herein,
9    and therefore are incapable of disinterestedly and independently considering
a demand to commence and vigorously prosecute this action;
10

e.    Defendant Roche, because of his business relationship with defendant Bondy
11    through GTCR, and because both defendant Roche and Bondy face a
substantial likelihood of being held liable for breaching their fiduciary duties
12    of loyalty and good faith for engaging in illegal insider trading of VeriFone
securities, as alleged herein, and therefore Roche is incapable of
13    disinterestedly and independently considering a demand to commence and
vigorously prosecute this action;
14

f.    Defendant Bergeron, because, according to the Company's Proxy statement,
15    defendant Bergeron's compensation is set by the Compensation Committee.
Thus, due to the fact that defendants Denend, Henske, and Roche directly
16    control Bergeron's compensation by virtue of their roles as members of the
Compensation Committee, Bergeron is incapable of disinterestedly and
17    independently considering a demand to commence and vigorously prosecute
this action.
18

19                                    **COUNT I**

20    **AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY
OF GOOD FAITH IN CONNECTION WITH IMPROPER BUSINESS PRACTICES**

21    58.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

22    fully set forth herein.

23    59.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among

24    other things, exercise good faith to ensure that the Company was operated in a diligent, honest and

25    prudent manner, that the Company's financial statements were prepared in accordance with GAAP,

26    and that the Company complied with all applicable federal and state laws, rules, regulations and

27    requirements, and, when put on notice of problems with the Company's business practices and

28

- 20 -

1   operations, exercise good faith in taking appropriate action to correct the misconduct and prevent
2   its recurrence.

3       60.    As alleged herein, the Individual Defendants willfully ignored the obvious and
4   pervasive problems with VeriFone's accounting, revenue recognition, and internal control practices
5   and procedures and failed to make a good faith effort to correct the problems or prevent their
6   recurrence.  Despite their actual knowledge of the Company's improper business practices,
7   including, but not limited to, failing to properly value the Company's inventory and cost of net
8   revenues, thereby materially overstating VeriFone's financial results, and failing to prepare the
9   Company's financial statements in accordance with GAAP, the Individual Defendants failed to
10   make a good faith effort to correct the problems or prevent their recurrence.

11       61.    As a direct and proximate result of the Individual Defendants' foregoing breaches of
12   fiduciary duties, the Company has sustained damages, including, but not limited to, the costs and
13   expenses incurred in connection with the restatement.

### COUNT II

**AGAINST DEFENDANTS ADAMS, ANGEL, ATKINSON,
BERGERON, BONDY, CASTLE, ROCHE, WALLER, AND
ZWARENSTEIN FOR BREACH OF FIDUCIARY DUTY OF LOYALTY
AND GOOD FAITH IN CONNECTION WITH INSIDER STOCK SALES**

18       62.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if
19   fully set forth herein.

20       63.    At the time of each of the stock sales set forth herein, each of defendants Adams,
21   Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein knew, but did not
22   disclose publicly, that the Company's financial results were false and misleading as a result of the
23   Company's failure to comply with applicable accounting and revenue recognition procedures.
24   Each of defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and
25   Zwarenstein made each of the stock sales described herein on the basis of and because of their
26   knowledge of the material non-public information described herein.

27       64.    At the time of their stock sales, each of defendants Adams, Angel, Atkinson,
28   Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein knew that when it was disclosed that the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
1064379.1

1    Company's financial results were false and misleading as a result of the Company's failure to

2    comply with applicable accounting and revenue recognition procedures, the price of the

3    Company's common stock would dramatically decrease. Defendants Adams, Angel, Atkinson,

4    Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein's sales of VeriFone common stock

5    based on their knowledge of this material non-public information was a breach of their fiduciary

6    duties of loyalty and good faith.

7        65.    Since the use of the Company's proprietary information for their own gain

8    constitutes a breach of defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche,

9    Waller, and Zwarenstein's fiduciary duties, the Company is entitled to the imposition of a

10   constructive trust on any proceeds defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle,

11   Roche, Waller, and Zwarenstein obtained thereby.

12                                    **COUNT III**

13                **AGAINST DEFENDANTS ADAMS, ANGEL, ATKINSON,**
     **BERGERON, BONDY, CASTLE, ROCHE, WALLER, AND ZWARENSTEIN**
14   **FOR UNJUST ENRICHMENT IN CONNECTION WITH INSIDER STOCK SALES**

15       66.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

16   fully set forth herein.

17       67.    Defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and

18   Zwarenstein were unjustly enriched by their receipt of proceeds from their illegal sales of VeriFone

19   common stock, as alleged herein, and it would be unconscionable to allow them to retain the

20   benefits of their illegal conduct.

21       68.    To remedy defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche,

22   Waller, and Zwarenstein's unjust enrichment, the Court should order them to disgorge to the

23   Company all proceeds derived from their illegal sales of VeriFone common stock.

24       WHEREFORE, Plaintiff demands judgment as follows:

25   A.    Against all of the Individual Defendants and in favor of the Company for the
           amount of damages sustained by the Company as a result of the Individual
26         Defendants' breaches of fiduciary duties;

27   B.    Imposing a constructive trust in favor of the Company for the amount of proceeds
           each of defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche,
28         Waller, and Zwarenstein received from their sales of VeriFone common stock

                                     - 22 -

alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

C.  Ordering defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein to disgorge to the Company all proceeds derived from their sales of VeriFone common stock alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

D.  Granting appropriate equitable relief to remedy Defendants' breach of fiduciary duties.

E.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  February 26, 2008          Respectfully submitted,

                                   _L. Timothy Fisher_ (signature)
                                   _____
                                   L. Timothy Fisher

                                   SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
                                   Alan R. Plutzik, Of Counsel (Bar No. 077785)
                                   L. Timothy Fisher, Of Counsel (Bar No. 191626)
                                   Nichole Browning (Bar No. 251937)
                                   2125 Oak Grove Road, Suite 120
                                   Walnut Creek, CA 94598
                                   Telephone: (925) 945-0770
                                   Facsimile: (925) 945-8792

                                   -and-

                                   Eric L. Zagar
                                   James H. Miller
                                   280 King of Prussia Road
                                   Radnor, PA 19087
                                   Telephone: (610) 667-7706
                                   Facsimile: (610) 667-7056

                                   _Attorneys for Plaintiff_

- 23 -

EXHIBIT 2

E-FILING

ADR

1
SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Alan R. Plutzik, Of Counsel (Bar No. 077785)

2
L. Timothy Fisher, Of Counsel (Bar No. 191626)
Nichole Browning (Bar No. 251937)

3
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598

4
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

5
-and-

6
Eric L. Zagar
James H. Miller

7
280 King of Prussia Road
Radnor, PA 19087

8
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

9
Attorneys for Plaintiff

*Filed*

FEB 2 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

10
UNITED STATES DISTRICT COURT

11
NORTHERN DISTRICT OF CALIFORNIA

12
SAN JOSE DIVISION

13
ARUNBHAI PATEL, Derivatively on Behalf of
Nominal Defendant, VERIFONE HOLDINGS,

14
INC.,

15
                        Plaintiff,

16
        v.

17
DOUGLAS G. BERGERON, JESSE ADAMS,
ISAAC ANGEL, WILLIAM ATKINSON,

18
CRAIG A. BONDY, JAMES C. CASTLE,
LESLIE G. DENEND, ALEX W. HART,

19
ROBERT B. HENSKE, CHARLES R.
RINEHART, COLLIN E. ROCHE, ELMORE

20
WALLER, and BARRY ZWARENSTEIN,

21
                        Defendants,

22
        and

23
VERIFONE HOLDINGS, INC.,

24
                Nominal Defendant.

C08 01133

Case

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

HRL

25

26
**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

27
        Plaintiff, by the undersigned attorneys, submits this Verified Shareholder Derivative

Complaint (the "Complaint") against the defendants named herein.

28

ORIGINAL

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought for the benefit of nominal defendant VeriFone Holdings, Inc. ("VeriFone" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2.     In contravention of their fiduciary duties, the defendants failed to ensure the effectiveness of the Company's internal controls. Despite these known failures, defendants caused the Company to disseminate to the public false and misleading statements that materially overstated VeriFone's financial results by failing to properly value inventory and cost of net revenue. In further violation of their fiduciary duties, certain defendants, based on their knowledge of material non-public information regarding the Company, sold 8,879,613 shares of VeriFone stock, garnering over *$332 million* in proceeds for their own personal benefit.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

4.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.   One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

5.     Plaintiff Arunbhai Patel ("Plaintiff") is a shareholder of nominal defendant VeriFone, was a shareholder of VeriFone at the time of the wrongdoing alleged herein, and has

-2-

1   been a shareholder of VeriFone continuously since that time. Plaintiff is a citizen of the State of

2   Ohio.

3         6.      Nominal defendant VeriFone is a corporation incorporated under the laws of the

4   State of Delaware, and maintains its principal executive offices at 2099 Gateway Place Suite 600,

5   San Jose, CA 95110. According to its public filings, VeriFone provides expertise, solutions, and

6   services that add value to the point of sale with merchant-operated, consumer-facing, and self-

7   service payment systems for the financial, retail, hospitality, petroleum, government, and

8   healthcare vertical markets.

9         7.      Defendant Douglas G. Bergeron ("Bergeron") is, and was at all times relevant

10  hereto, the Chief Executive Officer ("CEO") and Chairman of the Board ("Chairman") of

11  VeriFone. Bergeron has served as the CEO and Chairman of VeriFone since July 2001. At times

12  relevant hereto, Bergeron sold more than 1.4 million shares of VeriFone common stock for

13  proceeds in excess of $56.5 million based upon the knowledge that the Company had materially

14  overstated its inventory levels and materially understated its cost of net revenues, thereby

15  materially overstating its net income. Notably, defendant Bergeron sold 43,300 shares of VeriFone

16  common stock for proceeds in excess of $1.9 million on November 26, 2007, only 8 calendar days

17  before the Company announced on December 3, 2007 that it would be restating its financial results

18  for the first three fiscal quarters of fiscal 2007, and delaying the release of its financial results for

19  the fiscal quarter ended October 31, 2007. Prior to assuming his roles as Chairman and CEO of

20  VeriFone, Bergeron served as the President and CEO of Geac Computer Corporation ("Geac")

21  from April 1999 to October 2000 alongside defendant Adams, who served as a division president

22  and Senior Vice President of Geac from July 1999 through December 2000. Upon information and

23  belief, Bergeron is a citizen of the State of California.

24        8.      Defendant Jesse Adams ("Adams") is, and was at all times relevant hereto, the Vice

25  Chairman of the Board ("Vice Chairman") of VeriFone. Adams has served as the Vice Chairman

26  of VeriFone since November 2006. Prior to serving as VeriFone's Vice Chairman, Adams served

27  as the Company's Executive Vice President ("EVP") of North American Sales from July 2001 until

28  October 2006. At times relevant hereto, Adams sold more than 129,000 shares of VeriFone stock

- 3 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
1064377.1

1    for proceeds in excess of $4.6 million based upon the knowledge that the Company had materially

2    overstated its inventory levels and materially understated its cost of net revenues, thereby

3    materially overstating its net income.  Prior to beginning his service at VeriFone, Adams served as

4    a division president and Senior Vice President of Geac from July 1999 through December 2000

5    alongside defendant Bergeron, who served as the President and CEO of Geac from April 1999 to

6    October 2000.  Upon information and belief, Adams is a citizen of the State of California.

7          9.     Defendant Isaac Angel ("Angel") is, and was at all times relevant hereto,

8    VeriFone's EVP of Global Operations.  Angel has served as the Company's EVP of Global

9    Operations since November 2006.  At times relevant hereto, Angel sold approximately 135,000

10    shares of VeriFone stock for proceeds of nearly $5.2 million based upon the knowledge that the

11    Company had materially overstated its inventory levels and materially understated its cost of net

12    revenues, thereby materially overstating its net income.  Upon information and belief, Angel is a

13    citizen of Israel.

14          10.    Defendant William Atkinson ("Atkinson") was at times relevant hereto VeriFone's

15    EVP of Payment Systems.  Atkinson served as the Company's EVP of Payment Systems from

16    November 2006 to July 2007, and served the Company in other capacities prior to this position.  At

17    times relevant hereto, Atkinson sold approximately 117,000 shares of VeriFone stock for proceeds

18    in excess of $4.4 million based upon the knowledge that the Company had materially overstated its

19    inventory levels and materially understated its cost of net revenues, thereby materially overstating

20    its net income.  Upon information and belief, Atkinson is a citizen of the State of California.

21          11.    Defendant Craig A. Bondy ("Bondy") was at times relevant hereto a director of

22    VeriFone.  Bondy served as a director of VeriFone from July 2002 until his resignation on October

23    1, 2007.  During the relevant period, defendants Bondy and Roche were affiliated with GTCR

24    Golder Rauner, L.L.C. ("GTCR").  At times relevant hereto, Bondy, through GTCR, sold

25    approximately 6.8 million shares of VeriFone stock for proceeds in excess of $251 million based

26    upon the knowledge that the Company had materially overstated its inventory levels and materially

27    understated its cost of net revenues, thereby materially overstating its net income.  Upon

28    information and belief, Bondy is a citizen of the State of Illinois.

- 4 -

1        12.     Defendant James C. Castle ("Castle") is, and was at all times relevant hereto, a

2  director of VeriFone. Castle has served as a director of VeriFone since January 2005. At all times

3  relevant hereto, Castle served as a member of the Audit Committee of the Board ("Audit

4  Committee"). At times relevant hereto, Castle sold approximately 4,500 shares of VeriFone stock

5  for proceeds in excess of $176,000 based upon the knowledge that the Company had materially

6  overstated its inventory levels and materially understated its cost of net revenues, thereby

7  materially overstating its net income. Upon information and belief, Castle is a citizen of the State

8  of California.

9        13.     Defendant Leslie G. Denend ("Denend") is, and was at all times relevant hereto, a

10  director of VeriFone. Denend has served as a director of VeriFone since January 2005. At all

11  times relevant hereto, Denend served as a member of the Audit Committee and the Compensation

12  Committee of the Board (the "Compensation Committee"). Upon information and belief, Denend

13  is a citizen of the State of California.

14        14.     Defendant Alex W. Hart ("Hart") is, and was at all times relevant hereto, a director

15  of VeriFone. Hart has served as a director of VeriFone since July 2006. Upon information and

16  belief, Hart is a citizen of the State of California.

17        15.     Defendant Robert B. Henske ("Henske") is, and was at all times relevant hereto, a

18  director of VeriFone. Henske has served as a director of VeriFone since January 2005. At all

19  times relevant hereto, Henske has served as a member and chairman of the Audit Committee, and

20  as a member of the Compensation Committee. Upon information and belief, Henske is a citizen of

21  the State of California.

22        16.     Defendant Charles R. Rinehart ("Rinehart") is, and was at all times relevant hereto,

23  a director of VeriFone. Rinehart has served as a director of VeriFone since May 2006. At all times

24  relevant hereto, Rinehart has served as a member of the Audit Committee. Upon information and

25  belief, Rinehart is a citizen of the State of California.

26        17.     Defendant Collin E. Roche ("Roche") is, and was at all times relevant hereto, a

27  director of VeriFone. Roche has served as a director of VeriFone since July 2002. At all times

28  relevant hereto, Roche has served as a member of the Compensation Committee. During the

relevant period, defendants Roche and Bondy were affiliated with GTCR. At times relevant hereto, Roche, through GTCR, sold approximately 6.8 million shares of VeriFone stock for proceeds in excess of $251 million based upon the knowledge that the Company had materially overstated its inventory levels and materially understated its cost of net revenues, thereby materially overstating its net income. Upon information and belief, Roche is a citizen of the State of Illinois.

18.    Defendant Elmore Waller ("Waller") is, and was at all times relevant hereto, VeriFone's EVP of Integrated Solutions. Waller has served as the Company's EVP of Integrated Solutions since December 2004. At times relevant hereto, Waller sold approximately 90,000 shares of VeriFone stock for proceeds in excess of $3.5 million based upon the knowledge that the Company had materially overstated its inventory levels and materially understated its cost of net revenues, thereby materially overstating its net income. Upon information and belief, Waller is a citizen of the State of Florida.

19.    Defendant Barry Zwarenstein ("Zwarenstein") is, and was at all times relevant hereto, VeriFone's EVP and Chief Financial Officer ("CFO"). Zwarenstein has served as the Company's CFO since June 2004, and as EVP since November 2006. Previously, Zwarenstein served the Company in various other capacities. At times relevant hereto, Zwarenstein sold more than 161,000 shares of VeriFone stock for proceeds in excess of $6.2 million based upon the knowledge that the Company had materially overstated its inventory levels and materially understated its cost of net revenues, thereby materially overstating its net income. Upon information and belief, Zwarenstein is a citizen of the State of California.

20.    Collectively, defendants Castle, Denend, Henske, and Rinehart may be referred to herein as the "Audit Committee Defendants." Collectively, defendants Denend, Henske, and Roche may be referred to herein as the "Compensation Committee Defendants." Collectively, defendants Bergeron, Bondy, Castle, Denend, Hart, Henske, Rinehart, and Roche may be referred to herein as the "Director Defendants." Collectively, defendants Adams, Angel, Atkinson, Bergeron, Waller, and Zwarenstein may be referred to herein as the "Officer Defendants."

- 6 -

1    Together, the Director Defendants and Officer Defendants may be referred to herein as the

2    "Individual Defendants," and together with VeriFone, "Defendants."

3    ### DUTIES OF THE INDIVIDUAL DEFENDANTS

4    21.    By reason of their positions as officers and/or directors of the Company and because

5    of their ability to control the business and corporate affairs of the Company, the Individual

6    Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust,

7    loyalty, and due care, and were and are required to use their utmost ability to control and manage

8    the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

9    required to act in furtherance of the best interests of the Company and its shareholders so as to

10   benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each

11   director and officer of the Company owes to the Company and its shareholders the fiduciary duty

12   to exercise good faith and diligence in the administration of the affairs of the Company and in the

13   use and preservation of its property and assets, and the highest obligations of fair dealing.

14   22.    To discharge their duties, the officers and directors of the Company were required to

15   exercise reasonable and prudent supervision over the management, policies, practices and controls

16   of the Company.  By virtue of such duties, the officers and directors of the Company were required

17   to, among other things:

18   a.    Exercise good faith to ensure that the affairs of the Company were
19          conducted in an efficient, business-like manner so as to make it possible to
            provide the highest quality performance of its business;

20   b.    Exercise good faith to ensure that the Company was operated in a diligent,
21          honest and prudent manner and complied with the Company's by-laws and
            all applicable federal and state laws, rules, regulations and requirements,
22          including acting only within the scope of its legal authority;

23   c.    Exercise good faith to ensure that the Company's financial statements were
            prepared in accordance with Generally Accepted Accounting Principles
24          ("GAAP");

25   d.    Exercise good faith in supervising the preparation and filing of all financial
            statements and other financial information required by law, including
26          periodic financial statements and reports filed with the Securities and
            Exchange Commission ("SEC"), and in examining and evaluating the
27          financial statements and other information concerning the financial affairs of
            the Company;

28

-7-

e.   When placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and

f.   Act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

23.   The Individual Defendants, particularly the Audit Committee Defendants Castle, Denend, Henske, and Rinehart, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP and SEC rules, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

a.   Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b.   Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.   transactions are executed in accordance with management's general or specific authorization; and

ii.   transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

24.   VeriFone's Audit Committee Charter provides that the Audit Committee shall, among other things:

a.   meet to review and discuss the quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," with management and the independent auditors prior to the filing of the Company's Quarterly Report on Form 10-Q. Also, the Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards;

b.   review and discuss the type and presentation of information to be included in earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and

c.   discuss with management, the internal auditors, and the independent auditors the adequacy and effectiveness of internal control over financial reporting, including any significant deficiencies or material weaknesses identified by management of the Company in connection with its required quarterly

- 8 -

certifications under Section 302 of the Sarbanes-Oxley Act which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting. In addition, the Committee shall discuss with management, the internal auditors, and the independent auditors any significant changes in internal control over financial reporting that are disclosed, or considered for disclosures, in the Company's periodic filings with the SEC.

25.     According to the Audit Committee Charter:

The Committee's review of the Company's financial statements and disclosures shall include: (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles, and major issues as to the adequacy of the company's internal controls and any specific remedial actions adopted in light of material control deficiencies; (ii) discussions with management and the independent auditors regarding significant financial reporting issues and judgments made in connection with the preparation of the financial statements and the reasonableness of those judgments, including analyses of the effects of alternative GAAP methods on the financial statements; (iii) consideration of the effect of regulatory accounting initiatives, as well as off-balance sheet structures on the financial statements; (iv) consideration of the judgment of both management and the independent auditors about the quality, not just the acceptability of accounting principles; and (v) the clarity of the disclosures in the financial statements. Also, the Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under professional standards.

