1  JOHNSON BOTTINI, LLP
   FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
2  DEREK J. WILSON, Cal. Bar No. 250309
   655 West Broadway, Suite 1400
3  San Diego, California  92101
   Telephone:  619/230-0063
4  Facsimile:  619/233-5535

5

6  Attorneys for Plaintiffs Mary Lemmond and Wandell Everett

7

8

9

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12

13  Charles R. King, Derivatively On Behalf )   No.: CV 07-06347 MHP
    of VeriFone Holdings, Inc.              )
14                                          )
                            Plaintiff,      )   DECLARATION OF FRANCIS A.
15          vs.                             )   BOTTINI, JR. IN SUPPORT OF
                                            )   CROSS MOTION OF PLAINTIFFS
16  DOUGLAS G. BERGERON,                    )   LEMMOND AND EVERETT TO
    JAMES C. CASTLE,                        )   CONSOLIDATE CASES AND
17  LESLIE G. DENEND,                       )   APPOINT LEAD COUNSEL, AND
    ALEX W. (PETE) HART,                    )   OPPOSITION TO MOTIONS OF
18  ROBERT B. HENSKE,                       )   PLAINTIFFS KING AND PATEL
    EITAN RAFF,                             )
19  CHARLES R. RINEHART,                    )   Judge: The Hon. Marilyn H. Patel
    COLLIN E. ROCHE,                        )
20  CRAIG A. BONDY,                         )   Courtroom: 15
    and BARRY ZWARENSTEIN,                  )
21                                          )   Hearing Date: April 28, 2008
                            Defendants,     )
22                                          )   Hearing Time: 2:00 p.m.
            -and-                           )
23                                          )
    VERIFONE HOLDINGS, INC.,                )
24                                          )
                    Nominal Defendant.      )
25  _____)

26

27

28

- 1 –

DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF CROSS MOTION OF PLAINTIFFS
LEMMOND AND EVERETT

|  |  |
|---|---|
| ARTHUR HILBORN | No.: 5:08-cv-01132-MHP |
|             Plaintiff, | |
|    vs. | |
| DOUGLAS G. BERGERON, ET AL. | |
|             Defendants, | |

|  |  |
|---|---|
| ARUNBHAI PATEL | No.: 5:08-cv-01133-MHP |
|             Plaintiff, | |
|    vs. | |
| DOUGLAS G. BERGERON, et al. | |
|             Defendants, | |

|  |  |
|---|---|
| MARY LEMMOND AND WANDELL EVERETT | No.: 5:08-cv-01301-MHP |
|             Plaintiffs, | |
|    vs. | |
| DOUGLAS G. BERGERON, et al. | |
|             Defendants, | |

I, Francis A. Bottini, Jr. declare as follows:

1.      I am a partner at Johnson Bottini, LLP, counsel of record for plaintiffs Mary Lemmond and Wandell Everett. I am admitted to practice before all courts in the State of California, including this Court. I submit this declaration in support of the cross motion filed by plaintiffs Lemmond and Everett to consolidate cases and appoint lead counsel, and the opposition of Lemmond and Everett to the motions to consolidate, appoint a lead plaintiff, and appoint lead counsel filed by Plaintiffs King and Patel. I have personal knowledge of the facts stated below. If called upon to do so, I could and would competently testify thereto.

2.      On March 5, 2008, plaintiffs Mary Lemmond and Wandell Everett filed a detailed shareholder derivative complaint, a true and correct copy of which is attached hereto as **Exhibit 1**.

3.      Subsequent to the filing of their derivative complaint, plaintiffs Lemmond and Everett and their counsel have been working diligently and cooperatively with all the parties to the related cases to coordinate such cases and provide for the most efficient litigation of the cases.  On March 12, 2008, plaintiffs Lemmond and Everett filed an Administrative Motion to Consider Whether Cases Should be Related, pursuant to L.R. 3-12(b).  On March 19, 2008, the Court entered an order relating the cases.

4.      I have also worked with counsel for all parties in the case to attempt to coordinate the litigation of these derivative cases to the greatest extent possible with the securities fraud cases also pending before this Court, and to provide a uniform schedule for the filing of a consolidated amended complaint and defendants' response thereto.  To achieve those goals, I met and conferred with counsel for all the parties in the case and then subsequently drafted a Stipulation Regarding Filing of Consolidated Amended Complaint and Defendants' Response Thereto, a true and correct copy of which is attached hereto as **Exhibit 2**.  That stipulation was agreed to by counsel for all 10 individual defendants, counsel for Nominal Defendant Verifone Holdings, Inc., counsel for defendant GTCR Golden Rauner, LLC, and counsel for plaintiffs Hilborn and Patel. The only counsel who objected to the proposed stipulation was Scott + Scott, counsel for plaintiff King.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of the firm resume of Johnson Bottini, LLP.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of Miriam Marcus, "Buck Stops With Verifone CFO," FORBES, April 2, 2008.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the Form 8-K which Verifone Holdings, Inc. filed with the United States Securities and Exchange Commission on April 2, 2008.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of "Order Denying Without Prejudice Joint Motion for Consolidation and Appointment of Lead Counsel,"

DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF CROSS MOTION OF PLAINTIFFS LEMMOND AND EVERETT

1 | *Applebaum v. Mozilo et al.*, Case No. CV07-05567 (C.D. Cal. Oct. 25, 2007) (order
2 | denying motion to consolidate and appoint lead counsel in derivative action involving
3 | Countrywide Financial Corporation due to plaintiff's failure to allege diversity
4 | jurisdiction).

5 |    I declare under penalty of perjury under the laws of the United States of America
6 | that the foregoing is true and correct.

7 |    Executed this 7th day of April, 2008, at San Diego, California.

8 |

9 |    _____/s Francis A. Bottini, Jr._____
10 |    FRANCIS A. BOTTINI, JR.

DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF CROSS MOTION OF PLAINTIFFS
LEMMOND AND EVERETT

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on April 7, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such a filing to the email addresses denoted on the Electronic Mail Notice List for Case No. 3:07-cv-06347-MHP, and I hereby certify that I have mailed the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice Lists for Case No. 3:08-cv-01133-MHP and Case No. 3:08-cv-01132-MHP and 3:08-cv-01301-MHP.

      I certify under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed this 7th day of April 2008 at San Diego, California.

                                   _____/s/Francis A. Bottini, Jr._____
                                   FRANCIS A. BOTTINI, JR.

DECLARATION OF FRANCIS A. BOTTINI, JR. IN SUPPORT OF CROSS MOTION OF PLAINTIFFS LEMMOND AND EVERETT



ORIGINAL
FILED

MAR – 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

RS

1  JOHNSON BOTTINI, LLP
2  FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
   DEREK J. WILSON, Cal. Bar No. 250309
   655 West Broadway, Suite 1400
3  San Diego, California 92101
   Telephone: 619/230-0063
4  Facsimile: 619/233-5535

5  Attorneys for Plaintiffs

6

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9  Mary Lemmond and Wandell Everett,      ) No. CV 08 1301
   Derivatively On Behalf of VeriFone Holdings, )
10 Inc.                                    )
                                           ) SHAREHOLDER DERIVATIVE
11              Plaintiffs,                ) COMPLAINT
                                           )
12       vs.                               )
                                           ) DEMAND FOR JURY TRIAL
13 DOUGLAS G. BERGERON,                    )
   BARRY ZWARENSTEIN,                      )
14 JESSE ADAMS,                            )
   ISAAC ANGEL,                            )
15 ELMORE WALLER,                          )
   COLLIN E. ROCHE,                        )
16 JAMES C. CASTLE,                        )
   LESLIE G. DENEND,                       )
17 ALEX W. HART,                           )
   ROBERT B. HENSKE,                       )
18 CHARLES R. RINEHART,                    )
   EITAN RAFF,                             )
19 WILLIAM G. ATKINSON,                    )
   CRAIG A. BONDY,                         )
20 GTCR GOLDER RAUNER, LLC,                )
   and DOES 1-25, inclusive,              )
21                                         )
              Defendants,                  )
22                                         )
        -and-                              )
23                                         )
   VERIFONE HOLDINGS, INC., a Delaware     )
24 Corporation,                            )
                                           )
25              Nominal Defendant.         )

26

27

28

1  **SUMMARY AND OVERVIEW**

2      1.     This is a shareholder derivative complaint against officers and directors of VeriFone

3  Holdings, Inc. ("VeriFone" or the "Company") concerning wrongdoing that occurred between

4  September 1, 2006 and November 30, 2007 (the "Relevant Period"). Plaintiffs assert state law

5  claims for breach of fiduciary duty against defendants.

6      2.     VeriFone designs, markets, and services transaction automation systems that enable

7  secure electronic payments among consumers, merchants, and financial institutions.

8      3.     On December 3, 2007, VeriFone announced that following a review by and on the

9  recommendation of management, the Company's unaudited interim financial statements for the three

10  months ended January 31, 2007, the three and six months ended April 30, 2007, and the three and

11  nine months ended July 31, 2007 should no longer be relied upon, principally due to errors in

12  accounting related to the valuation of in-transit inventory and allocation of manufacturing and

13  distribution overhead to inventory. As a result of the false financial statements previously filed by

14  VeriFone, the Company announced that it was delaying the filing of its Annual Report on Form 10-

15  K for the fiscal year ending October 31, 2007. The Company anticipates that the restatement will

16  result in a reduction of reported inventories that amounted to $30 million at July 31, 2007 and a

17  reduction to previously-reported pre-tax income aggregating approximately $30 million for the

18  interim periods through July 31, 2007.

19      4.     In its December 3, 2007 revelation of false financial statements, VeriFone also stated

20  that when the Company eventually files the 2007 Form 10-K, and files amended financial statements

21  for previous periods to correct admitted accounting errors, *"management expects VeriFone to*

22  *report one or more material weaknesses in VeriFone's internal controls over financial reporting."*

23  Moreover, VeriFone's market capitalization has been damaged by over $2.6 billion.

24      5.     The Company's December 3, 2007 announcement was necessary because, during the

25  Relevant Period, defendants had caused VeriFone to issue false and misleading statements regarding

26  the Company's business and prospects. The true facts, which were known by each of the defendants

27  but concealed from the investing public during the Relevant Period, were as follows:

28

1       (a)     The Company's in-transit inventory was grossly overvalued due to accounting

2  errors related to allocation of manufacturing and distribution overhead to inventory, each of which

3  affects VeriFone's reported costs of net revenues. This fraud was revealed by a cost accounting

4  manager in the Company's Sacramento, California office;

5       (b)     The Company's gross margins were not 45-47% but were closer to 40%;

6       (c)     The Company was not on track to achieve profitability in 2007, but rather

7  losses due to problems related to the Company's acquisition of Lipman Electronic Engineering, Ltd.

8  ("Lipman"), which problems the Company discovered during the due diligence pertaining to the

9  Company's acquisition of Lipman in 2006;

10       (d)     The Company's gross margin projections were overstated;

11       (e)     The Company's supply chain management was severely deficient;

12       (f)     The Company's accounting during the Relevant Period was false and

13  misleading;

14       (g)     The Individual Defendants failed to adopt and implement adequate internal

15  controls over accounting and financial reporting; and

16       (h)     That as a result of (a)-(g) above, the Company's estimates of an eleventh

17  consecutive quarter of double digit revenue growth for the first quarter of 2007 and beyond and

18  income per share growth of 20% or more were grossly inflated and the Company's reported assets

19  and inventory were materially overstated as described at ¶¶87-92.

20      6.     As a result of the false statements, VeriFone's stock price traded at inflated levels

21  during the Relevant Period, increasing to as high as $50 just one month before the end of the

22  Relevant Period. The artificial inflation of the Company's stock allowed the defendants to sell more

23  than $469 million worth of their VeriFone stock at artificially inflated prices.

24      7.     The Individual Defendants' misconduct has damaged VeriFone and its shareholders.

25  VeriFone has been named as a defendant in class action securities fraud lawsuits. VeriFone is

26  currently incurring millions of dollars in costs due to required internal investigations into the

27  accounting errors, false financial statements, and insider selling. The Company has been forced to

28  hire outside attorneys (Simpson Thacher & Bartlett, LLP) and forensic accountants (Navigant

SHAREHOLDER DERIVATIVE COMPLAINT

1  Consulting, Inc.) to serve as advisors to the internal investigation. The Company's goodwill and

2  reputation have been materially undermined and tarnished.

3        8.     The Individual Defendants' wrongdoing has also significantly damaged VeriFone in

4  that it has caused VeriFone to default on its credit agreements. As a result, the Company has been

5  damaged in that it has been forced to (1) pay significant amounts of money to its lenders in exchange

6  for their agreement to waive the defaults; and (2) pay an extra 0.25% on the interest rate applicable

7  to its term loans and revolving credit agreements. VeriFone and VeriFone Intermediate Holdings,

8  Inc., a wholly-owned subsidiary of VeriFone, are parties to an October 31, 2006 Credit Agreement.

9  VeriFone has defaulted on this Credit Agreement due to its failure to timely file financial statements

10  for the three months ended January 31, 2007, April 30, 2007, July 31, 2007, the year ended October

11  31, 2007, and the three-month period ended January 31, 2008. As a result, VeriFone was forced to

12  enter into a First Amendment to Credit Agreement and Waiver ("First Amendment") with its lenders

13  on January 25, 2008. Pursuant to the First Amendment, VeriFone had to pay its lenders (1) a fee of

14  0.25% of the aggregate amount outstanding under the loans and revolving credit agreements; (2) pay

15  the lenders an increased rate of interest on the term loan – an additional 0.25%; and (3) pay all the

16  legal fees and costs of Fried, Frank, Harris, Shriver & Jacobson LLP (legal counsel to the

17  Administrative Agent of the lenders) relating to the First Amendment.

18                          **JURISDICTION AND VENUE**

19        9.     Jurisdiction is conferred by 28 U.S.C. §1332. There is complete diversity among the

20  parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and

21  costs.

22       10.     Venue is proper in this District pursuant to 28 U.S.C. §1391. Many of the acts

23  complained of herein occurred in this district and VeriFone's principal executive offices are located

24  at 2099 Gateway Place, Suite 600, San Jose, CA 95110, where the day-to-day operations of the

25  Company are directed and managed.

26                          **THE PARTIES**

27       11.     Plaintiff Mary Lemmond is a current shareholder of VeriFone and was a shareholder

28  of VeriFone at the time of the transaction complained of herein. Plaintiff Lemmond is a citizen of

SHAREHOLDER DERIVATIVE COMPLAINT

1   North Carolina.   Plaintiff Wandell Everett is a current shareholder of VeriFone and was a

2   shareholder of VeriFone at the time of the transaction complained of herein.  Plaintiff Everett is a

3   citizen of Georgia.

4          12.   Defendant VeriFone Holdings, Inc. is a corporation which designs, markets, and

5   services transaction automation systems that enable secure electronic payments among consumers,

6   merchants, and financial institutions.  The Company's stock is traded on the New York Stock

7   Exchange under the ticker "PAY."  VeriFone is incorporated in Delaware and has its principal place

8   of business in California.  VeriFone is a citizen of both Delaware and California.

9          13.   Defendant Douglas G. Bergeron ("Bergeron") is VeriFone's Chairman and Chief

10   Executive Officer and has been since July 2001.  Because of Bergeron's positions, he knew,

11   consciously disregarded, was reckless and grossly negligent in not knowing or should have known

12   the adverse, non-public information about the business of VeriFone including its finances, markets

13   and present and future business prospects, via access to internal corporate documents, conversations

14   and connections with other corporate officers and employees, attendance at management and Board

15   of Directors ("Board") meetings and committees thereof, as well as reports and other information

16   provided to him in connection therewith.  During the Relevant Period, Bergeron participated in the

17   issuance of improper statements, including the preparation of the improper press releases and other

18   statements and approval of other statements made to the press, securities analysts and VeriFone

19   shareholders.  Defendant Bergeron received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $597,313 | $1,500,000 | $1,154,400 | 225,000 | $45,824 |

23   During the Relevant Period, Bergeron sold 2,254,834 shares of VeriFone stock for proceeds of

24   $78,699,430.  Mr. Bergeron is a citizen of California.

25          14.   Defendant Barry Zwarenstein ("Zwarenstein") is VeriFone's Chief Financial Officer

26   and has been since June 2004.  Zwarenstein is also VeriFone's Executive Vice President and has

27   been since November 2006.  Zwarenstein was VeriFone's Senior Vice President from June 2004 to

28   November 2006.  Because of Zwarenstein's positions, he knew, consciously disregarded, was

1  reckless and grossly negligent in not knowing or should have known the adverse, non-public

2  information about the business of VeriFone including its finances, markets and present and future

3  business prospects, via access to internal corporate documents, conversations and connections with

4  other corporate officers and employees, attendance at management meetings, as well as reports and

5  other information provided to him in connection therewith. During the Relevant Period, Zwarenstein

6  participated in the issuance of improper statements, including the preparation of the improper press

7  releases and other statements and approval of other statements made to the press, securities analysts

8  and VeriFone shareholders. Defendant Zwarenstein received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $319,167 | $250,000 | $1,388,600 | 80,000 | $5,087 |

12  During the relevant period, Zwarenstein sold 186,792 shares of VeriFone stock for proceeds of

13  $7,075,260. Zwarenstein is a citizen of California.

14       15.    Defendant Jesse Adams ("Adams") is VeriFone's Vice Chairman and has been since

15  November 2006. Adams was also VeriFone's Executive Vice President, North American Sales from

16  July 2001 to October 2006. Because of Adams' positions, he knew, consciously disregarded, was

17  reckless and grossly negligent in not knowing or should have known the adverse, non-public

18  information about the business of VeriFone including its finances, markets and present and future

19  business prospects, via access to internal corporate documents, conversations and connections with

20  other corporate officers and employees, attendance at management meetings, as well as reports and

21  other information provided to him in connection therewith. During the Relevant Period, Adams

22  participated in the issuance of improper statements, including the preparation of the improper press

23  releases and other statements and approval of other statements made to the press, securities analysts

24  and VeriFone shareholders. Defendant Adams received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $299,167 | $125,000 | $288,600 | 40,000 | $11,687 |

1   During the Relevant Period, Adams sold 209,399 shares of VeriFone stock for proceeds of

2   $7,502,095. Adams is a citizen of California.

3         16.   Defendant Isaac Angel ("Angel") is VeriFone's Executive Vice President, Global

4   Operations and has been since VeriFone acquired Lipman Electronic Engineering, Inc. in November

5   2006. Angel was CEO of Lipman. Because of Angel's positions with Lipman and then with

6   VeriFone, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or

7   should have known the adverse, non-public information about the business of VeriFone including its

8   finances, markets and present and future business prospects, via access to internal corporate

9   documents, conversations and connections with other corporate officers and employees, attendance

10   at management meetings, as well as reports and other information provided to him in connection

11   therewith. Because he was CEO of Lipman prior to Lipman's acquisition by VeriFone, Lipman had

12   actual knowledge of the issues regarding VeriFone's acquisition of Lipman and regarding

13   VeriFone's inflated inventories during the Relevant Period. During the Relevant Period, Angel

14   participated in the issuance of improper statements, including the preparation of the improper press

15   releases and other statements and approval of other statements made to the press, securities analysts

16   and VeriFone shareholders. During the Relevant Period, Angel sold 150,000 shares of VeriFone

17   stock for proceeds of $5,805,400. Angel is a citizen of California.

18         17.   Defendant Elmore Waller ("Waller") is VeriFone's Executive Vice President,

19   Integrated Solution and has been since December 2004. From 1986 to November 2004, Waller has

20   served in a number of leadership positions including Senior Vice President and General Manager of

21   the Worldwide Petro Division. Because of Waller's positions, he knew, consciously disregarded,

22   was reckless and grossly negligent in not knowing or should have known the adverse, non-public

23   information about the business of VeriFone including its finances, markets and present and future

24   business prospects, via access to internal corporate documents, conversations and connections with

25   other corporate officers and employees, attendance at management meetings, as well as reports and

26   other information provided to him in connection therewith. During the Relevant Period, Waller

27   participated in the issuance of improper statements, including the preparation of the improper press

28   releases and other statements and approval of other statements made to the press, securities analysts

1    and VeriFone shareholders. During the Relevant Period, Waller sold 129,800 shares of VeriFone

2    stock for proceeds of $4,909,000. Waller is a citizen of California.

3        18.    Defendant Collin E. Roche ("Roche") is a VeriFone director and has been since July

4    2002. Mr. Roche is a principal of GTCR Golder Rauner, LLC, which owned more than 10% of

5    VeriFone's stock during the Relevant Period. Roche was also, at all relevant times, a member of

6    VeriFone's Compensation Committee. Because of Roche's positions, he knew, consciously

7    disregarded, was reckless and grossly negligent in not knowing or should have known the adverse,

8    non-public information about the business of VeriFone including its finances, markets and present

9    and future business prospects, via access to internal corporate documents, conversations and

10   connections with other corporate officers and employees, attendance at management meetings, as

11   well as reports and other information provided to him in connection therewith. During the Relevant

12   Period, Roche, GTCR Capital Partners, GTCR Co-Invest and CTCR Fund VII caused CTCR Golder

13   Rauner, LLC and its partners to sell 9,800,000 shares of VeriFone stock for proceeds of

14   $358,550,281. Roche is a citizen of Illinois.

15       19.    Defendant James C. Castle ("Castle") is a VeriFone director and has been since

16   January 2005. Castle was also, at all relevant times, a member of VeriFone's Audit Committee.

17   Because of Castle's positions, he knew, consciously disregarded, was reckless and grossly negligent

18   in not knowing or should have known the adverse, non-public information about the business of

19   VeriFone including its finances, markets and present and future business prospects, via access to

20   internal corporate documents, conversations and connections with other corporate officers and

21   employees, attendance at management meetings, as well as reports and other information provided to

22   him in connection therewith. During the Relevant Period, Castle participated in the issuance of

23   improper statements, including the preparation of the improper press releases and other statements

24   and approval of other statements made to the press, securities analysts and VeriFone shareholders.

25   During the Relevant Period, Castle sold 5,000 shares of VeriFone stock for proceeds of $194,300.

26   Castle is a citizen of California.

27       20.    Defendant Leslie G. Denend ("Denend") is a VeriFone director and has been since

28   January 2005. Denend was also, at all relevant times, a member of VeriFone's Audit Committee.

1  Because of Denend's positions, he knew, consciously disregarded, was reckless and grossly

2  negligent in not knowing or should have known the adverse, non-public information about the

3  business of VeriFone including its finances, markets and present and future business prospects, via

4  access to internal corporate documents, conversations and connections with other corporate officers

5  and employees, attendance at management meetings, as well as reports and other information

6  provided to him in connection therewith. During the Relevant Period, Denend participated in the

7  issuance of improper statements, including the preparation of the improper press releases and other

8  statements and approval of other statements made to the press, securities analysts and VeriFone

9  shareholders. Mr. Denend is a citizen of California.