26.     VeriFone's Compensation Committee charter provides that the Compensation Committee is responsible for, among other things:

a.     Reviewing and approving corporate goals and objectives relevant to the compensation of VeriFone's Chief Executive Officer ("CEO"), evaluating the CEO's performance in light of those goals and objectives and, either as a committee or together with the other independent directors (as directed by the Board), determining and approving the CEO's compensation level based on this evaluation;

b.     Making recommendations to the Board with respect to non-CEO compensation, incentive-compensation plans and equity-based plans, including the VeriFone Bonus Plan and the 2006 Equity Incentive Plan, overseeing the activities of the individuals responsible for administering these plans, and discharging any responsibilities imposed on the Compensation Committee by any of these plans; and

c.     In consultation with management, overseeing regulatory compliance with respect to compensation matters, including overseeing VeriFone's policies on structuring compensation programs to preserve tax deductibility, and, as and when required, establishing performance goals and certifying that

- 9 -

1    performance goals have been attained for purposes of Section 162(m) of the
2    Internal Revenue Code.

3    ## FACTUAL ALLEGATIONS

4    *The Company's False and Misleading Statements*

5    27.    Between March 9, 2007 and December 3, 2007, the Individual Defendants knew

6    that the Company's internal financial controls were ineffective.   The Company's ineffective

7    internal controls, and the Individual Defendants' failure to ensure their effectiveness, resulted in

8    the Company materially overstating its financial results by failing to properly value its inventory

9    and cost of net revenue.

10    28.    During this time period, the Individual Defendants knowingly caused the Company

11    to make a series of false and misleading statements concerning the Company's financial condition,

12    materially misrepresenting that the Company's financial condition was better than it actually was.

13    Furthermore, VeriFone, through the Individual Defendants, made a series of false and misleading

14    statements concerning the condition of the Company's internal controls, materially misrepresenting

15    that the Company maintained sound internal controls and was able to regulate its business in

16    accordance with applicable laws and regulations.   As a result of these materially false and

17    misleading statements, the Individual Defendants falsely inflated the Company's stock price, even

18    though the Individual Defendants knew that the information provided to the investing public was

19    untruthful, and knew that their conduct was harmful to the Company.

20    29.    Defendants Bergeron, Castle, Denend, Hart, Henske, Rinehart, and Roche, as a

21    result of their access to internal VeriFone documents and reports, conversations and discussions

22    with other officers, directors, and employees of VeriFone, and attendance at executive,

23    management, and Board meetings, and especially defendants Castle, Denend, Henske, and

24    Rinehart, as Audit Committee Defendants responsible for meeting with management and the

25    Company's independent auditors to discuss the Company's quarterly financial statements, knew

26    that the statements discussed herein were materially false and misleading at the time that they were

27    filed with the SEC and disseminated to the investing public.

28

- 10 -

1    30.    On December 18, 2006, the Company filed with the United States Securities and

2    Exchange Commission ("SEC") its annual report on Form 10-K for the fiscal year ended October

3    31, 2006 (the "2006 10-K").

4    31.    According to the 2006 10-K, the Company reviews the adequacy of its inventories

5    valuation on a quarterly basis:

6    The valuation of inventories requires us to determine obsolete or excess inventory
     and inventory that is not of saleable quality. The determination of obsolete or excess
7    inventories requires us to estimate the future demand for our products within
     specific time horizons, generally twelve months to eighteen months. If our demand
8    forecast for specific products is greater than actual demand and we fail to reduce
     manufacturing output accordingly, we could be required to record additional
9    inventories write-offs, which would have a negative impact on our gross profit
     percentage.
10
     We review the adequacy of our inventories valuation on a quarterly basis. For
11   production inventory, our methodology involves matching our on-hand and on-order
     inventories with our sales estimate over the next twelve and eighteen months. We
12   then evaluate the inventory found to be in excess of the twelve-month demand
     estimate and take appropriate write-downs to reflect the risk of obsolescence. For
13   on-hand and on-order inventory in excess of eighteen month requirements we
     generally record a 100% reserve. This methodology is significantly affected by our
14   sales estimate. If actual demand were to be substantially lower than estimated,
     additional inventories write-downs for excess or obsolete inventories may be
15   required.

16   32.    On March 9, 2007, the Company filed with the SEC its quarterly report for the fiscal

17   quarter ended January 31, 2007 (the "1Q07 10-Q"). In the 1Q07 10-Q, the Company stated that the

18   Company had inventories assets valued at approximately $130,815,000 at the end of the fiscal

19   quarter, and that the Company had incurred costs of net revenue equal to approximately

20   $135,246,000 in the fiscal quarter. For the same fiscal quarter, the Company reported net income

21   of -$984,000, and earnings per diluted share of -$0.01.

22   33.    Also in the 1Q07 10-Q, the review of which the Audit Committee was responsible

23   for prior to filing with the SEC, the Company stated that VeriFone's disclosure controls and

24   procedures were effective, and that there had been no changes in the Company's internal control

25   over financial reporting for the quarter ended January 31, 2007:

26   With the participation of our Chief Executive Officer and Chief Financial Officer,
     management has carried out an evaluation of the effectiveness of our disclosure
27   controls and procedures (as defined in Rule 13a-15(e) and 15d-15(f) under the
     Securities Exchange Act of 1934). Based upon that evaluation, our Chief Executive

28

- 11 -

Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

\* \* \*

There have been no other changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting for the quarter ended January 31, 2007.

34.    On May 31, 2007, the Company filed with the SEC its quarterly report for the fiscal quarter ended April 30, 2007 (the "2Q07 10-Q"). In the 2Q07 10-Q, the Company stated that the Company had inventories assets valued at approximately $125,390,000 at the end of the fiscal quarter, and that the Company had incurred costs of net revenue equal to approximately $127,013,000 in the fiscal quarter, and $262,259,000 for the six months ended April 30, 2007. For the fiscal quarter and six months ended April 30, 2007, the Company reported net income of $4,859,000 and $3875,000, respectively, and earnings per diluted share of $0.06 and $0.05, respectively.

35.    Also in the 2Q07 10-Q, the review of which the Audit Committee was responsible for prior to filing with the SEC, the Company stated that VeriFone's disclosure controls and procedures were effective, and that there had been no changes in the Company's internal control over financial reporting for the quarter ended April 30, 2007:

With the participation of our Chief Executive Officer and Chief Financial Officer, management has carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(f) under the Securities Exchange Act of 1934). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

\* \* \*

No change in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities and Exchange Act of 1934) occurred during the second quarter of our fiscal year ended April 30, 2007 that has materially affected, or is reasonably likely to affect, our internal control over financial reporting.

36.    On September 7, 2007, the Company filed with the SEC its quarterly report for the fiscal quarter ended July 31, 2007 (the "3Q07 10-Q"). In the 3Q07 10-Q, the Company stated that the Company had inventories assets valued at approximately $145,398,000 at the end of the fiscal quarter, and that the Company had incurred costs of net revenue equal to approximately $129,934,000 in the fiscal quarter, and $392,193,000 for the nine months ended July 31, 2007. For

- 12 -

1   the fiscal quarter and nine months ended July 31, 2007, the Company reported net income of

2   $13,439,000 and $17,314,000, respectively, and earnings per diluted share of $0.16 and $0.20,

3   respectively.

4       37.     Also in the 3Q07 10-Q, the review of which the Audit Committee was responsible

5   for prior to filing with the SEC, the Company stated that VeriFone's disclosure controls and

6   procedures were effective, and that there had been no changes in the Company's internal control

7   over financial reporting for the quarter ended July 31, 2007:

> With the participation of our Chief Executive Officer and Chief Financial Officer,
> management has carried out an evaluation of the effectiveness of our disclosure
> controls and procedures (as defined in Rule 13a-15(e) and 15d-15(f) under the
> Securities Exchange Act of 1934). Based upon that evaluation, our Chief Executive
> Officer and Chief Financial Officer concluded that our disclosure controls and
> procedures were effective as of the end of the period covered by this report.

* * *

> No change in our internal control over financial reporting (as defined in Rule 13a-
> 15(f) under the Securities and Exchange Act of 1934) occurred during the third
> quarter of our fiscal year ended July 31, 2007 that has materially affected, or is
> reasonably likely to affect, our internal control over financial reporting.

16      38.     The foregoing statements were false and misleading when made because the

17  Individual Defendants failed to disclose that the Company's net income for the first, second, and

18  third fiscal quarters of 2007 was materially overstated because the Company materially overstated

19  reported inventories and materially understated cost of net revenues during those quarters.   The

20  Company reported that its first, second, and third quarter reported inventories were overstated by

21  $7.7 million, $16.5 million, and $30.02 million, respectively.   As a result, the Company's reported

22  pre-tax income was overstated by $8.9 million, $7.0 million, and $13.8 million for the first, second,

23  and third quarters, respectively.

24              ***The Company Admits to its False and Misleading Statements***

25      39.     On December 3, 2007, the Company filed with the SEC a Form 8-K (the "8-K") in

26  which it announced that it "will restate its previously issued unaudited interim consolidated

27  financial statements for the three months ended January 31, 2007, the three and six months ended

28  April 30, 2007 and the three and nine months ended July 31, 2007."

- 13 -

40.     In the 8-K, the Company further disclosed that the financial statements for the quarters ended January 31, 2007, April 30, 2007, and July 31, 2007 should not be relied upon because the Company improperly and materially overstated in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which caused the Company's costs of net revenues to be improperly and materially understated, and the Company's net income to be improperly and materially inflated.  The Company further noted that it would delay the release of full financial results for the three months ended October 31, 2007 pending completion of the restatements.

> On December 2, 2007, following a review by and on the recommendation of management, the Company concluded that its unaudited interim consolidated financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007 and the three and nine months ended July 31, 2007 should no longer be relied upon, principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects the Company's reported costs of net revenues. The restatements are anticipated to correct errors that overstated previously reported inventories in material amounts as of January 31, 2007, April 30, 2007 and July 31, 2007, and understated cost of net revenues in material amounts for the three month periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly, investors are cautioned not to rely on the Company's historical financial statements and earnings press releases and similar communications for the periods ended January 31, 2007, April 30, 2007, and July 31, 2007.

> Based on its review to date, the Company's management currently anticipates that the restatement will result in reductions to previously reported inventories of approximately $7.7 million, $16.5 million and $30.2 million as of January 31, 2007, April 30, 2007 and July 31, 2007, respectively, and reductions to previously reported pre-tax income of approximately $8.9 million, $7.0 million and $13.8 million for the three month periods ended January 31, 2007, April 30, 2007 and July 31, 2007, respectively. The Company is currently evaluating the anticipated effect of the restatement on after-tax income for those periods.

> These estimates include corrections of other unrelated errors detected in the course of the Company's review to date, are based on currently available information and are subject to change during the course of the Company's restatement process. While the Company is not currently aware of other accounting errors requiring adjustment to any prior period financial statements, there can be no assurances that the Company or its independent registered public accounting firm will not find additional accounting errors requiring further adjustments in those or earlier periods.

> Also on December 2, 2007, the Company's management and the Audit Committee of its Board of Directors determined that the Company would delay the release of full fourth quarter 2007 financial results that were scheduled to be released on December 6, 2007, pending completion of the assessment of these errors and the restatements.

- 14 -

The Company concluded that a restatement of its interim unaudited financial statements is required as a result of an internal review of in-transit inventory balances conducted in preparation for the Company's fiscal 2007 audit. Upon completion of its assessment of these errors, the Company intends to file amended Quarterly Reports on Form 10-Q for the periods described above that will restate the previously issued financial statements included therein. The Company currently estimates that it will file these amended quarterly reports, together with its Annual Report on Form 10-K for the fiscal year ended October 31, 2007, in January 2008. However, the Company cannot be certain how much time will ultimately be required for it to complete the restatement process.

Although the Company's management is still evaluating the implications of the restatements described above on its internal control over financial reporting, when the Company files its Annual Report on Form 10-K for the year ended October 31, 2007 and amends the previously filed quarterly reports to effect the restatements, management expects the Company to report one or more material weaknesses in the Company's internal control over financial reporting.

The Company's management and the Audit Committee have discussed the matters disclosed in this Current Report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.

41.       The following table depicts the financial figures that will have to be restated, and the amount of such restatement, as a result of the Company's inadequate accounting and revenue recognition controls and procedures:

| Quarter | Previously Stated Inventories[1] | Amount of Reduction | % of Reduction | Previously Stated Pre-Tax Income | Amount of Reduction | % of Reduction |
|---------|------------------|---------------------|----------------|----------------------------------|---------------------|----------------|
| 1Q07 | $130,815 | $7,700 | 5.89% | $2,867 | $8,900 | 310.43% |
| 2Q07 | $125,390 | $16,500 | 13.16% | $9,351 | $7,000 | 74.86% |
| 3Q07 | $145,398 | $30,200 | 20.77% | $24,762 | $13,800 | 55.73% |

42.       On December 31, 2007, the Company filed with the SEC a Form NT 10-K in which it announced that its financial statements for the quarters ended January 31, 2007, April 30, 2007, and July 31, 2007 should not be relied upon due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects the Company's costs of net revenues. Accordingly, the Company announced that it would be unable to file its Annual Report on Form 10-K for the year ended October 31, 2007 in a timely manner.

VeriFone Holdings, Inc. ("VeriFone") is unable to file its Annual Report on Form 10-K for the year ended October 31, 2007 in a timely manner without unreasonable effort and expense in light of the circumstances described below.

[1] All dollar figures are in thousands unless otherwise stated.

- 15 -

On December 3, 2007, VeriFone announced that following a review by and on the recommendation of management, it has concluded that its unaudited interim consolidated financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007, and the three and nine months ended July 31, 2007, should no longer be relied upon, principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues. The restatements are anticipated to correct errors that overstated previously reported inventories in material amounts as of January 31, 2007, April 30, 2007, and July 31, 2007, and understated cost of net revenues in material amounts for the three month periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly, investors are cautioned not to rely on VeriFone's historical financial statements and earnings press releases and similar communications for the periods ended January 31, 2007, April 30, 2007, and July 31, 2007. These restatements are also anticipated to correct other errors that may be detected in the course of VeriFone's review.

VeriFone concluded that a restatement of its interim unaudited financial statements is required as a result of an internal review of in-transit inventory balances conducted in preparation for VeriFone's fiscal 2007 audit.

VeriFone's management and the Audit Committee of its Board of Directors have determined to delay the filing of VeriFone's Annual Report on Form 10-K for the fiscal year ended October 31, 2007 pending completion of the assessment of the errors and the restatements described above. Upon completion of its assessment of these errors, VeriFone intends to file amended Quarterly Reports on Form 10-Q for the periods described above that will restate the previously issued financial statements included therein, following which time VeriFone expects to complete and file its Annual Report on Form 10-K for the fiscal year ended October 31, 2007.

### *Individual Defendants' Stock Sales Based Upon Material Non-Public Information*

43.    From March 9, 2007 – the day the 1Q07 10-Q was filed with the SEC – until November 30, 2007 – the last trading day of the Company's common stock before the Company announced that its prior financial statements could not be relied upon – the Company's common stock climbed from $37.01 per share to $48.03, an increase of more than 29%. The Company's common stock peaked in 2007 at $49.43 per share on October 31, 2007.

44.    This dramatic gain was caused as a direct result of the Individual Defendants' failure to recognize and correct the Company's internal control failures, and the deliberate overstatement of the Company's financial performance in the Company's Form 10-Qs.

45.    In breach of both their fiduciary duty of good faith and loyalty, the Individual Defendants willfully ignored the obvious and pervasive problems with VeriFone's accounting and

1    internal control practices and procedures and failed to make a good faith effort to correct the

2    problems or prevent their recurrence.

3        46.    The material non-public information discussed above was well known among

4    VeriFone insiders, including the Individual Defendants, who comprise the entire executive corps of

5    the Company and its entire Board, and was discussed formally and informally during VeriFone

6    Board and committee meetings, management meetings, and other meetings attended by the

7    Individual Defendants.

8        47.    In contravention of their fiduciary duties of good faith and loyalty, defendants

9    Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein, with the

10   knowledge that the Company's financial statements were false and materially misstated, sold more

11   than *$332 million worth* of Company stock in order to line their own pockets, and the pockets of

12   their affiliates.

13       48.    From March 1, 2007 until November 26, 2007, defendants Adams, Angel, Atkinson,

14   Bergeron, Bondy, Castle, Roche, Waller and Zwarenstein, based on their knowledge of material

15   non-public information regarding the Company, sold a total of 8,879,613 shares of VeriFone stock,

16   garnering total proceeds of over $332 million, as follows:[2]

17

18

| Name | Date of First Sale | Date of Last Sale | Total Shares Sold | Proceeds |
|------|--------------------|--------------------|--------------------|----------|
| Adams | 3/1/07 | 9/24/07 | 129,478 | $4,690,583 |
| Angel | 3/13/07 | 11/13/07 | 135,000 | $5,198,721 |
| Atkinson | 3/1/07 | 9/26/07 | 117,000 | $4,457,464 |
| Bergeron | 3/15/07 | 11/26/07 | 1,441,735 | $56,523,631 |
| Bondy | 6/25/07 | 9/13/07 | 6,800,000[4] | $251,208,000 |
| Castle | 9/14/07 | 9/14/07 | 4,500 | $176,404 |
| Roche | 6/25/07 | 9/13/07 | 6,800,000 | $251,208,000 |
| Waller | 6/13/07 | 11/26/07 | 90,000 | $3,530,605 |

24   [2] Each of the stock sales conducted by defendants Adams, Angel, Atkinson, Bergeron, Bondy,
     Castle, Roche, Waller, and Zwarenstein are demonstrated in Exhibit A hereto.

25

26   [3] Proceeds are rounded to the nearest whole dollar.

27   [4] During the relevant period, Bondy and Roche were affiliated with GTCR. Bondy and Roche both
     used material inside information concerning the financial condition of the Company to cause
     GTCR to sell 6,800,000 shares of Company common stock for proceeds in excess of $251 million.
28   These shares and proceeds were not counted twice in calculating to total values in the table above.

- 17 -

| Name | Date of First Sale | Date of Last Sale | Total Shares Sold | Proceeds |
|------|------|------|------|------|
| Zwarenstein | 3/15/07 | 11/13/07 | 161,900 | $6,228,286 |
| **TOTAL** | **3/1/07** | **11/26/07** | **8,879,613** | **$332,013,694** |

49.    At the time that the stock sales referenced in the above paragraph were made, defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein each knew that the Company's financial statements were false and materially overstated, and that the Company's stock price was materially inflated as a result thereof.

50.    The stock sales described in paragraph 48 were not part of any normal or regular pattern or practice of such sales by the Individual Defendants, but rather were unusual in that the Individual Defendants sold large amounts of VeriFone stock prior to revealing the truth about the Company's internal control problems and materially overstated financial statements.

51.    Specifically, defendants Adams, Angel, Atkinson, Bergeron, Bondy, Roche, Waller, and Zwarenstein each sold significant portions of their VeriFone holdings between March 1, 2007 and November 26, 2007, as demonstrated by the following table:

| Name | Percentage of Holdings Sold |
|------|------|
| Adams | 72.00% |
| Angel | 57.42% |
| Atkinson | 45.14% |
| Bergeron | 40.61% |
| Bondy & Roche (through GTCR) | 41.32% |
| Waller | 67.75% |
| Zwarenstein | 41.54% |
| **TOTAL** | **41.85%** |

52.    Lastly, in order to present the appearance of propriety, many of the transactions in paragraph 48 above were conducted pursuant to Rule 10b5-1 Plans under the Securities Exchange Act. However, defendants Adams, Bergeron, and Zwarenstein, who conducted certain of these transactions pursuant to purportedly proper 10b5-1 Plans, entered into these plans when they were in possession of material non-public information, thereby rendering the plans invalid. Bergeron and Zwarenstein conducted their stock sales pursuant to 10b5-1 Plans that were entered into on

- 18 -

1    December 10, 2006, more than one month after the beginning of 1Q07, which was the subject of

2    the first false and misleading statement, as alleged herein at paragraphs 32 and 33.    Adams

3    conducted his stock sales pursuant to a 10b5-1 Plan that was entered into on January 3, 2007,

4    approximately two months after the beginning of 1Q07, which was the subject of the first false and

5    misleading statement, as alleged herein at paragraphs 32 and 33.

6                    **DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

7        53.    Plaintiff brings this action derivatively in the right and for the benefit of VeriFone to

8    redress breaches of fiduciary duty and unjust enrichment of the Individual Defendants.

9        54.    Plaintiff will adequately and fairly represent the interests of VeriFone and its

10    shareholders in enforcing and prosecuting its rights.

11        55.    Plaintiff is an owner of VeriFone common stock and was an owner of VeriFone

12    common stock at all times relevant to the Individual Defendants' wrongful course of conduct

13    alleged herein.

14        56.    At the time that this action was commenced, the VeriFone Board consisted of eight

15    directors: defendants Bergeron, Castle, Denend, Hart, Henske, Rinehart, and Roche, and non-

16    defendant Eitan Raff.