10      21.    Defendant Alex W. Hart ("Hart") is a VeriFone director and has been since July

11  2006. Because of Hart's positions, he knew, consciously disregarded, was reckless and grossly

12  negligent in not knowing or should have known the adverse, non-public information about the

13  business of VeriFone including its finances, markets and present and future business prospects, via

14  access to internal corporate documents, conversations and connections with other corporate officers

15  and employees, attendance at management meetings, as well as reports and other information

16  provided to him in connection therewith. During the Relevant Period, Hart participated in the

17  issuance of improper statements, including the preparation of the improper press releases and other

18  statements and approval of other statements made to the press, securities analysts and VeriFone

19  shareholders. Mr. Hart is a citizen of Pennsylvania.

20      22.    Defendant Robert B. Henske ("Henske") is a VeriFone director and has been since

21  January 2005. Henske was also, at all relevant times, Chairman of VeriFone's Audit Committee and

22  a member of the Compensation Committee. Because of Henske's positions, he knew, consciously

23  disregarded, was reckless and grossly negligent in not knowing or should have known the adverse,

24  non-public information about the business of VeriFone including its finances, markets and present

25  and future business prospects, via access to internal corporate documents, conversations and

26  connections with other corporate officers and employees, attendance at management meetings, as

27  well as reports and other information provided to him in connection therewith. During the Relevant

28  Period, Henske participated in the issuance of improper statements, including the preparation of the

SHAREHOLDER DERIVATIVE COMPLAINT

1  improper press releases and other statements and approval of other statements made to the press,

2  securities analysts and VeriFone shareholders. Mr. Henske is a citizen of California.

3        23.    Defendant Charles R. Rinehart ("Rinehart") is a VeriFone director and has been since

4  May 2006. Rinehart was also, at all relevant times, a member of VeriFone's Audit Committee.

5  Because of Rinehart's positions, he knew, consciously disregarded, was reckless and grossly

6  negligent in not knowing or should have known the adverse, non-public information about the

7  business of VeriFone including its finances, markets and present and future business prospects, via

8  access to internal corporate documents, conversations and connections with other corporate officers

9  and employees, attendance at management meetings, as well as reports and other information

10  provided to him in connection therewith. During the Relevant Period, Rinehart participated in the

11  issuance of improper statements, including the preparation of the improper press releases and other

12  statements and approval of other statements made to the press, securities analysts and VeriFone

13  shareholders. Mr. Rinehart is a citizen of California.

14        24.    Defendant Eitan Raff ("Raff") is a VeriFone director and has been since October

15  2007. Because of Raff's positions, he knew, consciously disregarded, was reckless and grossly

16  negligent in not knowing or should have known the adverse, non-public information about the

17  business of VeriFone including its finances, markets and present and future business prospects, via

18  access to internal corporate documents, conversations and connections with other corporate officers

19  and employees, attendance at management meetings, as well as reports and other information

20  provided to him in connection therewith. During the Relevant Period, Raff participated in the

21  issuance of improper statements, including the preparation of the improper press releases and other

22  statements and approval of other statements made to the press, securities analysts and VeriFone

23  shareholders. Mr. Raff is a citizen of Israel.

24        25.    Defendant William G. Atkinson ("Atkinson") was VeriFone's Executive Vice

25  President, Payment Systems from November 2006 to July 2007. Atkinson was also VeriFone's

26  Executive Vice President of global Marketing and Business Development from August 2002 to

27  October 2006 and Vice President, North American Financial Channels from August 2001 to April

28  2002. Because of Atkinson's positions, he knew, consciously disregarded, was reckless and grossly

1  negligent in not knowing or should have known the adverse, non-public information about the

2  business of VeriFone including its finances, markets and present and future business prospects, via

3  access to internal corporate documents, conversations and connections with other corporate officers

4  and employees, attendance at management meetings, as well as reports and other information

5  provided to him in connection therewith. During the Relevant Period, Atkinson participated in the

6  issuance of improper statements, including the preparation of the improper press releases and other

7  statements and approval of other statements made to the press, securities analysts and VeriFone

8  shareholders. Defendant Atkinson received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $298,958 | $224,664 | $1,388,600 | 40,000 | $9,523 |

12  During the Relevant Period, Atkinson sold 172,118 shares of VeriFone stock for proceeds of

13  $6,404,758. Mr. Atkinson is a citizen of California.

14      26.    Defendant Craig A. Bondy ("Bondy") was a VeriFone director from July 2002 to

15  September 2007. Mr. Bondy is a principal of GTCR Golden Rauner, LLC, which owned more than

16  10% of VeriFone's stock during the Relevant Period. Because of Bondy's positions, he knew,

17  consciously disregarded, was reckless and grossly negligent in not knowing or should have known

18  the adverse, non-public information about the business of VeriFone including its finances, markets

19  and present and future business prospects, via access to internal corporate documents, conversations

20  and connections with other corporate officers and employees, attendance at management meetings,

21  as well as reports and other information provided to him in connection therewith. During the

22  Relevant Period, Bondy participated in the issuance of improper statements, including the

23  preparation of the improper press releases and other statements and approval of other statements

24  made to the press, securities analysts and VeriFone shareholders. Bondy, GTCR Capital Partners,

25  GTCR Co-Invest and CTCR Fund VII caused CTCR Golder Rauner, LLC and its partners to sell

26  9,800,000 shares of VeriFone stock for proceed of $358,550,281. Mr. Bondy is a citizen of Illinois.

27      27.    Defendant DTCR Golder Rauner, LLC is an Illinois limited liability company and has

28  its principal place of business at 6100 Sears Tower, Chicago, Illinois 60606. GTCR is a private

- 10 -

1  equity firm. Throughout the Relevant Period, GTCR was the single largest VeriFone shareholder
2  and had two designees on VeriFone's board of directors -- defendants Bondy and Roche. Because of
3  Bondy and Roche's positions on the Board, GTCR knew the adverse non-public information about
4  the business of VeriFone. During the Relevant Period, GTCR and its affiliates, of which Bondy and
5  Roche were principals, sold 9,800,000 shares of VeriFone stock for proceeds of $358,550,281.
6  GTCR is a citizen of Illinois.

7       28.     The defendants identified in ¶¶13, 18-24, and 26 are referred to herein as the
8  "Director Defendants." The defendants identified in ¶¶13-17 and 25 are referred to herein as the
9  "Officer Defendants." The defendants identified in ¶¶13-19 and 25-27 are referred to herein as the
10  "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the
11  Insider Selling Defendants are referred to herein as the "Individual Defendants."

12       29.     The true names and capacities of defendants sued herein under California Code of
13  Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to Plaintiffs, who
14  therefore sues these defendants by such fictitious names. Plaintiffs will seek to amend this
15  Complaint and include these Doe defendants' true names and capacities when they are ascertained.
16  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged
17  herein and for the injuries suffered by the company as a result of defendants' wanton and illegal
18  conduct.

19                        **IMPROPER PERSONAL FINANCIAL BENEFITS**

20       30.     The Individual Defendants and GTCR had knowledge of VeriFone's problems and
21  were motivated to conceal such problems. Zwarenstein, as CFO, was responsible for financial
22  reporting and communications with the market. Many of the internal reports showing VeriFone's
23  forecasted and actual growth were prepared by the finance department under Zwarenstein's
24  direction. During the Relevant Period, Zwarenstein sold 186,792 shares of VeriFone common stock
25  at artificially inflated prices for proceeds of over $7 million. Prior to the Relevant Period,
26  Zwarenstein sold an average of 4,000 shares per month from December until the beginning of the
27  class period. The sale of nearly 187,000 shares over the course of the Relevant Period, a fifteen
28  month period, is an average of 12,452 shares a month, or a 211% increase in sales of Verifone stock.

1      31.    Defendant Bergeron, as CEO and Chairman, was responsible for the financial results

2  and press releases issued by the Company and/or projections issued by the Company. Bergeron sold

3  2,254,834 shares of VeriFone stock during the Relevant Period for proceeds of nearly $79 million.

4      32.    Defendant Atkinson, as an Executive Vice President of Verifone, had knowledge of

5  material, non-public information with regard to the financial outlook of the Company. During the

6  Relevant Period, Atkinson sold over 172,000 shares of VeriFone common stock at artificially

7  inflated prices for proceeds of over $6.4 million. In the fifteen months preceding the Relevant

8  Period, Atkinson sold roughly 90,600 shares of Verifone stock. His sale activity in the Relevant

9  Period represents an increase of 90% from his level of sales prior to the Relevant Period.

10     33.    Defendant Adams, as an Executive Vice President and Vice Chairman, had

11  knowledge of material, non-public information with regard to the financial outlook of the Company.

12  During the Relevant Period, Adams sold nearly 210,000 shares of VeriFone common stock at

13  artificially inflated prices for proceeds of over $7.5 million. In the fifteen months preceding the

14  Relevant Period, Adams sold roughly 161,000 shares of Verifone stock. Her sale activity in the

15  Relevant Period represents an increase of 30% from her level of sales prior to the Relevant Period.

16     34.    Defendant Waller, as an Executive Vice President of Verifone, had knowledge of

17  material, non-public information with regard to the financial outlook of the Company. During the

18  Relevant Period, a fifteen month period, Waller sold nearly 130,000 shares in contrast to the under

19  60,000 shares he sold in the fifteen months preceding the Relevant Period. His sale activity in the

20  Relevant Period represents an increase of 117% from his level of sales prior to the Relevant Period.

21     35.    Defendant Angel, as an Executive Vice President of Verifone, had knowledge of

22  material, non-public information with regard to the financial outlook of the Company. Angel sold

23  150,000 shares in the Relevant Period for proceeds of over $5.8 million.

24     36.    Defendant Castle, as a Director and member of the Verifone Audit Committee, had

25  knowledge of material, non-public information with regard to the financial outlook of the Company.

26  Castle sold 5,000 shares of VeriFone stock during the Relevant Period for proceeds of $194,300.

27  Castle used his positions at the company to benefit financially while on possession of material, non-

28  public information.

37. The Defendants' illegal insider selling was as follows:

| INSIDER/total | DATE (Mo/Day/Yr) | SHARES | PRICE (in $) | PROCEEDS (in $) |
|---|---|---|---|---|
| BERGERON | 11-26-07 | 38,000 | 44.70-46.43 | 1,631,000 |
| | 11-19-07 | 14,405 | 44.70-44.93 | 645,000 |
| | 11-14-07 | 130,792 | 44.70-45.95 | 5,912,000 |
| | 10-10-07 | 200,000 | 45.13-46.56 | 9,137,000 |
| | 09-24-07 | 893 | 38.64 | 34,505 |
| | 09-10-07 | 200,000 | 38.73-39.39 | 3,218,000 |
| | 08-10-07 | 83,700 | 39.05-39.15 | 3,273,000 |
| | 07-12-07 | 200,000 | 36.31-37.00 | 7,325,000 |
| | 06-22-07 | 894 | 36.36 | 32,505 |
| | 06-12-07 | 150,000 | 32.43-33.10 | 4,916,000 |
| | 05-14-07 | 88,100 | 37.78-37.99 | 3,338,000 |
| | 05-10-07 | 97,435 | 37.78-38.34 | 3,702,000 |
| | 04-11-07 | 24,000 | 37.50-37.80 | 904,000 |
| | 03-22-07 | 3,575 | 37.60 | 134,420 |
| | 03-15-07 | 200,000 | 35.83-36.27 | 7,191,000 |
| | 01-10-07 | 200,000 | 35.30-35.55 | 7,085,000 |
| | 12-13-06 | 100,040 | 36.39-37.21 | 3,665,000 |
| | 12-11-06 | 99,900 | 35.55-36.50 | 3,588,000 |
| | 12-04-06 | 82,000 | 33.99-34.57 | 2,807,000 |
| | 12-01-06 | 68,000 | 33.26-33.63 | 2,270,000 |
| | 11-01-06 | 125,000 | 29.29-30.30 | 3,731,000 |
| | 10-02-06 | 28,300 | 28.05-28.45 | 797,000 |
| | 09-05-06 | 119,800 | 27.97-28.76 | 3,363,000 |
| **Total** | | **2,254,834** | | **$78,699,430** |
| ZWARENSTEIN | 11-13-07 | 17,878 | 43.53-44.37 | 799,000 |
| | 10-09-07 | 18,000 | 43.45-45.73 | 805,501 |
| | 09-24-07 | 222 | 38.64 | 8,578 |
| | 09-12-07 | 3574 | 39.85 | 142,423 |
| | 09-11-07 | 18,000 | 39.00-39.99 | 714,000 |
| | 08-14-07 | 18,000 | 36.35-37.52 | 663,000 |
| | 07-10-07 | 18,000 | 36.07-36.76 | 655,000 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-12-07 | 18,000 | 32.50-33.00 | 590,000 |
| | 05-08-07 | 18,000 | 37.14-37.88 | 672,000 |
| | 04-10-07 | 18,000 | 37.48-38.04 | 682,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-15-07 | 18,000 | 35.75-36.22 | 647,000 |
| | 01-09-07 | 4,000 | 35.21-35.58 | 142,000 |
| | 12-12-06 | 4,000 | 36.86-37.57 | 149,000 |
| | 11-30-06 | 4,000 | 32.82-33.75 | 133,000 |
| | 10-31-06 | 4,000 | 29.00-29.22 | 116,000 |
| | 09-29-06 | 4,000 | 28.55-29.00 | 115,000 |
| **Total** | | **186,792** | | **$7,075,260** |
| BONDY; | 12-19-06 | 2,773,042 | | 99,219,442 |
| ROCHE; | 12-19-06 | 201,571 | | 7,212,210 |
| GTCR | 12-19-06 | 25,837 | | 910,631 |
| ENTITIES | 06-25-07 | 3,235,216 | | 114,429,589 |

- 13 -
SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 06-25-07 | 235,165 | | 8,317,786 |
| | 06-25-07 | 29,619 | | 1,047,624 |
| | 09-13-07 | 3,050,346 | | 117,773,859 |
| | 09-13-07 | 221,728 | | 8,560,918 |
| | 09-13-07 | 27,926 | | 1,078,222 |
| **GTCR TOTAL** | | **9,800,000** | | **$358,550,281** |
| **ATKINSON** | 09-26-07 | 35,000 | 42.65-43.73 | 1,508,000 |
| | 07-10-07 | 10,000 | 36.07-36.75 | 364,000 |
| | 07-02-07 | 8,000 | 35.11-35.48 | 283,000 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-11-07 | 10,000 | 32.44-33.00 | 327,000 |
| | 06-01-07 | 8,000 | 34.41-34.93 | 277,000 |
| | 05-10-07 | 10,000 | 37.51-38.30 | 379,000 |
| | 05-01-07 | 8,000 | 35.50-35.97 | 287,000 |
| | 04-10-07 | 10,000 | 37.48-38.04 | 379,000 |
| | 04-02-07 | 8,000 | 36.18-37.76 | 292,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-12-07 | 10,000 | 36.38-36.83 | 366,000 |
| | 03-01-07 | 8,000 | 37.23-38.79 | 306,000 |
| | 02-01-07 | 8,000 | 39.96-40.44 | 322,000 |
| | 01-22-07 | 18,000 | 37.47-38.08 | 680,000 |
| | 12-01-06 | 5,000 | 33.12-33.60 | 166,000 |
| | 11-01-06 | 5,000 | 29.39-30.17 | 149,000 |
| | 10-02-06 | 5,000 | 27.63-28.52 | 140,000 |
| | 09-01-06 | 5,000 | 27.25-28.11 | 138,000 |
| **Total** | | **172,118** | | **$6,404,758** |
| **ADAMS** | 09-24-07 | 222 | 38.64 | 8,578 |
| | 08-10-07 | 20,000 | 38.52-39.10 | 777,000 |
| | 08-01-07 | 61,109 | 35.05-36.58 | 2,186,647 |
| | 07-02-07 | 1,250 | 35.29 | 44,112 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-01-07 | 11,354 | 34.41-34.93 | 393,000 |
| | 05-01-07 | 21,167 | 35.50-35.97 | 758,000 |
| | 04-02-07 | 14,604 | 36.18-36.85 | 531,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-01-07 | 13,354 | 37.23-38.79 | 512,000 |
| | 02-01-07 | 21,166 | 39.96-40.44 | 851,000 |
| | 01-03-07 | 15,524 | 35.11-36.13 | 553,000 |
| | 12-1-06 | 4,945 | 33.12-33.60 | 164,000 |
| | 11-01-06 | 7,793 | 29.39-30.17 | 237,000 |
| | 10-02-06 | 7,793 | 27.63-28.52 | 224,000 |
| | 09-01-06 | 8,000 | 27.25-28.11 | 221,000 |
| **Total** | | **209,399** | | **$7,502,095** |
| **WALLER** | 11-26-07 | 9,800 | 44.39-46.41 | 441,000 |
| | 10-26-07 | 10,000 | 46.25-47.24 | 469,000 |
| | 09-25-07 | 10,000 | 40.00 | 400,000 |
| | 08-10-07 | 20,000 | 38.52-39.12 | 776,000 |
| | 07-09-07 | 20,000 | 36.35-36.94 | 732,000 |
| | 06-13-07 | 20,000 | 35.00 | 700,000 |
| | 02-01-07 | 10,000 | 39.96-40.44 | 402,000 |

SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 01-03-07 | 10,000 | 35.58-36.10 | 358,000 |
| | 12-01-06 | 10,000 | 33.12-33.60 | 333,000 |
| | 11-01-06 | 10,000 | 29.39-30.17 | 298,000 |
| **Total** | | **129,800** | | **$4,909,000** |
| **ANGEL** | 11-13-07 | 15,000 | 43.60-44.12 | 654,000 |
| | 10-09-07 | 15,000 | 43.97-44.13 | 661,000 |
| | 09-11-07 | 15,000 | 39.62-39.77 | 595,000 |
| | 08-14-07 | 15,000 | 36.68-36.84 | 551,000 |
| | 07-10-07 | 15,000 | 36.38-36.46 | 546,000 |
| | 06-13-07 | 15,000 | 34.36 | 515,400 |
| | 05-08-07 | 15,000 | 37.56-37.58 | 564,000 |
| | 04-10-07 | 15,000 | 37.85-37.87 | 568,000 |
| | 03-13-07 | 15,000 | 35.93-36.24 | 541,000 |
| | 02-08-07 | 15,000 | 40.60-40.75 | 610,000 |
| **Total** | | **150,000** | | **$5,805,400** |
| **CASTLE** | 09-14-07 | 4500 | 39.20-39.22 | 176,000 |
| | 12-13-06 | 500 | 36.60 | 18,300 |
| **Total** | | **5000** | | **$194,300** |
| **COMBINED TOTAL** | | **12,907,943** | | **$469,140,524** |

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.    In committing the wrongful acts alleged herein, the Individual Defendants and GTCR have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants and GTCR further aided and abetted and/or assisted each other in breaching their respective duties.

39.    During all times relevant hereto, the Individual Defendants and GTCR collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly portraying its business prospects in order to allow defendants to artificially inflate the price of the Company's shares and sell over $469 million of VeriFone stock; (ii) maintain the Individual Defendants' executive and directorial positions at VeriFone and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of VeriFone, regarding the Individual Defendants' management of VeriFone's operations, the Company's financial health and stability,

- 15 -
SHAREHOLDER DERIVATIVE COMPLAINT

1  and future business prospects, specifically related to the Company's financials that had been

2  misrepresented by defendants throughout the Relevant Period.   In furtherance of this plan,

3  conspiracy and course of conduct, the Individual Defendants and GTCR collectively and

4  individually took the actions set forth herein.

5        40.    The Individual Defendants and GTCR engaged in a conspiracy, common enterprise

6  and/or common course of conduct commencing by at least September 1, 2006 and continuing

7  thereafter.  During this time, the Individual Defendants caused the Company to conceal the true

8  fact that VeriFone was misrepresenting its business prospects and in-transit inventory. In addition,

9  defendants also made other specific, improper statements about VeriFone's financial performance

10  and future business prospects, as alleged herein.

11        41.    The purpose and effect of the conspiracy, common enterprise, and/or common

12  course of conduct was, among other things, to disguise the Individual Defendants' violations of

13  law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal

14  adverse information concerning the Company's operations, financial condition and future business

15  prospects; and to artificially inflate the price of VeriFone common stock so defendants could: (i)

16  engage in insider selling of VeriFone securities; and (ii) protect and enhance their executive and

17  directorial positions and the substantial compensation and prestige they obtained as a result thereof.

18        42.    The Individual Defendants and GTCR accomplished their conspiracy, common

19  enterprise and/or common course of conduct by causing the Company to purposefully, recklessly

20  or negligently misrepresent its business prospects and release improper statements.  Because the

21  actions described herein occurred under the authority of the Board, each of the Individual

22  Defendants and GTCR was a direct, necessary and substantial participant in the conspiracy,

23  common enterprise and/or common course of conduct complained of herein.

24        43.    Each of the Individual Defendants and GTCR aided and abetted and rendered

25  substantial assistance in the wrongs complained of herein.  In taking such actions to substantially

26  assist the commission of the wrongdoing complained of herein, each Individual Defendant and

27  GTCR acted with knowledge of the primary wrongdoing, substantially assisted the

28

- 16 -

1   accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance

2   of the wrongdoing.

3   ## DUTIES OF THE INDIVIDUAL DEFENDANTS

4       44.    By reason of their positions as officers, directors and/or fiduciaries of VeriFone, and

5   because of their ability to control the business and corporate affairs of VeriFone, the Individual

6   Defendants owed VeriFone and its shareholders fiduciary obligations of trust, loyalty, good faith

7   and due care, and were and are required to use their utmost ability to control and manage VeriFone

8   in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act

9   in furtherance of the best interests of VeriFone and its shareholders so as to benefit all shareholders

10  equally and not in furtherance of their personal interest or benefit.

11      45.    Each director and officer of the Company owes to VeriFone and its shareholders the

12  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

13  Company and in the use and preservation of its property and assets, and the highest obligations of

14  fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual

15  Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

16  Company's revenue, margins, operations, performance, management, projections and forecasts so

17  that the market price of the Company's stock would be based on truthful and accurate information.