17
18        57.    As a result of the facts set forth herein, Plaintiff has not made any demand on the

19    VeriFone Board to institute this action against the Individual Defendants.    Such demand would be a

20    futile and useless act with respect to the following director defendants because they are incapable

21    of making an independent and disinterested decision to institute and vigorously prosecute this

22    action for the following reasons:

23        a.    Defendants Bergeron, Castle, and Roche, because all three of them face a
              substantial likelihood of being held liable for breaching their fiduciary duties
24            of loyalty and good faith for engaging in illegal insider trading of VeriFone
              securities, as alleged herein, and therefore they are incapable of
25            disinterestedly and independently considering a demand to commence and
              vigorously prosecute this action;

26        b.    Defendants Castle, Denend, Henske, and Rinehart, because each of them
27            knew of the Company's ongoing improper accounting and revenue
              recognition practices, yet still permitted the Company to portray to the
28            investing public the Company's false and misleading financial condition
              despite their heightened fiduciary obligations as members of the Audit

- 19 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
1064377.1

Committee, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

c.    Defendants Bergeron, Castle, Denend, Hart, Henske, Rinehart, and Roche, because all seven of them knew of the Company's ongoing improper accounting and revenue recognition practices, and thus face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

d.    Defendants Denend, Henske, and Roche, because each of them knew of the Company's ongoing improper accounting and revenue recognition practices, yet, as members of the Compensation Committee, still permitted defendants Adams, Bergeron, and Zwarenstein to enter into 10b5-1 Plans in order to present the appearance of propriety when defendants Adams, Bergeron, and Zwarenstein conducted the transactions referred to in paragraph 48 herein, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

e.    Defendant Roche, because of his business relationship with defendant Bondy through GTCR, and because both defendant Roche and Bondy face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith for engaging in illegal insider trading of VeriFone securities, as alleged herein, and therefore Roche is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

f.    Defendant Bergeron, because, according to the Company's Proxy statement, defendant Bergeron's compensation is set by the Compensation Committee. Thus, due to the fact that defendants Denend, Henske, and Roche directly control Bergeron's compensation by virtue of their roles as members of the Compensation Committee, Bergeron is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

## COUNT I

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH IN CONNECTION WITH IMPROPER BUSINESS PRACTICES

58.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

59.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, that the Company's financial statements were prepared in accordance with GAAP, and that the Company complied with all applicable federal and state laws, rules, regulations and requirements, and, when put on notice of problems with the Company's business practices and

- 20 -

1    operations, exercise good faith in taking appropriate action to correct the misconduct and prevent

2    its recurrence.

3        60.        As alleged herein, the Individual Defendants willfully ignored the obvious and

4    pervasive problems with VeriFone's accounting, revenue recognition, and internal control practices

5    and procedures and failed to make a good faith effort to correct the problems or prevent their

6    recurrence.    Despite their actual knowledge of the Company's improper business practices,

7    including, but not limited to, failing to properly value the Company's inventory and cost of net

8    revenues, thereby materially overstating VeriFone's financial results, and failing to prepare the

9    Company's financial statements in accordance with GAAP, the Individual Defendants failed to

10    make a good faith effort to correct the problems or prevent their recurrence.

11        61.        As a direct and proximate result of the Individual Defendants' foregoing breaches of

12    fiduciary duties, the Company has sustained damages, including, but not limited to, the costs and

13    expenses incurred in connection with the restatement.

## COUNT II

### AGAINST DEFENDANTS ADAMS, ANGEL, ATKINSON, BERGERON, BONDY, CASTLE, ROCHE, WALLER, AND ZWARENSTEIN FOR BREACH OF FIDUCIARY DUTY OF LOYALTY AND GOOD FAITH IN CONNECTION WITH INSIDER STOCK SALES

18        62.        Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

19    fully set forth herein.

20        63.        At the time of each of the stock sales set forth herein, each of defendants Adams,

21    Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein knew, but did not

22    disclose publicly, that the Company's financial results were false and misleading as a result of the

23    Company's failure to comply with applicable accounting and revenue recognition procedures.

24    Each of defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and

25    Zwarenstein made each of the stock sales described herein on the basis of and because of their

26    knowledge of the material non-public information described herein.

27        64.        At the time of their stock sales, each of defendants Adams, Angel, Atkinson,

28    Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein knew that when it was disclosed that the

- 21 -

1    Company's financial results were false and misleading as a result of the Company's failure to

2    comply with applicable accounting and revenue recognition procedures, the price of the

3    Company's common stock would dramatically decrease. Defendants Adams, Angel, Atkinson,

4    Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein's sales of VeriFone common stock

5    based on their knowledge of this material non-public information was a breach of their fiduciary

6    duties of loyalty and good faith.

7        65.    Since the use of the Company's proprietary information for their own gain

8    constitutes a breach of defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche,

9    Waller, and Zwarenstein's fiduciary duties, the Company is entitled to the imposition of a

10   constructive trust on any proceeds defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle,

11   Roche, Waller, and Zwarenstein obtained thereby.

12                                    **COUNT III**

13                   **AGAINST DEFENDANTS ADAMS, ANGEL, ATKINSON,**
     **BERGERON, BONDY, CASTLE, ROCHE, WALLER, AND ZWARENSTEIN**
14   **FOR UNJUST ENRICHMENT IN CONNECTION WITH INSIDER STOCK SALES**

15       66.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

16   fully set forth herein.

17       67.    Defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and

18   Zwarenstein were unjustly enriched by their receipt of proceeds from their illegal sales of VeriFone

19   common stock, as alleged herein, and it would be unconscionable to allow them to retain the

20   benefits of their illegal conduct.

21       68.    To remedy defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche,

22   Waller, and Zwarenstein's unjust enrichment, the Court should order them to disgorge to the

23   Company all proceeds derived from their illegal sales of VeriFone common stock.

24       WHEREFORE, Plaintiff demands judgment as follows:

25   A.    Against all of the Individual Defendants and in favor of the Company for the
          amount of damages sustained by the Company as a result of the Individual
26        Defendants' breaches of fiduciary duties;

27   B.    Imposing a constructive trust in favor of the Company for the amount of proceeds
          each of defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche,
28        Waller, and Zwarenstein received from their sales of VeriFone common stock

                                       - 22 -

alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

C. Ordering defendants Adams, Angel, Atkinson, Bergeron, Bondy, Castle, Roche, Waller, and Zwarenstein to disgorge to the Company all proceeds derived from their sales of VeriFone common stock alleged herein, in addition to all proceeds otherwise derived from their service as directors and/or executives of the Company;

D. Granting appropriate equitable relief to remedy Defendants' breach of fiduciary duties.

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 26, 2008

Respectfully submitted,

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

L. Timothy Fisher

Alan R. Plutzik, Of Counsel (Bar No. 077785)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
Nichole Browning (Bar No. 251937)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792

-and-

Eric L. Zagar
James H. Miller
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
1064377.1

EXHIBIT 3

FILED

MAR - 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  JOHNSON BOTTINI, LLP
   FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
2  DEREK J. WILSON, Cal. Bar No. 250309
   655 West Broadway, Suite 1400
3  San Diego, California 92101
   Telephone: 619/230-0063
4  Facsimile: 619/233-5535

5  Attorneys for Plaintiffs

E-filing

RS

6

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

CV 08  1301

9  Mary Lemmond and Wandell Everett,          )
   Derivatively On Behalf of VeriFone Holdings, )   No.
10 Inc.                                        )
                                               )   SHAREHOLDER DERIVATIVE
11                  Plaintiffs,                 )   COMPLAINT
                                               )
12        vs.                                   )
                                               )   DEMAND FOR JURY TRIAL
13 DOUGLAS G. BERGERON,                        )
   BARRY ZWARENSTEIN,                          )
14 JESSE ADAMS.                                )
   ISAAC ANGEL,                                )
15 ELMORE WALLER,                              )
   COLLIN E. ROCHE,                            )
16 JAMES C. CASTLE,                            )
   LESLIE G. DENEND,                           )
17 ALEX W. HART,                               )
   ROBERT B. HENSKE,                           )
18 CHARLES R. RINEHART,                        )
   EITAN RAFF,                                 )
19 WILLIAM G. ATKINSON,                        )
   CRAIG A. BONDY,                             )
20 GTCR GOLDER RAUNER, LLC,                    )
   and DOES 1-25, inclusive,                   )
21                                             )
                    Defendants,                )
22                                             )
          -and-                                )
23                                             )
   VERIFONE HOLDINGS, INC., a Delaware         )
24 Corporation,                                )
                                               )
25                  Nominal Defendant.         )
   _____

26

27

28

_____
                 SHAREHOLDER DERIVATIVE COMPLAINT

**SUMMARY AND OVERVIEW**

1.     This is a shareholder derivative complaint against officers and directors of VeriFone Holdings, Inc. ("VeriFone" or the "Company") concerning wrongdoing that occurred between September 1, 2006 and November 30, 2007 (the "Relevant Period"). Plaintiffs assert state law claims for breach of fiduciary duty against defendants.

2.     VeriFone designs, markets, and services transaction automation systems that enable secure electronic payments among consumers, merchants, and financial institutions.

3.     On December 3, 2007, VeriFone announced that following a review by and on the recommendation of management, the Company's unaudited interim financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007, and the three and nine months ended July 31, 2007 should no longer be relied upon, principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory. As a result of the false financial statements previously filed by VeriFone, the Company announced that it was delaying the filing of its Annual Report on Form 10-K for the fiscal year ending October 31, 2007. The Company anticipates that the restatement will result in a reduction of reported inventories that amounted to $30 million at July 31, 2007 and a reduction to previously-reported pre-tax income aggregating approximately $30 million for the interim periods through July 31, 2007.

4.     In its December 3, 2007 revelation of false financial statements, VeriFone also stated that when the Company eventually files the 2007 Form 10-K, and files amended financial statements for previous periods to correct admitted accounting errors, *"management expects VeriFone to report one or more material weaknesses in VeriFone's internal controls over financial reporting."* Moreover, VeriFone's market capitalization has been damaged by over $2.6 billion.

5.     The Company's December 3, 2007 announcement was necessary because, during the Relevant Period, defendants had caused VeriFone to issue false and misleading statements regarding the Company's business and prospects. The true facts, which were known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)     The Company's in-transit inventory was grossly overvalued due to accounting errors related to allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues. This fraud was revealed by a cost accounting manager in the Company's Sacramento, California office;

(b)     The Company's gross margins were not 45-47% but were closer to 40%;

(c)     The Company was not on track to achieve profitability in 2007, but rather losses due to problems related to the Company's acquisition of Lipman Electronic Engineering, Ltd. ("Lipman"), which problems the Company discovered during the due diligence pertaining to the Company's acquisition of Lipman in 2006;

(d)     The Company's gross margin projections were overstated;

(e)     The Company's supply chain management was severely deficient;

(f)     The Company's accounting during the Relevant Period was false and misleading;

(g)     The Individual Defendants failed to adopt and implement adequate internal controls over accounting and financial reporting; and

(h)     That as a result of (a)-(g) above, the Company's estimates of an eleventh consecutive quarter of double digit revenue growth for the first quarter of 2007 and beyond and income per share growth of 20% or more were grossly inflated and the Company's reported assets and inventory were materially overstated as described at ¶¶87-92.

6.     As a result of the false statements, VeriFone's stock price traded at inflated levels during the Relevant Period, increasing to as high as $50 just one month before the end of the Relevant Period. The artificial inflation of the Company's stock allowed the defendants to sell more than $469 million worth of their VeriFone stock at artificially inflated prices.

7.     The Individual Defendants' misconduct has damaged VeriFone and its shareholders. VeriFone has been named as a defendant in class action securities fraud lawsuits. VeriFone is currently incurring millions of dollars in costs due to required internal investigations into the accounting errors, false financial statements, and insider selling. The Company has been forced to hire outside attorneys (Simpson Thacher & Bartlett, LLP) and forensic accountants (Navigant

1  Consulting, Inc.) to serve as advisors to the internal investigation. The Company's goodwill and
2  reputation have been materially undermined and tarnished.

3      8.    The Individual Defendants' wrongdoing has also significantly damaged VeriFone in
4  that it has caused VeriFone to default on its credit agreements. As a result, the Company has been
5  damaged in that it has been forced to (1) pay significant amounts of money to its lenders in exchange
6  for their agreement to waive the defaults; and (2) pay an extra 0.25% on the interest rate applicable
7  to its term loans and revolving credit agreements. VeriFone and VeriFone Intermediate Holdings,
8  Inc., a wholly-owned subsidiary of VeriFone, are parties to an October 31, 2006 Credit Agreement.
9  VeriFone has defaulted on this Credit Agreement due to its failure to timely file financial statements
10  for the three months ended January 31, 2007, April 30, 2007, July 31, 2007, the year ended October
11  31, 2007, and the three-month period ended January 31, 2008. As a result, VeriFone was forced to
12  enter into a First Amendment to Credit Agreement and Waiver ("First Amendment") with its lenders
13  on January 25, 2008. Pursuant to the First Amendment, VeriFone had to pay its lenders (1) a fee of
14  0.25% of the aggregate amount outstanding under the loans and revolving credit agreements; (2) pay
15  the lenders an increased rate of interest on the term loan – an additional 0.25%; and (3) pay all the
16  legal fees and costs of Fried, Frank, Harris, Shriver & Jacobson LLP (legal counsel to the
17  Administrative Agent of the lenders) relating to the First Amendment.

18                                    **JURISDICTION AND VENUE**

19      9.    Jurisdiction is conferred by 28 U.S.C. §1332. There is complete diversity among the
20  parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and
21  costs.

22      10.    Venue is proper in this District pursuant to 28 U.S.C. §1391. Many of the acts
23  complained of herein occurred in this district and VeriFone's principal executive offices are located
24  at 2099 Gateway Place, Suite 600, San Jose, CA 95110, where the day-to-day operations of the
25  Company are directed and managed.

26                                        **THE PARTIES**

27      11.    Plaintiff Mary Lemmond is a current shareholder of VeriFone and was a shareholder
28  of VeriFone at the time of the transaction complained of herein. Plaintiff Lemmond is a citizen of

North Carolina. Plaintiff Wandell Everett is a current shareholder of VeriFone and was a shareholder of VeriFone at the time of the transaction complained of herein. Plaintiff Everett is a citizen of Georgia.

12.     Defendant VeriFone Holdings, Inc. is a corporation which designs, markets, and services transaction automation systems that enable secure electronic payments among consumers, merchants, and financial institutions. The Company's stock is traded on the New York Stock Exchange under the ticker "PAY." VeriFone is incorporated in Delaware and has its principal place of business in California. VeriFone is a citizen of both Delaware and California.

13.     Defendant Douglas G. Bergeron ("Bergeron") is VeriFone's Chairman and Chief Executive Officer and has been since July 2001. Because of Bergeron's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of VeriFone including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors ("Board") meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Bergeron participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of other statements made to the press, securities analysts and VeriFone shareholders. Defendant Bergeron received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $597,313 | $1,500,000 | $1,154,400 | 225,000 | $45,824 |

During the Relevant Period, Bergeron sold 2,254,834 shares of VeriFone stock for proceeds of $78,699,430. Mr. Bergeron is a citizen of California.

14.     Defendant Barry Zwarenstein ("Zwarenstein") is VeriFone's Chief Financial Officer and has been since June 2004. Zwarenstein is also VeriFone's Executive Vice President and has been since November 2006. Zwarenstein was VeriFone's Senior Vice President from June 2004 to November 2006. Because of Zwarenstein's positions, he knew, consciously disregarded, was

1  reckless and grossly negligent in not knowing or should have known the adverse, non-public
2  information about the business of VeriFone including its finances, markets and present and future
3  business prospects, via access to internal corporate documents, conversations and connections with
4  other corporate officers and employees, attendance at management meetings, as well as reports and
5  other information provided to him in connection therewith. During the Relevant Period, Zwarenstein
6  participated in the issuance of improper statements, including the preparation of the improper press
7  releases and other statements and approval of other statements made to the press, securities analysts
8  and VeriFone shareholders. Defendant Zwarenstein received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $319,167 | $250,000 | $1,388,600 | 80,000 | $5,087 |

12  During the relevant period, Zwarenstein sold 186,792 shares of VeriFone stock for proceeds of
13  $7,075,260. Zwarenstein is a citizen of California.

14       15.    Defendant Jesse Adams ("Adams") is VeriFone's Vice Chairman and has been since
15  November 2006. Adams was also VeriFone's Executive Vice President, North American Sales from
16  July 2001 to October 2006. Because of Adams' positions, he knew, consciously disregarded, was
17  reckless and grossly negligent in not knowing or should have known the adverse, non-public
18  information about the business of VeriFone including its finances, markets and present and future
19  business prospects, via access to internal corporate documents, conversations and connections with
20  other corporate officers and employees, attendance at management meetings, as well as reports and
21  other information provided to him in connection therewith. During the Relevant Period, Adams
22  participated in the issuance of improper statements, including the preparation of the improper press
23  releases and other statements and approval of other statements made to the press, securities analysts
24  and VeriFone shareholders. Defendant Adams received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $299,167 | $125,000 | $288,600 | 40,000 | $11,687 |

1 During the Relevant Period, Adams sold 209,399 shares of VeriFone stock for proceeds of
2 $7,502,095. Adams is a citizen of California.

3       16.   Defendant Isaac Angel ("Angel") is VeriFone's Executive Vice President, Global
4 Operations and has been since VeriFone acquired Lipman Electronic Engineering, Inc. in November
5 2006. Angel was CEO of Lipman. Because of Angel's positions with Lipman and then with
6 VeriFone, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or
7 should have known the adverse, non-public information about the business of VeriFone including its
8 finances, markets and present and future business prospects, via access to internal corporate
9 documents, conversations and connections with other corporate officers and employees, attendance
10 at management meetings, as well as reports and other information provided to him in connection
11 therewith. Because he was CEO of Lipman prior to Lipman's acquisition by VeriFone, Lipman had
12 actual knowledge of the issues regarding VeriFone's acquisition of Lipman and regarding
13 VeriFone's inflated inventories during the Relevant Period. During the Relevant Period, Angel
14 participated in the issuance of improper statements, including the preparation of the improper press
15 releases and other statements and approval of other statements made to the press, securities analysts
16 and VeriFone shareholders. During the Relevant Period, Angel sold 150,000 shares of VeriFone
17 stock for proceeds of $5,805,400. Angel is a citizen of California.

18       17.   Defendant Elmore Waller ("Waller") is VeriFone's Executive Vice President,
19 Integrated Solution and has been since December 2004. From 1986 to November 2004, Waller has
20 served in a number of leadership positions including Senior Vice President and General Manager of
21 the Worldwide Petro Division. Because of Waller's positions, he knew, consciously disregarded,
22 was reckless and grossly negligent in not knowing or should have known the adverse, non-public
23 information about the business of VeriFone including its finances, markets and present and future
24 business prospects, via access to internal corporate documents, conversations and connections with
25 other corporate officers and employees, attendance at management meetings, as well as reports and
26 other information provided to him in connection therewith. During the Relevant Period, Waller
27 participated in the issuance of improper statements, including the preparation of the improper press
28 releases and other statements and approval of other statements made to the press, securities analysts

1  and VeriFone shareholders. During the Relevant Period, Waller sold 129,800 shares of VeriFone
2  stock for proceeds of $4,909,000. Waller is a citizen of California.

3      18.    Defendant Collin E. Roche ("Roche") is a VeriFone director and has been since July
4  2002. Mr. Roche is a principal of GTCR Golder Rauner, LLC, which owned more than 10% of
5  VeriFone's stock during the Relevant Period. Roche was also, at all relevant times, a member of
6  VeriFone's Compensation Committee. Because of Roche's positions, he knew, consciously
7  disregarded, was reckless and grossly negligent in not knowing or should have known the adverse,
8  non-public information about the business of VeriFone including its finances, markets and present
9  and future business prospects, via access to internal corporate documents, conversations and
10  connections with other corporate officers and employees, attendance at management meetings, as
11  well as reports and other information provided to him in connection therewith. During the Relevant
12  Period, Roche, GTCR Capital Partners, GTCR Co-Invest and CTCR Fund VII caused CTCR Golder
13  Rauner, LLC and its partners to sell 9,800,000 shares of VeriFone stock for proceeds of
14  $358,550,281. Roche is a citizen of Illinois.

15      19.    Defendant James C. Castle ("Castle") is a VeriFone director and has been since
16  January 2005. Castle was also, at all relevant times, a member of VeriFone's Audit Committee.
17  Because of Castle's positions, he knew, consciously disregarded, was reckless and grossly negligent
18  in not knowing or should have known the adverse, non-public information about the business of
19  VeriFone including its finances, markets and present and future business prospects, via access to
20  internal corporate documents, conversations and connections with other corporate officers and
21  employees, attendance at management meetings, as well as reports and other information provided to
22  him in connection therewith. During the Relevant Period, Castle participated in the issuance of
23  improper statements, including the preparation of the improper press releases and other statements
24  and approval of other statements made to the press, securities analysts and VeriFone shareholders.
25  During the Relevant Period, Castle sold 5,000 shares of VeriFone stock for proceeds of $194,300.
26  Castle is a citizen of California.

27      20.    Defendant Leslie G. Denend ("Denend") is a VeriFone director and has been since
28  January 2005. Denend was also, at all relevant times, a member of VeriFone's Audit Committee.

- 7 -

1   Because of Denend's positions, he knew, consciously disregarded, was reckless and grossly

2   negligent in not knowing or should have known the adverse, non-public information about the

3   business of VeriFone including its finances, markets and present and future business prospects, via

4   access to internal corporate documents, conversations and connections with other corporate officers

5   and employees, attendance at management meetings, as well as reports and other information

6   provided to him in connection therewith. During the Relevant Period, Denend participated in the

7   issuance of improper statements, including the preparation of the improper press releases and other

8   statements and approval of other statements made to the press, securities analysts and VeriFone

9   shareholders. Mr. Denend is a citizen of California.