18      46.    The Individual Defendants, because of their positions of control and authority as

19  directors and/or officers of VeriFone, were able to and did, directly and/or indirectly, exercise

20  control over the wrongful acts complained of herein, as well as the contents of the various public

21  statements issued by the Company. Because of their advisory, executive, managerial and

22  directorial positions with VeriFone, each of the Individual Defendants had access to adverse non

23  public information about the financial condition, operations, and improper representations of

24  VeriFone.

25      47.    At all times relevant hereto, each of the Individual Defendants was the agent of each

26  of the other Individual Defendants and of VeriFone, and was at all times acting within the course

27  and scope of such agency.

28

48.    To discharge their duties, the officers and directors of VeriFone were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of VeriFone were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how VeriFone conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

49.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

1   obligations as directors and officers of VeriFone, the absence of good faith on their part, and a

2   reckless disregard for their duties to the Company and its shareholders that the Individual

3   Defendants were aware or should have been aware posed a risk of serious injury to the Company.

4   The conduct of the Individual Defendants who were also officers and/or directors of the Company

5   during the Relevant Period have been ratified by the remaining Individual Defendants who

6   collectively comprised all of VeriFone's Board during the Relevant Period.

7        50.   Furthermore, defendants Henske, Castle, Denend and Rinehart, as members of the

8   Audit Committee, had a special duty to know and understand this material information as set out in

9   the Audit Committee's charter which provides that the committee is responsible for reviewing and

10   discussing: (i) the Company's earnings press releases, as well as financial information and earnings

11   guidance provided by the Company to analysts and rating agencies; and (ii) the Company's internal

12   controls.

13        51.   Specifically, the Audit Committee's purpose is to assist the Board of Directors'

14   oversight of:

15       (i) the integrity of the Company's financial statements, (ii) the accounting and
        financial reporting processes of the Company and the audits of the financial

16       statements of the Company, (iii) the Company's compliance with legal and regulatory
        requirements, (iii) the independent auditors' qualifications and independence, and (iv)

17       the performance of the Company's internal audit function and independent auditors.

18        52.   The Audit Committee also has the following responsibilities: (i) supervise the

19   independent audit, (ii) oversee internal audit, internal controls and risk management, (iii) oversee

20   financial reporting, (iv) oversee legal and ethical compliance, and (v) prepare minutes and reports.

21        53.   The Individual Defendants breached their duties of loyalty and good faith by allowing

22   defendants to cause, or by themselves causing, the Company to misrepresent its financial results and

23   prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking

24   such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct

25   during the Relevant Period, the Company is now the subject of a class action lawsuit that alleges

26   violations of federal securities laws. As a result, VeriFone has expended, and will continue to

27   expend, significant sums of money.

28

1    54.    Moreover, these actions have irreparably damaged VeriFone's corporate image and

2    goodwill.  VeriFone's Board has misled the investing public, such that VeriFone's ability to raise

3    equity capital or debt on favorable terms in the future is now impaired.

4    **BACKGROUND TO THE RELEVANT PERIOD**

5    55.    Prior to the beginning of the Relevant Period, VeriFone's stock price had dropped by

6    over 20% (from the $30s to the low $20s) due to the market's concern that VeriFone's gross margins

7    were slowing and would be flat or actually decrease in 2007.  In an effort to dispel these concerns,

8    the Individual Defendants embarked on a scheme to falsely report gross margins in the mid to high

9    40%, when in fact VeriFone's gross margins were stuck at around 40% and were actually at risk of

10    decreasing.

11    56.    Defendants' scheme of portraying VeriFone as experiencing increased gross margins

12    depended in large part on the pending Lipman acquisition, and VeriFone's ability to integrate that

13    acquisition with minimal costs and with the acquisition being accretive to both earnings and margins.

14    Defendants falsely told the market that this would occur.  However, defendants discovered negative

15    information about Lipman during the due diligence that demonstrated that increased expenses and

16    reduced margins would occur.

17    57.    VeriFone and Lipman Electronic Engineering, Ltd. ("Lipman") had been familiar

18    with each other's businesses for several years.  There were intermittent informal contacts between

19    representatives and VeriFone and Lipman at various times prior to VeriFone's initial public offering

20    in April 2005.

21    58.    On May 10, 2005, Douglas Bergeron had contacted defendant Isaac Angel, who at the

22    time was the CEO of Lipman, and suggested a meeting to discuss whether a future business

23    combination or strategic transaction would be feasible.

24    59.    To facilitate discussions, VeriFone and Lipman entered into a confidentiality

25    agreement on June 1, 2005.  On June 7, 2005, Mr. Angel and Mike Lilo, the CFO of Lipman, met

26    with Mr. Bergeron and Mr. Swarenstein in New York to discuss the possibility of a business

27    combination.

28

SHAREHOLDER DERIVATIVE COMPLAINT

1    60.    On September 28, 2005, Lipman had announced that it was lowering its full year

2   2005 earnings guidance with respect to revenues and net income per share as a result of substantially

3   weaker than expected performance at its Dione subsidiary.  Lipman's stock price decreased by

4   approximately $6 per share on the news.

5    61.    On December 4, 2005, Mr. Bergeron contacted Mr. Angel to inquire whether Lipman

6   was interested in renewing discussions with VeriFone.  On December 7, 2005, Mssrs. Angel, Lilo,

7   Bergeron and Swarenstein participated in a conference call and agreed to renew merger discussions.

8   During the next several months, into the spring of 2006, Lipman and VeriFone engaged in

9   significant merger discussions which included their legal and financial advisors.

10    62.    On March 17, 2006, VeriFone's outside legal counsel delivered a formal request for

11   due diligence to outside counsel for Lipman.  On March 23, 2006, VeriFone and Lipman signed an

12   exclusivity letter providing for an exclusivity period up to and including April 15, 2006.  The parties

13   commenced a due diligence process on March 24, 2006 when Lipman's electronic data room became

14   accessible to representatives of VeriFone.  Between March 24, 2006 and April 10, 2006, VeriFone

15   and its financial advisors and legal counsel conducted due diligence on Lipman.

16    63.    On April 10, 2006, Lipman and VeriFone signed a merger agreement pursuant to

17   which VeriFone acquired Lipman later in 2006, with the acquisition closing on November 1, 2006.

18   ### FALSE AND MISLEADING STATEMENTS

19    64.    On August 31, 2006, the Company announced record Q3 2006 financial results,

20   sending the Company's shares soaring.  The Company announced net revenues for the third quarter

21   of $147.6 million, an increase of 17% over net revenues of $125.7 million for the comparable period

22   of 2005.  The Individual Defendants caused the Company to announce the results in a press release

23   entitled:  "VeriFone Reports Third Quarter Fiscal 2006 Results," which stated as follows:

24       "Net revenues for the three months ended July 31, 2006, were $147.6 million, an
        increase of 17% over net revenues of $125.7 million for the comparable period of
25       fiscal 2005.  The increase was driven by a 19% increase in net revenues from
        VeriFone's North America business and a 16% increase in net revenues in VeriFone's
26       International business.

27       *Gross margins, under generally accepted accounting principles (GAAP), for the*
        *three months ended July 31, 2006, were 45.0%, compared to 40.7% for the three*
28       *months ended July 31, 2005. Gross margins, excluding non-cash amortization of*

- 21.-
SHAREHOLDER DERIVATIVE COMPLAINT

1   *purchased intangibles and stock-based compensation expense, expanded for the*
    *seventh consecutive quarter and reached 45.9% compared to 42.0% for the three*
2   *months ended July 31, 2005.*

3   Net income for the three months ended July 31, 2006, was $16.8 million, or $0.24
    per diluted share, compared to $6.5 million, or $0.10 per diluted share, for the
4   comparable period of fiscal 2005. Net income, as adjusted, which excludes non-cash
    amortization of purchased intangibles and debt issuance costs, as well as non-cash
5   stock-based compensation expense, for the three months ended July 31, 2006, was
    $19.7 million, or $0.28 per diluted share, compared to $13.1 million, or $0.20 per
6   diluted share, for the comparable period of fiscal 2005.

7   "We are once again extremely pleased with the consistency of our quarterly results,
    demonstrated by our tenth consecutive quarter with double-digit revenue growth and
8   our eighth consecutive quarter of expanded EBITDA as adjusted margins, which
    reached a record level of 22.6% in the quarter," said Douglas G. Bergeron, Chairman
9   and Chief Executive Officer. "We are expecting to close the acquisition of Lipman
    Electronic Engineering Ltd. by November 1, 2006, and remain confident that we will
10  receive clearance by the United States Department of Justice very shortly. We remain
    on track to deliver another year of outstanding results and *we remain confident in*
11  *our long-term model, which calls for annual revenue growth of 10 to 15% and*
    *annual adjusted net income per share growth of 20% or more."*

12
    "Based on our confidence with our near term and long term outlook, *we are raising*
13  *our FY06 year end guidance to $1.07 to $1.08 of adjusted net income per share.*
    *We are also raising our FY07 guidance to $1.40 to $1.42 of adjusted net income*
14  *per share, assuming a November 1, 2006, completion of the Lipman acquisition,"*
    *continued Bergeron.*

15
        65.    On this news of this increased guidance, the Company's shares soared to $28.47 per
16
    share on September 1, 2006.
17
        66.    On September 5, 2006, Bergeron sold 119,800 shares of VeriFone stock at
18
    approximately $28 per share.
19
        67.    On September 7, 2006, the Individual Defendants caused the Company to issue the
20
    following press release:
21
    VeriFone's Proposed Acquisition of Lipman Receives Department of Justice
22  Clearance

23  SAN JOSE, CA, and ROSH HAAYIN, Israel - September 07, 2006 - VeriFone
    Holdings, Inc. (NYSE: PAY) and Lipman Electronic Engineering Ltd. (NASDAQ:
24  LPMA; TASE: LPMA) today announced they have received clearance from the
    United States Department of Justice (DOJ) to complete VeriFone's pending
25  acquisition of Lipman. Shareholder meetings for each company are scheduled for
    mid-September and, if each group of shareholders approves the transaction, the
26  parties expect to close on November 1 following the expiration of a 30-day waiting
    period required by Israeli law after the Lipman shareholders' meeting.
27
        68.    On September 15, 2006, VeriFone issued the following press release:
28

- 22 -
SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7

"San Jose, CA - September 15, 2006 - VeriFone Holdings, Inc. (NYSE: PAY) announced that at a special meeting today its stockholders overwhelmingly voted to approve its acquisition of Lipman Electronic Engineering Ltd. At the VeriFone special meeting more than 99.5 percent of the shares represented were voted in favor of the issuance of VeriFone stock in the transaction, constituting a substantial majority of the outstanding VeriFone shares. The acquisition had previously been approved by the Lipman shareholders in a special meeting held on September 14. "We are very pleased by the strong support for the transaction from both VeriFone and Lipman shareholders," said Douglas G. Bergeron, chairman and chief executive officer of VeriFone. *"This combination will provide VeriFone with the product breadth, global reach and R&D capabilities to drive significant value for shareholders, customers and employers.* We look forward to completing the Lipman acquisition on November 1, 2006, as planned."

8
9

69.     On September 29, 2006, Zwarenstein sold 4,000 shares of VeriFone stock at approximately $29 per share.

10
11

70.     On December 7, 2006, the Individual Defendants caused VeriFone to announce the following financial results:

12

VeriFone Reports Fourth Quarter and Fiscal 2006 Results

13

     Fourth-Quarter Revenues Increased 20% to $157 Million

14

     EBITDA, as Adjusted, Margins Increased to 24.2% for the Quarter

15

     Fourth Quarter Net Income, as Adjusted, Increased 50% to $22.3 Million

16
17
18

SAN JOSE, Calif.--(BUSINESS WIRE)--Dec. 7, 2006--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months and fiscal year ended October 31, 2006.

19
20
21

     Net revenues for the three months ended October 31, 2006, were $156.6 million, an increase of 20% over net revenues of $130.5 million for the comparable period of 2005. The increase was driven by a 30% increase in net revenues from VeriFone's International business and a 14% increase in net revenues from VeriFone's North America business.

22
23
24
25

     *Gross margins, under generally accepted accounting principles (GAAP), for the three months ended October 31, 2006, were 46.0%, compared to 42.7% for the three months ended October 31, 2005. Gross margins,* excluding non-cash amortization of purchased intangibles and stock-based compensation expense, *expanded for the eighth consecutive quarter and reached 47.1% for the three months ended October 31, 2006, compared to 44.0% for the comparable period of 2005.*

26
27
28

     Net income for the three months ended October 31, 2006, was $13.9 million, or $0.20 per diluted share, compared to $12.1 million, or $0.18 per diluted share, for the comparable period of fiscal 2005. GAAP net income was impacted in the quarter by the $4.1 million after-tax write off of debt issuance costs, attributable to the refinancing of outstanding debt in connection with the Lipman acquisition. Net income, as adjusted, which excludes non-cash amortization of purchased intangibles

1    and debt issuance costs, as well as non-cash stock-based compensation expense, for
     the three months ended October 31, 2006, was $22.3 million, or $0.32 per diluted
2    share, compared to $14.9 million, or $0.22 per diluted share, for the comparable
     period of fiscal 2005.

3
          EBITDA, as adjusted, which excludes non-cash amortization of purchased
4    intangibles and debt issuance costs, as well as non-cash stock-based compensation
     expense, expanded for the ninth consecutive quarter and reached a record level of
5    $38.0 million, a 44% increase over the $26.5 million recorded in the three months
     ended October 31, 2005. EBITDA, as adjusted, margins for the three months ended
6    October 31, 2006, reached 24.2%, as compared to the 20.3% recorded in the three
     months ended October 31, 2005.

7
          Net revenues for the fiscal year ended October 31, 2006, were $581.0 million,
8    an increase of 20% over the $485.4 million recorded for fiscal 2005.

9         Net income for the fiscal year ended October 31, 2006, was $59.5 million,
     compared to $33.2 million for fiscal 2005. Net income, as adjusted, for the fiscal year
10   ended October 31, 2006, was $76.4 million, compared to $49.7 million, for fiscal
     2005.
11
          EBITDA, as adjusted, for the fiscal year ended October 31, 2006, was $130.4
12   million, an increase of 51% over the $86.4 million recorded for fiscal 2005.
     EBITDA, as adjusted, margins for the fiscal year ended October 31, 2006, were
13   22.4%, compared to 17.8% for the comparable period of 2005.

14        "VeriFone has completed another outstanding quarter and achieved record
     revenue and earnings for fiscal year 2006. *This year was highlighted by our*
15   *transformative acquisition of Lipman* which combined the two strongest financial
     performers in the industry to create the world leader in payment technology," said
16   Douglas G. Bergeron, Chairman and Chief Executive Officer.

17        "We enter our new financial year poised to capitalize on our numerous
     competitive advantages and our very wide range of product offerings," continued
18   Bergeron. *"The integration of Lipman into VeriFone has been completed ahead of*
     *schedule and we have created a single-branded, unified company with tremendous*
19   *scale advantages. Already, we are enjoying several supply chain efficiencies and*
     *earnings accretion."*
20
          *"As a result, we have increased our internal expectations for fiscal Q1 2007*
21   *net earnings per share, as adjusted, to be in the range of $0.33 to $0.34. We remain*
     *very confident of our prospects in fiscal 2007."*
22
          71.    On March 1, 2007, the Individual Defendants caused VeriFone to issue the following
23
     press release:
24
     SAN JOSE, Calif.--(BUSINESS WIRE)--March 1, 2007--VeriFone Holdings, Inc.
25   (NYSE: PAY), the global leader in secure electronic payment solutions, today
     announced financial results for the three months ended January 31, 2007. The
26   Company's first quarter results reflect the November 1, 2006, acquisition of Lipman
     and, because of the integration of Lipman's products and distribution channels as
27   well as the lack of comparable quarter ends of VeriFone and Lipman, are compared
     to pre-acquisition results of prior fiscal periods.
28

Net revenues, for the three months ended January 31, 2007, were $216.6 million, 61% higher than the net revenues of $134.6 million for the comparable period of 2006. The record revenues were driven by the Lipman acquisition and a strong performance internationally.

*Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, were 47.1%, for the three months ended January 31, 2007, compared to 45.6% for the comparable period of 2006.* GAAP gross margins for the three months ended January 31, 2007, were 37.6%, compared to 44.3% for the three months ended January 31, 2006, as a result of increased amortization of purchased technology assets and the step-up in inventory.

EBITDA, as adjusted, margins for the three months ended January 31, 2007, expanded for the tenth consecutive quarter and reached a record level of 25.7%, compared to the 21.0% recorded in the three months ended January 31, 2006.

GAAP EPS for the three months ended January 31, 2007, was a loss of ($0.01) per diluted share, compared to $0.20 per diluted share, for the comparable period of fiscal 2006, due to acquisition related charges and a higher GAAP tax rate. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended January 31, 2007, increased 54% to $0.37 per diluted share, compared to $0.24 per diluted share, for the three months ended January 31, 2006.

*"VeriFone has successfully completed its first quarter since our transformative acquisition of Lipman.* I am delighted both with the progress that we have made in integrating Lipman's business into VeriFone and in generating another very strong quarter financially and operationally," said Douglas G. Bergeron, Chairman and Chief Executive Officer.

"VeriFone's newly configured worldwide sales force is serving customers through a fully integrated distribution channel and supply chain. At the same time we have been reducing inventory and generating considerable operating cash flow," continued Bergeron.

*"Based on these results, we are increasing our second quarter internal expectations for net income, as adjusted, per share to be in the range of $0.36 to $0.37. We remain very confident of our prospects for fiscal 2007."*

72. On March 6, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - March 06, 2007 - VeriFone Holdings, Inc. (NYSE: PAY; TASE: PAY) today announced that it has installed one of the largest and most complex card payment systems in the UK for retail giant Argos. VeriFone's PAYware Merchant system has been rolled out to more than 600 Argos stores in the UK, allowing Argos to process 50 transactions per second – more than 100 million transactions every year.

Argos – part of the Home Retail Group which also owns Homebase -- has implemented the PAYware Merchant system nationwide as part of its move to EMV Chip and PIN, enabling secure authorization of payments in seconds and providing sophisticated management and reporting capabilities, including a comprehensive audit trail.

SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4

PAYware Merchant is ideal for medium- and large-size retailers who need a secure, reliable, and easy-to-implement credit and debit card authorization and settlement solution that supports EMV Chip and PIN. This fully scalable, bank-certified solution provides rapid payment processing that is tightly integrated with any front-end environment and is proven to increase revenue, reduce costs and improve customer satisfaction.

5
6
7

"We saw the move to Chip and PIN as an opportunity to review our existing EFT system," said Jacqui Glenn, head of Argos IT. "As a business-critical system, we were looking for a card payment solution that offered security, speed and reliability. We chose PAYware because of its proven success with other retailers, and the smooth implementation and fast 'go live' confirmed that we made the right decision."

8
9
10

Nigel Bidmead, managing director for VeriFone EMEA added, "The PAYware Merchant system deserves its excellent reputation as a robust and reliable solution for high-volume environments. We are very pleased to add Argos to the list of major UK retail customers who are gaining tangible business benefits from VeriFone's card payment systems."

11
12
13
14

PAYware Merchant accepts all major cards and supports the latest fraud prevention initiatives, including EMV and 3D Secure for Internet payments. Designed with industry best practices for data security, it enables retailers to become compliant with the Payment Card Industry Data Security Standard (PCI DSS). All of this guards against fraud and helps protect brand reputation and consumer confidence.

15
16
17
18
19
20
21
22
23

73.    On March 30, 2007, Individual Defendants Bergeron and Zwarenstein caused VeriFone to file a letter with the SEC on EDGAR responding to a February 28, 2007 letter from the SEC raising questions about the significant increase in VeriFone's inventory that had been reported in VeriFone's fiscal year 2006 financial results reported in the Company's Form 10-K for 2006. The SEC's letter had stated: "We note that your inventory increased dramatically during 2006. Please quantify the amount of the increase caused by each factor cited on page 49. In addition, explain to us, in more detail, why the acquisition contributed to this large increase and what impact, if any, that increase may have on the inventory that you acquired from Lipman." In response, VeriFone's letter stated:

24
25
26
27

"While VeriFone expected that it would have to increase inventories at least to planned levels in early fiscal 2006, as revenues continued to increase during fiscal 2006, VeriFone began to realize that its business required higher than planned inventory levels in order to

28

1    support future expected levels of revenues. Consequently, during fiscal 2006, VeriFone's

2    inventories increased in each quarter."

3        74.    VeriFone's March 30, 2007 letter to the SEC also falsely blamed its increased

4    inventory levels on "the impact of VeriFone's planned acquisition of Lipman which was announced

5    in the last month of the second quarter, as well as the continuing effect of further revenue increases."

6    The Company also attributed the increased inventories to the fact that "the Company sought to

7    respond to more uncertain demand patterns." The Company also stated: "Finally, in the fourth

8    quarter of fiscal 2006, inventory increased a further $13 million, mainly due to stocking of new

9    product inventory and the Company's decision to accelerate deliveries from certain suppliers in

10   anticipation of a physical inventory count at a large distribution center."

11       75.    The statements in the Company's March 30, 2007 letter to the SEC were false and

12   misleading when made since Bergeron and Zwarenstein attributed false reasons in the letter for the

13   dramatic increase in VeriFone's inventory.

14       76.    On April 18, 2007, VeriFone issued the following press release:

15   San Jose, CA - April 18, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today
     announced that it has secured a key contract with leading transaction switching and
16   electronic payment processing company InterSwitch Nigeria Limited to enable inter-
     bank electronics payments for Nigerian cardholders. VeriFone's GPRS-enabled $V_x$
17   610 payment systems are being rolled out nationwide to InterSwitch's bank and
     merchant customers.

18

19       InterSwitch is the leading e-payment solutions provider in Nigeria – Africa's
     most populous country – and, according to Financial Standard Newspaper, one of
20   Nigeria's top 10 recognized brands. Any Nigerian cardholder will now be able to use
     their Nigeria Debit Cards, CashCards and other payment cards issued on the
21   InterSwitch platform at ATMs and point of sale devices deployed by banks other
     than their own. Currently, InterSwitch has an online real-time integration to 23 out of
22   the 25 banks in Nigeria. This infrastructure allows almost all of the country's banks
     to share ATM and point of sale systems.

23       "We have a high regard for VeriFone and its excellent product offerings,"
     said Mitchell Elegbe, CEO of InterSwitch Nigeria. "VeriFone has earned a strong
24   reputation in West Africa through its commitment to helping develop this growing
     payments sector, and with access to such advanced payment systems it will create the
25   opportunity for us to enhance our strong market presence here."

26       Nigel Bidmead, managing director for VeriFone EMEA, said, "VeriFone's
     advanced GPRS technology payment systems are especially suited to Nigeria's large
27   developing payments markets, where a constant online communication channel
     between the merchant and InterSwitch is the key to fast and secure transactions."