10        21.    Defendant Alex W. Hart ("Hart") is a VeriFone director and has been since July

11   2006. Because of Hart's positions, he knew, consciously disregarded, was reckless and grossly

12   negligent in not knowing or should have known the adverse, non-public information about the

13   business of VeriFone including its finances, markets and present and future business prospects, via

14   access to internal corporate documents, conversations and connections with other corporate officers

15   and employees, attendance at management meetings, as well as reports and other information

16   provided to him in connection therewith. During the Relevant Period, Hart participated in the

17   issuance of improper statements, including the preparation of the improper press releases and other

18   statements and approval of other statements made to the press, securities analysts and VeriFone

19   shareholders. Mr. Hart is a citizen of Pennsylvania.

20        22.    Defendant Robert B. Henske ("Henske") is a VeriFone director and has been since

21   January 2005. Henske was also, at all relevant times, Chairman of VeriFone's Audit Committee and

22   a member of the Compensation Committee. Because of Henske's positions, he knew, consciously

23   disregarded, was reckless and grossly negligent in not knowing or should have known the adverse,

24   non-public information about the business of VeriFone including its finances, markets and present

25   and future business prospects, via access to internal corporate documents, conversations and

26   connections with other corporate officers and employees, attendance at management meetings, as

27   well as reports and other information provided to him in connection therewith. During the Relevant

28   Period, Henske participated in the issuance of improper statements, including the preparation of the

SHAREHOLDER DERIVATIVE COMPLAINT

1  improper press releases and other statements and approval of other statements made to the press,

2  securities analysts and VeriFone shareholders. Mr. Henske is a citizen of California.

3      23.    Defendant Charles R. Rinehart ("Rinehart") is a VeriFone director and has been since

4  May 2006. Rinehart was also, at all relevant times, a member of VeriFone's Audit Committee.

5  Because of Rinehart's positions, he knew, consciously disregarded, was reckless and grossly

6  negligent in not knowing or should have known the adverse, non-public information about the

7  business of VeriFone including its finances, markets and present and future business prospects, via

8  access to internal corporate documents, conversations and connections with other corporate officers

9  and employees, attendance at management meetings, as well as reports and other information

10  provided to him in connection therewith. During the Relevant Period, Rinehart participated in the

11  issuance of improper statements, including the preparation of the improper press releases and other

12  statements and approval of other statements made to the press, securities analysts and VeriFone

13  shareholders. Mr. Rinehart is a citizen of California.

14      24.    Defendant Eitan Raff ("Raff") is a VeriFone director and has been since October

15  2007. Because of Raff's positions, he knew, consciously disregarded, was reckless and grossly

16  negligent in not knowing or should have known the adverse, non-public information about the

17  business of VeriFone including its finances, markets and present and future business prospects, via

18  access to internal corporate documents, conversations and connections with other corporate officers

19  and employees, attendance at management meetings, as well as reports and other information

20  provided to him in connection therewith. During the Relevant Period, Raff participated in the

21  issuance of improper statements, including the preparation of the improper press releases and other

22  statements and approval of other statements made to the press, securities analysts and VeriFone

23  shareholders. Mr. Raff is a citizen of Israel.

24      25.    Defendant William G. Atkinson ("Atkinson") was VeriFone's Executive Vice

25  President, Payment Systems from November 2006 to July 2007. Atkinson was also VeriFone's

26  Executive Vice President of global Marketing and Business Development from August 2002 to

27  October 2006 and Vice President, North American Financial Channels from August 2001 to April

28  2002. Because of Atkinson's positions, he knew, consciously disregarded, was reckless and grossly

1  negligent in not knowing or should have known the adverse, non-public information about the

2  business of VeriFone including its finances, markets and present and future business prospects, via

3  access to internal corporate documents, conversations and connections with other corporate officers

4  and employees, attendance at management meetings, as well as reports and other information

5  provided to him in connection therewith. During the Relevant Period, Atkinson participated in the

6  issuance of improper statements, including the preparation of the improper press releases and other

7  statements and approval of other statements made to the press, securities analysts and VeriFone

8  shareholders. Defendant Atkinson received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $298,958 | $224,664 | $1,388,600 | 40,000 | $9,523 |

12  During the Relevant Period, Atkinson sold 172,118 shares of VeriFone stock for proceeds of

13  $6,404,758. Mr. Atkinson is a citizen of California.

14      26.    Defendant Craig A. Bondy ("Bondy") was a VeriFone director from July 2002 to

15  September 2007. Mr. Bondy is a principal of GTCR Golden Rauner, LLC, which owned more than

16  10% of VeriFone's stock during the Relevant Period. Because of Bondy's positions, he knew,

17  consciously disregarded, was reckless and grossly negligent in not knowing or should have known

18  the adverse, non-public information about the business of VeriFone including its finances, markets

19  and present and future business prospects, via access to internal corporate documents, conversations

20  and connections with other corporate officers and employees, attendance at management meetings,

21  as well as reports and other information provided to him in connection therewith. During the

22  Relevant Period, Bondy participated in the issuance of improper statements, including the

23  preparation of the improper press releases and other statements and approval of other statements

24  made to the press, securities analysts and VeriFone shareholders. Bondy, GTCR Capital Partners,

25  GTCR Co-Invest and CTCR Fund VII caused CTCR Golder Rauner, LLC and its partners to sell

26  9,800,000 shares of VeriFone stock for proceed of $358,550,281. Mr. Bondy is a citizen of Illinois.

27      27.    Defendant DTCR Golder Rauner, LLC is an Illinois limited liability company and has

28  its principal place of business at 6100 Sears Tower, Chicago, Illinois 60606. GTCR is a private

SHAREHOLDER DERIVATIVE COMPLAINT

equity firm. Throughout the Relevant Period, GTCR was the single largest VeriFone shareholder and had two designees on VeriFone's board of directors -- defendants Bondy and Roche. Because of Bondy and Roche's positions on the Board, GTCR knew the adverse non-public information about the business of VeriFone. During the Relevant Period, GTCR and its affiliates, of which Bondy and Roche were principals, sold 9,800,000 shares of VeriFone stock for proceeds of $358,550,281. GTCR is a citizen of Illinois.

28. The defendants identified in ¶¶13, 18-24, and 26 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-17 and 25 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-19 and 25-27 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

29. The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to Plaintiffs, who therefore sues these defendants by such fictitious names. Plaintiffs will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the company as a result of defendants' wanton and illegal conduct.

## IMPROPER PERSONAL FINANCIAL BENEFITS

30. The Individual Defendants and GTCR had knowledge of VeriFone's problems and were motivated to conceal such problems. Zwarenstein, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing VeriFone's forecasted and actual growth were prepared by the finance department under Zwarenstein's direction. During the Relevant Period, Zwarenstein sold 186,792 shares of VeriFone common stock at artificially inflated prices for proceeds of over $7 million. Prior to the Relevant Period, Zwarenstein sold an average of 4,000 shares per month from December until the beginning of the class period. The sale of nearly 187,000 shares over the course of the Relevant Period, a fifteen month period, is an average of 12,452 shares a month, or a 211% increase in sales of Verifone stock.

31.     Defendant Bergeron, as CEO and Chairman, was responsible for the financial results and press releases issued by the Company and/or projections issued by the Company. Bergeron sold 2,254,834 shares of VeriFone stock during the Relevant Period for proceeds of nearly $79 million.

32.     Defendant Atkinson, as an Executive Vice President of Verifone, had knowledge of material, non-public information with regard to the financial outlook of the Company. During the Relevant Period, Atkinson sold over 172,000 shares of VeriFone common stock at artificially inflated prices for proceeds of over $6.4 million. In the fifteen months preceding the Relevant Period, Atkinson sold roughly 90,600 shares of Verifone stock. His sale activity in the Relevant Period represents an increase of 90% from his level of sales prior to the Relevant Period.

33.     Defendant Adams, as an Executive Vice President and Vice Chairman, had knowledge of material, non-public information with regard to the financial outlook of the Company. During the Relevant Period, Adams sold nearly 210,000 shares of VeriFone common stock at artificially inflated prices for proceeds of over $7.5 million. In the fifteen months preceding the Relevant Period, Adams sold roughly 161,000 shares of Verifone stock. Her sale activity in the Relevant Period represents an increase of 30% from her level of sales prior to the Relevant Period.

34.     Defendant Waller, as an Executive Vice President of Verifone, had knowledge of material, non-public information with regard to the financial outlook of the Company. During the Relevant Period, a fifteen month period, Waller sold nearly 130,000 shares in contrast to the under 60,000 shares he sold in the fifteen months preceding the Relevant Period. His sale activity in the Relevant Period represents an increase of 117% from his level of sales prior to the Relevant Period.

35.     Defendant Angel, as an Executive Vice President of Verifone, had knowledge of material, non-public information with regard to the financial outlook of the Company. Angel sold 150,000 shares in the Relevant Period for proceeds of over $5.8 million.

36.     Defendant Castle, as a Director and member of the Verifone Audit Committee, had knowledge of material, non-public information with regard to the financial outlook of the Company. Castle sold 5,000 shares of VeriFone stock during the Relevant Period for proceeds of $194,300. Castle used his positions at the company to benefit financially while on possession of material, non-public information.

37.     The Defendants' illegal insider selling was as follows:

| INSIDER/total | DATE (Mo/Day/Yr) | SHARES | PRICE (in $) | PROCEEDS (in $) |
|---|---|---|---|---|
| **BERGERON** | 11-26-07 | 38,000 | 44.70-46.43 | 1,631,000 |
| | 11-19-07 | 14,405 | 44.70-44.93 | 645,000 |
| | 11-14-07 | 130,792 | 44.70-45.95 | 5,912,000 |
| | 10-10-07 | 200,000 | 45.13-46.56 | 9,137,000 |
| | 09-24-07 | 893 | 38.64 | 34,505 |
| | 09-10-07 | 200,000 | 38.73-39.39 | 3,218,000 |
| | 08-10-07 | 83,700 | 39.05-39.15 | 3,273,000 |
| | 07-12-07 | 200,000 | 36.31-37.00 | 7,325,000 |
| | 06-22-07 | 894 | 36.36 | 32,505 |
| | 06-12-07 | 150,000 | 32.43-33.10 | 4,916,000 |
| | 05-14-07 | 88,100 | 37.78-37.99 | 3,338,000 |
| | 05-10-07 | 97,435 | 37.78-38.34 | 3,702,000 |
| | 04-11-07 | 24,000 | 37.50-37.80 | 904,000 |
| | 03-22-07 | 3,575 | 37.60 | 134,420 |
| | 03-15-07 | 200,000 | 35.83-36.27 | 7,191,000 |
| | 01-10-07 | 200,000 | 35.30-35.55 | 7,085,000 |
| | 12-13-06 | 100,040 | 36.39-37.21 | 3,665,000 |
| | 12-11-06 | 99,900 | 35.55-36.50 | 3,588,000 |
| | 12-04-06 | 82,000 | 33.99-34.57 | 2,807,000 |
| | 12-01-06 | 68,000 | 33.26-33.63 | 2,270,000 |
| | 11-01-06 | 125,000 | 29.29-30.30 | 3,731,000 |
| | 10-02-06 | 28,300 | 28.05-28.45 | 797,000 |
| | 09-05-06 | 119,800 | 27.97-28.76 | 3,363,000 |
| **Total** | | **2,254,834** | | **$78,699,430** |
| **ZWARENSTEIN** | 11-13-07 | 17,878 | 43.53-44.37 | 799,000 |
| | 10-09-07 | 18,000 | 43.45-45.73 | 805,501 |
| | 09-24-07 | 222 | 38.64 | 8,578 |
| | 09-12-07 | 3574 | 39.85 | 142,423 |
| | 09-11-07 | 18,000 | 39.00-39.99 | 714,000 |
| | 08-14-07 | 18,000 | 36.35-37.52 | 663,000 |
| | 07-10-07 | 18,000 | 36.07-36.76 | 655,000 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-12-07 | 18,000 | 32.50-33.00 | 590,000 |
| | 05-08-07 | 18,000 | 37.14-37.88 | 672,000 |
| | 04-10-07 | 18,000 | 37.48-38.04 | 682,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-15-07 | 18,000 | 35.75-36.22 | 647,000 |
| | 01-09-07 | 4,000 | 35.21-35.58 | 142,000 |
| | 12-12-06 | 4,000 | 36.86-37.57 | 149,000 |
| | 11-30-06 | 4,000 | 32.82-33.75 | 133,000 |
| | 10-31-06 | 4,000 | 29.00-29.22 | 116,000 |
| | 09-29-06 | 4,000 | 28.55-29.00 | 115,000 |
| **Total** | | **186,792** | | **$7,075,260** |
| **BONDY;** | 12-19-06 | 2,773,042 | | 99,219,442 |
| **ROCHE;** | 12-19-06 | 201,571 | | 7,212,210 |
| **GTCR** | 12-19-06 | 25,837 | | 910,631 |
| **ENTITIES** | 06-25-07 | 3,235,216 | | 114,429,589 |

SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 06-25-07 | 235,165 | | 8,317,786 |
| | 06-25-07 | 29,619 | | 1,047,624 |
| | 09-13-07 | 3,050,346 | | 117,773,859 |
| | 09-13-07 | 221,728 | | 8,560,918 |
| | 09-13-07 | 27,926 | | 1,078,222 |
| **GTCR TOTAL** | | **9,800,000** | | **$358,550,281** |
| **ATKINSON** | 09-26-07 | 35,000 | 42.65-43.73 | 1,508,000 |
| | 07-10-07 | 10,000 | 36.07-36.75 | 364,000 |
| | 07-02-07 | 8,000 | 35.11-35.48 | 283,000 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-11-07 | 10,000 | 32.44-33.00 | 327,000 |
| | 06-01-07 | 8,000 | 34.41-34.93 | 277,000 |
| | 05-10-07 | 10,000 | 37.51-38.30 | 379,000 |
| | 05-01-07 | 8,000 | 35.50-35.97 | 287,000 |
| | 04-10-07 | 10,000 | 37.48-38.04 | 379,000 |
| | 04-02-07 | 8,000 | 36.18-37.76 | 292,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-12-07 | 10,000 | 36.38-36.83 | 366,000 |
| | 03-01-07 | 8,000 | 37.23-38.79 | 306,000 |
| | 02-01-07 | 8,000 | 39.96-40.44 | 322,000 |
| | 01-22-07 | 18,000 | 37.47-38.08 | 680,000 |
| | 12-01-06 | 5,000 | 33.12-33.60 | 166,000 |
| | 11-01-06 | 5,000 | 29.39-30.17 | 149,000 |
| | 10-02-06 | 5,000 | 27.63-28.52 | 140,000 |
| | 09-01-06 | 5,000 | 27.25-28.11 | 138,000 |
| **Total** | | **172,118** | | **$6,404,758** |
| **ADAMS** | 09-24-07 | 222 | 38.64 | 8,578 |
| | 08-10-07 | 20,000 | 38.52-39.10 | 777,000 |
| | 08-01-07 | 61,109 | 35.05-36.58 | 2,186,647 |
| | 07-02-07 | 1,250 | 35.29 | 44,112 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-01-07 | 11,354 | 34.41-34.93 | 393,000 |
| | 05-01-07 | 21,167 | 35.50-35.97 | 758,000 |
| | 04-02-07 | 14,604 | 36.18-36.85 | 531,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-01-07 | 13,354 | 37.23-38.79 | 512,000 |
| | 02-01-07 | 21,166 | 39.96-40.44 | 851,000 |
| | 01-03-07 | 15,524 | 35.11-36.13 | 553,000 |
| | 12-1-06 | 4,945 | 33.12-33.60 | 164,000 |
| | 11-01-06 | 7,793 | 29.39-30.17 | 237,000 |
| | 10-02-06 | 7,793 | 27.63-28.52 | 224,000 |
| | 09-01-06 | 8,000 | 27.25-28.11 | 221,000 |
| **Total** | | **209,399** | | **$7,502,095** |
| **WALLER** | 11-26-07 | 9,800 | 44.39-46.41 | 441,000 |
| | 10-26-07 | 10,000 | 46.25-47.24 | 469,000 |
| | 09-25-07 | 10,000 | 40.00 | 400,000 |
| | 08-10-07 | 20,000 | 38.52-39.12 | 776,000 |
| | 07-09-07 | 20,000 | 36.35-36.94 | 732,000 |
| | 06-13-07 | 20,000 | 35.00 | 700,000 |
| | 02-01-07 | 10,000 | 39.96-40.44 | 402,000 |

- 14 -

SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 01-03-07 | 10,000 | 35.58-36.10 | 358,000 |
| | 12-01-06 | 10,000 | 33.12-33.60 | 333,000 |
| | 11-01-06 | 10,000 | 29.39-30.17 | 298,000 |
| **Total** | | **129,800** | | **$4,909,000** |
| **ANGEL** | 11-13-07 | 15,000 | 43.60-44.12 | 654,000 |
| | 10-09-07 | 15,000 | 43.97-44.13 | 661,000 |
| | 09-11-07 | 15,000 | 39.62-39.77 | 595,000 |
| | 08-14-07 | 15,000 | 36.68-36.84 | 551,000 |
| | 07-10-07 | 15,000 | 36.38-36.46 | 546,000 |
| | 06-13-07 | 15,000 | 34.36 | 515,400 |
| | 05-08-07 | 15,000 | 37.56-37.58 | 564,000 |
| | 04-10-07 | 15,000 | 37.85-37.87 | 568,000 |
| | 03-13-07 | 15,000 | 35.93-36.24 | 541,000 |
| | 02-08-07 | 15,000 | 40.60-40.75 | 610,000 |
| **Total** | | **150,000** | | **$5,805,400** |
| **CASTLE** | 09-14-07 | 4500 | 39.20-39.22 | 176,000 |
| | 12-13-06 | 500 | 36.60 | 18,300 |
| **Total** | | **5000** | | **$194,300** |
| **COMBINED TOTAL** | | **12,907,943** | | **$469,140,524** |

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants and GTCR have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants and GTCR further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants and GTCR collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly portraying its business prospects in order to allow defendants to artificially inflate the price of the Company's shares and sell over $469 million of VeriFone stock; (ii) maintain the Individual Defendants' executive and directorial positions at VeriFone and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of VeriFone, regarding the Individual Defendants' management of VeriFone's operations, the Company's financial health and stability,

1   and future business prospects, specifically related to the Company's financials that had been

2   misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan,

3   conspiracy and course of conduct, the Individual Defendants and GTCR collectively and

4   individually took the actions set forth herein.

5        40.    The Individual Defendants and GTCR engaged in a conspiracy, common enterprise

6   and/or common course of conduct commencing by at least September 1, 2006 and continuing

7   thereafter. During this time, the Individual Defendants caused the Company to conceal the true

8   fact that VeriFone was misrepresenting its business prospects and in-transit inventory. In addition,

9   defendants also made other specific, improper statements about VeriFone's financial performance

10  and future business prospects, as alleged herein.

11       41.    The purpose and effect of the conspiracy, common enterprise, and/or common

12  course of conduct was, among other things, to disguise the Individual Defendants' violations of

13  law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal

14  adverse information concerning the Company's operations, financial condition and future business

15  prospects; and to artificially inflate the price of VeriFone common stock so defendants could: (i)

16  engage in insider selling of VeriFone securities; and (ii) protect and enhance their executive and

17  directorial positions and the substantial compensation and prestige they obtained as a result thereof.

18       42.    The Individual Defendants and GTCR accomplished their conspiracy, common

19  enterprise and/or common course of conduct by causing the Company to purposefully, recklessly

20  or negligently misrepresent its business prospects and release improper statements. Because the

21  actions described herein occurred under the authority of the Board, each of the Individual

22  Defendants and GTCR was a direct, necessary and substantial participant in the conspiracy,

23  common enterprise and/or common course of conduct complained of herein.

24       43.    Each of the Individual Defendants and GTCR aided and abetted and rendered

25  substantial assistance in the wrongs complained of herein.  In taking such actions to substantially

26  assist the commission of the wrongdoing complained of herein, each Individual Defendant and

27  GTCR acted with knowledge of the primary wrongdoing, substantially assisted the

28

1  accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance

2  of the wrongdoing.

3  **DUTIES OF THE INDIVIDUAL DEFENDANTS**

4  44.    By reason of their positions as officers, directors and/or fiduciaries of VeriFone, and

5  because of their ability to control the business and corporate affairs of VeriFone, the Individual

6  Defendants owed VeriFone and its shareholders fiduciary obligations of trust, loyalty, good faith

7  and due care, and were and are required to use their utmost ability to control and manage VeriFone

8  in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act

9  in furtherance of the best interests of VeriFone and its shareholders so as to benefit all shareholders

10  equally and not in furtherance of their personal interest or benefit.

11  45.    Each director and officer of the Company owes to VeriFone and its shareholders the

12  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

13  Company and in the use and preservation of its property and assets, and the highest obligations of

14  fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual

15  Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

16  Company's revenue, margins, operations, performance, management, projections and forecasts so

17  that the market price of the Company's stock would be based on truthful and accurate information.