28

SHAREHOLDER DERIVATIVE COMPLAINT

1    77.    On May 29, 2007, the Individual Defendants caused VeriFone to announce record

2    second quarter 2007 financial results in the following press release:

3    SAN JOSE, Calif.--(BUSINESS WIRE)--May 29, 2007--VeriFone Holdings, Inc.
     (NYSE: PAY), the global leader in secure electronic payment solutions, today
4    announced financial results for the three months ended April 30, 2007.

5    Net revenues, for the three months ended April 30, 2007, were $217.2
     million, 53% higher than the net revenues of $142.2 million for the comparable
6    period of 2006. VeriFone's International business increased 97% and VeriFone's
     North America business increased 19%. The significant increase in sales was driven
7    largely by the acquisition of Lipman, which closed November 1, 2006.

8    Subsequent to the end of the quarter, management determined that booked
     orders of approximately $4 million could not be recognized as revenue due to
9    incomplete sales administration requirements in our international operations. These
     orders were largely sourced from VeriFone's new Israeli and Turkish facilities and all
10   were headed to high growth markets in Asia, Eastern Europe and Africa. The
     Company is confident that the shortcomings in applying these field processes have
11   now been remedied. All of this revenue has now been fully recognized and is
     reflected in guidance for the third quarter.

12
     Gross margins, excluding non-cash acquisition related charges and stock-
13   based compensation expense, expanded to a record 48.1%, for the three months
     ended April 30, 2007, compared to 45.7% for the comparable period of 2006. GAAP
14   gross margins for the three months ended April 30, 2007, were 41.5%, compared to
     44.6% for the three months ended April 30, 2006, as a result of increased
15   amortization of purchased technology assets, the step-up in inventory and stock-
     based compensation.
16
     GAAP operating expenses for the three months ended April 30, 2007, were
17   $72.9 million compared to $37.8 million for the comparable period of 2006. In
     addition to the effect of the Lipman acquisition and related integration expenses, the
18   Company incurred higher non-cash stock compensation expenses and amortization of
     purchased intangible assets. Stock based compensation for the three months ended
19   April 30, 2007 was $9.8 million compared to $1.0 million for the comparable period
     of 2006. This increase was primarily due to the acceleration of the vesting of options
20   of Lipman executives, the increase in the number of option holders following the
     Lipman acquisition and the grant of performance-based restricted stock units to the
21   Company's Chief Executive Officer. Amortization of purchased intangible assets for
     the three months ended April 30, 2007 was $6.1 million compared to $1.2 million for
22   the comparable period of 2006, primarily due to the Lipman acquisition.

23   EBITDA, as adjusted, margins for the three months ended April 30, 2007,
     expanded for the eleventh consecutive quarter and reached a record level of 26.3%,
24   compared to the 21.6% recorded in the three months ended April 30, 2006.

25   GAAP EPS for the three months ended April 30, 2007, was $0.06 per diluted
     share, compared to $0.22 per diluted share, for the comparable period of fiscal 2006,
26   due to acquisition related non-cash charges, higher stock-based compensation
     expense primarily related to the Lipman acquisition and to a significantly higher
27   GAAP tax rate driven by an increase in the valuation allowance related to Lipman.
     Net income, as adjusted, which excludes non-cash acquisition related charges and
28   debt issuance costs, as well as non-cash stock-based compensation expense and

1    Lipman integration costs, for the three months ended April 30, 2007, increased 50%
2    to $0.39 per diluted share, compared to $0.26 per diluted share, for the three months
     ended April 30, 2006.

3        "I am pleased to report on another very successful quarter for VeriFone as we
4    once again achieved record profitability," said Douglas G. Bergeron, Chairman and
     Chief Executive Officer. "During the quarter, our record margins drove our robust
5    EPS growth, and also resulted in strong cash flow," continued Bergeron. "We were
     especially pleased with our continuing success of our wireless products and were
6    delighted with the resurgence of our North American business which grew
     sequentially 8 percent from the previous quarter."

7        "Based on these results and the $4 million of revenue which has been
     recognized in the third quarter, *we are increasing our third quarter internal*
8    *expectations for net revenue to $225 - $227 million and increasing our guidance*
     *for net income, as adjusted, per share to a range of $0.39 - $0.40. We remain*
9    *confident of our prospects for the remainder of fiscal 2007."*

10       78.    On July 12, 2007, the Individual Defendants caused VeriFone to issue the following

11   press release:

12       New York, NY - July 12, 2007 - VeriFone Holdings, Inc. (NYSE:PAY) announced
     today an agreement to be the preferred vendor of integrated payment solutions to the
13   largest licensed leasing association in New York City, the Committee for Taxi Safety
     with 3,000 member taxis. VeriFone also announced that more than 5,000 New York
14   City taxis are signed or committed to comprehensive multi-year agreements for in-
     taxi acceptance of credit cards.
15
         Last month, systems implemented by VeriFone's US-based taxi business,
16   VeriFone Transportation Systems, were the first authorized by the NYC Taxi and
     Limousine Commission (TLC) for the city's more than 13,000 taxis.
17
         Jeff Dumbrell, VeriFone senior vice president, North America, said, "New
18   York City currently has over 13,000 active yellow cabs that have been mandated to
     provide card payment and passenger information services by the end of the year. We
19   are continuing our sales campaign and expect to make further progress in the months
     ahead."
20
         Committee for Taxi Safety Agreement Amos Tamam, president and CEO of
21   VeriFone Transportation Systems, said the company is eager to work with member
     organizations of the Committee for Taxi Safety. "In addition to providing customers
22   with convenient payment choices, member organizations will benefit from improved
     fleet management and the potential for enhanced revenue through advertising,"
23   Tamam said. "They will be able to provide better customer service to New York
     residents and visitors through up-to-the-minute access to real-time traffic
24   information, news, sports, weather and entertainment."

25       According to David Pollack, executive director of the Committee for Taxi
     Safety, "Reliability, previous experience and a wealth of functionality made
26   VeriFone Transportation Systems the logical choice for all members of our
     organization. We are pleased to begin this new era in technology with a company
27   that has impeccable equipment and software for our drivers, passengers and
     members."

28

SHAREHOLDER DERIVATIVE COMPLAINT

1    Beginning October 1, 2007, upon their next scheduled inspection all New York taxis are mandated to have technology-based customer service improvements
2    that will include credit/debit card acceptance and an interactive electronic passenger map and information screen.

3
    Previously, VeriFone was awarded similar services for 100 percent of the
4    Philadelphia taxi fleet, and a significant award in Mexico City, Mexico. Discussions and pilots continue with several other worldwide metropolitan organizations.
5
    The VeriFone-based solution utilizes wireless technology to provide
6    integrated payment in the passenger cab, including a card swipe and contactless payment for credit and debit payment of fares, in an easy-to-use ATM style interface.
7    The riding experience is further enhanced with the Passenger Information Monitor, a 10.4-inch touch-screen monitor that provides exclusive news and content for
8    passengers through an exclusive partnership with market-leading WABC-TV New York.
9
    A smaller model utilizes the VeriFone MX870, which supports secure credit
10   card transactions and PIN-based debit card transactions with contactless payment and electronic signature capture, as well as advertising and content delivery. The smaller
11   option will provide an ideal solution for the integration of potentially smaller hybrid vehicles.
12
    VeriFone is the majority shareholder of VeriFone Transportation Systems, a
13   joint venture between VeriFone Holdings, Inc. and TaxiTronics, the company that services over 8,000 of the taxi meters in the city cab fleet.
14
15   79.    On September 6, 2007, the Individual Defendants caused VeriFone to publicly

announce its Q3 '07 financial results:
16
17   SAN JOSE, Calif.--(BUSINESS WIRE)--Sept. 6, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today
     announced financial results for the three months ended July 31, 2007.
18
19   Net revenues, for the three months ended July 31, 2007, were $231.9 million, 57% higher than the net revenues of $147.6 million for the comparable period of
20   2006. Net revenues from VeriFone's International business increased 106% while net revenues from VeriFone's North America business increased 22%. The significant
21   increase in net revenues was driven largely by the acquisition of Lipman Electronic Engineering Ltd., which closed November 1, 2006.

22   Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.2%, for the three months
23   ended July 31, 2007, compared to 45.9% for the comparable period of 2006. GAAP gross margins for the three months ended July 31, 2007, declined to 44.0% from
24   45.0% for the three months ended July 31, 2006, primarily as a result of increased amortization of purchased technology assets.
25
     GAAP operating expenses for the three months ended July 31, 2007 were
26   $65.5 million compared to $38.0 million for the comparable period of 2006. This increase was primarily due to the Lipman acquisition and related integration
27   expenses.
28

SHAREHOLDER DERIVATIVE COMPLAINT

1    EBITDA, as adjusted, margins for the three months ended July 31, 2007,
2 expanded for the twelfth consecutive quarter and reached a record level of 27.3%, compared to the 22.6% recorded in the three months ended July 31, 2006.

3    GAAP EPS for the three months ended July 31, 2007, was $0.16 per diluted
4 share, compared to $0.24 per diluted share, for the comparable period of fiscal 2006. *This decline resulted from acquisition related non-cash charges, higher stock-based compensation expense and a higher GAAP tax rate driven by an increase in*
5 *the valuation allowance related to the Lipman acquisition.* Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well
6 as non-cash stock-based compensation expense and Lipman integration costs, for the three months ended July 31, 2007, increased 50% to $0.42 per diluted share,
7 compared to $0.28 per diluted share, for the comparable period in 2006.

8    "I am extremely pleased to report on another outstanding quarter as we once
9 again achieved exceptional financial results," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "During the quarter, we achieved record revenues and
10 record gross and operating margins, all which led to strong EPS growth," continued Bergeron. "Our North American business continued to surge, growing 9%
11 sequentially. Our compelling portfolio of wireless solutions and our strength in emerging markets were also significant factors driving our success this quarter."

12    *"We are increasing our internal expectations for the fourth quarter and*
13 *now expect to repeat these record third quarter results. Our guidance for the fourth quarter, therefore, is for net revenue of $231 - $233 million and net income, as*
14 *adjusted, per share of $0.41 - $0.42. As a result, we are also increasing our full year fiscal year 2007 expectations for net income, as adjusted per share to $1.59 to*
15 *$1.60 per share. As well, given the out-performance in profitability that we have consistently enjoyed since the closing of the Lipman acquisition last November, we*
16 *are now taking this opportunity to update our long term financial model. We are reaffirming our revenue growth rate projection in the 10% - 15% range and we are*
17 *increasing our margin expectations as reflected in the table below."*

18                              Long Term Model

| | Prior | New |
|---|---|---|
| Gross Margin | 42%-47% | 45%-50% |
| EBITDA Margin | 18% - 24% | 25% - 30% |
| Net Margin | 12% - 17% | 15% - 20% |

21    80.    On October 11, 2007, the Individual Defendants caused VeriFone to issue the
22 following press release:

23    San Jose, CA - October 11, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today
24 announced it has added Ruth's Chris Steak House of Austin to the roster of restaurants using its ON THE SPOT payment at the table solution.

25    Servers at the fine dining restaurant at 107 West Sixth Street will bring their
26 patrons a small, handheld VeriFone $V_x$ 670 payment system that allows them to swipe their own credit or debit cards at their table. ON THE SPOT speeds service to
27 Ruth's Chris's customers and allows for a secure transaction with no fear of identity theft.

28

- 31 -

SHAREHOLDER DERIVATIVE COMPLAINT

Sal Olivas, Ruth Chris's general manager, said he turned to ON THE SPOT to streamline the payment transaction and serve his customers faster. "When people want to leave the table, they want to leave," he said. "We try to expedite their needs on their timetable.

Olivas said he believes ON THE SPOT will speed his guests' transaction time by five to 10 minutes. "On a busy night, when customers need a table, that will be crucial," Olivas said of the quicker table turns. But he also noted the security benefits for customers: "We're doing this for our guests' sake, for their conveniences, security and peace of mind."

"Ruth's Chris's use of ON THE SPOT shows the versatility of our suite of products," said Paul Rasori, VeriFone's vice president of global product marketing. "In today's environment, payment at the point of service is more important than ever, as operators and patrons want security against identity theft. The additional value the product brings to an operator is greater operational efficiency and profitability as it relates to table turns, server time and processing fees."

ON THE SPOT is designed to cut down on the increasingly common problem of credit card fraud and also allows restaurant operators to take advantage of lower-cost PIN debit payment.

By allowing patrons to slide their own cards rather than handing them to another person, ON THE SPOT virtually eliminates the possibility of a server "skimming" a card and cloning account information. TransUnion has estimated that 70 percent of all skimming takes place in a restaurant environment.

ON THE SPOT uses special encryption and other security features to protect all financial data transacted over a restaurant's Wi-Fi network. These security features are a necessity today, with credit card fraud now the most common form of identity theft, according to the Federal Trade Commission. ON THE SPOT has pioneered the use of Wi-Fi and GPRS cellular communications to provide online payment authorization at the point of service in North American restaurants.

81.    On November 1, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - November 01, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) announced today that it will report its financial results for the three months ended and fiscal year ended October 31, 2007, on December 6, 2007.

The management of VeriFone will host a conference call on December 6, 2007, at 1:30 p.m. (PST) to discuss VeriFone's fourth quarter and year end results, which will be simultaneously webcast. Management may also provide forward looking guidance on this call.

82.    On November 13, 2007, Zwarenstein sold 17,878 shares of VeriFone stock at approximately $44 per share.

83.    Between November 14, 2007 and November 26, 2007, Bergeron sold 383,197 shares of VeriFone stock at prices between $44.70 and $46.43 per share.  On November 30, 2006,

SHAREHOLDER DERIVATIVE COMPLAINT

1    Zwarenstein sold 4000 shares of VeriFone stock for proceeds of $133,000. On December 1, 2006,

2    Adams sold 4,945 shares of Verifone stock for proceeds of $164,000. On the same day, Defendant

3    Waller sold 10,000 shares of VeriFone stock for proceeds of $333,000.

4        84.    On December 3, 2007, VeriFone shocked the stock market by announcing the

5    following press release:

6    **VeriFone Announces Anticipated Restatement of 2007 Quarterly Financial
     Statements**

7    ~~San Jose, CA - December 03, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today~~
8    ~~announced that~~ following a review by and on the recommendation of management,
     it has concluded that *its unaudited interim consolidated financial statements for the*
9    *three months ended January 31, 2007, the three and six months ended April 30,*
     *2007 and the three and nine months ended July 31, 2007 should no longer be*
10   *relied upon,* principally due to errors in accounting related to the valuation of in-
     transit inventory and allocation of manufacturing and distribution overhead to
11   inventory, each of which affects VeriFone's reported costs of net revenues. The
     restatements are anticipated to correct errors that overstated previously reported
12   inventories in material amounts as of January 31, 2007, April 30, 2007 and July 31,
     2007, and understated cost of net revenues in material amounts for the three month
13   periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly,
     investors are cautioned not to rely on VeriFone's historical financial statements and
14   earnings press releases and similar communications for the periods ended January 31,
     2007, April 30, 2007, and July 31, 2007.

15
16       Based on its review to date, *management currently anticipates that the*
     *restatement will result in reductions to previously reported inventories of*
17   *approximately $7.7 million, $16.5 million and $30.2 million as of January 31,*
     *2007, April 30, 2007 and July 31, 2007, respectively, and reductions to previously*
18   *reported pre tax income of approximately $8.9 million, $7.0 million and $13.8*
     *million for the three month periods ended January 31, 2007, April 30, 2007 and*
19   *July 31, 2007, respectively.* VeriFone is currently evaluating the anticipated effect of
     the restatement on after-tax income for those periods.

20       These estimates include corrections of other unrelated errors detected in the
     course of VeriFone's review to date, are based on currently available information and
21   are subject to change during the course of the company's restatement process. While
     VeriFone is not currently aware of other accounting errors requiring adjustment to
22   any prior period financial statements, there can be no assurances that VeriFone or its
     independent registered public accounting firm will not find additional accounting
23   errors requiring further adjustments in those or earlier periods.

24       85.    On this news, the Company's shares plummeted by almost 46% to close at

25   approximately $26.03, a dramatic fall from the opening price of $48.03 the preceding business day.

26   The volume of VeriFone shares traded on December 3, 2007 was 49.8 million shares, compared to

27   just 1.4 million shares traded on the preceding trading day.

28

1      86.     On December 3, 2007, during a conference call with analysts to discuss VeriFone's

2  anticipated restatement of its financial results, and its lower gross margins, Defendant Bergeron

3  conceded that the Lipman acquisition had dramatically increased the magnitude of complexity of

4  several material issues pertaining to VeriFone's earnings.

5      87.    The true facts, which were known by each of the defendants but concealed from the

6  investing public during the Relevant Period, were as follows:

7         (a)     the Company's in-transit inventory was grossly overvalued due to accounting

8  errors related to allocation of manufacturing and distribution overhead to inventory, each of which

9  affects VeriFone's reported costs of net revenues.  This fraud was recently revealed by a cost

10  accounting manager in the Company's Sacramento, California office;

11        (b)     the Company's gross margins were not 45-47% but were closer to 40%;

12        (c)     the Company was not on track to achieve profitability in 2007, but rather

13  losses due to problems related to the Company's acquisition of Lipman Electronic Engineering, Ltd.

14  ("Lipman"), which problems the Company discovered during the due diligence pertaining to the

15  Company's acquisition of Lipman in 2006;

16        (d)     the Company's gross margin projections were overstated;

17        (e)     the Company's supply chain management was severely deficient;

18        (f)     the Company's accounting during the Relevant Period was false and

19  misleading;

20        (g)     the Company lacked adequate internal controls over accounting and financial

21  reporting during the Relevant Period; and

22        (h)     that as a result of (a)-(g) above, the Company's estimates of an eleventh

23  consecutive quarter of double digit revenue growth for the first quarter of 2007 and income per share

24  growth of 20% or more were grossly inflated and the Company's reported assets and inventory were

25  materially overstated, as described herein.

26      88.     In its December 3, 2007 revelation of false financial statements, VeriFone also stated

27  that when the Company eventually files the 2007 Form 10-K, and files amended financial statements

28

SHAREHOLDER DERIVATIVE COMPLAINT

1  for previous periods to correct admitted accounting errors, *"management expects VeriFone to*
2  *report one or more material weaknesses in VeriFone's internal controls over financial reporting."*

### VERIFONE'S FALSE FINANCIAL
3  ### REPORTING DURING THE RELEVANT PERIOD

4
5      89.     In order to inflate the price of VeriFone stock, defendants caused the Company to
6  falsely report its results during the Relevant Period by grossly overvaluing its inventory and failing
7  to "write down" the value of its inventory in violation of Generally Accepted Accounting Principles
   ("GAAP").

8
9      90.     GAAP are those principles recognized by the accounting profession as the
10 conventions, rules and procedures necessary to define accepted accounting practice at a particular
   time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the
11
   SEC which are not prepared in compliance with GAAP are presumed to be misleading and
12
   inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial
13
   statements must also comply with GAAP, with the exception that interim financial statements need
14
   not include disclosure which would be duplicative of disclosures accompanying annual financial
15
   statements.  17 C.F.R. §210.10-01(a).
16
17     91.     The Individual Defendants caused VeriFone to falsify its reported financial results by
   overstating the value of its inventory and failing to write down its inventory.
18
19     92.     Due to these accounting improprieties, the Company presented its financial results
20 and statements in a manner which violated GAAP, including the following fundamental accounting
   principles:
21
22          (a)     The principle that interim financial reporting should be based upon the same
23 accounting principles and practices used to prepare annual financial statements was violated (APB
   No. 28, ¶10);
24
25          (b)     The principle that financial reporting should provide information that is useful
26 to present and potential investors and creditors and other users in making rational investment, credit
   and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);
27

28

1    (c)  The principle that financial reporting should provide information about the

2 economic resources of an enterprise, the claims to those resources, and effects of transactions, events

3 and circumstances that change resources and claims to those resources was violated (FASB

4 Statement of Concepts No. 1, ¶40);

5    (d)  The principle that financial reporting should provide information about how

6 management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

7 for the use of enterprise resources entrusted to it was violated. To the extent that management offers

8 securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

9 accountability to prospective investors and to the public in general (FASB Statement of Concepts

10 No. 1, ¶50);

11    (e)  The principle that financial reporting should provide information about an

12 enterprise's financial performance during a period was violated. Investors and creditors often use

13 information about the past to help in assessing the prospects of an enterprise. Thus, although

14 investment and credit decisions reflect investors' expectations about future enterprise performance,

15 those expectations are commonly based at least partly on evaluations of past enterprise performance

16 (FASB Statement of Concepts No. 1, ¶42);

17    (f)  The principle that financial reporting should be reliable in that it represents

18 what it purports to represent was violated. That information should be reliable as well as relevant is

19 a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

20    (g)  The principle of completeness, which means that nothing is left out of the

21 information that may be necessary to insure that it validly represents underlying events and

22 conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

23    (h)  The principle that conservatism be used as a prudent reaction to uncertainty to

24 try to ensure that uncertainties and risks inherent in business situations are adequately considered

25 was violated. The best way to avoid injury to investors is to try to ensure that what is reported

26 represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

27    (i)  Further, the undisclosed adverse information concealed by defendants during

28 the Relevant Period is the type of information which, because of SEC regulations, regulations of the

SHAREHOLDER DERIVATIVE COMPLAINT

1  national stock exchanges and customary business practice, is expected by investors and securities

2  analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

3  be the type of information which is expected to be and must be disclosed.

4  ### DAMAGES TO THE COMPANY

5       93.    As a result of the Individual Defendants' improprieties, VeriFone disseminated

6  improper statements concerning its business prospects as alleged above. In addition, as a result of

7  defendants' Relevant Period improprieties, the Company is now the subject of a class action lawsuit

8  that alleges violations of the federal securities laws.

9       94.    As a direct and proximate result of the Individual Defendants' actions as alleged

10  above, VeriFone's market capitalization has been damaged by over $2.6 billion. At the same time

11  that the Individual Defendants were causing VeriFone to suffer such devastation of its market

12  capitalization, the Insider Selling Defendants were profiting by selling over $110 million of their

13  personally held stock.