18  46.    The Individual Defendants, because of their positions of control and authority as

19  directors and/or officers of VeriFone, were able to and did, directly and/or indirectly, exercise

20  control over the wrongful acts complained of herein, as well as the contents of the various public

21  statements issued by the Company.   Because of their advisory, executive, managerial and

22  directorial positions with VeriFone, each of the Individual Defendants had access to adverse non

23  public information about the financial condition, operations, and improper representations of

24  VeriFone.

25  47.    At all times relevant hereto, each of the Individual Defendants was the agent of each

26  of the other Individual Defendants and of VeriFone, and was at all times acting within the course

27  and scope of such agency.

28

48. To discharge their duties, the officers and directors of VeriFone were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of VeriFone were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) remain informed as to how VeriFone conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

49. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

- 18 -

SHAREHOLDER DERIVATIVE COMPLAINT

1   obligations as directors and officers of VeriFone, the absence of good faith on their part, and a

2   reckless disregard for their duties to the Company and its shareholders that the Individual

3   Defendants were aware or should have been aware posed a risk of serious injury to the Company.

4   The conduct of the Individual Defendants who were also officers and/or directors of the Company

5   during the Relevant Period have been ratified by the remaining Individual Defendants who

6   collectively comprised all of VeriFone's Board during the Relevant Period.

7        50.    Furthermore, defendants Henske, Castle, Denend and Rinehart, as members of the

8   Audit Committee, had a special duty to know and understand this material information as set out in

9   the Audit Committee's charter which provides that the committee is responsible for reviewing and

10  discussing: (i) the Company's earnings press releases, as well as financial information and earnings

11  guidance provided by the Company to analysts and rating agencies; and (ii) the Company's internal

12  controls.

13       51.    Specifically, the Audit Committee's purpose is to assist the Board of Directors'

14  oversight of:

15      (i) the integrity of the Company's financial statements, (ii) the accounting and
        financial reporting processes of the Company and the audits of the financial
16      statements of the Company, (iii) the Company's compliance with legal and regulatory
        requirements, (iii) the independent auditors' qualifications and independence, and (iv)
17      the performance of the Company's internal audit function and independent auditors.

18       52.    The Audit Committee also has the following responsibilities: (i) supervise the

19  independent audit, (ii) oversee internal audit, internal controls and risk management, (iii) oversee

20  financial reporting, (iv) oversee legal and ethical compliance, and (v) prepare minutes and reports.

21       53.    The Individual Defendants breached their duties of loyalty and good faith by allowing

22  defendants to cause, or by themselves causing, the Company to misrepresent its financial results and

23  prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking

24  such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct

25  during the Relevant Period, the Company is now the subject of a class action lawsuit that alleges

26  violations of federal securities laws.  As a result, VeriFone has expended, and will continue to

27  expend, significant sums of money.

28

54. Moreover, these actions have irreparably damaged VeriFone's corporate image and goodwill. VeriFone's Board has misled the investing public, such that VeriFone's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### BACKGROUND TO THE RELEVANT PERIOD

55. Prior to the beginning of the Relevant Period, VeriFone's stock price had dropped by over 20% (from the $30s to the low $20s) due to the market's concern that VeriFone's gross margins were slowing and would be flat or actually decrease in 2007. In an effort to dispel these concerns, the Individual Defendants embarked on a scheme to falsely report gross margins in the mid to high 40%, when in fact VeriFone's gross margins were stuck at around 40% and were actually at risk of decreasing.

56. Defendants' scheme of portraying VeriFone as experiencing increased gross margins depended in large part on the pending Lipman acquisition, and VeriFone's ability to integrate that acquisition with minimal costs and with the acquisition being accretive to both earnings and margins. Defendants falsely told the market that this would occur. However, defendants discovered negative information about Lipman during the due diligence that demonstrated that increased expenses and reduced margins would occur.

57. VeriFone and Lipman Electronic Engineering, Ltd. ("Lipman") had been familiar with each other's businesses for several years. There were intermittent informal contacts between representatives and VeriFone and Lipman at various times prior to VeriFone's initial public offering in April 2005.

58. On May 10, 2005, Douglas Bergeron had contacted defendant Isaac Angel, who at the time was the CEO of Lipman, and suggested a meeting to discuss whether a future business combination or strategic transaction would be feasible.

59. To facilitate discussions, VeriFone and Lipman entered into a confidentiality agreement on June 1, 2005. On June 7, 2005, Mr. Angel and Mike Lilo, the CFO of Lipman, met with Mr. Bergeron and Mr. Swarenstein in New York to discuss the possibility of a business combination.

60.    On September 28, 2005, Lipman had announced that it was lowering its full year 2005 earnings guidance with respect to revenues and net income per share as a result of substantially weaker than expected performance at its Dione subsidiary.  Lipman's stock price decreased by approximately $6 per share on the news.

61.    On December 4, 2005, Mr. Bergeron contacted Mr. Angel to inquire whether Lipman was interested in renewing discussions with VeriFone. On December 7, 2005, Mssrs. Angel, Lilo, Bergeron and Swarenstein participated in a conference call and agreed to renew merger discussions. During the next several months, into the spring of 2006, Lipman and VeriFone engaged in significant merger discussions which included their legal and financial advisors.

62.    On March 17, 2006, VeriFone's outside legal counsel delivered a formal request for due diligence to outside counsel for Lipman.  On March 23, 2006, VeriFone and Lipman signed an exclusivity letter providing for an exclusivity period up to and including April 15, 2006.  The parties commenced a due diligence process on March 24, 2006 when Lipman's electronic data room became accessible to representatives of VeriFone.  Between March 24, 2006 and April 10, 2006, VeriFone and its financial advisors and legal counsel conducted due diligence on Lipman.

63.    On April 10, 2006, Lipman and VeriFone signed a merger agreement pursuant to which VeriFone acquired Lipman later in 2006, with the acquisition closing on November 1, 2006.

## FALSE AND MISLEADING STATEMENTS

64.    On August 31, 2006, the Company announced record Q3 2006 financial results, sending the Company's shares soaring. The Company announced net revenues for the third quarter of $147.6 million, an increase of 17% over net revenues of $125.7 million for the comparable period of 2005.  The Individual Defendants caused the Company to announce the results in a press release entitled: "VeriFone Reports Third Quarter Fiscal 2006 Results," which stated as follows:

> "Net revenues for the three months ended July 31, 2006, were $147.6 million, an increase of 17% over net revenues of $125.7 million for the comparable period of fiscal 2005. The increase was driven by a 19% increase in net revenues from VeriFone's North America business and a 16% increase in net revenues in VeriFone's International business.
>
> ***Gross margins, under generally accepted accounting principles (GAAP), for the three months ended July 31, 2006, were 45.0%, compared to 40.7% for the three months ended July 31, 2005. Gross margins, excluding non-cash amortization of***

- 21 -

SHAREHOLDER DERIVATIVE COMPLAINT

*purchased intangibles and stock-based compensation expense, expanded for the seventh consecutive quarter and reached 45.9% compared to 42.0% for the three months ended July 31, 2005.*

Net income for the three months ended July 31, 2006, was $16.8 million, or $0.24 per diluted share, compared to $6.5 million, or $0.10 per diluted share, for the comparable period of fiscal 2005. Net income, as adjusted, which excludes non-cash amortization of purchased intangibles and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended July 31, 2006, was $19.7 million, or $0.28 per diluted share, compared to $13.1 million, or $0.20 per diluted share, for the comparable period of fiscal 2005.

"We are once again extremely pleased with the consistency of our quarterly results, demonstrated by our tenth consecutive quarter with double digit revenue growth and our eighth consecutive quarter of expanded EBITDA as adjusted margins, which reached a record level of 22.6% in the quarter," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "We are expecting to close the acquisition of Lipman Electronic Engineering Ltd. by November 1, 2006, and remain confident that we will receive clearance by the United States Department of Justice very shortly. We remain on track to deliver another year of outstanding results and *we remain confident in our long-term model, which calls for annual revenue growth of 10 to 15% and annual adjusted net income per share growth of 20% or more."*

"Based on our confidence with our near term and long term outlook, *we are raising our FY06 year end guidance to $1.07 to $1.08 of adjusted net income per share. We are also raising our FY07 guidance to $1.40 to $1.42 of adjusted net income per share, assuming a November 1, 2006, completion of the Lipman acquisition,"* continued Bergeron.

65.     On this news of this increased guidance, the Company's shares soared to $28.47 per share on September 1, 2006.

66.     On September 5, 2006, Bergeron sold 119,800 shares of VeriFone stock at approximately $28 per share.

67.     On September 7, 2006, the Individual Defendants caused the Company to issue the following press release:

VeriFone's Proposed Acquisition of Lipman Receives Department of Justice Clearance

SAN JOSE, CA, and ROSH HAAYIN, Israel - September 07, 2006 - VeriFone Holdings, Inc. (NYSE: PAY) and Lipman Electronic Engineering Ltd. (NASDAQ: LPMA; TASE: LPMA) today announced they have received clearance from the United States Department of Justice (DOJ) to complete VeriFone's pending acquisition of Lipman. Shareholder meetings for each company are scheduled for mid-September and, if each group of shareholders approves the transaction, the parties expect to close on November 1 following the expiration of a 30-day waiting period required by Israeli law after the Lipman shareholders' meeting.

68.     On September 15, 2006, VeriFone issued the following press release:

"San Jose, CA - September 15, 2006 - VeriFone Holdings, Inc. (NYSE: PAY) announced that at a special meeting today its stockholders overwhelmingly voted to approve its acquisition of Lipman Electronic Engineering Ltd. At the VeriFone special meeting more than 99.5 percent of the shares represented were voted in favor of the issuance of VeriFone stock in the transaction, constituting a substantial majority of the outstanding VeriFone shares. The acquisition had previously been approved by the Lipman shareholders in a special meeting held on September 14. "We are very pleased by the strong support for the transaction from both VeriFone and Lipman shareholders," said Douglas G. Bergeron, chairman and chief executive officer of VeriFone. *"This combination will provide VeriFone with the product breadth, global reach and R&D capabilities to drive significant value for shareholders, customers and employers.* We look forward to completing the Lipman acquisition on November 1, 2006, as planned."

69. On September 29, 2006, Zwarenstein sold 4,000 shares of VeriFone stock at approximately $29 per share.

70. On December 7, 2006, the Individual Defendants caused VeriFone to announce the following financial results:

VeriFone Reports Fourth Quarter and Fiscal 2006 Results

Fourth-Quarter Revenues Increased 20% to $157 Million

EBITDA, as Adjusted, Margins Increased to 24.2% for the Quarter

Fourth Quarter Net Income, as Adjusted, Increased 50% to $22.3 Million

SAN JOSE, Calif.--(BUSINESS WIRE)--Dec. 7, 2006--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months and fiscal year ended October 31, 2006.

Net revenues for the three months ended October 31, 2006, were $156.6 million, an increase of 20% over net revenues of $130.5 million for the comparable period of 2005. The increase was driven by a 30% increase in net revenues from VeriFone's International business and a 14% increase in net revenues from VeriFone's North America business.

*Gross margins, under generally accepted accounting principles (GAAP), for the three months ended October 31, 2006, were 46.0%, compared to 42.7% for the three months ended October 31, 2005.* Gross margins, excluding non-cash amortization of purchased intangibles and stock-based compensation expense, *expanded for the eighth consecutive quarter and reached 47.1% for the three months ended October 31, 2006, compared to 44.0% for the comparable period of 2005.*

Net income for the three months ended October 31, 2006, was $13.9 million, or $0.20 per diluted share, compared to $12.1 million, or $0.18 per diluted share, for the comparable period of fiscal 2005. GAAP net income was impacted in the quarter by the $4.1 million after-tax write off of debt issuance costs, attributable to the refinancing of outstanding debt in connection with the Lipman acquisition. Net income, as adjusted, which excludes non-cash amortization of purchased intangibles

- 23 -

SHAREHOLDER DERIVATIVE COMPLAINT

and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended October 31, 2006, was $22.3 million, or $0.32 per diluted share, compared to $14.9 million, or $0.22 per diluted share, for the comparable period of fiscal 2005.

EBITDA, as adjusted, which excludes non-cash amortization of purchased intangibles and debt issuance costs, as well as non-cash stock-based compensation expense, expanded for the ninth consecutive quarter and reached a record level of $38.0 million, a 44% increase over the $26.5 million recorded in the three months ended October 31, 2005. EBITDA, as adjusted, margins for the three months ended October 31, 2006, reached 24.2%, as compared to the 20.3% recorded in the three months ended October 31, 2005.

Net revenues for the fiscal year ended October 31, 2006, were $581.0 million, an increase of 20% over the $485.4 million recorded for fiscal 2005.

Net income for the fiscal year ended October 31, 2006, was $59.5 million, compared to $33.2 million for fiscal 2005. Net income, as adjusted, for the fiscal year ended October 31, 2006, was $76.4 million, compared to $49.7 million, for fiscal 2005.

EBITDA, as adjusted, for the fiscal year ended October 31, 2006, was $130.4 million, an increase of 51% over the $86.4 million recorded for fiscal 2005. EBITDA, as adjusted, margins for the fiscal year ended October 31, 2006, were 22.4%, compared to 17.8% for the comparable period of 2005.

"VeriFone has completed another outstanding quarter and achieved record revenue and earnings for fiscal year 2006. *This year was highlighted by our transformative acquisition of Lipman* which combined the two strongest financial performers in the industry to create the world leader in payment technology," said Douglas G. Bergeron, Chairman and Chief Executive Officer.

"We enter our new financial year poised to capitalize on our numerous competitive advantages and our very wide range of product offerings," continued Bergeron. *"The integration of Lipman into VeriFone has been completed ahead of schedule and we have created a single-branded, unified company with tremendous scale advantages. Already, we are enjoying several supply chain efficiencies and earnings accretion."*

*"As a result, we have increased our internal expectations for fiscal Q1 2007 net earnings per share, as adjusted, to be in the range of $0.33 to $0.34. We remain very confident of our prospects in fiscal 2007."*

71.     On March 1, 2007, the Individual Defendants caused VeriFone to issue the following press release:

SAN JOSE, Calif.--(BUSINESS WIRE)--March 1, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended January 31, 2007. The Company's first quarter results reflect the November 1, 2006, acquisition of Lipman and, because of the integration of Lipman's products and distribution channels as well as the lack of comparable quarter ends of VeriFone and Lipman, are compared to pre-acquisition results of prior fiscal periods.

SHAREHOLDER DERIVATIVE COMPLAINT

Net revenues, for the three months ended January 31, 2007, were $216.6 million, 61% higher than the net revenues of $134.6 million for the comparable period of 2006. The record revenues were driven by the Lipman acquisition and a strong performance internationally.

*Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, were 47.1%, for the three months ended January 31, 2007, compared to 45.6% for the comparable period of 2006.* GAAP gross margins for the three months ended January 31, 2007, were 37.6%, compared to 44.3% for the three months ended January 31, 2006, as a result of increased amortization of purchased technology assets and the step-up in inventory.

EBITDA, as adjusted, margins for the three months ended January 31, 2007, expanded for the tenth consecutive quarter and reached a record level of 25.7%, compared to the 21.0% recorded in the three months ended January 31, 2006.

GAAP EPS for the three months ended January 31, 2007, was a loss of ($0.01) per diluted share, compared to $0.20 per diluted share, for the comparable period of fiscal 2006, due to acquisition related charges and a higher GAAP tax rate. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended January 31, 2007, increased 54% to $0.37 per diluted share, compared to $0.24 per diluted share, for the three months ended January 31, 2006.

*"VeriFone has successfully completed its first quarter since our transformative acquisition of Lipman.* I am delighted both with the progress that we have made in integrating Lipman's business into VeriFone and in generating another very strong quarter financially and operationally," said Douglas G. Bergeron, Chairman and Chief Executive Officer.

"VeriFone's newly configured worldwide sales force is serving customers through a fully integrated distribution channel and supply chain. At the same time we have been reducing inventory and generating considerable operating cash flow," continued Bergeron.

*"Based on these results, we are increasing our second quarter internal expectations for net income, as adjusted, per share to be in the range of $0.36 to $0.37. We remain very confident of our prospects for fiscal 2007."*

72.     On March 6, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - March 06, 2007 - VeriFone Holdings, Inc. (NYSE: PAY; TASE: PAY) today announced that it has installed one of the largest and most complex card payment systems in the UK for retail giant Argos. VeriFone's PAYware Merchant system has been rolled out to more than 600 Argos stores in the UK, allowing Argos to process 50 transactions per second – more than 100 million transactions every year.

Argos – part of the Home Retail Group which also owns Homebase – has implemented the PAYware Merchant system nationwide as part of its move to EMV Chip and PIN, enabling secure authorization of payments in seconds and providing sophisticated management and reporting capabilities, including a comprehensive audit trail.

- 25 -

PAYware Merchant is ideal for medium- and large-size retailers who need a secure, reliable, and easy-to-implement credit and debit card authorization and settlement solution that supports EMV Chip and PIN. This fully scalable, bank-certified solution provides rapid payment processing that is tightly integrated with any front-end environment and is proven to increase revenue, reduce costs and improve customer satisfaction.

"We saw the move to Chip and PIN as an opportunity to review our existing EFT system," said Jacqui Glenn, head of Argos IT. "As a business-critical system, we were looking for a card payment solution that offered security, speed and reliability. We chose PAYware because of its proven success with other retailers, and the smooth implementation and fast 'go live' confirmed that we made the right decision."

Nigel Bidmead, managing director for VeriFone EMEA added, "The PAYware Merchant system deserves its excellent reputation as a robust and reliable solution for high-volume environments. We are very pleased to add Argos to the list of major UK retail customers who are gaining tangible business benefits from VeriFone's card payment systems."

PAYware Merchant accepts all major cards and supports the latest fraud prevention initiatives, including EMV and 3D Secure for Internet payments. Designed with industry best practices for data security, it enables retailers to become compliant with the Payment Card Industry Data Security Standard (PCI DSS). All of this guards against fraud and helps protect brand reputation and consumer confidence.

73.    On March 30, 2007, Individual Defendants Bergeron and Zwarenstein caused VeriFone to file a letter with the SEC on EDGAR responding to a February 28, 2007 letter from the SEC raising questions about the significant increase in VeriFone's inventory that had been reported in VeriFone's fiscal year 2006 financial results reported in the Company's Form 10-K for 2006. The SEC's letter had stated: "We note that your inventory increased dramatically during 2006. Please quantify the amount of the increase caused by each factor cited on page 49. In addition, explain to us, in more detail, why the acquisition contributed to this large increase and what impact, if any, that increase may have on the inventory that you acquired from Lipman." In response, VeriFone's letter stated:

"While VeriFone expected that it would have to increase inventories at least to planned levels in early fiscal 2006, as revenues continued to increase during fiscal 2006, VeriFone began to realize that its business required higher than planned inventory levels in order to

SHAREHOLDER DERIVATIVE COMPLAINT

1    support future expected levels of revenues. Consequently, during fiscal 2006, VeriFone's

2    inventories increased in each quarter."

3    74.    VeriFone's March 30, 2007 letter to the SEC also falsely blamed its increased

4    inventory levels on "the impact of VeriFone's planned acquisition of Lipman which was announced

5    in the last month of the second quarter, as well as the continuing effect of further revenue increases."

6    The Company also attributed the increased inventories to the fact that "the Company sought to

7    respond to more uncertain demand patterns." The Company also stated: "Finally, in the fourth

8    quarter of fiscal 2006, inventory increased a further $13 million, mainly due to stocking of new

9    product inventory and the Company's decision to accelerate deliveries from certain suppliers in

10    anticipation of a physical inventory count at a large distribution center."

11    75.    The statements in the Company's March 30, 2007 letter to the SEC were false and

12    misleading when made since Bergeron and Zwarenstein attributed false reasons in the letter for the

13    dramatic increase in VeriFone's inventory.

14    76.    On April 18, 2007, VeriFone issued the following press release:

15    San Jose, CA - April 18, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today
      announced that it has secured a key contract with leading transaction switching and
16    electronic payment processing company InterSwitch Nigeria Limited to enable inter-
      bank electronics payments for Nigerian cardholders. VeriFone's GPRS-enabled $V_x$
17    610 payment systems are being rolled out nationwide to InterSwitch's bank and
      merchant customers.

18
      InterSwitch is the leading e-payment solutions provider in Nigeria – Africa's
19    most populous country – and, according to Financial Standard Newspaper, one of
      Nigeria's top 10 recognized brands. Any Nigerian cardholder will now be able to use
20    their Nigeria Debit Cards, CashCards and other payment cards issued on the
      InterSwitch platform at ATMs and point of sale devices deployed by banks other
21    than their own. Currently, InterSwitch has an online real-time integration to 23 out of
      the 25 banks in Nigeria. This infrastructure allows almost all of the country's banks
22    to share ATM and point of sale systems.

23    "We have a high regard for VeriFone and its excellent product offerings,"
      said Mitchell Elegbe, CEO of InterSwitch Nigeria. "VeriFone has earned a strong
24    reputation in West Africa through its commitment to helping develop this growing
      payments sector, and with access to such advanced payment systems it will create the
25    opportunity for us to enhance our strong market presence here."

26    Nigel Bidmead, managing director for VeriFone EMEA, said, "VeriFone's
      advanced GPRS technology payment systems are especially suited to Nigeria's large
27    developing payments markets, where a constant online communication channel
      between the merchant and InterSwitch is the key to fast and secure transactions."