14       95.    Further, as a direct and proximate result of Individual Defendants' actions, VeriFone

15  has expended and will continue to expend significant sums of money. Such expenditures include,

16  but are not limited to:

17          (a)    Costs incurred to carry out internal investigations, including legal fees paid

18  to outside counsel;

19          (b)    Costs incurred in investigating and defending VeriFone and certain officers

20  in the class actions, plus potentially millions of dollars in settlements or adverse judgment;

21          (c)    Costs incurred from compensation and benefits paid to the defendants,

22  which compensation was based at least in part on VeriFone's artificially-inflated stock price and

23  inflated revenues; and

24          (d)    Costs incurred from the loss of the Company's customers' confidence in

25  VeriFone's services.

26       96.    The costs VeriFone has incurred due to required internal investigations into the

27  accounting errors, false financial statements, and insider selling include fees for outside attorneys

28  (Simpson Thacher &Bartlett, LLP) and forensic accountants (Navigant Consulting, Inc.) to serve as

1  advisors to the internal investigation.  The Company's goodwill and reputation have been materially

2  undermined and tarnished.

3      97.    The Individual Defendants' wrongdoing has also significantly damaged VeriFone in

4  that it has caused VeriFone to default on its credit agreements.  As a result, the Company has been

5  damaged in that it has been forced to (1) pay significant amounts of money to its lenders in exchange

6  for their agreement to waive the defaults; and (2) pay an extra 0.25% on the interest rate applicable

7  to its term loans and revolving credit agreements.  VeriFone and VeriFone Intermediate Holdings,

8  Inc., a wholly-owned subsidiary of VeriFone, are parties to an October 31, 2006 Credit Agreement.

9  VeriFone has defaulted on this Credit Agreement due to its failure to timely file financial statements

10  for the three months ended January 31, 2007, April 30, 2007, July 31, 2007, the year ended October

11  31, 2007, and the three-month period ended January 31, 2008.  As a result, VeriFone was forced to

12  enter into a First Amendment to Credit Agreement and Waiver ("First Amendment") with its lenders

13  on January 25, 2008.  Pursuant to the First Amendment, VeriFone had to pay its lenders (1) a fee of

14  0.25% of the aggregate amount outstanding under the loans and revolving credit agreements; (2) pay

15  the lenders an increased rate of interest on the term loan -- an additional 0.25%; and (3) pay all the

16  legal fees and costs of Fried, Frank, Harris, Shriver & Jacobson LLP (legal counsel to the

17  Administrative Agent of the lenders) relating to the First Amendment.

18  **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

19      98.    Plaintiffs bring this action derivatively in the right and for the benefit of VeriFone to

20  redress injuries suffered, and to be suffered, by VeriFone as a direct result of the breaches of

21  fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting

22  thereof, by the Individual Defendants.  VeriFone is named as a nominal defendant solely in a

23  derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would

24  not otherwise have.

25      99.    Plaintiffs will adequately and fairly represent the interests of VeriFone in enforcing

26  and prosecuting its rights.

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1    .    100.    Plaintiffs are and were owners of the common stock of VeriFone during the time of

2    the transactions complained of herein, and have continuously remained shareholders of the

3    Company.

4    101.    The current Board of VeriFone consists of the following eight individuals: defendants

5    Bergeron, Roche, Castle, Denend, Hart, Henske, Rinehart and Raff.

6    102.    Defendants Henske, Castle, Denend and Rinehart (the "Audit Committee

7    Defendants") were, during the Relevant Period, members of the Audit Committee.    The Audit

8    Committee's charter provides that the Audit Committee is responsible for, among other things: (i)

9    reviewing the Company's quarterly and annual financial statements prior to the filing of such

10   statements; (ii) reviewing the effectiveness of the Company's internal control over financial

11   reporting; and (iii) discussing with management, the internal auditors, and the independent auditors

12   the adequacy and effectiveness of internal control over financial reporting.    Thus, the Audit

13   Committee Defendants were responsible for overseeing and directly participating in the

14   dissemination of VeriFone's financial results and guidance.    The Audit Committee Defendants,

15   however, breached their fiduciary duties of due care, loyalty and good faith because they participated

16   in the preparation of improper financial statements and earnings press releases that contained

17   improper material information.    Particularly, these defendants reviewed and failed to correct

18   VeriFone's improper statements described above.    Thus, the Audit Committee Defendants face a

19   sufficiently substantial likelihood of liability for their breach of fiduciary duties, rendering any

20   demand upon them futile.

21   103.    As members of the Audit Committee, Defendants Henske, Castle, Denend and

22   Rinehart had the following duties, which they failed to adequately perform:

23        (a)    The Committee shall regularly review with the independent auditors any audit

24   problems or difficulties encountered during the course of the audit work, including any restrictions

25   on the scope of the independent auditors' activities or access to requested information, and

26   management's response. The Committee should review any accounting adjustments that were noted

27   or proposed by the auditors but were "passed" (as immaterial or otherwise); any communications

28   between the audit team and the audit firm's national office relating to problems or difficulties

SHAREHOLDER DERIVATIVE COMPLAINT

1   encountered with respect to significant auditing or accounting issues; any "management" or "internal

2   control" letter issued, or proposed to be issued, by the audit firm to the Company; and the form of

3   opinion that the audit firm proposes to render to the Board of Directors and the shareholders.

4          (b)    The Committee shall meet to review and discuss the quarterly financial

5   statements, including reviewing the Company's specific disclosures under "Management's

6   Discussion and Analysis of Financial Condition and Results of Operations," with management and

7   the independent auditors prior to the filing of the Company's Quarterly Report on Form 10-Q. Also,

8   the Committee shall discuss the results of the quarterly review and any other matters required to be

9   communicated to the Committee by the independent auditors under generally accepted auditing

10  standards.

11         (c)    The Committee shall meet to review and discuss the annual audited financial

12  statements, including reviewing the Company's specific disclosures under "Management's

13  Discussion and Analysis of Financial Condition and Results of Operations," with management and

14  the independent auditors prior to the filing of the Company's Annual Report on Form 10-K (or the

15  annual report to shareholders if distributed prior to the filing of Form 10-K).

16         (d)    The Committee's review of the Company's financial statements and

17  disclosures shall include: (i) major issues regarding accounting principles and financial statement

18  presentations, including any significant changes in the company's selection or application of

19  accounting principles, and major issues as to the adequacy of the company's internal controls and

20  any specific remedial actions adopted in light of material control deficiencies; (ii) discussions with

21  management and the independent auditors regarding significant financial reporting issues and

22  judgments made in connection with the preparation of the financial statements and the

23  reasonableness of those judgments, including analyses of the effects of alternative GAAP methods

24  on the financial statements; (iii) consideration of the effect of regulatory accounting initiatives, as

25  well as off-balance sheet structures on the financial statements; (iv) consideration of the judgment of

26  both management and the independent auditors about the quality, not just the acceptability of

27  accounting principles; and (v) the clarity of the disclosures in the financial statements. Also, the

28

SHAREHOLDER DERIVATIVE COMPLAINT

1  Committee shall discuss the results of the annual audit and any other matters required to be

2  communicated to the Committee by the independent auditors under professional standards.

3      (e)    The Committee shall receive and review a report from the independent

4  auditors, prior to the filing of the Company's Annual Report on Form 10-K (or the annual report to

5  shareholders if distributed prior to the filing of Form 10-K), on all critical accounting policies and

6  practices of the Company; all material alternative treatments of financial information within

7  generally accepted accounting principles that have been discussed with management, including the

8  ramifications of the use of such alternative treatments and disclosures and the treatment preferred by

9  the independent auditor; and other material written communications between the independent

10  auditors and management.

11      (f)    The Committee shall obtain from the independent auditors assurance that the

12  audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of

13  1934, as amended, which sets forth certain procedures to be followed in any audit of financial

14  statements required under the Securities Exchange Act of 1934.

15      (g)    The Committee shall discuss with appropriate counsel to the Company any

16  significant legal, compliance or regulatory matters that may have a material effect on the financial

17  statements or the Company's business, financial statements or compliance policies, including

18  material notices to or inquiries received from governmental agencies.

19      104.    As a result of their access to and review of internal corporate documents;

20  conversations and connections with other corporate officers, employees and directors; and

21  attendance at management and Board meetings, each of the defendants knew the adverse non-public

22  information regarding VeriFone's accounting practices and financial results. While in possession of

23  this material adverse non-public information regarding the Company, the following current members

24  of the VeriFone Board participated in the illegal insider selling by selling the following amounts:

25      (a)    while in possession of adverse non-public information, Bergeron sold

26  2,254,834 shares of VeriFone stock for proceeds of $78,699,430;

27      (b)    while in possession of adverse non-public information, Castle sold 5,000

28  shares of VeriFone stock for proceeds of $194,300; and

SHAREHOLDER DERIVATIVE COMPLAINT

1        (c)    while in possession of adverse non-public information, Roche and Bondy

2  caused GTCR and its affiliates to sell 9,800,000 shares of VeriFone stock for proceeds of

3  $358,550,281.

4  Because these defendants received a personal financial benefit from the challenged insider selling

5  transactions, these defendants are interested.    Moreover, these defendants face a sufficiently

6  substantial threat of liability for breach of their fiduciary duties for insider selling.    Since these

7  directors have breached their fiduciary duties and are interested, any demand upon them is futile.

8        105.    Defendant Roche is a principal of GTCR.  GTCR received significant fees from

9  VeriFone as a result of a Professional Services Agreement.  VeriFone pays GTCR millions of dollars

10  in management fees and placement fees relating to debt and equity financing.  VeriFone pays an

11  annual management fee to GTCR of $250,000.  It paid GTCR $2.9 million in 2004 in connection

12  with services GRCR provided relating to a secured credit facility.  Since GTCR is integral to

13  VeriFone's credit facilities, the Company would never authorize suit against Roche, who is a

14  principal of GTCR.

15        106.    VeriFone has also paid significant fees to companies controlled by GTCR. VeriFone

16  paid $1.8 million to Driver Alliant Insurance Services, Inc. and $91,000 to Horn Murdock Cole, both

17  of which entities are controlled by GTCR.

18        107.    Demand is futile as to Roche because Roche is a principal of GTCR, which

19  dominated and controlled VeriFone through its controlling stake in VeriFone.  As of December 31,

20  2006, GTCR and its affiliates owned 20% of the common stock of VeriFone.  VeriFone was also

21  controlled by GTCR because VeriFone borrowed $60 million from GTCR.  In addition, GTCR has

22  the right to designate at least one member of each of the Compensation Committee and Corporate

23  Governance and Nominating Committee.

24        108.    Demand is also futile as to Roche and Bergeron because none of VeriFone's

25  agreements with Bergeron, including his employment agreement, can be modified without GTCR's

26  approval.  VeriFone also may not modify any agreements with other key executives, including Jesse

27  Adams, William Atkinson, David Turnbull, Elmore Waller, Nigel Bidmead, and Robert Lopez,

28  without GTCR's consent.

SHAREHOLDER DERIVATIVE COMPLAINT

1    109.    Bergeron owns 4.2% of all VeriFone's stock. He is the single largest shareholder in

2    the Company.  Moreover, the principal professional occupation of defendant Bergeron is his

3    employment with VeriFone, pursuant to which he received and continues to receive substantial

4    monetary compensation and other benefits.  Specifically, VeriFone paid Bergeron the following

5    compensation:

6

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $597,313 | $1,500,000 | $1,154,400 | 225,000 | $45,824 |

8

9    Accordingly, Bergeron lacks independence from defendants Denend, Henske and Roche, who are

10   not disinterested and/or independent and who exert influence over Bergeron's compensation by

11   virtue of their positions as members of the Compensation Committee.  The Compensation

12   Committee has the authority to review and approve Bergeron's base salary, bonus and equity

13   compensation.  This lack of independence renders defendant Bergeron incapable of impartially

14   considering a demand to commence and vigorously prosecute this action.

15   110.   Each of the key officers and directors knew of and/or directly benefited from the

16   wrongdoing complained of herein.

17   111.   The Director Defendants of VeriFone, as more fully detailed herein, participated in,

18   approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to

19   conceal or disguise those wrongs from VeriFone's stockholders or recklessly and/or negligently

20   disregarded the wrongs complained of herein and are therefore not disinterested parties.

21   112.   Defendants Castle, Hart and Raff were and are members of VeriFone's Corporate

22   Governance and Nominating Committee. They failed to adequately perform the following duties

23   which they assumed as members of such Committee:

24        (a)    Establish procedures for the Committee to exercise oversight of the evaluation

25   of the Board and management.

26        (b)    Develop and recommend to the Board a set of corporate governance principles

27   applicable to the Company, and to review those principles at least once a year.

28

SHAREHOLDER DERIVATIVE COMPLAINT

1      113.   The acts complained of constitute violations of the fiduciary duties owed by

2 VeriFone's officers and directors and these acts are incapable of ratification.

3      114.   Each of the Director Defendants of VeriFone authorized and/or permitted the false

4 statements disseminated directly to the public or made directly to securities analysts and which were

5 made available and distributed to shareholders, authorized and/or permitted the issuance of various

6 improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could

7 not fairly and fully prosecute such a suit even if such suit was instituted by them.

8      115.   Any suit by the current directors of VeriFone to remedy these wrongs would likely

9 expose the Individual Defendants and VeriFone to further violation of the securities laws that would

10 result in civil actions being filed against one or more of the Individual Defendants. Thus, they are

11 hopelessly conflicted in making any supposedly independent determination whether to sue

12 themselves.

13      116.   VeriFone has been and will continue to be exposed to significant losses due to the

14 wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed

15 any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

16 to recover for VeriFone any part of the damages VeriFone suffered and will suffer thereby.

17      117.   If the current directors were to bring this derivative action against themselves, they

18 would thereby expose their own misconduct, which underlies allegations against them contained in

19 the class action complaints for violations of securities laws, which admissions would impair their

20 defense of the class actions and greatly increase the probability of their personal liability in the class

21 actions, in an amount likely to be in excess of any insurance coverage available to the Individual

22 Defendants. In essence, they would be forced to take positions contrary to the defenses they will

23 likely assert in the securities class actions. This they will not do. Thus, demand is futile.

24      118.   Moreover, despite the Individual Defendants having knowledge of the claims and

25 causes of action raised by Plaintiffs, the current Board has filed and refused to seek to recovery for

26 VeriFone for any of the wrongdoing alleged by Plaintiffs herein.

27      119.   A true and correct copy of this Complaint was delivered to VeriFone prior to it being

28 filed with this Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FIRST CAUSE OF ACTION

**Derivatively Against the Officer Defendants for Violation of
§10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder**

120.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    During the Relevant Period, the Officer Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122.    The Insider Selling Defendants also sold VeriFone stock as set forth herein, receiving ill gotten gains while in possession of material non-public information. These defendants misappropriated VeriFone's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold VeriFone stock without disclosing the information alleged to have been concealed herein.

123.    During the Relevant Period, at the same time the price of the Company's common stock was inflated by the Officer Defendants' misstatements as alleged herein, and the Insider Selling Defendants were selling stock into the market as alleged herein, the Individual Defendants caused VeriFone to repurchase hundreds of millions of dollars worth of its own stock on the open market at inflated prices.

124.    During the Relevant Period each of the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)    Employed devices, schemes and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 45 -

1        (c)      Engaged in acts, practices and a course of business that operated as a fraud

2 or deceit upon VeriFone in connection with VeriFone's purchases of VeriFone common stock

3 during the Relevant Period.

4       125.    As a result of the Officer Defendants' misconduct, VeriFone has and will suffer

5 damages in that it paid artificially inflated prices for VeriFone common stock purchased on the

6 open market. VeriFone would not have purchased VeriFone common stock at all, or at the inflated

7 prices it paid, had the market been aware that the price of VeriFone's stock was artificially and

8 falsely inflated by the Officer Defendants' misleading statements. As a direct and proximate result

9 of these defendants' wrongful conduct, VeriFone suffered damages in connection with its

10 purchases of VeriFone common stock during the Relevant Period. By reason of such conduct, the

11 Officer Defendants are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated

12 thereunder.

### SECOND CAUSE OF ACTION

**Against the Insider Selling Defendants for Violation of
California Corporations Code §25402**

126.    Plaintiffs incorporate by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

127.    At the time that the Insider Selling Defendants sold their VeriFone common stock as

set forth herein, by reason of their high executive and/or directorship positions with VeriFone, the

Insider Selling Defendants had access to highly material information regarding the Company,

including the information set forth herein regarding the true adverse facts of VeriFone's improper

financial reporting.

128.    At the time of such sales, that information was not generally available to the public

or the securities markets. Had such information been generally available, it would have

significantly reduced the market price of VeriFone shares at that time.

129.    The Insider Selling Defendants, and each of them, had actual knowledge of

material, adverse, non-public information and thus sold their VeriFone common stock in California

in violation of California Corporations Code §25402.

SHAREHOLDER DERIVATIVE COMPLAINT

130.   As a result of the wrongful conduct of the Insider Selling Defendants, VeriFone has been damaged.   Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to VeriFone for damages in an amount up to three times the difference between the price at which VeriFone common stock was sold by the defendants, and each of them, and the market value which that VeriFone common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

131.   The Insider Selling Defendants are also liable for reasonable costs and attorney fees pursuant to Cal. Corp. Code §25502.5.

### THIRD CAUSE OF ACTION

**Against the Officer and Director Defendants for Violation of
California Corporations Code §25403**

132.   Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   The Officer and Director Defendants, through their positions, exercised control and influence over the Insider Selling Defendants' sale of VeriFone common stock in violation of the California Corporations Code.   The Officer and Director Defendants are statutorily liable to the same extent as the Insider Selling Defendants under California Corporations Code §25403.

134.   The Officer and Director Defendants knowingly provided substantial assistance to the Insider Selling Defendants.   The Officer and Director Defendants were aware of the Insider Selling Defendants' knowledge of the material adverse non-public information and the Officer and Director Defendants were aware of the Insider Selling Defendants' intent to sell VeriFone common stock while in possession material adverse non-public information.

135.   The Officer and Director Defendants are culpable for the Insider Selling Defendants' underlying violations of California Corporations Code §25402 because of their knowledge and ability to control and influence the Insider Selling Defendants.

136.    Under California Corporations Code §25403, the Officer and Director Defendants, and each of them, are liable to VeriFone for damages in an amount up to three times the difference between the price at which VeriFone common stock was sold by the Insider Selling Defendants, and each of them, and the market value which VeriFone common stock would have had at the time of the sale if the information known to the Individual Defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## FOURTH CAUSE OF ACTION

### Against the Officer and Director Defendants for Breach of Fiduciary Duty for Improper Financial Reporting

137.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    The Officer and Director Defendants owed and owe VeriFone fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe VeriFone the highest obligation of good faith, fair dealing, loyalty and due care.

139.    The Officer and Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

140.    Each of the Officer and Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.    As a direct and proximate result of the Officer and Director Defendants' failure to perform their fiduciary obligations, VeriFone has sustained significant damages. As a result of the misconduct alleged herein, the Officer and Director Defendants are liable to the Company.

142.    Plaintiffs on behalf of VeriFone have no adequate remedy at law.

SHAREHOLDER DERIVATIVE COMPLAINT

**FIFTH CAUSE OF ACTION**

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

143.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold VeriFone common stock on the basis of such information.

145.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold VeriFone common stock.

146.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of VeriFone common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

147.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**SIXTH CAUSE OF ACTION**

**Against All Individual Defendants for Breach of Fiduciary Duty**

148.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    The Individual Defendants' misconduct alleged herein constituted a breach of their fiduciary duties to VeriFone for abuse of control, gross mismanagement, and waste of corporate assets, for which they are legally responsible.

1    150.   As a direct and proximate result of the Individual Defendants' breaches, VeriFone

2  has sustained significant damages.

3    151.   As a result of the misconduct alleged herein, the Individual Defendants are liable to

4  the Company.

5    152.   Plaintiffs on behalf of VeriFone have no adequate remedy at law.

6                                **SEVENTH CAUSE OF ACTION**

7                     **Against All Defendants for Unjust Enrichment**

8    153.   Plaintiffs incorporate by reference and realleges each and every allegation set forth

9  above, as though fully set forth herein.

10    154.   By their wrongful acts and omissions, defendants were unjustly enriched at the

11  expense of and to the detriment of VeriFone.

12    155.   Plaintiffs, as shareholders and representatives of VeriFone, seek restitution from

13  these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits

14  and other compensation obtained by these defendants, and each of them, from their wrongful

15  conduct and fiduciary breaches.

16                                **EIGHTH CAUSE OF ACTION**

17    **Derivative Claim for Aiding & Abetting Breach of Fiduciary Duties -- Against Defendant
GTCR Golder Rauner LLC**

18
19    156.   Plaintiffs repeat and reallege each allegation set forth herein.

20    157.   Plaintiffs bring this cause of action derivatively on behalf of VeriFone against

21  defendant GTCR Golder Rauner LLC.

22    158.   As alleged above, the Individual Defendants have breached their fiduciary duties of

23  good faith, fair dealing, and care to VeriFone.

24    159.   By the acts, transactions and courses of conduct alleged herein, defendants,

25  individually and as part of a common plan and scheme and in breach of their fiduciary duties to

26  VeriFone, have damaged VeriFone through their breaches of fiduciary duty.

27    160.   GTCR was aware of the breaches of fiduciary duty being committed by the

28  Individual Defendants and gave substantial assistance and encouragement to the Individual

1  Defendants.  Defendant GTCR aided and abetted the Individual Defendants by, among other

2  things:

3             (b)     Causing Individual Defendants Roche and Bondy to take the actions they

4  took;

5             (c)     Using confidential information that Roche and Bondy, both of whom are

6  principals of GTCR,  acquired as members of VeriFone's board of directors to benefit GTCR

7  through the illegal insider selling of 9,800,000 shares of VeriFone common stock for proceeds of

8  $358,550,281;

9             (d)     Abusing its position of control as an owner of over 10% of VeriFone's stock

10 during the Relevant Period;

11            (e)     Failing to either disclose the material, non-public information that GTCR had

12 knowledge of as a result of Roche and Bondy's positions as directors of VeriFone or abstaining from

13 trading in VeriFone's stock based on this material, undisclosed financial information.

14     161.    The breaches of fiduciary duty committed by the Individual Defendants advanced

15 GTCR's own financial self-interest.  By facilitating the breaches of fiduciary duty committed by the

16 Individual Defendants, GTCR benefitted from the artificial inflation of VeriFone's stock price.

17 While VeriFone's stock was still artificially inflated, GTCR sold 9,800,000 shares of VeriFone

18 common stock for proceeds of $358,550,281.

19     2.    By reason of the foregoing acts, practices and course of conduct, GTCR has aided and

20 abetted the breaches of fiduciary duties committed by the Individual Defendants.