28

- 27 -

SHAREHOLDER DERIVATIVE COMPLAINT

77.     On May 29, 2007, the Individual Defendants caused VeriFone to announce record second quarter 2007 financial results in the following press release:

SAN JOSE, Calif.--(BUSINESS WIRE)--May 29, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended April 30, 2007.

Net revenues, for the three months ended April 30, 2007, were $217.2 million, 53% higher than the net revenues of $142.2 million for the comparable period of 2006. VeriFone's International business increased 97% and VeriFone's North America business increased 19%. The significant increase in sales was driven largely by the acquisition of Lipman, which closed November 1, 2006.

Subsequent to the end of the quarter, management determined that booked orders of approximately $4 million could not be recognized as revenue due to incomplete sales administration requirements in our international operations. These orders were largely sourced from VeriFone's new Israeli and Turkish facilities and all were headed to high growth markets in Asia, Eastern Europe and Africa. The Company is confident that the shortcomings in applying these field processes have now been remedied. All of this revenue has now been fully recognized and is reflected in guidance for the third quarter.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.1%, for the three months ended April 30, 2007, compared to 45.7% for the comparable period of 2006. GAAP gross margins for the three months ended April 30, 2007, were 41.5%, compared to 44.6% for the three months ended April 30, 2006, as a result of increased amortization of purchased technology assets, the step-up in inventory and stock-based compensation.

GAAP operating expenses for the three months ended April 30, 2007, were $72.9 million compared to $37.8 million for the comparable period of 2006. In addition to the effect of the Lipman acquisition and related integration expenses, the Company incurred higher non-cash stock compensation expenses and amortization of purchased intangible assets. Stock based compensation for the three months ended April 30, 2007 was $9.8 million compared to $1.0 million for the comparable period of 2006. This increase was primarily due to the acceleration of the vesting of options of Lipman executives, the increase in the number of option holders following the Lipman acquisition and the grant of performance-based restricted stock units to the Company's Chief Executive Officer. Amortization of purchased intangible assets for the three months ended April 30, 2007 was $6.1 million compared to $1.2 million for the comparable period of 2006, primarily due to the Lipman acquisition.

EBITDA, as adjusted, margins for the three months ended April 30, 2007, expanded for the eleventh consecutive quarter and reached a record level of 26.3%, compared to the 21.6% recorded in the three months ended April 30, 2006.

GAAP EPS for the three months ended April 30, 2007, was $0.06 per diluted share, compared to $0.22 per diluted share, for the comparable period of fiscal 2006, due to acquisition related non-cash charges, higher stock-based compensation expense primarily related to the Lipman acquisition and to a significantly higher GAAP tax rate driven by an increase in the valuation allowance related to Lipman. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and

Lipman integration costs, for the three months ended April 30, 2007, increased 50% to $0.39 per diluted share, compared to $0.26 per diluted share, for the three months ended April 30, 2006.

"I am pleased to report on another very successful quarter for VeriFone as we once again achieved record profitability," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "During the quarter, our record margins drove our robust EPS growth, and also resulted in strong cash flow," continued Bergeron. "We were especially pleased with our continuing success of our wireless products and were delighted with the resurgence of our North American business which grew sequentially 8 percent from the previous quarter."

"Based on these results and the $4 million of revenue which has been recognized in the third quarter, *we are increasing our third quarter internal expectations for net revenue to $225 - $227 million and increasing our guidance for net income, as adjusted, per share to a range of $0.39 - $0.40. We remain confident of our prospects for the remainder of fiscal 2007.*"

78.    On July 12, 2007, the Individual Defendants caused VeriFone to issue the following press release:

New York, NY - July 12, 2007 - VeriFone Holdings, Inc. (NYSE:PAY) announced today an agreement to be the preferred vendor of integrated payment solutions to the largest licensed leasing association in New York City, the Committee for Taxi Safety with 3,000 member taxis. VeriFone also announced that more than 5,000 New York City taxis are signed or committed to comprehensive multi-year agreements for in-taxi acceptance of credit cards.

Last month, systems implemented by VeriFone's US-based taxi business, VeriFone Transportation Systems, were the first authorized by the NYC Taxi and Limousine Commission (TLC) for the city's more than 13,000 taxis.

Jeff Dumbrell, VeriFone senior vice president, North America, said, "New York City currently has over 13,000 active yellow cabs that have been mandated to provide card payment and passenger information services by the end of the year. We are continuing our sales campaign and expect to make further progress in the months ahead."

Committee for Taxi Safety Agreement Amos Tamam, president and CEO of VeriFone Transportation Systems, said the company is eager to work with member organizations of the Committee for Taxi Safety. "In addition to providing customers with convenient payment choices, member organizations will benefit from improved fleet management and the potential for enhanced revenue through advertising," Tamam said. "They will be able to provide better customer service to New York residents and visitors through up-to-the-minute access to real-time traffic information, news, sports, weather and entertainment."

According to David Pollack, executive director of the Committee for Taxi Safety, "Reliability, previous experience and a wealth of functionality made VeriFone Transportation Systems the logical choice for all members of our organization. We are pleased to begin this new era in technology with a company that has impeccable equipment and software for our drivers, passengers and members."

SHAREHOLDER DERIVATIVE COMPLAINT

Beginning October 1, 2007, upon their next scheduled inspection all New York taxis are mandated to have technology-based customer service improvements that will include credit/debit card acceptance and an interactive electronic passenger map and information screen.

Previously, VeriFone was awarded similar services for 100 percent of the Philadelphia taxi fleet, and a significant award in Mexico City, Mexico. Discussions and pilots continue with several other worldwide metropolitan organizations.

The VeriFone-based solution utilizes wireless technology to provide integrated payment in the passenger cab, including a card swipe and contactless payment for credit and debit payment of fares, in an easy-to-use ATM style interface. The riding experience is further enhanced with the Passenger Information Monitor, a 10.4-inch touch-screen monitor that provides exclusive news and content for passengers through an exclusive partnership with market-leading WABC-TV New York.

A smaller model utilizes the VeriFone MX870, which supports secure credit card transactions and PIN-based debit card transactions with contactless payment and electronic signature capture, as well as advertising and content delivery. The smaller option will provide an ideal solution for the integration of potentially smaller hybrid vehicles.

VeriFone is the majority shareholder of VeriFone Transportation Systems, a joint venture between VeriFone Holdings, Inc. and TaxiTronics, the company that services over 8,000 of the taxi meters in the city cab fleet.

79.     On September 6, 2007, the Individual Defendants caused VeriFone to publicly announce its Q3 '07 financial results:

SAN JOSE, Calif.--(BUSINESS WIRE)--Sept. 6, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended July 31, 2007.

Net revenues, for the three months ended July 31, 2007, were $231.9 million, 57% higher than the net revenues of $147.6 million for the comparable period of 2006. Net revenues from VeriFone's International business increased 106% while net revenues from VeriFone's North America business increased 22%. The significant increase in net revenues was driven largely by the acquisition of Lipman Electronic Engineering Ltd., which closed November 1, 2006.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.2%, for the three months ended July 31, 2007, compared to 45.9% for the comparable period of 2006. GAAP gross margins for the three months ended July 31, 2007, declined to 44.0% from 45.0% for the three months ended July 31, 2006, primarily as a result of increased amortization of purchased technology assets.

GAAP operating expenses for the three months ended July 31, 2007 were $65.5 million compared to $38.0 million for the comparable period of 2006. This increase was primarily due to the Lipman acquisition and related integration expenses.

- 30 -

EBITDA, as adjusted, margins for the three months ended July 31, 2007, expanded for the twelfth consecutive quarter and reached a record level of 27.3%, compared to the 22.6% recorded in the three months ended July 31, 2006.

GAAP EPS for the three months ended July 31, 2007, was $0.16 per diluted share, compared to $0.24 per diluted share, for the comparable period of fiscal 2006. *This decline resulted from acquisition related non-cash charges, higher stock-based compensation expense and a higher GAAP tax rate driven by an increase in the valuation allowance related to the Lipman acquisition.* Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and Lipman integration costs, for the three months ended July 31, 2007, increased 50% to $0.42 per diluted share, compared to $0.28 per diluted share, for the comparable period in 2006.

"I am extremely pleased to report on another outstanding quarter as we once again achieved exceptional financial results," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "During the quarter, we achieved record revenues and record gross and operating margins, all which led to strong EPS growth," continued Bergeron. "Our North American business continued to surge, growing 9% sequentially. Our compelling portfolio of wireless solutions and our strength in emerging markets were also significant factors driving our success this quarter."

*"We are increasing our internal expectations for the fourth quarter and now expect to repeat these record third quarter results. Our guidance for the fourth quarter, therefore, is for net revenue of $231 - $233 million and net income, as adjusted, per share of $0.41 - $0.42. As a result, we are also increasing our full year fiscal year 2007 expectations for net income, as adjusted per share to $1.59 to $1.60 per share. As well, given the out-performance in profitability that we have consistently enjoyed since the closing of the Lipman acquisition last November, we are now taking this opportunity to update our long term financial model. We are reaffirming our revenue growth rate projection in the 10% - 15% range and we are increasing our margin expectations as reflected in the table below."*

Long Term Model

| | Prior | New |
|---|---|---|
| Gross Margin | 42%-47% | 45%-50% |
| EBITDA Margin | 18% - 24% | 25% - 30% |
| Net Margin | 12% - 17% | 15% - 20% |

80.    On October 11, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - October 11, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today announced it has added Ruth's Chris Steak House of Austin to the roster of restaurants using its ON THE SPOT payment at the table solution.

Servers at the fine dining restaurant at 107 West Sixth Street will bring their patrons a small, handheld VeriFone $V_x$ 670 payment system that allows them to swipe their own credit or debit cards at their table. ON THE SPOT speeds service to Ruth's Chris's customers and allows for a secure transaction with no fear of identity theft.

- 31 -

Sal Olivas, Ruth Chris's general manager, said he turned to ON THE SPOT to streamline the payment transaction and serve his customers faster. "When people want to leave the table, they want to leave," he said. "We try to expedite their needs on their timetable.

Olivas said he believes ON THE SPOT will speed his guests' transaction time by five to 10 minutes. "On a busy night, when customers need a table, that will be crucial," Olivas said of the quicker table turns. But he also noted the security benefits for customers: "We're doing this for our guests' sake, for their conveniences, security and peace of mind."

"Ruth's Chris's use of ON THE SPOT shows the versatility of our suite of products," said Paul Rasori, VeriFone's vice president of global product marketing. "In today's environment, payment at the point of service is more important than ever, as operators and patrons want security against identity theft. The additional value the product brings to an operator is greater operational efficiency and profitability as it relates to table turns, server time and processing fees."

ON THE SPOT is designed to cut down on the increasingly common problem of credit card fraud and also allows restaurant operators to take advantage of lower-cost PIN debit payment.

By allowing patrons to slide their own cards rather than handing them to another person, ON THE SPOT virtually eliminates the possibility of a server "skimming" a card and cloning account information. TransUnion has estimated that 70 percent of all skimming takes place in a restaurant environment.

ON THE SPOT uses special encryption and other security features to protect all financial data transacted over a restaurant's Wi-Fi network. These security features are a necessity today, with credit card fraud now the most common form of identity theft, according to the Federal Trade Commission. ON THE SPOT has pioneered the use of Wi-Fi and GPRS cellular communications to provide online payment authorization at the point of service in North American restaurants.

81.    On November 1, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - November 01, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) announced today that it will report its financial results for the three months ended and fiscal year ended October 31, 2007, on December 6, 2007.

The management of VeriFone will host a conference call on December 6, 2007, at 1:30 p.m. (PST) to discuss VeriFone's fourth quarter and year end results, which will be simultaneously webcast. Management may also provide forward looking guidance on this call.

82.    On November 13, 2007, Zwarenstein sold 17,878 shares of VeriFone stock at approximately $44 per share.

83.    Between November 14, 2007 and November 26, 2007, Bergeron sold 383,197 shares of VeriFone stock at prices between $44.70 and $46.43 per share. On November 30, 2006,

1   Zwarenstein sold 4000 shares of VeriFone stock for proceeds of $133,000.  On December 1, 2006,

2   Adams sold 4,945 shares of Verifone stock for proceeds of $164,000. On the same day, Defendant

3   Waller sold 10,000 shares of VeriFone stock for proceeds of $333,000.

4         84.    On December 3, 2007, VeriFone shocked the stock market by announcing the

5   following press release:

**VeriFone Announces Anticipated Restatement of 2007 Quarterly Financial Statements**

San Jose, CA - December 03, 2007 - *VeriFone Holdings, Inc. (NYSE: PAY) today announced that* following a review by and on the recommendation of management, it has concluded that *its unaudited interim consolidated financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007 and the three and nine months ended July 31, 2007 should no longer be relied upon,* principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues. The restatements are anticipated to correct errors that overstated previously reported inventories in material amounts as of January 31, 2007, April 30, 2007 and July 31, 2007, and understated cost of net revenues in material amounts for the three month periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly, investors are cautioned not to rely on VeriFone's historical financial statements and earnings press releases and similar communications for the periods ended January 31, 2007, April 30, 2007, and July 31, 2007.

Based on its review to date, *management currently anticipates that the restatement will result in reductions to previously reported inventories of approximately $7.7 million, $16.5 million and $30.2 million as of January 31, 2007, April 30, 2007 and July 31, 2007, respectively, and reductions to previously reported pre tax income of approximately $8.9 million, $7.0 million and $13.8 million for the three month periods ended January 31, 2007, April 30, 2007 and July 31, 2007, respectively.* VeriFone is currently evaluating the anticipated effect of the restatement on after-tax income for those periods.

These estimates include corrections of other unrelated errors detected in the course of VeriFone's review to date, are based on currently available information and are subject to change during the course of the company's restatement process. While VeriFone is not currently aware of other accounting errors requiring adjustment to any prior period financial statements, there can be no assurances that VeriFone or its independent registered public accounting firm will not find additional accounting errors requiring further adjustments in those or earlier periods.

24         85.    On this news, the Company's shares plummeted by almost 46% to close at

25   approximately $26.03, a dramatic fall from the opening price of $48.03 the preceding business day.

26   The volume of VeriFone shares traded on December 3, 2007 was 49.8 million shares, compared to

27   just 1.4 million shares traded on the preceding trading day.

28

86. On December 3, 2007, during a conference call with analysts to discuss VeriFone's anticipated restatement of its financial results, and its lower gross margins, Defendant Bergeron conceded that the Lipman acquisition had dramatically increased the magnitude of complexity of several material issues pertaining to VeriFone's earnings.

87. The true facts, which were known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a) the Company's in-transit inventory was grossly overvalued due to accounting errors related to allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues. This fraud was recently revealed by a cost accounting manager in the Company's Sacramento, California office;

(b) the Company's gross margins were not 45-47% but were closer to 40%;

(c) the Company was not on track to achieve profitability in 2007, but rather losses due to problems related to the Company's acquisition of Lipman Electronic Engineering, Ltd. ("Lipman"), which problems the Company discovered during the due diligence pertaining to the Company's acquisition of Lipman in 2006;

(d) the Company's gross margin projections were overstated;

(e) the Company's supply chain management was severely deficient;

(f) the Company's accounting during the Relevant Period was false and misleading;

(g) the Company lacked adequate internal controls over accounting and financial reporting during the Relevant Period; and

(h) that as a result of (a)-(g) above, the Company's estimates of an eleventh consecutive quarter of double digit revenue growth for the first quarter of 2007 and income per share growth of 20% or more were grossly inflated and the Company's reported assets and inventory were materially overstated, as described herein.

88. In its December 3, 2007 revelation of false financial statements, VeriFone also stated that when the Company eventually files the 2007 Form 10-K, and files amended financial statements

1  for previous periods to correct admitted accounting errors, *"management expects VeriFone to*

2  *report one or more material weaknesses in VeriFone's internal controls over financial reporting."*

3  **VERIFONE'S FALSE FINANCIAL**
   **REPORTING DURING THE RELEVANT PERIOD**

4

5  89.     In order to inflate the price of VeriFone stock, defendants caused the Company to

6  falsely report its results during the Relevant Period by grossly overvaluing its inventory and failing

   to "write down" the value of its inventory in violation of Generally Accepted Accounting Principles

7  ("GAAP").

8

9  90.     GAAP are those principles recognized by the accounting profession as the

10 conventions, rules and procedures necessary to define accepted accounting practice at a particular

   time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

11 SEC which are not prepared in compliance with GAAP are presumed to be misleading and

12 inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial

13 statements must also comply with GAAP, with the exception that interim financial statements need

14 not include disclosure which would be duplicative of disclosures accompanying annual financial

15 statements.  17 C.F.R. §210.10-01(a).

16 91.     The Individual Defendants caused VeriFone to falsify its reported financial results by

17 overstating the value of its inventory and failing to write down its inventory.

18 92.     Due to these accounting improprieties, the Company presented its financial results

19 and statements in a manner which violated GAAP, including the following fundamental accounting

20 principles:

21      (a)     The principle that interim financial reporting should be based upon the same

22 accounting principles and practices used to prepare annual financial statements was violated (APB

23 No. 28, ¶10);

24      (b)     The principle that financial reporting should provide information that is useful

25 to present and potential investors and creditors and other users in making rational investment, credit

26 and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

27

28

1                (c)     The principle that financial reporting should provide information about the

2  economic resources of an enterprise, the claims to those resources, and effects of transactions, events

3  and circumstances that change resources and claims to those resources was violated (FASB

4  Statement of Concepts No. 1, ¶40);

5                (d)     The principle that financial reporting should provide information about how

6  management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

7  for the use of enterprise resources entrusted to it was violated. To the extent that management offers

8  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

9  accountability to prospective investors and to the public in general (FASB Statement of Concepts

10  No. 1, ¶50);

11              (e)     The principle that financial reporting should provide information about an

12  enterprise's financial performance during a period was violated. Investors and creditors often use

13  information about the past to help in assessing the prospects of an enterprise. Thus, although

14  investment and credit decisions reflect investors' expectations about future enterprise performance,

15  those expectations are commonly based at least partly on evaluations of past enterprise performance

16  (FASB Statement of Concepts No. 1, ¶42);

17              (f)     The principle that financial reporting should be reliable in that it represents

18  what it purports to represent was violated. That information should be reliable as well as relevant is

19  a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

20              (g)     The principle of completeness, which means that nothing is left out of the

21  information that may be necessary to insure that it validly represents underlying events and

22  conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

23              (h)     The principle that conservatism be used as a prudent reaction to uncertainty to

24  try to ensure that uncertainties and risks inherent in business situations are adequately considered

25  was violated. The best way to avoid injury to investors is to try to ensure that what is reported

26  represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

27             (i)     Further, the undisclosed adverse information concealed by defendants during

28  the Relevant Period is the type of information which, because of SEC regulations, regulations of the

national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DAMAGES TO THE COMPANY

93. As a result of the Individual Defendants' improprieties, VeriFone disseminated improper statements concerning its business prospects as alleged above. In addition, as a result of defendants' Relevant Period improprieties, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws.

94. As a direct and proximate result of the Individual Defendants' actions as alleged above, VeriFone's market capitalization has been damaged by over $2.6 billion. At the same time that the Individual Defendants were causing VeriFone to suffer such devastation of its market capitalization, the Insider Selling Defendants were profiting by selling over $110 million of their personally held stock.

95. Further, as a direct and proximate result of Individual Defendants' actions, VeriFone has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b) Costs incurred in investigating and defending VeriFone and certain officers in the class actions, plus potentially millions of dollars in settlements or adverse judgment;

(c) Costs incurred from compensation and benefits paid to the defendants, which compensation was based at least in part on VeriFone's artificially-inflated stock price and inflated revenues; and

(d) Costs incurred from the loss of the Company's customers' confidence in VeriFone's services.

96. The costs VeriFone has incurred due to required internal investigations into the accounting errors, false financial statements, and insider selling include fees for outside attorneys (Simpson Thacher & Bartlett, LLP) and forensic accountants (Navigant Consulting, Inc.) to serve as

1  advisors to the internal investigation. The Company's goodwill and reputation have been materially

2  undermined and tarnished.

3        97.    The Individual Defendants' wrongdoing has also significantly damaged VeriFone in

4  that it has caused VeriFone to default on its credit agreements. As a result, the Company has been

5  damaged in that it has been forced to (1) pay significant amounts of money to its lenders in exchange

6  for their agreement to waive the defaults; and (2) pay an extra 0.25% on the interest rate applicable

7  to its term loans and revolving credit agreements. VeriFone and VeriFone Intermediate Holdings,

8  Inc., a wholly-owned subsidiary of VeriFone, are parties to an October 31, 2006 Credit Agreement.

9  VeriFone has defaulted on this Credit Agreement due to its failure to timely file financial statements

10  for the three months ended January 31, 2007, April 30, 2007, July 31, 2007, the year ended October

11  31, 2007, and the three-month period ended January 31, 2008. As a result, VeriFone was forced to

12  enter into a First Amendment to Credit Agreement and Waiver ("First Amendment") with its lenders

13  on January 25, 2008. Pursuant to the First Amendment, VeriFone had to pay its lenders (1) a fee of

14  0.25% of the aggregate amount outstanding under the loans and revolving credit agreements; (2) pay

15  the lenders an increased rate of interest on the term loan – an additional 0.25%; and (3) pay all the

16  legal fees and costs of Fried, Frank, Harris, Shriver & Jacobson LLP (legal counsel to the

17  Administrative Agent of the lenders) relating to the First Amendment.

18        **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

19        98.    Plaintiffs bring this action derivatively in the right and for the benefit of VeriFone to

20  redress injuries suffered, and to be suffered, by VeriFone as a direct result of the breaches of

21  fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting

22  thereof, by the Individual Defendants. VeriFone is named as a nominal defendant solely in a

23  derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would

24  not otherwise have.