21 As a result of GTCR's actions, VeriFone has been damaged.

22 ## PRAYER FOR RELIEF

23     WHEREFORE, plaintiffs demand judgment as follows:

24     1.    Against all Defendants and in favor of the Company for the amount of damages

25 sustained by the Company as a result of the Individual Defendants' fraud, breaches of fiduciary

26 duties, aiding and abetting breach of fiduciary duty, and unjust enrichment;

27

28

1    2.    Determining and awarding VeriFone treble damages pursuant to California

2  Corporations Code §25502.5(a) for the Insider Selling Defendants' violations of California

3  Corporations Code §25402;

4    3.    Determining and awarding VeriFone treble damages against the Officer and Director

5  Defendants pursuant to California Corporations Code §25403;

6    4.    Directing VeriFone to take all necessary actions to reform and improve its corporate

7  governance and internal procedures to comply with applicable laws and to protect VeriFone and its

8  shareholders from a repeat of the damaging events described herein, including, but not limited to,

9  putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or

10  Articles of Incorporation and taking such other action as may be necessary to place before

11  shareholders for a vote the following Corporate Governance Policies:

12    •    a proposal to strengthen the Board's supervision of operations and develop and
13    implement procedures for greater shareholder input into the policies and guidelines
      of the Board;

14    •    control and limit insider stock selling;

15    •    a provision to permit the shareholders of VeriFone to nominate at least two
16    candidates for election to the Board;

17    •    a proposal to ensure the accuracy of the qualifications of VeriFone's directors,
      executives and other employees;

18    •    a proposal to strengthen the Company's procedures for the receipt, retention and
19    treatment of complaints received by the Company regarding accounting, internal
      controls and auditing matters; and

20    •    appropriately test and then strengthen the internal audit and control functions.

21    5.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

22  statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

23  on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to

24  assure that plaintiff on behalf of VeriFone has an effective remedy;

25    6.    Awarding to VeriFone restitution from the defendants, and each of them, and

26  ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

27    7.    Awarding to plaintiff the costs and disbursements of the action, including reasonable

28  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

SHAREHOLDER DERIVATIVE COMPLAINT

1     8.     Granting such other and further relief as the Court deems just and proper.

2                                **JURY DEMAND**

3     Plaintiffs demand a trial by jury.

4   DATED:  March 5, 2008

                                           FRANCIS A. BOTTINI, JR.

6                             JOHNSON BOTTINI, LLP

                            FRANCIS A. BOTTINI, JR.

7                             DEREK J. WILSON

                            655 West Broadway, Suite 1400

8                             San Diego, California 92101

                            Telephone:  619/230-0063

9                             Facsimile:  619/233-5535

10                             Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I hereby verify that I am a shareholder of VeriFone Holdings, Inc. (the "Company"). I have reviewed the allegations made in this Derivative Complaint. The allegations concerning me and my holdings of VeriFone common stock are true based on my personal knowledge. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

*Mary F. Lemmond*

Mary F. Lemmond

1

## VERIFICATION

2      I hereby verify that I am a shareholder of VeriFone Holdings, Inc. (the "Company"). I have

3  reviewed the allegations made in this Derivative Complaint. The allegations concerning me and my

4  holdings of VeriFone common stock are true based on my personal knowledge. As to those

5  allegations of which I do not have personal knowledge, I rely upon my counsel and their

6  investigation and believe them to be true. Having received a copy of this Complaint, having

7  reviewed it with my counsel, I hereby authorize its filing.

8

9                                           Wandell Everett

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page

-1-

VERIFICATION

1   JOHNSON BOTTINI, LLP
    FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
2   DEREK J. WILSON, Cal. Bar No. 250309
    655 West Broadway, Suite 1400
3   San Diego, California 92101
    Telephone: 619/230-0063
4   Facsimile: 619/233-5535

5   Attorneys for Plaintiffs Mary Lemmond and Wandell Everett

6   [Additional counsel appear on signature page]

7

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10  Charles R. King, Derivatively On Behalf of      )   No.: CV 07-06347 MHP
    VeriFone Holdings, Inc.                          )
11                                                   )
                           Plaintiff,                )
12              vs.                                  )   STIPULATION REGARDING FILING OF
                                                     )   CONSOLIDATED AMENDED
13  DOUGLAS G. BERGERON,                             )   COMPLAINT AND DEFENDANTS'
    JAMES C. CASTLE,                                 )   RESPONSE THERETO
14  LESLIE G. DENEND,                                )
    ALEX W. (PETE) HART,                             )
15  ROBERT B. HENSKE,                                )
    EITAN RAFF,                                      )
16  CHARLES R. RINEHART,                             )
    COLLIN E. ROCHE,                                 )
17  CRAIG A. BONDY,                                  )
    and BARRY ZWARENSTEIN,                           )
18                                                   )
                           Defendants,               )
19                                                   )
             -and-                                   )
20                                                   )
    VERIFONE HOLDINGS, INC.,                         )
21                                                   )
                     Nominal Defendant.              )
22  _____         )
    ARTHUR HILBORN                                   )   No.: 5:08-cv-01132-PVT
23                                                   )
                           Plaintiff,                )
24              vs.                                  )
                                                     )
25  DOUGLAS G. BERGERON, ET AL.                      )
                                                     )
26                         Defendants,               )
                                                     )
27

28

                                      - 1 -



1  ARUNBHAI PATEL                                    )  No.: 5:08-cv-01133-HRL
                                                     )
2                          Plaintiff,                )
            vs.                                      )
3                                                    )
   DOUGLAS G. BERGERON, ET AL.                       )
4                                                    )
                           Defendants,               )
5  _____ )
   MARY LEMMOND AND                                  )  No.: 5:08-cv-01301-RS
6  WANDELL EVERETT                                   )
                                                     )
7                          Plaintiff,                )
            vs.                                      )
8                                                    )
   DOUGLAS G. BERGERON, ET AL.                       )
9                                                    )
                           Defendants,               )
10

11         Whereas, the following shareholder derivative actions have been filed in this district on

12  behalf of Nominal Defendant VeriFone Holdings, Inc.: *Charles King v. Douglas G. Bergeron, et al.,*

13  Case No. 5:08-cv-06347-MHP filed on December 14, 2007, *Arunbhai Patel v. Douglas G. Bergeron,*

14  *et al.,* Case No. 5:08-cv-01133-HRL, filed on February 26, 2008, *Arthur Hilborn v. Douglas G.*

15  *Bergeron, et al.,* Case No. 5:08-cv-01132-PVT, filed on February 26, 2008, and *Mary Lemmond and*

16  *Wandell Everett v. Douglas G. Bergeron, et al.,* Case No. 5:08-cv-01301-RS, filed on March 5, 2008

| Case Name | Case No. | Filing Date |
|-----------|----------|-------------|
| *Charles King v. Douglas G. Bergeron, et al.* | 3:07-cv-06347-MHP | December 14, 2007 |
| *Arthur Hilborn v. Douglas G. Bergeron, et al.* | 5:08-cv-01132-PVT | February 26, 2008 |
| *Arunbhai Patel v. Douglas G. Bergeron, et al.* | 5:08-cv-01133-HRL | February 26, 2008 |
| *Mary Lemmond and Wandell Everett v. Douglas G. Bergeron, et al.* | 5:08-cv-01301-RS | March 5, 2008 |

25         Whereas, Plaintiffs Lemmond and Everett filed an Administrative Motion to Consider

26  Whether Cases Should be Related on March 12, 2008;

27         Whereas, on March 19, 2008, this Court granted the Administrative Motion and deemed the

28  cases related;

- 2 -

STIPULATION REGARDING FILING OF CONSOLIDATED AMENDED COMPLAINT

1      Whereas, on February 26, 2008 this Court entered an order that the low-numbered case, *King*

2  *v. Bergeron et al.*, Case No. 3:07-cv-06347-MHP, is related to the securities fraud class action case

3  pending against VeriFone Holdings, Inc. and certain other individual defendants -- *In re VeriFone*

4  *Holdings, Inc. Sec. Litig.*, Master File No. C07-6140; while the derivative cases and the securities

5  fraud cases are different cases, the parties desire to coordinate activity in the two sets of cases to the

6  extent possible so as to achieve efficiencies;

7      Whereas, on March 21, 2008 this Court reassigned the related *Hilborn, Patel, and Lemmond*

8  derivative cases to this Court;

9      Whereas, motions have been filed to consolidate the related cases and to appoint lead counsel

10  for plaintiffs, and such motions are set for hearing on April 28, 2008;

11      Whereas, the parties anticipate that a Consolidated Amended Complaint will be filed

12  subsequent to the entry of an order on the motions to consolidate and appoint lead counsel. As a

13  result, the parties believe it is unnecessary and undesirable for defendants to have to respond to any

14  of the individual related complaints at this time.

15      THEREFORE, the parties hereby stipulate as follows:

16    1.  No defendant shall be required to respond to any of the individual related complaints at

17        this time;

18    2.  Within 45 days of the entry of an order ruling on the motions to consolidate the related

19        cases and appoint lead counsel, the lead counsel appointed by the Court shall file a

20        Consolidated Amended Complaint;

21    3.  Defendants shall file a response to the Consolidated Amended Complaint within 30 days

22        of the entry of an order by this Court ruling on the motion to dismiss the consolidated

23        amended complaint filed in the related securities fraud class action case – *In re VeriFone*

24        *Holdings, Inc. Sec. Litig.*, Master File No. C07-6140.

25    4.  Plaintiffs shall file any opposition to Defendants' response to the Consolidated Amended

26        Complaint within 30 days;

27    5.  Defendants shall file any reply brief within 30 days of the service of Plaintiffs'

28        opposition brief, and the hearing on the motion shall be set two weeks after the filing of

- 3 -

STIPULATION REGARDING FILING OF CONSOLIDATED AMENDED COMPLAINT



1        Defendants' reply brief, or at such other time as the Court and the parties are available.

2        **IT IS SO STIPULATED.**

3                           JOHNSON BOTTINI, LLP

4                           FRANCIS A. BOTTINI, JR.
                              DEREK J. WILSON

5                           FRANCIS A. BOTTINI, JR

6  DATED:              /s/Francis A. Bottini

7                            FRANCIS A. BOTTINI, JR.

8                         655 West Broadway, Suite 1400
                         San Diego, California 92101

9                         Telephone: 619/230-0063
                         Facsimile: 619/233-5535

10                       Attorneys for Plaintiffs Mary Lemmond
                       and Wandell Everett

11

12                       SCOTT + SCOTT, LLC
                       ARTHUR L. SHINGLER, III

13 DATED:

14                        ARTHUR L. SHINGLER, III

15                       600 B Street, Suite 1500
                       San Diego, CA 92101

16                       Telephone: 619/233-4565
                       Facsimile: 619/233-0508

17                       Attorneys for Plaintiffs Charles R. King

18                       SCHIFFRIN  BARROWAY  TOPAZ  &
                       KESSLER,LLP

19                       NICHOLE BROWNING
                       ERIC L. ZAGAR

20                       LEE D. RUDY
                       JAMES MILLER

21
  DATED:

22                       NICHOLE BROWNING

23                       2125 Oak Grove Road, Suite 120
                       Walnut Creek, CA 94598

24                       Telephone: 925/945-0770
                       Facsimile: 925/945-8792

25                       Attorneys for Plaintiffs Arunbgai Patel
                       and Arthur Hilborn

26

27

28

- 4 -

1

2

DATED:

3

4

5

6

7

8

9

10

11  DATED: _____

12

13

14

15

16

17

18

19  Dated: _____

20

21

22

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP
BRENDAN P. CULLEN

_____
BRENDAN P. CULLEN

1870 Embarcadero Road
Palo Alto, CA 94303
Telephone: 650/461-5650
Facsimile: 650/461-5700
Attorneys for Defendants Douglas G.
Bergeron, James C. Castel, Leslie G. Denend,
Alex W. (Pete) Hart, Robert B. Henske, Eitan
Raff, Charles R. Rinehart, Colin E. Roche,
Craig A. Bondy, Barry Zwarenstein and
Nominal Defendant Verifone Holdings, Inc.

KIRKLAND & ELLIS LLP
MARK MCKANE

_____
MARK MCKANE

555 California Street, Ste. 2700
San Francisco, CA 94104
Telephone: 415/439-1473
Facsimile: 415/439-1500
Attorneys for Defendant GTCR Golden
Rauner, LLC

**IT IS SO ORDERED.**

_____
The Honorable Marilyn H. Patel
UNITED STATES DISTRICT COURT JUDGE

- 5 -

STIPULATION REGARDING FILING OF CONSOLIDATED AMENDED COMPLAINT



## FIRM RESUME

Johnson Bottini, LLP is committed to providing the highest quality legal services expected at a large law firm with the efficiency and personal touch that only a small firm can offer. Prior to opening their own law firm, the founding partners of Johnson Bottini, LLP were both partners at two of the largest and most preeminent law firms in the country.

The attorneys at Johnson Bottini, LLP have the "big firm" experience to offer clients, but at a more affordable price. Johnson Bottini, LLP provides efficient and excellent legal services to its clients. With lawyers experienced in representing large publicly traded corporations, Johnson Bottini, LLP now represents clients from defrauded individuals to large corporations in complex civil trials.

## OUR ATTORNEYS

### Frank J. Johnson



Prior to starting his own law firm, Mr. Johnson was a partner in the law firm Sheppard, Mullin, Richter & Hampton LLP, a full service Am Law 100 law firm with more than 400 attorneys in nine offices located throughout the country. Mr. Johnson has represented some of the largest well known companies in the country in complex business disputes. He has conducted both jury and non-jury trials in state and federal court.

Areas of Practice: Mr. Johnson's practice focuses on complex litigation. Mr. Johnson has extensive experience in all aspects of trial practice, mediation, trial preparation, and non-jury and jury trials in state and federal court. In addition to his general trial practice, Mr. Johnson has both prosecuted and defended a number of cases involving securities fraud in class actions and derivative cases.

Professional Qualifications and Activities: Mr. Johnson was admitted to the State Bar of California in 1994. He has an AV rating with Martindale-Hubble which indicates very high to preeminent legal ability and very high ethical standards as established by confidential opinions from members of the Bar. He is currently admitted in good standing with the following courts:

- All courts of the State of California
- The United States Court of Appeals for the Ninth Circuit
- The United States District Courts for the Southern and Central Districts of California
- The United States Court of Federal Claims

Mr. Johnson is also a member of the following professional organizations:

- The American Bar Association
- The San Diego County Bar Association
- The Federal Bar Association
- The Litigation Section of the State Bar of California
- SD Regional Chamber of Commerce, Vice Chair Tech Comm. (2002-03, 2003-04, 2004-05)

Mr. Johnson completed the following trial advocacy programs:

- San Diego County District Attorney one-month misdemeanor jury trial program
- Louis M. Welsh American Inn of Court, one year program
- San Diego Inn of Court College of Advocacy, multi-week trial course
- San Diego Inn of Court College of Advocacy, multi-week evidence course

Following graduation from law school in 1994, Mr. Johnson clerked for one year for the Honorable John S. Rhoades, a federal trial judge in the United States District Court for the Southern District of California in San Diego.

Education: Mr. Johnson received his Juris Doctorate degree from Washington University School of Law in 1994, where he was in the top 10% of his class while in attendance. Mr. Johnson received his B.S. degree in Business Administration - Finance from San Diego State University in 1990, where he graduated second in his class major, with honors and *summa cum laude*.

### Francis A. Bottini, Jr.



Mr. Bottini is one of the founding partners of Johnson Bottini, LLP. Prior to starting his own law firm, Mr. Bottini was a partner in the law firm Wolf Haldenstein Adler Freeman & Herz LLP, a full-service law firm that has provided legal services to its clients since 1888. Mr. Bottini has successfully achieved several multi-million dollar recoveries in securities and antitrust class action cases throughout the country. Mr. Bottini has served as an Adjunct Professor of Business Law at the University of San Diego in the past.

He is a graduate of St. Louis University (B.A. *magna cum laude*), and the University of San Diego School of Law (J.D. *cum laude*), where he was the Lead Articles Editor of the San Diego Law Review and received the American Jurisprudence Award in Property. Mr. Bottini is admitted to practice before the United States Supreme Court, all California courts, and the Ninth Circuit Court of Appeals. He is AV rated by Martindale-Hubbell.

Mr. Bottini practices in the areas of securities litigation (including securities fraud litigation under the PSLRA and Sarbanes-Oxley Act, mergers & acquisitions, and proxy litigation), antitrust, consumer, and employment class action litigation. His representative cases include:

- *In re DRAM Antitrust Litig.*, MDL No. 1486 (United States District Court for the Northern District of California); Mr. Bottini was Co-Lead Counsel for the Class; $325, 997,000 in settlements were obtained for the Class from nine defendants in one of the largest and most complex civil antitrust class actions in the country. Mr. Bottini was involved in all aspects of the case from the filing of the first complaint in 2002 to the final approval of the settlements which occurred in August 2007. Mr. Bottini was part of the trial team that was set to try the case against the two remaining defendants – Mosel Vitelic, Inc. and Nanya – when separate settlements with these last two defendants were reached on March 21, 2007, the day before oral argument was to be conducted on the *motions in limine* for trial. On August 15, 2007, Judge Phyllis J. Hamilton granted final approval to the settlements.

- In *Karlin v. Alcatel*, Mr. Bottini represented investors who received a tender offer for their shares from Alcatel S.A., a French telecommunications company; Mr. Bottini served as Co-Lead Counsel and the case settled for $10.5 million on the eve of trial.

Johnson Bottini, LLP
Firm Resume
Page 3 of 6

- *In re Dole Shareholder Litig.*, Lead Case No. B281969 (L.A. Superior Court March 2003). In this mergers & acquisitions, going-private class action case , Mr. Bottini was Co-Lead Counsel for the plaintiffs and was involved in all aspects of the litigation. A $172 million settlement was obtained for the Class when the tender offer price was increased by $4 per share.

- *In re Brocade Communications, Systems, Inc. Derivative Litig.,* Case No. 1:05cv41683 (Superior Court for the State of California, County of Santa Clara); Mr. Bottini is Co-Lead Counsel in one of the highest-profile cases in the country challenging the award of backdated stock options by executive officers of Brocade. The case was filed in May 2005 and is currently pending.

- *In re Heritage Bond Litig.,* Case No. 02-MDL-1475-DT (C.D. Cal.). In this class action bondholder litigation, which was ordered consolidated in Los Angeles by the Panel on Multidistrict Litigation, Mr. Bottini was lead counsel for the outside director defendants. After obtaining dismissal of most of the claims against the outside directors, Mr. Bottini obtained dismissal of the remaining claims against outside directors Greenspan, Wexler, Chalker, Medill, and Saltzman for a combined payment of $102,500. The other defendants not represented by Mr. Bottini paid $27 million to settle the case. *See In re Heritage Bond Litig.,* 2005 U.S. Dist. LEXIS 13627 (C.D Cal.).

- *Intel x86 Microprocessor Cases*, JCCP Case No. 4443 (Santa Clara Superior Court, Judge Komar). In this complex class action antitrust case, the California Judicial Council coordinated the cases in Santa Clara before Judge Komar. Mr. Bottini is a member of the Plaintiffs' Executive Committee and is active in all aspects of the case. By order dated May 15, 2007, Judge Komar issued an order denying defendants' demurrer to the complaint in its entirety. The case is ongoing.

- *In re Dell, Inc. Derivative Litig.*, Case No. 1:06-cv-00839 (United States District Court for the Western District of Texas). By order dated March 1, 2007, the Honorable Sam Sparks appointed Johnson Bottini LLP Co-Lead Counsel in this shareholder derivative action.

- *In re Sunterra Corp. Shareholder Litigation*, Lead Case No. A525433 (Eighth Judicial District Court for the State of Nevada, County of Clark); Mr. Bottini is Co-Lead Counsel in this shareholder action challenging the fairness and disclosures made in SEC filings pertaining to a buyout offer for the company and certain actions by present and former officers and directors of Sunterra. The case was settled in 2007 when Sunterra agreed to file a supplemental filing with the United States Securities and Exchange Commission providing additional material information pertaining to the tender offer.

- *Deane v. Tombros et al.,* Case No. 60913838 (Third Judicial District Court, Salt Lake City, Utah); Johnson Bottini LLP is Lead Counsel in this shareholder derivative action filed against current and former officers and directors of NPS Pharmaceuticals, Inc., filed in 2006.

Mr. Bottini's published cases include *Karlin v. Alcatel*, 2001 WL 1301216, Fed. Sec. L. Rep. (CCH) ¶91, 526 (C. D. Cal. 2001) (denying defendants'; motion for summary judgment); *In re Imperial Credit Industries, Inc. Sec. Litig.*, 2000 WL 1049320, Fed. Sec. L. Rep. (CCH) ¶91,024 (C. D. Cal. 2000) (denying defendants' motion to dismiss in a securities fraud action under Section 10(b) of the Securities Exchange Act of 1934); *In re USA Talks.com Sec. Litig.*, 2000 WL 1887516 (S.D. Cal.)(denying defendants' motion to dismiss in 10b-5 case).

On April 18-20, 2005, Mr. Bottini gave a speech on Securities Class Action Litigation at the 2nd Annual CFO Forum in Seoul, South Korea.

### Brett M. Weaver

Areas of Practice: In addition to complex business litigation, Mr. Weaver's practice areas include professional malpractice defense, malicious prosecution actions, employment law, and real estate disputes. Mr. Weaver has also handled a number of anti-SLAPP cases arising from the exercise of free speech and petitioning activities. Mr. Weaver has litigated cases in both state and federal court and has handled all aspects of litigation including mediation, trial preparation, jury trials and appeals.



Professional Qualifications and Activities: Mr. Weaver was admitted to the State Bar of California in 1999. He is currently admitted in good standing with the following courts:

- All courts of the State of California
- The United States District Court for the Southern and Central Districts of California

Mr. Weaver completed the following trial advocacy programs:

- Louis M. Welch American Inn of Court, one year program
- San Diego Inn of Court, multi-week evidence course

During law school, Mr. Weaver served as a judicial extern for Justice Judith L. Haller at the California Court of Appeal (4th District, Division 1) and Hon. J. Richard Haden (Ret.) at the San Diego Superior Court. Before joining the Johnson Bottini, Mr. Weaver was an associate at the mid-sized San Diego firms of Butz Dunn DeSantis & Bingham and Mazzarella Dunwoody & Caldarelli.

Education: Mr. Weaver received his Juris Doctorate degree from the University of Arizona College of Law in 1999. Mr. Weaver actively participated in moot court and was named a member of the moot court board, national moot court team and was named the school's Most Outstanding Oral Advocate. Mr. Weaver graduated with honors from the University of Arizona in 1996, receiving a B.A. in Political Science.