25        99.    Plaintiffs will adequately and fairly represent the interests of VeriFone in enforcing

26  and prosecuting its rights.

27

28

1      100.    Plaintiffs are and were owners of the common stock of VeriFone during the time of

2 the transactions complained of herein, and have continuously remained shareholders of the

3 Company.

4      101.    The current Board of VeriFone consists of the following eight individuals: defendants

5 Bergeron, Roche, Castle, Denend, Hart, Henske, Rinehart and Raff.

6      102.    Defendants Henske, Castle, Denend and Rinehart (the "Audit Committee

7 Defendants") were, during the Relevant Period, members of the Audit Committee. The Audit

8 Committee's charter provides that the Audit Committee is responsible for, among other things: (i)

9 reviewing the Company's quarterly and annual financial statements prior to the filing of such

10 statements; (ii) reviewing the effectiveness of the Company's internal control over financial

11 reporting; and (iii) discussing with management, the internal auditors, and the independent auditors

12 the adequacy and effectiveness of internal control over financial reporting. Thus, the Audit

13 Committee Defendants were responsible for overseeing and directly participating in the

14 dissemination of VeriFone's financial results and guidance. The Audit Committee Defendants,

15 however, breached their fiduciary duties of due care, loyalty and good faith because they participated

16 in the preparation of improper financial statements and earnings press releases that contained

17 improper material information. Particularly, these defendants reviewed and failed to correct

18 VeriFone's improper statements described above. Thus, the Audit Committee Defendants face a

19 sufficiently substantial likelihood of liability for their breach of fiduciary duties, rendering any

20 demand upon them futile.

21      103.    As members of the Audit Committee, Defendants Henske, Castle, Denend and

22 Rinehart had the following duties, which they failed to adequately perform:

23      (a)    The Committee shall regularly review with the independent auditors any audit

24 problems or difficulties encountered during the course of the audit work, including any restrictions

25 on the scope of the independent auditors' activities or access to requested information, and

26 management's response. The Committee should review any accounting adjustments that were noted

27 or proposed by the auditors but were "passed" (as immaterial or otherwise); any communications

28 between the audit team and the audit firm's national office relating to problems or difficulties

SHAREHOLDER DERIVATIVE COMPLAINT

1  encountered with respect to significant auditing or accounting issues; any "management" or "internal

2  control" letter issued, or proposed to be issued, by the audit firm to the Company; and the form of

3  opinion that the audit firm proposes to render to the Board of Directors and the shareholders.

4        (b)    The Committee shall meet to review and discuss the quarterly financial

5  statements, including reviewing the Company's specific disclosures under "Management's

6  Discussion and Analysis of Financial Condition and Results of Operations," with management and

7  the independent auditors prior to the filing of the Company's Quarterly Report on Form 10-Q. Also,

8  the Committee shall discuss the results of the quarterly review and any other matters required to be

9  communicated to the Committee by the independent auditors under generally accepted auditing

10  standards.

11        (c)    The Committee shall meet to review and discuss the annual audited financial

12  statements, including reviewing the Company's specific disclosures under "Management's

13  Discussion and Analysis of Financial Condition and Results of Operations," with management and

14  the independent auditors prior to the filing of the Company's Annual Report on Form 10-K (or the

15  annual report to shareholders if distributed prior to the filing of Form 10-K).

16        (d)    The Committee's review of the Company's financial statements and

17  disclosures shall include: (i) major issues regarding accounting principles and financial statement

18  presentations, including any significant changes in the company's selection or application of

19  accounting principles, and major issues as to the adequacy of the company's internal controls and

20  any specific remedial actions adopted in light of material control deficiencies; (ii) discussions with

21  management and the independent auditors regarding significant financial reporting issues and

22  judgments made in connection with the preparation of the financial statements and the

23  reasonableness of those judgments, including analyses of the effects of alternative GAAP methods

24  on the financial statements; (iii) consideration of the effect of regulatory accounting initiatives, as

25  well as off-balance sheet structures on the financial statements; (iv) consideration of the judgment of

26  both management and the independent auditors about the quality, not just the acceptability of

27  accounting principles; and (v) the clarity of the disclosures in the financial statements. Also, the

28

SHAREHOLDER DERIVATIVE COMPLAINT

1 Committee shall discuss the results of the annual audit and any other matters required to be
2 communicated to the Committee by the independent auditors under professional standards.

3         (e)    The Committee shall receive and review a report from the independent
4 auditors, prior to the filing of the Company's Annual Report on Form 10-K (or the annual report to
5 shareholders if distributed prior to the filing of Form 10-K), on all critical accounting policies and
6 practices of the Company; all material alternative treatments of financial information within
7 generally accepted accounting principles that have been discussed with management, including the
8 ramifications of the use of such alternative treatments and disclosures and the treatment preferred by
9 the independent auditor; and other material written communications between the independent
10 auditors and management.

11         (f)    The Committee shall obtain from the independent auditors assurance that the
12 audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of
13 1934, as amended, which sets forth certain procedures to be followed in any audit of financial
14 statements required under the Securities Exchange Act of 1934.

15         (g)    The Committee shall discuss with appropriate counsel to the Company any
16 significant legal, compliance or regulatory matters that may have a material effect on the financial
17 statements or the Company's business, financial statements or compliance policies, including
18 material notices to or inquiries received from governmental agencies.

19     104.   As a result of their access to and review of internal corporate documents;
20 conversations and connections with other corporate officers, employees and directors; and
21 attendance at management and Board meetings, each of the defendants knew the adverse non-public
22 information regarding VeriFone's accounting practices and financial results. While in possession of
23 this material adverse non-public information regarding the Company, the following current members
24 of the VeriFone Board participated in the illegal insider selling by selling the following amounts:

25         (a)    while in possession of adverse non-public information, Bergeron sold
26 2,254,834 shares of VeriFone stock for proceeds of $78,699,430;

27         (b)    while in possession of adverse non-public information, Castle sold 5,000
28 shares of VeriFone stock for proceeds of $194,300; and

1               (c)     while in possession of adverse non-public information, Roche and Bondy

2 caused GTCR and its affiliates to sell 9,800,000 shares of VeriFone stock for proceeds of

3 $358,550,281.

4 Because these defendants received a personal financial benefit from the challenged insider selling

5 transactions, these defendants are interested. Moreover, these defendants face a sufficiently

6 substantial threat of liability for breach of their fiduciary duties for insider selling. Since these

7 directors have breached their fiduciary duties and are interested, any demand upon them is futile.

8        105.    Defendant Roche is a principal of GTCR. GTCR received significant fees from

9 VeriFone as a result of a Professional Services Agreement. VeriFone pays GTCR millions of dollars

10 in management fees and placement fees relating to debt and equity financing. VeriFone pays an

11 annual management fee to GTCR of $250,000. It paid GTCR $2.9 million in 2004 in connection

12 with services GRCR provided relating to a secured credit facility. Since GTCR is integral to

13 VeriFone's credit facilities, the Company would never authorize suit against Roche, who is a

14 principal of GTCR.

15        106.    VeriFone has also paid significant fees to companies controlled by GTCR. VeriFone

16 paid $1.8 million to Driver Alliant Insurance Services, Inc. and $91,000 to Horn Murdock Cole, both

17 of which entities are controlled by GTCR.

18        107.    Demand is futile as to Roche because Roche is a principal of GTCR, which

19 dominated and controlled VeriFone through its controlling stake in VeriFone. As of December 31,

20 2006, GTCR and its affiliates owned 20% of the common stock of VeriFone. VeriFone was also

21 controlled by GTCR because VeriFone borrowed $60 million from GTCR. In addition, GTCR has

22 the right to designate at least one member of each of the Compensation Committee and Corporate

23 Governance and Nominating Committee.

24        108.    Demand is also futile as to Roche and Bergeron because none of VeriFone's

25 agreements with Bergeron, including his employment agreement, can be modified without GTCR's

26 approval. VeriFone also may not modify any agreements with other key executives, including Jesse

27 Adams, William Atkinson, David Turnbull, Elmore Waller, Nigel Bidmead, and Robert Lopez,

28 without GTCR's consent.

SHAREHOLDER DERIVATIVE COMPLAINT

109.    Bergeron owns 4.2% of all VeriFone's stock. He is the single largest shareholder in the Company. Moreover, the principal professional occupation of defendant Bergeron is his employment with VeriFone, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, VeriFone paid Bergeron the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $597,313 | $1,500,000 | $1,154,400 | 225,000 | $45,824 |

Accordingly, Bergeron lacks independence from defendants Denend, Henske and Roche, who are not disinterested and/or independent and who exert influence over Bergeron's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve Bergeron's base salary, bonus and equity compensation. This lack of independence renders defendant Bergeron incapable of impartially considering a demand to commence and vigorously prosecute this action.

110.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

111.    The Director Defendants of VeriFone, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from VeriFone's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

112.    Defendants Castle, Hart and Raff were and are members of VeriFone's Corporate Governance and Nominating Committee. They failed to adequately perform the following duties which they assumed as members of such Committee:

(a)    Establish procedures for the Committee to exercise oversight of the evaluation of the Board and management.

(b)    Develop and recommend to the Board a set of corporate governance principles applicable to the Company, and to review those principles at least once a year.

1     113.   The acts complained of constitute violations of the fiduciary duties owed by

2  VeriFone's officers and directors and these acts are incapable of ratification.

3     114.   Each of the Director Defendants of VeriFone authorized and/or permitted the false

4  statements disseminated directly to the public or made directly to securities analysts and which were

5  made available and distributed to shareholders, authorized and/or permitted the issuance of various

6  improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could

7  not fairly and fully prosecute such a suit even if such suit was instituted by them.

8     115.   Any suit by the current directors of VeriFone to remedy these wrongs would likely

9  expose the Individual Defendants and VeriFone to further violation of the securities laws that would

10  result in civil actions being filed against one or more of the Individual Defendants. Thus, they are

11  hopelessly conflicted in making any supposedly independent determination whether to sue

12  themselves.

13     116.   VeriFone has been and will continue to be exposed to significant losses due to the

14  wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed

15  any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

16  to recover for VeriFone any part of the damages VeriFone suffered and will suffer thereby.

17     117.   If the current directors were to bring this derivative action against themselves, they

18  would thereby expose their own misconduct, which underlies allegations against them contained in

19  the class action complaints for violations of securities laws, which admissions would impair their

20  defense of the class actions and greatly increase the probability of their personal liability in the class

21  actions, in an amount likely to be in excess of any insurance coverage available to the Individual

22  Defendants. In essence, they would be forced to take positions contrary to the defenses they will

23  likely assert in the securities class actions. This they will not do. Thus, demand is futile.

24     118.   Moreover, despite the Individual Defendants having knowledge of the claims and

25  causes of action raised by Plaintiffs, the current Board has filed and refused to seek to recovery for

26  VeriFone for any of the wrongdoing alleged by Plaintiffs herein.

27     119.   A true and correct copy of this Complaint was delivered to VeriFone prior to it being

28  filed with this Court.

# FIRST CAUSE OF ACTION

## Derivatively Against the Officer Defendants for Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder

120. Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

121. During the Relevant Period, the Officer Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122. The Insider Selling Defendants also sold VeriFone stock as set forth herein, receiving ill gotten gains while in possession of material non-public information. These defendants misappropriated VeriFone's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold VeriFone stock without disclosing the information alleged to have been concealed herein.

123. During the Relevant Period, at the same time the price of the Company's common stock was inflated by the Officer Defendants' misstatements as alleged herein, and the Insider Selling Defendants were selling stock into the market as alleged herein, the Individual Defendants caused VeriFone to repurchase hundreds of millions of dollars worth of its own stock on the open market at inflated prices.

124. During the Relevant Period each of the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)    Employed devices, schemes and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 45 -

1      (c)     Engaged in acts, practices and a course of business that operated as a fraud

2 or deceit upon VeriFone in connection with VeriFone's purchases of VeriFone common stock

3 during the Relevant Period.

4     125.   As a result of the Officer Defendants' misconduct, VeriFone has and will suffer

5 damages in that it paid artificially inflated prices for VeriFone common stock purchased on the

6 open market. VeriFone would not have purchased VeriFone common stock at all, or at the inflated

7 prices it paid, had the market been aware that the price of VeriFone's stock was artificially and

8 falsely inflated by the Officer Defendants' misleading statements. As a direct and proximate result

9 of these defendants' wrongful conduct, VeriFone suffered damages in connection with its

10 purchases of VeriFone common stock during the Relevant Period. By reason of such conduct, the

11 Officer Defendants are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated

12 thereunder.

13         **SECOND CAUSE OF ACTION**

14      **Against the Insider Selling Defendants for Violation of**
**California Corporations Code §25402**

15

16     126.   Plaintiffs incorporate by reference and realleges each and every allegation set forth

above, as though fully set forth herein.
17

18     127.   At the time that the Insider Selling Defendants sold their VeriFone common stock as

19 set forth herein, by reason of their high executive and/or directorship positions with VeriFone, the

Insider Selling Defendants had access to highly material information regarding the Company,
20

21 including the information set forth herein regarding the true adverse facts of VeriFone's improper

financial reporting.
22

23     128.   At the time of such sales, that information was not generally available to the public

24 or the securities markets. Had such information been generally available, it would have

25 significantly reduced the market price of VeriFone shares at that time.

26     129.   The Insider Selling Defendants, and each of them, had actual knowledge of

material, adverse, non-public information and thus sold their VeriFone common stock in California
27

28 in violation of California Corporations Code §25402.

130.     As a result of the wrongful conduct of the Insider Selling Defendants, VeriFone has been damaged.    Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to VeriFone for damages in an amount up to three times the difference between the price at which VeriFone common stock was sold by the defendants, and each of them, and the market value which that VeriFone common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

131.     The Insider Selling Defendants are also liable for reasonable costs and attorney fees pursuant to Cal. Corp. Code §25502.5.

## THIRD CAUSE OF ACTION

### Against the Officer and Director Defendants for Violation of California Corporations Code §25403

132.     Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.     The Officer and Director Defendants, through their positions, exercised control and influence over the Insider Selling Defendants' sale of VeriFone common stock in violation of the California Corporations Code.  The Officer and Director Defendants are statutorily liable to the same extent as the Insider Selling Defendants under California Corporations Code §25403.

134.     The Officer and Director Defendants knowingly provided substantial assistance to the Insider Selling Defendants.  The Officer and Director Defendants were aware of the Insider Selling Defendants' knowledge of the material adverse non-public information and the Officer and Director Defendants were aware of the Insider Selling Defendants' intent to sell VeriFone common stock while in possession material adverse non-public information.

135.     The Officer and Director Defendants are culpable for the Insider Selling Defendants' underlying violations of California Corporations Code §25402 because of their knowledge and ability to control and influence the Insider Selling Defendants.

1     136.   Under California Corporations Code §25403, the Officer and Director Defendants,

2   and each of them, are liable to VeriFone for damages in an amount up to three times the difference

3   between the price at which VeriFone common stock was sold by the Insider Selling Defendants,

4   and each of them, and the market value which VeriFone common stock would have had at the time

5   of the sale if the information known to the Individual Defendants, and each of them, had been

6   publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb

7   the information.

8                            **FOURTH CAUSE OF ACTION**

9           **Against the Officer and Director Defendants for Breach of Fiduciary Duty**
                          **for Improper Financial Reporting**

10

11    137.   Plaintiffs incorporate by reference and realleges each and every allegation contained

    above, as though fully set forth herein.

12
      138.   The Officer and Director Defendants owed and owe VeriFone fiduciary obligations.
13
    By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed
14
    and owe VeriFone the highest obligation of good faith, fair dealing, loyalty and due care.
15
      139.   The Officer and Director Defendants, and each of them, violated and breached their
16
    fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.
17
      140.   Each of the Officer and Director Defendants had actual or constructive knowledge
18
    that they had caused the Company to improperly misrepresent the financial results of the Company
19
    and failed to correct the Company's publicly reported financial results and guidance. These actions
20
    could not have been a good faith exercise of prudent business judgment to protect and promote the
21
    Company's corporate interests.
22
      141.   As a direct and proximate result of the Officer and Director Defendants' failure to
23
    perform their fiduciary obligations, VeriFone has sustained significant damages. As a result of the
24
    misconduct alleged herein, the Officer and Director Defendants are liable to the Company.
25
      142.   Plaintiffs on behalf of VeriFone have no adequate remedy at law.
26

27

28

# FIFTH CAUSE OF ACTION

## Against the Insider Selling Defendants for Breach of Fiduciary
## Duties for Insider Selling and Misappropriation of Information

143.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold VeriFone common stock on the basis of such information.

145.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold VeriFone common stock.

146.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of VeriFone common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

147.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

# SIXTH CAUSE OF ACTION

## Against All Individual Defendants for Breach of Fiduciary Duty

148.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    The Individual Defendants' misconduct alleged herein constituted a breach of their fiduciary duties to VeriFone for abuse of control, gross mismanagement, and waste of corporate assets, for which they are legally responsible.

1    150.   As a direct and proximate result of the Individual Defendants' breaches, VeriFone

2   has sustained significant damages.

3    151.   As a result of the misconduct alleged herein, the Individual Defendants are liable to

4   the Company.

5    152.   Plaintiffs on behalf of VeriFone have no adequate remedy at law.

6   **SEVENTH CAUSE OF ACTION**

7   **Against All Defendants for Unjust Enrichment**

8    153.   Plaintiffs incorporate by reference and realleges each and every allegation set forth

9   above, as though fully set forth herein.

10    154.   By their wrongful acts and omissions, defendants were unjustly enriched at the

11   expense of and to the detriment of VeriFone.

12    155.   Plaintiffs, as shareholders and representatives of VeriFone, seek restitution from

13   these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits

14   and other compensation obtained by these defendants, and each of them, from their wrongful

15   conduct and fiduciary breaches.

16   **EIGHTH CAUSE OF ACTION**

17   **Derivative Claim for Aiding & Abetting Breach of Fiduciary Duties – Against Defendant GTCR Golder Rauner LLC**

18

19    156.   Plaintiffs repeat and reallege each allegation set forth herein.

20    157.   Plaintiffs bring this cause of action derivatively on behalf of VeriFone against

21   defendant GTCR Golder Rauner LLC.

22    158.   As alleged above, the Individual Defendants have breached their fiduciary duties of

23   good faith, fair dealing, and care to VeriFone.

24    159.   By the acts, transactions and courses of conduct alleged herein, defendants,

25   individually and as part of a common plan and scheme and in breach of their fiduciary duties to

26   VeriFone, have damaged VeriFone through their breaches of fiduciary duty.

27    160.   GTCR was aware of the breaches of fiduciary duty being committed by the

28   Individual Defendants and gave substantial assistance and encouragement to the Individual

2.      Determining and awarding VeriFone treble damages pursuant to California Corporations Code §25502.5(a) for the Insider Selling Defendants' violations of California Corporations Code §25402;

3.      Determining and awarding VeriFone treble damages against the Officer and Director Defendants pursuant to California Corporations Code §25403;

4.      Directing VeriFone to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect VeriFone and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- control and limit insider stock selling;

- a provision to permit the shareholders of VeriFone to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of VeriFone's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- appropriately test and then strengthen the internal audit and control functions.

5.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of VeriFone has an effective remedy;

6.      Awarding to VeriFone restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

7.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

- 52 -

8.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 5, 2008

_FRANCIS A. BOTTINI, JR._

JOHNSON BOTTINI, LLP
FRANCIS A. BOTTINI, JR.
DEREK J. WILSON
655 West Broadway, Suite 1400
San Diego, California  92101
Telephone:  619/230-0063
Facsimile:  619/233-5535

Attorneys for Plaintiffs

1                              **VERIFICATION**

2         I hereby verify that I am a shareholder of VeriFone Holdings, Inc. (the "Company"). I have

3  reviewed the allegations made in this Derivative Complaint. The allegations concerning me and my

4  holdings of VeriFone common stock are true based on my personal knowledge. As to those

5  allegations of which I do not have personal knowledge, I rely upon my counsel and their

6  investigation and believe them to be true. Having received a copy of this Complaint, having

7  reviewed it with my counsel, I hereby authorize its filing.

8

9                                           Mary P. Lemmond

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I hereby verify that I am a shareholder of VeriFone Holdings, Inc. (the "Company"). I have reviewed the allegations made in this Derivative Complaint. The allegations concerning me and my holdings of VeriFone common stock are true based on my personal knowledge. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

_____
Wandell Everett

Page
-1-
VERIFICATION

# CIVIL COVER SHEET

JS 44

**E-filing**

§ JS 44 (Rev. 12/07) (cand rev 1-16-08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Mary Lemmond, Derivatively on Behalf of Verifone Holdings, Inc.