### Derek J. Wilson

Mr. Wilson grew up in Las Vegas, Nevada. He attended California State Polytechnic University, Pomona where he received a B.A. in Political Science, graduating *magna cum laude*. Mr. Wilson was also a scholarship athlete in baseball. Mr. Wilson received his Juris Doctorate degree from the University of San Diego in 2006.

During law school, Mr. Wilson was a law clerk at the office of the Alternate Public Defender of San Diego County.

Since joining the firm in October 2007, Mr. Wilson has focused his practice on complex securities litigation. Mr. Wilson is currently admitted to practice law in California. He has also passed the bar examination in Arizona, and his admission to the bar there is pending.

Johnson Bottini, LLP
Firm Resume
Page 5 of 6

## TESTIMONIALS

Johnson Law Firm, one of the founding partners of Johnson Bottini, LLP is "exceptionally qualified and experienced." *Greenmeadows Partners LLP v. Tomkinson, et al.,* C.D. Cal. Case No. SACV 06-91 CJC (appointing Johnson Law Firm lead counsel in a complex shareholder derivative litigation in which six separate lawsuits were filed).

> The Honorable Cormac J. Carney
> United States District Court Judge
> Central District of California

As chairman of the board of a public company, I retained Johnson Law Firm, one of the founding partners of Johnson Bottini, LLP, to pursue claims for breach of fiduciary duty for millions of dollars against former directors of a company formed in England. I have retained law firms throughout the world and found Johnson Law Firm and its lawyers to be superb. Mr. Johnson was very responsive and he grasped complex corporate matters involving international real estate transactions. Johnson Law Firm aggressively litigated my company's claims against several defendants who were represented by one of the largest law firms in the world. This case was very complex and complicated and involved three jurisdictions (US, Europe, and Sweden). Johnson Law Firm played an instrumental role in bringing the whole case to a successful settlement out of court. We ultimately reached a resolution short of trial with which I was very pleased.

> Rolf L. Nordström
> Chairman of the Board
> International Real Estate PLC

While I was the Executive Vice President and Chief Financial Officer for a publicly traded company, I consulted Frank Johnson on various legal issues. As CFO I was responsible for SEC reporting requirements and compliance with GAAP. In addition, I successfully completed the public offering of the company's stock which was a consistent top performer on the NASDAQ from 1998 to 1999. During the ten years I've known him, I've been very impressed with Mr. Johnson's integrity, business acumen, and understanding of complex securities issues. Based upon these factors, I retained Johnson Law Firm, one of the founding partners of Johnson Bottini, LLP, to represent me in matters where it appeared that a public company's officers or directors engaged in fraudulent conduct to the detriment of the company's shareholders (of which I was one). As a former CFO for a public company and as a shareholder, I can say with confidence that this firm has proven to be aggressive and astute in identifying claims for fraudulent conduct in connection with the sale of publicly traded securities.

> James Baker
> Chief Cost Reduction Officer
> DCI Solutions

While I was assistant general counsel for GNC Corporation, a publicly traded company at the time, I had the good fortune of working with Frank Johnson as GNC's lawyer. While he was at Sheppard Mullin, he successfully defended GNC in several matters, including a consumer class action and various business litigation matters. I have since left GNC Corporation and am now a partner at one of the largest law firms in the country. I have worked with Johnson Law Firm on various matters, including a jury trial in San Diego, California. Mr. Johnson proved to be an exceptional trial lawyer who assisted my firm in obtaining an outstanding verdict in our client's favor. I have recommended Johnson Bottini, LLP without reservation to both clients and lawyers who need highly skilled and effective representation.

> Gerald J. Stubenhofer, Esq.
> Partner
> McGuireWoods LLP

In 2004, Axeus, Inc. was using Sheppard Mullin, a large law firm, for nearly all of its legal matters. When Frank Johnson, who was then a partner at Sheppard Mullin, announced that he was departing to start his own law firm, I did not hesitate in my decision to send all of Axeus's litigation work to Mr. Johnson. At the time, Axeus was embroiled in a huge legal battle involving more than 20,000 pages of evidence and millions of dollars. Johnson Law Firm, one of the founding partners of Johnson Bottini, LLP, helped Axeus successfully resolve that matter and has since handled several litigation matters for Axeus, all with outstanding results. I have worked with many different law firms over the years and I can say with confidence that Mr. Johnson is one of the best lawyers I've worked with. He understands what is important to his clients: excellent legal work and value. While other firms may be less expensive, Johnson Law Firm provides value for its fees.

> Sean H. Mallean
> President & CEO
> Axeus, Inc.

Johnson Law Firm, one of the founding partners of Johnson Bottini, LLP, was Awesome! They were professional, organized and as evidenced by juror testimonials following a one-week jury trial.... extremely effective. On claims for breach of contract and fraud, Johnson Law Firm won a 7 figure verdict for me and my company and I will forever be grateful. You never realize how important it is to have a good attorney until you need one!

> Ronald T. Fricke
> President
> Healthy Life Marketing, LLC

I am the owner of Natural Energy, which was established in 1977 and is the largest solar energy company in the western United States. Although we have an exceptional reputation, as with any large company, legal disputes are sometimes inevitable. After using a number of law firms, for the past several years Natural Energy has used Johnson Law Firm, one of the founding partners of Johnson Bottini, LLP, for all of its business litigation matters, from general business disputes to successfully getting a baseless class action dismissed. The lawyers at Johnson Bottini, LLP are aggressive, have a strong work ethic and, of utmost importance to me, have unquestionable integrity. I have the utmost faith and confidence in Johnson Bottini, LLP.

> Ted Mount
> Owner
> Natural Energy



# Forbes.com

Market Scan

# Buck Stops With VeriFone CFO

Miriam Marcus, 04.02.08, 5:05 PM ET

VeriFone Holdings completed its self-investigation of its internal control failures and several key players are getting the axe.

The maker of point-of-sale electronic payment devices saw its shares slump Wednesday after announcing, also on Wednesday, that it had completed its independent investigation into ill-reported financial statements for fiscal year 2007. (See VeriFone Feels Accounting Pain)

San Jose, Calif.-based VeriFone Holdings disclosed in December that it would restate financial statements for the fiscal first three quarters of 2007, and would delay filing its annual report and first quarterly report for fiscal 2008 until it had completed the investigation. Results reported Wednesday morning indicate internal control failures and remain up for review by VeriFone's public accounting firm and the Securities and Exchange Commission.

It turns out that mistakes disclosed by VeriFone in December are actually bigger than previously disclosed. Most significantly, the company said in a press release that it expects gross margin percentages for the period ended Oct. 31, 2007 to be between 32%-to-34%, compared to a reported 46% in the year-earlier period. Increased costs, which lead to lower gross profit margins, are largely due to excess inventory and liabilities surrounding purchase obligations.

VeriFone's December report anticipated the restatement to report sales of $238.9 million for the period ended Oct. 31 and annual revenue of $903.9 million. Wednesday's announcement from the company confirmed that those numbers remain consistent. VeriFone's market capitalization is $1.1 billion.

In light of the day's news, share prices dropped $2.94, or 17.5% to $13.89 in afternoon trading. Shares have fallen 71.1% since Nov. 30, 2007, the last trading day before VeriFone announced its accounting woes.

VeriFone confirmed that it "did not maintain effective internal control over financial reporting." In response to the severe inventory miscalculations, the company terminated its supply chain controller. Additionally, Chief Financial Officer Barry Zwarensteinsubmitted his resignation which will become effective once the company files its restatements to the SEC.

"Anytime you have this magnitude of control failure, the CFO, who's job it is to supervise internal controls, often ends up being where the buck stops," said Wedbush Morgan Securities analyst Gil B. Luria.

Luria cautioned that until subsequent investigations are resolved, "VeriFone is still not out of the woods."

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# Form 8-K

---

## CURRENT REPORT

### Pursuant to Section 13 OR 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): April 1, 2008**

# VERIFONE HOLDINGS, INC.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-32465** | **04-3692546** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2099 Gateway Place, Suite 600**
**San Jose, CA 95110**
(Address of principal executive offices with zip code)

**(408) 232-7800**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## TABLE OF CONTENTS

Item 2.02. Results of Operations and Financial Condition
Item 5.02. Departure of Directors or Principal Officers; Election of Directors;
Appointment      of Principal Officers; Compensatory Arrangements of Certain Officers
Item 8.01 Other Events
Item 9.01 Financial Statements and Exhibits
SIGNATURE
EXHIBIT INDEX
EXHIBIT 99.1
EXHIBIT 99.2
EXHIBIT 99.3

Table of Contents

**Item 2.02.  Results of Operations and Financial Condition**

On April 2, 2008, in connection with the announcement by VeriFone Holdings, Inc. ("VeriFone" or the "Company") that its Audit Committee has completed its independent investigation into certain accounting and financial control matters, the Company provided certain financial information for the fiscal period ended October 31, 2007. Copies of the Company's press releases that contain this financial information are being furnished as Exhibit 99.1 and Exhibit 99.2 to this report on Form 8-K and are incorporated herein by reference.

The information furnished pursuant to this report, including Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section or Sections 11 and 12(a)(2) of the Securities Act of 1933, as amended. The information contained herein and in Exhibit 99.1 and Exhibit 99.2 shall not be incorporated by reference into any filing with the U.S. Securities and Exchange Commission made by the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

**Item 5.02.  Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers; Compensatory Arrangements of Certain Officers**

On April 1, 2008, the Company's Executive Vice President and Chief Financial Officer, Barry Zwarenstein, resigned from his position. Mr. Zwarenstein's resignation will become effective subsequent to the completion of the restatement and filing of VeriFone's quarterly reports and annual report with the Securities and Exchange Commission VeriFone will commence a search for a new Chief Financial Officer immediately.

Mr. Zwarenstein and the Company have entered into a separation agreement which, subject to the terms and conditions thereof, will provide for payment of certain severance amounts to which he is entitled under his original offer letter entered into in 2004. Mr. Zwarenstein will also be entitled to certain receive health insurance and similar welfare benefits for 18 months from his resignation date. Indemnification and confidentiality provisions to which Mr Zwarenstein is entitled or bound under pre-existing employment arrangements remain in full force and effect. Mr. Zwarenstein and the Company have agreed to cooperate with one another to ensure an orderly transition and in respect of any ongoing legal proceedings or related matters. The Company and Mr. Zwarenstein also agreed to enter into mutual releases. A copy of the separation agreement is attached hereto as Exhibit 99.3 and incorporated herein by reference.

**Item 8.01  Other Events**

On April 2, 2008, the Company announced that its Audit Committee has completed its independent investigation into certain accounting and financial control matters following the Company's December 3, 2007 announcement that it would restate financial statements for the three month periods ended January 31, 2007, April 30, 2007 and July 31, 2007. The Company also announced additional details about the accounting errors that will be corrected, including the estimated monetary amounts involved, which amounts remain preliminary and subject to review by the Company's independent registered public accounting firm in connection with the preparation and review of the amended quarterly reports and the audit of the annual financial statements to be included in the annual report on Form 10-K for the year ended October 31, 2007. The Company also announced that following the report of the Audit Committee, the Board of Directors directed that a number of remedial measures be taken in response to the Audit Committee investigation. The additional details regarding the accounting errors and

2

Table of Contents

the remedial measures are set forth in the Company's press release which is furnished as Exhibit 99.3 to this Current Report on Form 8-K and incorporated herein by reference.

The information furnished pursuant to this report, including Exhibit 99.1, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section or Sections 11 and 12(a)(2) of the Securities Act of 1933, as amended. The information contained herein and in Exhibit 99.1 shall not be incorporated by reference into any filing with the U.S. Securities and Exchange Commission made by the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

**Item 9.01    Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| Exhibit 99.1 | Press Release, dated April 2, 2008. |
| Exhibit 99.2 | Press Release, dated April 2, 2008. |
| Exhibit 99.3 | Separation Agreement, dated as of April 1, 2008, among VeriFone Holdings, Inc., VeriFone, Inc and Barry Zwarenstein. |

3

Table of Contents

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

VERIFONE HOLDINGS, INC.

Date: April 2, 2008                              By: /s/ Douglas Bergeron _____
                                                     Name:  Douglas Bergeron
                                                     Title:   Chief Executive Officer

4

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| Exhibit 99.1 | Press Release, dated April 2, 2008. |
| Exhibit 99.2 | Press Release, dated April 2, 2008. |
| Exhibit 99.3 | Separation Agreement, dated as of dated April 1, 2008, among VeriFone Holdings, Inc., VeriFone, Inc and Barry Zwarenstein. |

5

EX-99.1 2 f39562exv99w1.htm EXHIBIT 99.1

▪▪▪▪▪    ▪▪▪▪  ▪▪▪▪▪    ▪▪

**Exhibit 99.1**



**VeriFone Completes Independent Investigation**

**Updates Restatement Process and Announces
Remedial Action to Correct Control Deficiencies**

SAN JOSE, CA. — April 2, 2008 — VeriFone Holdings Inc. (NYSE: PAY). today announced that its Audit Committee has completed its independent investigation into certain accounting and financial control matters following VeriFone's December 3, 2007 announcement that it would restate financial statements for the three month periods ended January 31, 2007, April 30, 2007 and July 31, 2007. Subsequent to the December 3, 2007 announcement, VeriFone disclosed that it would delay filing its annual report on Form 10-K for the year ended October 31, 2007 and its quarterly report on Form 10-Q for the three months ended January 31, 2008 until the completion of the Audit Committee investigation and restatement process.

When completed, the restatements will correct the accounting errors that were identified by management and described in VeriFone's December 3, 2007 announcement as well as further errors uncovered during the investigation process.

Subject to completion of the restatements and review by VeriFone's auditors, the restatements are expected to have the following effects:

- Previously reported inventories will be reduced by approximately $13.3 million, $23.9 million and $40.6 million as compared to originally reported amounts at January 31, 2007, April 30, 2007 and July 31, 2007; and

- Previously reported operating income will be decreased by approximately $12.5 million, $9.8 million and $14.7 million as compared to originally reported amounts for the three months periods ended January 31, 2007, April 30, 2007 and July 31, 2007, principally due to higher cost of net revenues as compared to originally reported amounts.

- The aggregate decrease in operating income for the nine months ended July 31, 2007 of approximately $36.9 million, as determined through the Audit Committee investigation, represents an increase of approximately $7.2 million compared to the original estimate of approximately $29.7 million reported on December 3, 2007.

These amounts remain preliminary and are subject to review by VeriFone's independent registered public accounting firm in connection with the preparation and review of the amended quarterly reports and the audit of the annual financial statements to be included in the annual report on Form 10-K for the year ended October 31, 2007.

VeriFone, Inc.
2099 Gateway Place, Suite 600 San Jose, CA, 95110 USA

The Audit Committee's independent investigation, which began on December 3, 2007, involved approximately 70 professionals retained by the audit committee's independent counsel, Simpson Thacher & Bartlett LLP and forensic accountants, Navigant LLC, who in aggregate evaluated more than 5 million documents and conducted more than 25 interviews of current and former VeriFone personnel. The investigation confirmed that incorrect manual journal and elimination entries were made with respect to certain inventory-related matters, that existing policies with respect to manual journal entries were not followed, and that insufficient review processes and controls were in place to identify and correct the erroneous manual journal and elimination entries in a timely manner.

As a result of the issues identified by management and the Audit Committee independent investigation, management has concluded that VeriFone did not maintain effective internal control over financial reporting.

Following the report of the Audit Committee, the Board of Directors has directed that a number of remedial measures be taken in response to the Audit Committee investigation including:

- Implementation of a more stringent voucher approval process for manual journal entries;

- Implementation of enhanced information technology/enterprise resource planning systems commensurate with the increased size and complexity of VeriFone's businesses;

- Adding appropriate accounting and finance resources through additional centralized staffing with individuals having sufficient knowledge and experience in cost accounting and other GAAP principles;

- Enhanced segregation of duties between the financial planning and the accounting and control functions;

- Improvements in governance and compliance functions to improve control consciousness and appropriate adherence to generally accepted accounting principles, as well as improved tone, communication, documentation, education and training for employees involved in the financial reporting process, including the appointment of a chief legal and compliance officer; and

- Personnel actions, including the termination of the Company's supply chain controller, enhanced supervision and other actions.

Preliminary results of the Audit Committee independent investigation have been shared with the staff of the Securities and Exchange Commission on a voluntary basis. The staff of the SEC has since provided VeriFone with an informal request seeking voluntary production by VeriFone of documents and has indicated an interest in interviewing several current and former VeriFone officers and employees. VeriFone is continuing to cooperate with the SEC in meeting the SEC's requests for documents and other information.

VeriFone, Inc.
2099 Gateway Place, Suite 600 San Jose, CA, 95110 USA

Douglas Bergeron, VeriFone's Chief Executive Officer, said, "The completion of the Audit Committee investigation marks an important milestone in our efforts to restore our investors' confidence in VeriFone. We are focused on addressing the errors we made to ensure they are not repeated, while remaining committed to driving the business forward in these admittedly challenging times."

Barry Zwarenstein, Executive Vice President and Chief Financial Officer has tendered his resignation, which has been accepted by the Board of Directors. Mr. Zwarenstein's resignation will become effective subsequent to the completion of the restatement and filing of VeriFone's quarterly reports and annual report with the Securities and Exchange Commission VeriFone will commence a search for a new Chief Financial Officer immediately.

VeriFone also announced that, in keeping with developing best practices in corporate governance, it will separate the roles of Chairman and Chief Executive Officer. Charles Rinehart, who has been an independent director of VeriFone since May 2006, has been elected to serve as the new non-executive Chairman of the Board. Mr. Rinehart is the former Chairman and Chief Executive Officer of H.F. Ahmanson & Company, which, prior to its acquisition by Washington Mutual was the parent company of the nation's then-largest savings and loan.

"The separation of the Chairman and CEO roles and Charlie's willingness to accept the Chairman's responsibilities will enable me to focus all my efforts on improving VeriFone's operating performance, ensuring that the necessary control improvements are implemented and positioning the business for the months and years ahead," said Mr. Bergeron.

Subject to management's completion of the restated financial statements and related disclosures for the three quarterly periods being restated, the preparation of the Form 10-K and Form 10-Q for the fiscal periods subsequent to July 31, 2007 as well as the reviews and audit to be conducted by VeriFone's independent registered public accounting firm, VeriFone is currently targeting to file its amended and restated quarterly reports on Form 10-Q/A, its annual report on Form 10-K and its first quarter quarterly report on Form 10-Q on or about April 30, 2008. Because of the rigorous processes that required for the restatement and the related review and audit and the number of periods required to be reported, VeriFone cannot be certain how much time will ultimately be required to complete the restatement process or even whether VeriFone will be able to file these reports by April 30, 2008 and there remains a substantial risk that additional time will be required. VeriFone does not expect to report further on the restatement process, other than possibly to provide updates as to the timing of the process, until the process is complete and its restated financial statements have been published.

VeriFone, Inc.
2099 Gateway Place, Suite 600 San Jose, CA, 95110 USA



## CAUTIONARY INFORMATION REGARDING FORWARD-LOOKING STATEMENTS

This news release contains forward-looking statements, including, without limitation, as to the estimated restated changes to inventory and operating income, and the restatement process, that involve risks and uncertainties. In some cases, forward-looking statements can be identified by words such as "anticipates," "expects," "believes," "plans," "predicts," and similar terms. Risks, uncertainties and assumptions that could affect VeriFone's forward-looking statements include, among other things, completion of the restatements described above and completion of VeriFone's financial statements as of and for the fiscal year ended October 31, 2007 and for the three months ended January 31, 2008. Other risks and uncertainties include, but are not limited to, those discussed under the heading "Risk Factors" in VeriFone's Annual Report on Form 10-K for the year ended October 31, 2006 and subsequent Quarterly Reports on Form 10-Q. Unless required by law, VeriFone expressly disclaims any obligation to update publicly any forward-looking statements, whether as result of new information, future events or otherwise.

About VeriFone Holdings, Inc. (www.verifone.com)

VeriFone Holdings, Inc. ("VeriFone") (NYSE: PAY) is the global leader in secure electronic payment solutions. VeriFone provides expertise, solutions and services that add value to the point of sale with merchant-operated, consumer-facing and self-service payment systems for the financial, retail, hospitality, petroleum, government and healthcare vertical markets. VeriFone solutions are designed to meet the needs of merchants, processors and acquirers in developed and emerging economies worldwide.

Investor Contact:
William Nettles -- Vice President Corporate Development & IR
Tel: 408-232-7979
Email: ir@verifone.com

Editorial Contact:
Pete Bartolik
VeriFone, Inc.
Tel: 508-283-4112
Email: pete_bartolik@verifone.com

VeriFone, Inc.
2099 Gateway Place, Suite 600 San Jose, CA, 95110 USA

EX-99.2 3 f39562exv99w2.htm EXHIBIT 99.2

██████   ████████   ████ █████   ██

Exhibit 99.2



**VeriFone Provides Business Update**

SAN JOSE, CA. – April 2, 2008 -- VeriFone Holdings Inc. (NYSE: PAY) today announced selected preliminary financial information for the period ended October 31, 2007. The financial information set out below is preliminary and remains subject adjustment as the Company's restatement originally announced on December 3, 2007 is completed. This financial information is also subject to audit by VeriFone's independent registered public accounting firm.

VeriFone expects to report revenues for the three months ended October 31, 2007, of $238.9 million, consistent with its December 3, 2007 announcement of the anticipated restatement. For the full year ended October 31, 2007, VeriFone expects to report net revenues of $903.9 million, also consistent with the information reported on December 3, 2007. Net revenues in the Company's fourth quarter were relatively strong in certain emerging markets, notably in Brazil, as well as in Canada, the U.K. and in the U.S. multi-lane business. These strengths were offset to some extent by softness in Mexico and Venezuela.

During the three months ended October 31, 2007, VeriFone's gross margin percentages were adversely affected by charges for excess and obsolete inventory as well as liabilities related to purchase obligations for excess components held by contract manufacturers, in each case largely non-PCI compliant inventory and components. In addition International margins were affected by adverse mix in country and products, as well as lower service margins and several lower margin deals. VeriFone also established a reserve for claims related to an acquired product which has proven defective in the field. Including these events and charges, VeriFone expects to report gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, as a percentage of net revenues, of approximately 32-34 %, for the three months ended October 31, 2007. GAAP gross margins as a percentage of net revenues for the three months ended October 31, 2007, are expected to come in at approximately 28-29%, primarily as a result of the amortization of purchased technology assets.

VeriFone intends to provide as soon as practicable financial information in a similar form for its first fiscal quarter ended January 31, 2008. Toward the end of the first quarter, management took a number of actions to respond to the extremely challenging net revenue environment. These actions included the reduction in the Company's total headcount by approximately 6% worldwide and the consolidation of the Company's Turkish assembly operation into Israel and its outsourced Thailand assembly operation into existing contract manufacturing operations in China.