**DEFENDANTS**
DOUGLAS G. BERGERON, BARRY ZWARENSTEIN, JESSE ADAMS, ISAAC ANGEL, ELMORE WALLER, COLLIN E. ROCHE, JAMES C. CASTLE, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, CHARLES R. RINEHART, EITAN RAFF, WILLIAM G. ATKINSON, CRAIG A. BONDY, GYCR GOLDER RAUNER, LLC

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)
**North Carolina**

County of Residence of First Listed Defendant    Verifone Holdings, Inc.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Frank Johnson
JOHNSON BOTTINI, LLP
655 W. Broadway, Ste. 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 233-5535

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

|  |  |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |  | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act |  | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate | ☐ 791 Empl. Ret. Inc. | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Sentence | Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | Habeas Corpus: | | or Defendant) | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities – | ☐ 535 Death Penalty | | 26 USC 7609 | Determination |
|  | Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** |  | Under Equal Access |
|  | ☐ 446 Amer. w/Disabilities – | ☐ 550 Civil Rights | ☐ 462 Naturalization Application |  | to Justice |
|  | Other | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – |  | ☐ 950 Constitutionality of |
|  | ☐ 440 Other Civil Rights | | Alien Detainee |  | State Statutes |
|  |  |  | ☐ 465 Other Immigration Actions |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | Transferred from ☐ 5 another district (specify) | ☐ 6 Multidistrict Litigation | Appeal to District ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332

Brief description of cause:
Breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION    DEMAND $
UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE". King v. Bergeron, et al., No. C07-06347 PVT MHP

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)         ☐ SAN FRANCISCO/OAKLAND          ☒ SAN JOSE

DATE  MARCH 5, 2008

SIGNATURE OF ATTORNEY OF RECORD   _Francis Elbert_

EXHIBIT 4

# SCOTT + SCOTT LLP



**MISSION STATEMENT**

The firm prides itself on its continuing dedication to client satisfaction and communication.  Founded by alumni of larger firms, our attorneys encourage our clients to share their fiduciary, business and personal philosophies with us.  We then invest the time to learn about our clients' operations and interests so that each representation can truly be a collaborative effort.  We believe strongly that the practice of law should be conducted in a straightforward and honorable manner.  We work diligently to ensure that intelligence, preparation and knowledge, as opposed to abusive and often counterproductive gamesmanship, are utilized to achieve the best result for our clients in a cost-effective manner.  In so doing, we dedicate ourselves to practicing at the highest legal and ethical standards.  We believe that our clients, as well as the numerous established law firms with whom we work and oppose, trust our word and respect the nature of our advocacy.

Scott + Scott regularly works with other firms on major litigation and with firms of only the highest quality and reputation so as to ensure the best representation for our clients.  From its inception, the firm has been committed to producing legal work of the highest professional quality.  It combines the flexible, informal and cooperative atmosphere of a smaller firm with a sophisticated practice, involving substantial and challenging legal issues more typically associated with larger firms.

**<u>Securities Class Action and Corporate Governance/Shareholder Derivative Litigation</u>**

Scott + Scott is a nationally recognized law firm that recovers money for individual and institutional investors who have suffered from corporate stock fraud through securities class action and corporate governance/shareholder derivative litigation.  Scott + Scott's philosophy is simple – officers and directors of a corporation should be responsible to their shareholders and the public markets.  The firm has participated in recovering billions of dollars and achieved precedent-setting reforms in corporate governance on behalf of investors and shareholders.

**<u>Employee Retirement Litigation</u>**

Scott + Scott actively litigates complex class actions across the United States on behalf of corporate employees alleging violations of the federal Employee Retirement Income Security Act of 1974 (ERISA).  ERISA was enacted by Congress to prevent employers from exercising improper control over retirement plan assets and requires that pension and 401(k) plan trustees, including employer corporations, owe the highest fiduciary duties to retirement plans and their participants as to their retirement funds.  Scott + Scott is committed to continuing its leadership

in ERISA and related employee-retirement litigation, as well as to those employees who entrust their employers with hard-earned retirement savings.

### Antitrust Litigation

The firm is actively involved in litigating many complex antitrust cases throughout the United States.  In such actions, Scott + Scott works to ensure that the markets remain free, open and competitive to the benefit of both consumers purchasing and business enterprises operating in such markets. In addition to traditional price-fixing cases, the firm has taken the lead in a number of novel antitrust claims throughout the United States.

### Consumer Rights Litigation

Scott + Scott regularly represents aggrieved consumers in a variety of class action cases pending throughout the United States.  In addition to more typical cases involving consumer finance issues, such as *In re: Providian Credit Card Litigation* (Superior Court of California, County of San Francisco), the firm is litigating cases against a number of health maintenance organizations (HMO) and other corporate defendants, including: *Albert v. Physician Health Services of Connecticut, Inc.* and *O'Brien v. Aetna, Inc. and Aetna-U.S. Healthcare, Inc.* (United States District Court, District of Connecticut); *Medical Society of the State of New York v. Connecticut General Corporation, et al.* (New York Supreme Court, County of New York); and *Granito, et al. v. International Business Machines, Inc.* (Connecticut Superior Court).  Scott + Scott also has been involved in a number of major consumer fraud cases under state consumer protection laws, including: *Harnage v. Publishers Clearing House* (Connecticut Superior Court); *Gould v. IDT Corporation* (United States District Court, District of New Jersey); *In re: Kava Kava Litigation* (Superior Court of California, County of Los Angeles); *Fischer, et al. v. MasterCard International, Inc., et al.* (New York Supreme Court, County of New York); and *Paton, et al. v. Cingular Wireless, et al.* (Superior Court of California, County of San Francisco).

### Human Rights & Civil Rights Litigation

Scott + Scott is also an advocate of human and civil rights.  For instance, Scott + Scott was active in the *World War II Era Japanese Forced Labor Litigation*, suing Japanese companies in U.S. court on behalf of thousands of aging veterans and civilians forced to work as slaves for Japanese corporations during World War II.  In addition, Scott + Scott currently represents a nationwide class of workers of United Parcel Service (UPS), alleging that UPS violates the Americans with Disabilities Act.

**ATTORNEY BACKGROUND AND EXPERIENCE**

**MELVIN SCOTT** is a graduate of the University of Connecticut (B.A. 1950) and the University of Kentucky (M.A. 1953; LL.B. 1957). Mr. Scott founded the firm in 1975. He is admitted to practice in Kentucky (now retired), Connecticut and Pennsylvania. Mr. Scott was a member of the Kentucky Law Review, where he submitted several articles for publication. He has served as an Attorney Trial Referee since the inception of this program in the State of Connecticut and is a member of the Fee Dispute Committee for New London County. Mr. Scott also formerly served as a Special Public Defender in criminal cases and as a member of the New London County Grievance Committee. Mr. Scott actively represents aggrieved parties in securities, commercial and criminal litigation and served or serves as counsel in: *Irvine, et al. v. ImClone Systems, Inc., et al.; Schnall, et al. v. Annuity and Life Re (Holdings) Ltd., et al.; In re: 360networks Class Action Securities Litigation; In re: General Motors ERISA Litigation;* and *Hohider v. UPS*, among others.

**DAVID R. SCOTT** is a graduate of St. Lawrence University (B.A., *cum laude*, 1986), Temple University School of Law (J.D., Moot Court Board, 1989) and New York University School of Law (LL.M. in taxation). He concentrates in commercial and class action trial work. Mr. Scott's trial work involves antitrust, intellectual property, commercial and complex securities litigation. Mr. Scott's antitrust litigation experience includes matters dealing with illegal tying, price-fixing and monopolization actions. He has served as lead counsel in numerous antitrust and securities class action lawsuits. Notably, Mr. Scott served as co-lead counsel in *In re: Priceline.com Securities Litigation* ($80 million settlement); *Thurber v. Mattel, Inc.* ($122 million settlement); *In re: Emulex Corp. Securities Litigation* ($39 million settlement); *In re: Sprint Securities Litigation* ($50 million settlement); *In re: Northwestern Corporation Securities Litigation* ($61 million settlement); *Irvine, et al. v. Imclone Systems, Inc., et al.* ($75 million settlement); *Schnall, et al. v. Annuity and Life Re (Holdings) Ltd., et al.* ($16 million settlement); and *In re: Qwest Communications International, Inc.* (significant corporate governance reforms and $25 million for the company), among others. His securities litigation experience includes matters dealing with securities fraud class actions, derivative/corporate governance litigation and representation of start-up technology companies in private securities litigation. Presently, Mr. Scott is serving as lead counsel in: *In re: General Motors ERISA Litigation; In re: Guidant Corp. Securities Litigation; Shirk v. Fifth Third Bancorp, et al.; In re Merck ERISA Litigation;* and *Pugh, et al. v. Tribune Company, et al.*, among others. Mr. Scott is admitted to practice in Connecticut, Pennsylvania, New York, the United States Tax Court and many United States District Courts.

**ARTHUR L. SHINGLER** is a graduate of Point Loma College (B.A., *cum laude*, 1989) and Boston University School of Law (J.D. 1995). Mr. Shingler specializes in complex consumer and securities class actions, as well as related shareholder derivative litigation. Mr. Shingler is or has been counsel in numerous actions, including: *In Re: Lattice Semiconductor Derivative Litigation; In re: Priceline.com Securities Litigation; In re: 360networks Class Action Securities Litigation; Irvine, et al. v. ImClone Systems, Inc., et al.; In re: Cyberonics Securities Litigation; Lancaster, et al. v. Royal Dutch Petroleum Co.; In re: HealthSouth Corporation Derivative*

*Litigation;* and *In Re: Guidant Corp. Securities Litigation,* among other representative actions. In addition to numerous successful recoveries in class litigation, of particular note are Mr. Shingler's efforts on behalf of the class in the Halliburton securities litigation, where he successfully argued against final approval of an inadequate settlement and continues to represent plaintiffs as the action proceeds. Mr. Shingler also played a primary role in substantially changing executive management and corporate governance, as well as advancing shareholder rights in the Lattice Semiconductor Derivative Litigation. Of additional note, Mr. Shingler has represented aggrieved class members in a number of consumer protection actions and has been instrumental in expanding and clarifying consumer and class interests nationwide. As two examples, Mr. Shingler was fundamentally involved before the Massachusetts Supreme Judicial Court in shaping the contours of class certification under Massachusetts state law (*Weld v. Glaxo Wellcome, Inc.,* 434 Mass. 81 (2001)) and, before the California Court of Appeals, in shaping the scope of California's Unfair Practices Act and the limits of its False Claims Act (*Rothchild v. Tyco Internat.* (US), Inc., et al., 83 Cal. App. 4th 488 (Cal. App. 4th D.C.A. 2000)) Mr. Shingler is admitted to practice before the Supreme and all other Courts of the State of California, the United States Court of Appeals for the Third Circuit, and various United States District Courts.

**ANITA MELEY LAING** is a graduate of Ohio University (B.S., *cum laude*, 1963), University of Tennessee (M.S., *summa cum laude*, 1967) and University of Pittsburgh School of Law (J.D., *cum laude*, 1978). She is admitted to practice in California and Pennsylvania (inactive). Ms. Laing was the Notes Editor of the University of Pittsburgh Law Review and has authored articles for publication there and in the legal magazine *Trial*. Ms. Laing's entire legal career has involved complex commercial and class action cases. Her practice has ranged: from representation of employees in nationwide class action discrimination cases, to thousands of individuals who lived near a major California Superfund site for personal injuries and property damage sustained from exposure to toxic waste emissions; from companies who paid inflated premiums for workers' compensation insurance, to elderly investors in a multi-million dollar Ponzi scheme; and from purchasers of publicly traded securities at fraudulently inflated prices to consumers nationwide. Ms. Laing is active in litigation, including: *Hohider v. UPS; In re: Guidant Securities Litigation*; and *In re: Diebold Inc. Securities Litigation,* among others.

**BETH KASWAN** has represented plaintiffs in cases involving securities and consumer fraud since 1998. Prior to 1998, Ms. Kaswan served in the Giuliani administration as New York City's Chief Procurement Officer, a Deputy Commissioner in the Department of Investigations and the Finance Department's Chief Counsel.

Ms. Kaswan, having majored in accounting at college, began her career at Peat, Marwick, Mitchell & Co. and later served as a trial attorney with the U.S. Department of Justice, Tax Division. In 1985, she joined the U.S. Attorney's Office for the Southern District of New York, and was promoted to Chief of Commercial Litigation and then Deputy Chief of the Civil Division. While employed by the government, Ms. Kaswan litigated several high-profile cases to judgment, including the landmark case of *United States v. Gleneagles Inv. Co.*, where following a multi-stage, thirteen month trial, the fraudulent conveyance laws were first applied to set aside a leveraged buy-out. She also represented the Federal Reserve for its enforcement actions against the rogue bank, BCCI, leading to the global RICO plea agreement and forfeiture of BCCI's $550 million of United States assets; the IRS for its $5 billion claim against Drexel, the Defense Department and MARAD for *qui tam* and other false claims actions against Goodyear Aerospace,

Loral and General Dynamics and the FDA to enjoin the manufacture of adulterated generic drugs. See, e.g., *United States v. Gleneagles Inv. Co.,* 565 F. Supp. 556 ("Gleneagles I"), 571. F. Supp. 935 ("Gleneagles II"), 584 F. Supp. 671 ("Gleneagles III") (M.D. Pa. 1981), aff'd in part and rev'd in part sub. nom., *United States v. Tabor Ct. Realty Corp.,* 803 F.2d 1288 (3d Cir. 1986); In re Smouha ("BCCI"), 136 B.R. 921 (S.D.N.Y. 1992); *United States v. Davis,* 803 F. Supp. 830 (S.D.N.Y. 1992), aff'd in part and rev'd in part sub. nom., *United States v. General Dynamics Corp.*, 19 F.3d 770 (2d Cir. 1994); *United States v. Barr Laboratories, Inc.*, 812 F. Supp. 458 (D.N.J. 1993).

Ms. Kaswan received several awards from the Justice Department and the agencies she represented, including the Justice Department's John Marshall award, Special Commendation from the Attorney General, a Superior Performance award from the Executive Office of U.S. Attorneys, Tax Division Outstanding Achievement awards, and awards from the FDA Commissioner and U.S. Customs Service. She has testified before the New York legislature as a government expert on money-laundering and lectured in Justice Department training programs on evidence and other subjects.

**MARIA K. TOUGAS** is a graduate of Bowdoin College (B.A., *magna cum laude*, 1985) and Western New England College School of Law (J.D. 1989), where she was a member of the National Moot Court Team. Ms. Tougas' experience includes complex commercial litigation, creditor's rights and bankruptcy. At Scott + Scott, Ms. Tougas is actively engaged in complex class action litigation, including securities, consumer and antitrust litigation. She also focuses on bankruptcy and creditor's rights issues associated with complex class action litigation. Ms. Tougas actively practices all types of commercial litigation. She is admitted to practice in Connecticut, as well as the U.S. Court of Appeals for the Second Circuit.

**DEIRDRE DEVANEY** is a graduate of New York University (B.A., *cum laude*, 1990) and the University of Connecticut School of Law (J.D., with honors, 1998) where she was the Managing Editor of the Connecticut Journal of International Law. Ms. Devaney's experience includes commercial and probate litigation, as well as trusts and estates. Currently, Ms. Devaney's practice areas include commercial and securities litigation. Ms. Devaney is involved in litigation, including: *In re: Priceline.com Securities Litigation*; and *In re: Guidant Corp. Securities Litigation*, among others. Ms. Devaney is admitted to practice in Connecticut, New York and the United States District Court for the District of Connecticut.

**GEOFFREY JOHNSON** is a graduate of Grinnell College (B.A., with honors, 1996) and the University of Chicago Law School (J.D., with honors, 1999), where he served on the law review. An attorney with the firm's Ohio office, Mr. Johnson's main practice areas include securities and ERISA class action litigation, corporate governance and other complex commercial litigation, including among others: *In re: Priceline.com Securities Litigation; In re: GM ERISA Litigation;; Shirk v. Fifth Third Bancorp.;* and *In re: Merck ERISA Litigation*. Prior to joining Scott + Scott, Mr. Johnson clerked for the Honorable Karen Nelson Moore, Sixth Circuit United States Court of Appeals. Mr. Johnson has been active in pro bono matters, handling cases for the Legal Aid Society of Cleveland. Mr. Johnson is a member of the Ohio Bar.

**WALTER NOSS** is a graduate of the University of Toledo (B.A., *magna cum laude*, Economics 1997) and the Ohio State University College of Law (J.D., with honors, 2000), where he served

as a member of the Ohio State Law Journal. Mr. Noss' main practice areas include securities, antitrust and complex litigation, including: *In re: Rubber Chemicals Antitrust Litigation; In re: Plastic Additives Antitrust Litigation;* and *In re: Polychlorprene Rubber Antitrust Litigation*, among others. Mr. Noss is a member of the Ohio Bar.

**DONALD D. BROGGI** is a graduate of University of Pittsburgh (B.A. 1990) and Duquesne University School of Law (J.D. 2000). He is licensed to practice in Pennsylvania and currently is engaged in the firm's complex securities, antitrust and consumer litigation, including: *Hohider v. UPS; In re: Priceline.com Securities Litigation; In re: Rubber Chemicals Antitrust Litigation;* and *In re: Plastic Additives Antitrust Litigation*, among others.

**ERIN GREEN COMITE** is a graduate of Dartmouth College (B.A., *magna cum laude*, 1994) and the University of Washington School of Law (J.D. 2002). Prior to entering law school, Ms. Comite was a legal assistant at The White House. At Scott + Scott she actively is engaged in the firm's complex securities, corporate governance and antitrust litigation, including: *Hohider v. UPS; In re: Priceline.com Securities Litigation;* and *In re: Host America Securities Litigation*, among others. Ms. Comite also assists in the firm's institutional investor and class member services. She is licensed to practice in Connecticut.

**DAVID H. GOLDBERGER** is a graduate of the University of Colorado (B.A. 1999) and California Western School of Law (J.D. 2002). Mr. Goldberger is currently actively involved in litigation, including: *In re: Priceline.com Securities Litigation*; *In re: GM ERISA Litigation;* and *In re: Plastic Additives Antitrust Litigation*, among others. He is licensed to practice in California and is currently involved in the firm's complex securities and antitrust litigation.

**DESSETA MARSIE-HAZEN** is a graduate of Wellesley College (B.A. 1978), the Woodrow Wilson School of Public and International Affairs at Princeton University (M.P.A. 1980) and the New York University School of Law (J.D. 1987). She is licensed to practice in the Virgin Islands, New York, Florida and the District of Columbia. She currently spearheads all aspects of discovery in the firm's antitrust and securities practice.

**LUIS LORENZANA** is a graduate of Santa Clara University (B.A. 1998) and The George Washington University Law School (J.D., with honors, 2006). Mr. Lorenzana is licensed to practice in California and is involved in the firm's securities and antitrust class action litigation. Currently, Mr. Lorenzana is involved in litigation, including: *In re: Priceline.com Securities Litigation*; and *In re: Payment Card Interchange Fee* and *Merchant Discount Antitrust Litigation*, among others. As part of his *pro bono* work, Mr. Lorenzana has worked with La Raza Centro Legal in San Francisco, where he represented low-income, Spanish-speaking clients facing housing, labor and consumer issues.

**HAL CUNNINGHAM** is a graduate of Murray State University (B.S. Biological Chemistry, 1997) and the University of San Diego School of Law (J.D. 2005). In addition to his law practice, Mr. Cunningham has over eight years of research and development experience in the chemical and pharmaceutical industries. Mr. Cunningham is licensed to practice in California and currently is involved in the firm's securities and consumer litigation, including: *In re:*

*Cardinal Health, Inc. Securities Litigation*; *Paton, et al. v. Cingular Wireless, et al.* and *Deitz v. Comcast Corporation*.

**JUDY SCOLNICK** is a graduate of New York University (BA *cum laude* 1972), Brandeis University (MA 1973) and Boston College Law School (JD *summa cum laude* 1976) where she served on the *Boston College Industrial and Commercial Law Review*. She began her career as a law clerk to the late Honorable Anthony Julian of the United States District Court in Massachusetts and then served as a trial attorney in the Civil Division of the United States Department of Justice from 1977 until 1981. As a trial attorney Ms. Scolnick was the lead counsel in several high-profile employment discrimination lawsuits against various US agencies around the country. She also drafted the policy position followed by all US Attorneys' offices concerning employment discrimination cases that ensured coordination between the positions of the Civil Rights Division as prosecutor of discrimination cases against private employer and the Civil Division as the defender of employment cases against US agencies. Ms Scolnick then served with the General Counsel's office of British Airways, where she primarily practiced employment law. Ms. Scolnick also played a primary role in negotiating key operating contracts and obtaining governmental approval of the alliance between British Airways and American Airlines. Ms. Scolnick has lectured and written extensively in the areas of prosecution and defense of Title VII , Americans with Disabilities Act, age discrimination, and compliance with the discrimination provisions of the Air Carrier Access Act. Ms. Scolnick is admitted to practice in New York, New Jersey, and Massachusetts.

**AMANDA F. LAWRENCE** is a graduate of Dartmouth College (B.A. , cum laude, 1998) Yale University (J.D., 2002). Ms. Lawrence is admitted to practice in Connecticut. Her primary areas of practice are complex securities litigation, securities class action litigation, commercial and land use litigation.