Douglas Bergeron, Chief Executive Officer, said: "Although we have faced a number of very difficult challenges over the past several months, we remain confident in the fundamentals of the Company's business model and the inherent growth prospects of the industry; namely, providing technology infrastructure that facilitates the worldwide trend towards electronic payments as a substitute for cash."

"We are working hard to regain our investors' confidence in our ability to execute on this business model in the quarters ahead."

VeriFone, Inc.
2099 Gateway Place, Suite 600 San Jose, CA, 95110 USA



## CAUTIONARY INFORMATION REGARDING FORWARD-LOOKING STATEMENTS

This news release contains forward-looking statements, including, without limitation, as to the estimated restated changes to inventory and operating income, and the restatement process, that involve risks and uncertainties. In some cases, forward-looking statements can be identified by words such as "anticipates," "expects," "believes," "plans," "predicts," and similar terms. Risks, uncertainties and assumptions that could affect VeriFone's forward-looking statements include, among other things, completion of the restatements described above and completion of VeriFone's financial statements as of and for the fiscal year ended October 31, 2007 and for the three months ended January 31, 2008. Other risks and uncertainties include, but are not limited to, those discussed under the heading "Risk Factors" in VeriFone's Annual Report on Form 10-K for the year ended October 31, 2006 and subsequent Quarterly Reports on Form 10-Q. Unless required by law, VeriFone expressly disclaims any obligation to update publicly any forward-looking statements, whether as result of new information, future events or otherwise.

About VeriFone Holdings, Inc. (www.verifone.com)

VeriFone Holdings, Inc. ("VeriFone") (NYSE: PAY) is the global leader in secure electronic payment solutions. VeriFone provides expertise, solutions and services that add value to the point of sale with merchant-operated, consumer-facing and self-service payment systems for the financial, retail, hospitality, petroleum, government and healthcare vertical markets. VeriFone solutions are designed to meet the needs of merchants, processors and acquirers in developed and emerging economies worldwide.

Investor Contact:
William Nettles -- Vice President Corporate Development & IR
Tel: 408-232-7979
Email: ir@verifone.com

Editorial Contact:
Pete Bartolik
VeriFone, Inc.
Tel: 508-283-4112
Email: pete_bartolik@verifone.com

VeriFone, Inc.
2099 Gateway Place, Suite 600 San Jose, CA, 95110 USA

exv99w3

EX-99.3 4 f39562exv99w3.htm EXHIBIT 99.3

Exhibit 99.3

CONFORMED COPY

### SEPARATION AGREEMENT AND GENERAL RELEASE

This Agreement is between VeriFone, Inc. and VeriFone Holdings, Inc. (collectively, "Employer"), and Barry Zwarenstein, an individual ("Employee") (collectively, "Parties").

### RECITALS

Employee is currently employed by Employer.

Employee is willing to tender his resignation from employment with Employer and all Affiliates, and Employer desires to accept Employee's resignation, as provided herein. "Affiliate" shall be defined as any entity that directly or indirectly controls, is controlled by, or is under common control with Employer.

ACCORDINGLY, the Parties agree as follows:

1. **Employer Obligations.**

(a) **Severance Payment.** Within five (5) business days of the Resignation Date, as defined below, Employer shall pay Employee the lump sum of Two Hundred Fifty Thousand Dollars ($250,000), representing Employee's right to severance under any and all severance agreements and Employer's severance policies, if any, offset by the amount of quarterly bonus payments received by Employee with respect to Employer's fiscal year ended October 31, 2007 which Employee has agreed to reimburse to Employer because Employer's restated results did not achieve the bonus targets. Notwithstanding anything in this Agreement to the contrary, Employee shall have no right to severance payments hereunder or under any severance agreements or Employer's severance policies, if Employee voluntarily terminates his employment hereunder or his employment is terminated for cause by Employer prior to the Resignation Date.

(b) **Continued Employment.** Employer shall continue to employ Employee through the Resignation Date under the same terms and conditions of employment as existed immediately prior to the Effective Date, including without limitation base salary and benefits.

(c) **Accrued Pay.** On the Resignation Date, Employer shall pay Employee unpaid compensation earned through the Resignation Date and earned but untaken vacation earned through the Resignation Date.

(d) **Business Expenses.** Employer shall reimburse Employee for all reasonable business expenses incurred on or prior to the Resignation Date promptly upon submission by Employee of appropriate documentation of such expenses in accordance with normal Employer policy.

(e) **Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").** Employer shall provide Employee COBRA benefits following the

1

Resignation Date as required by law, with Employer to pay the COBRA premiums for a period not to exceed eighteen (18) months. Employee promptly shall notify Employer in the event that Employee is covered by a subsequent employer's medical plan. Employer shall have no obligation to pay COBRA premiums on behalf of Employee after the effective date of coverage of Employee by a subsequent employer's medical plan.

(f) **Access to Documents**. Upon request by Employee or his counsel, Employer shall provide Employee or his counsel reasonable and prompt access to non-privileged documents that will assist Employee in defending himself against any action, investigation, or other proceeding.

(g) **Indemnification and Advancement of Fees**. Employer shall indemnify Employee and shall advance him attorney's fees and costs, within thirty (30) days of receipt of each invoice, as required by applicable law and as provided by the Certificate of Incorporation and By-Laws of Employer and any Affiliate. .

(h) **Attorneys Fees and Costs**. Employer shall pay counsel for Employee within thirty (30) days of receipt of invoices for reasonable attorneys fees and costs incurred prior to the Effective Date in connection with (a) the negotiation and drafting of this Agreement and (b) the investigation or defense of any pending or threatened litigation or governmental action.

(i) **Prospective Employers**. Unless otherwise authorized by Employee, Employer (i) shall communicate to any prospective employer of Employee only the dates of his employment and his title as of the Resignation Date and (ii) shall not communicate to such prospective employers any view regarding Employee's performance or conduct while employed by Employer or any view regarding his responsibility or lack of responsibility for Employer's restatement of earnings.

2. **Employee Obligations**.

(a) **Continued Employment and Resignation**. From the Effective Date through the Resignation Date, Employee shall continue to perform the same duties and have the same responsibilities under the same terms and conditions of employment as were in effect immediately prior to the Effective Date. Employee hereby resigns his employment with Employer and all Affiliates with effect as of the close of business on the business day after the Reporting Completion Date, as defined below, or such earlier date as the Board of Directors of Employer may in its complete discretion determine ("Resignation Date"). Subject to Section 1(a), Employee may, at his complete discretion, voluntarily terminate his employment hereunder at any time prior to the Resignation Date. Employee also hereby resigns from all offices and directorships, if any, with Employer and all Affiliates effective as of the Resignation Date including such earlier date as the Board of Directors of Employer may in its complete discretion determine. The "Reporting Completion Date" means the last date on which Employer has completed and filed all of the following reports: its amended and restated quarterly reports on Form 10-Q/A for the three month periods ended January 31, April 30 and July 31, 2007; its

2

annual report on Form 10-K for the year ended October 31, 2007; and its Form 10-Q for the three months ended January 31, 2008.

(b) **Cooperation**. Both before and after the Resignation Date, Employee shall cooperate reasonably with Employer in connection with (i) the orderly transfer of Employee's responsibilities, (ii) any internal investigation, and the defense or prosecution of any claim that may be made against or by Employer or any of its Affiliates (with the exception of any claims that may be asserted by Employer against Employee or Employee against Employer), or in connection with any ongoing or future investigation or dispute or claim of any kind involving Employer or any of its Affiliates, including any proceeding, civil or criminal, before any arbitral, administrative, judicial, legislative, or other body or agency, including testifying in or in connection with any proceeding, to the extent such claims, investigations or proceedings relate to services performed or required to be performed by Employee, pertinent knowledge possessed by Employee, or any act or omission by Employee (including without limitation the defense of any action or proceeding brought by any governmental agency or third party against Employer or any of its Affiliates that relates in any way to Employee's acts or omissions while employed by Employer or any of its Affiliates); and (iii) any effort by Employer to obtain the proceeds of insurance policies with respect to the matters set forth in section (b)(ii) hereof. Employee shall not be obliged to provide cooperation under this Section 2(b) where providing such cooperation would impose an undue hardship on Employee, or unreasonably interfere with, Employee's business, personal, or other obligations. Solely for purposes of responding to or cooperating with Employer in responding to any ongoing or future investigation or dispute or claim involving Employer or any of its Affiliates or Employee, Employer will provide to Employee's counsel, within five (5) business days of the Effective Date, a forensic copy of Employee's Employer-issued computer hard drive. Information contained in said forensic copy shall be maintained by Employee's counsel as confidential and privileged for use only in connection with proceedings as described above and no such information may be disclosed by Employee or his counsel to any third party without the prior approval of Employer except to the extent such information is disclosed pursuant to valid legal process after reasonable prior notice to Employer enabling Employer to take reasonable steps to preserve or protect confidential or proprietary information.

(c) **Return of Property**. Other than as set forth in Section 2(b), not later than the Resignation Date, Employee shall return to Employer all property of Employer, including, without limitation, all equipment, computers, documents, books, records, reports, contracts, lists, and computer files and data. .

(d) **Confidential Information**. The Patent and Confidential Information Agreement between Employer and Employee dated June 1, 2004 shall remain in full force and effect, and Employee shall continue to be bound by its provisions.

(e) Withholding. Employer will withhold from any compensation and benefits payable to Employee hereunder, including all appropriate deductions for

3

employee benefits, if applicable, and the amounts necessary for Employer to satisfy its withholding obligations under Federal, state and local income and employment tax laws.

**3. Releases.**

(a) **Employee Release.** Employee and his representatives, heirs, successors, and assigns do hereby completely release and forever discharge Employer, any Affiliate, and its and their present and former shareholders, officers, directors, agents, employees, attorneys (of Employer, any Affiliate, any director, and any committee of directors), successors, and assigns (collectively, "Employee Released Parties") from all claims, rights, demands, actions, obligations, liabilities, and causes of action of every kind and character, known or unknown, mature or unmatured, which Employee may have as of the Effective Date or has ever had, whether based on tort, contract (express or implied), or any federal, state, or local law, statute, or regulation (collectively, the "Employee Released Claims"). By way of example and not in limitation of the foregoing, Employee Released Claims shall include any claims arising under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the California Fair Employment and Housing Act, as well as any claims asserting wrongful termination, breach of contract, breach of the covenant of good faith and fair dealing, violation of public policy, negligent or intentional infliction of emotional distress, negligent or intentional misrepresentation, fraud, negligent or intentional interference with contract or prospective economic advantage, defamation, invasion of privacy, and claims related to disability. Employee Released Claims shall also include, but not be limited to, claims for severance pay, bonuses, sick leave, vacation pay, life or health insurance, or any other fringe benefit. Employee likewise releases the Employee Released Parties from any and all obligations for attorneys' fees incurred in regard to the above claims or otherwise incurred prior to the Effective Date, except as provided in this Agreement. Notwithstanding the foregoing, Employee Released Claims shall not include any claims based on or relating to (i) obligations created by or reaffirmed in this Agreement; (ii) Employee's 401(k) plan; (iii) stock options or restricted stock units that are vested as of the Effective Date or will vest on or before the Resignation Date; (iv) claims which by law cannot be waived, including without limitation workers' compensation claims (the settlement of which would require approval by the California Workers' Compensation Appeals Board) and unemployment claims; (v) any right to indemnification, including advancement of fees and costs, under the California Labor Code, the Delaware General Corporation Law, or other applicable law or under the Employer's Certificate of Incorporation or By-Laws; and (vi) any right under any of the Excluded Agreements, as defined below.

(b) **Employer Release.** Employer, its Affiliates, and their successors and assigns do hereby completely release and forever discharge Employee, his representatives, heirs, successors, and assigns (collectively, "Employer Released Parties") from all claims, rights, demands, actions, obligations, liabilities, and causes of action of every kind and character, known or unknown, matured or unmatured, that Employer may have as of the Effective Date or has ever had, whether based on tort, contract (express or implied), or any federal, state, or local law, statute, or regulation (collectively, the "Employer Released Claims"). Employer likewise releases the

4

Employer Released Parties from any and all obligations for attorneys' fees incurred in regard to the above claims or otherwise incurred prior to the Effective Date. Notwithstanding the foregoing, Employer Released Claims shall not include any claims based on or relating to (i) obligations created by or reaffirmed in this Agreement; (ii) any of the Excluded Agreements, as defined below; (iii) claims asserted by persons or entities other than Employer (regardless of whether any such claims ultimately benefit employer); (iv) in the event that Employee is not entitled to indemnification under the Delaware General Corporation law, rights to contribution in any federal securities class action pursuant to the terms of the Private Securities Litigation Reform Act; and (v) claims which by law cannot be waived.

"Excluded Agreements" means the following written agreements between Employee and Employer:

- the Indemnification Agreement entered into December 19, 2005;
- the Patent and Confidential Information Agreement dated June 1, 2004;
- all stock option plans, including without limitation,
  - the VeriFone Holdings, Inc. New Founders Stock Option Plan adopted by the Board of Directors on April 29, 2003
  - the VeriFone Holdings, Inc. 2005 Employee Equity Incentive Plan
  - the VeriFone Holdings, Inc. 2006 Equity Incentive Plan
- all agreements relating to stock options, including without limitation
  - the Non-Qualified Stock Option Notice dated August 9, 2004 (Grant no. 458 for 325,000 option shares),
  - the Non-Qualified Stock Option Notice dated April 29, 2005 (Grant no. 824 for 125,000 option shares),
  - the Non-Qualified Stock Option Notice dated March 22, 2006 (Grant no. 1085 for 80,000 option shares)
  - the Non-Qualified Stock Option Notice dated July 2, 2007 (Grant no. 2677 for 35,000 option shares)
  - the Nonqualified Stock Option Agreement dated July 1, 2004
- all agreement relating to restricted stock units, including without limitation
  - the Restricted Stock Unit Award Notice dated March 22, 2006 (Grant no. 1090 for 10,000 restricted stock units)

5

- the Restricted Stock Unit Award Notice dated September 12, 2006 (Grant no. 1773 for 40,000 restricted stock units)

Wherever this Agreement refers to any "Released Party" it shall mean any Employee Released Party or any Employer Released Party, as applicable, and "Released Claim" shall mean any Employee Released Claim or any Employer Released Claim, as applicable.

4. **Section 1542 Waiver**. Employee and Employer understand and agree that the Released Claims include not only claims presently known to Employee and Employer but also include all unknown or unanticipated claims, rights, demands, actions, obligations, liabilities, and causes of action of every kind and character that would otherwise come within the scope of the Released Claims as described in the preceding Section 3. Employee and Employer understand that they may hereafter discover facts different from what they now believe to be true, which if known, could have materially affected this Agreement, but nevertheless waive any claims or rights based on different or additional facts. To ensure that the releases set forth in Section 3 are fully enforceable in accordance with their terms, Employee and Employer knowingly and voluntarily waive any and all rights or benefits that they may have, now or may discover in the future, in regard to Released Claims, under the terms of Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

5. **Non-admission**. The Parties understand and agree that the furnishing of the consideration for this Agreement shall not be deemed or construed at any time or for any purpose as an admission of liability by Employer or by Employee. The liability for any and all claims is expressly denied by Employer and by Employee.

6. **Confidentiality**. The Parties understand and agree that this Agreement and each of its terms, and the negotiations surrounding it, are confidential and shall not be disclosed by Employee, or by any director, officer, manager, or employee of Employer or any Affiliate, to any entity or person, for any reason, at any time, without the prior written consent of the other Party, unless required by law. Notwithstanding the foregoing, this Agreement may be filed as an Exhibit to a Current Report on Form 8-K by Employer within four (4) business days of the date of this Agreement. Notwithstanding the foregoing, Employee may disclose the terms of this Agreement in confidence to his spouse, and for legitimate business reasons, in confidence to his legal, financial, and tax advisors. Employer may disclose the terms of this Agreement in confidence for legitimate business reasons to its directors, officers, employees, and legal, financial, and tax advisors.

6

7. **Integration**. The Parties understand and agree that the preceding Sections recite the sole consideration for this Agreement; that no representation or promise has been made by Employee, Employer, or any other Released Party concerning the subject matter of this Agreement, except as expressly set forth in this Agreement; and that all agreements and understandings between the Parties concerning the subject matter of this Agreement are embodied and expressed in this Agreement. This Agreement shall supersede all prior or contemporaneous agreements and understandings among Employee, Employer, and any other Released Party, whether written or oral, express or implied, with respect to the employment, termination, and benefits of Employee, including without limitation, any employment-related agreement or benefit plan, except to the extent that the provisions of any such agreement or plan have been expressly referred to in this Agreement as having continued effect.

8. **Amendments; Waivers**. This Agreement may not be amended except by an instrument in writing, signed by each of the Parties. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power under this Agreement preclude any other or further exercise thereof, or the exercise of any other right, remedy, or power provided herein or by law or in equity.

9. **Assignment; Successors and Assigns**. Employee agrees that he will not assign, sell, transfer, delegate, or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any rights or obligations under this Agreement. Any such purported assignment, transfer, or delegation shall be null and void. Employee represents that he has not previously assigned or transferred any claims or rights released by his pursuant to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, successors, attorneys, and permitted assigns. This Agreement shall also inure to the benefit of any Released Party.

10. **Severability**. If any provision of this Agreement, or its application to any person, place, or circumstance, is held by an arbitrator or a court of competent jurisdiction to be invalid, unenforceable, or void, such provision shall be enforced to the greatest extent permitted by law, and the remainder of this Agreement and such provision as applied to other persons, places, and circumstances shall remain in full force and effect.

11. **Attorneys' Fees**. In any legal action or other proceeding brought to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs.

12. **Governing Law**. This Agreement shall be governed by and construed in accordance with the law of the State of California.

13. **Interpretation**. This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party. By way of example and not in limitation, this Agreement shall not be construed in favor of the party receiving a benefit

7

nor against the party responsible for any particular language in this Agreement. Captions are used for reference purposes only and should be ignored in the interpretation of the Agreement.

14. **Acknowledgment**. The Parties acknowledge (i) that they have read and understand the Agreement and they are fully aware of its legal effect; and (ii) they are entering into this Agreement freely and voluntarily, and based on each party's own judgment and not on any representations or promises made by the other party, other than those contained in this Agreement.

15. **Effective Date**. This Agreement shall become effective on the date on which it shall first have been executed by both Parties ("Effective Date").

The Parties have duly executed this Agreement as of the dates indicated below.

/s/ ZWARENSTEIN                                    Date: April 1, 2008
Barry Zwarenstein

VeriFone, Inc.

By: /s/ DOUGLAS BERGERON                           Date: April 1, 2008

Its: Chief Executive Officer

VeriFone Holdings, Inc.

By: /s/ DOUGLAS BERGERON                           Date: April 1, 2008

Its: Chief Executive Officer

8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**PRIORITY SEND**

CIVIL MINUTES -- GENERAL

Case No.   **CV 07-05567-JFW (SSx)**
**CV 07-05855-JFW (SSx)**

Date: October 25, 2007

Title:   Martin Appelbaum derivatively on behalf of Countrywide Financial Corporation v.
Angelo R. Mozilo et al.
Earl G. Hemberger derivatively on behalf of Countrywide Financial Corporation v.
Angelo R. Mozilo et al.

PRESENT:

HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

Shannon Reilly                    None Present
Courtroom Deputy                Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:
None                                    None

PROCEEDINGS (IN CHAMBERS):      **ORDER DENYING WITHOUT PREJUDICE JOINT
MOTION FOR CONSOLIDATION AND
APPOINTMENT OF LEAD COUNSEL [filed
9/11/07; docket no. 6]; and**

**ORDER TO SHOW CAUSE WHY CASE NO. CV
07-05855-JFW (SSx) SHOULD NOT BE
DISMISSED FOR LACK OF SUBJECT MATTER
JURISDICTION**

On September 7, 2007, Plaintiff Earl G. Hemberger ("Plaintiff") filed a Complaint against
Defendants Countrywide Financial Corporation ("Countrywide"), Angelo R. Mozilo, Henry G.
Cisneros, Jeffrey M. Cunningham, Robert J. Donato, Michael E. Dougherty, Martin R. Melone,
Robert T. Parry, Oscar P. Robertson, Keith P. Russell, and Harley W. Snyder (collectively
"Defendants") alleging violation of California Corporations Code section 25402, violation of
California Corporations Code section 25403, four claims for relief for breach of fiduciary duty, a
claim for relief for waste of corporate assets, and a claim for relief for quasi-contract/unjust
enrichment. In his Complaint, Plaintiff alleges that this Court has subject matter jurisdiction over
this matter on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332.

Subject matter jurisdiction based upon diversity of citizenship requires that all plaintiffs be of
different citizenship than all defendants. *See Strawbridge v. Curtiss*, 7 U.S. 267 (1806); *Tosco
Corp. v. Communities for a Better Environment*, 236 F.3d 495, 499 (9th Cir. 2001) ("diversity of

citizenship requires that no defendant have the same citizenship as any plaintiff"). In the Verified Shareholder Derivative Complaint, Plaintiff fails to allege the citizenship of the following defendants: Angelo R. Mozilo, Henry G. Cisneros, Jeffrey M. Cunningham, Robert J. Donato, Michael E. Dougherty, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, and Harley W. Snyder. Moreover, Plaintiff alleges that he is a citizen of Ohio. However, in case No. CV 07-05567-JFW (SSx), *Martin Appelbaum derivatively on behalf of Countrywide Financial Corporation v. Angelo R. Mozilo et al.*, Plaintiff Martin Appelbaum alleges in his First Amended Shareholder Derivative Complaint that Defendant Oscar P. Robertson is also a citizen of Ohio. Therefore, it appears that the Court does not have subject matter jurisdiction over Case No. CV 07-05855-JFW (SSx).

Accordingly, Plaintiff is hereby ordered to show cause, in writing, no later than November 2, 2007, why this action should not be dismissed for lack of subject matter jurisdiction. No oral argument on this matter will be heard unless otherwise ordered by the Court. *See* Fed. R. Civ. P. 78; Local Rule 7-15. The Order will stand submitted upon the filing of the response to the Order to Show Cause.

If Plaintiff files an amended complaint which corrects the jurisdictional defects noted above on or before November 2, 2007, the Court will consider that a satisfactory response to the Order to Show Cause. Failure to respond to the Order to Show Cause will result in the dismissal of this action

In light of the Court's OSC, the Joint Motion for Consolidation and Appointment of Lead Counsel is **DENIED without prejudice**.

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.

Initials of Deputy Clerk _sr_