1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE VERIFONE HOLDINGS, INC.
SHAREHOLDER DERIVATIVE
LITIGATION

No. C 07-6347 MHP

This Document Relates to:
C 07-6347 (King); C 08-1132 (Hillborn);
C 08-1133 (Patel); C 08-1301 (Lemmond)

_____/

**MEMORANDUM & ORDER**

**Re:  Nominal Defendant's Motion to Dismiss
Plaintiff's Second Consolidated Amended
Shareholder Derivative Complaint for
Failure to Make Demand**

This action is related to *In re VeriFone
Holdings Inc. Sec. Litig.*, C 07-6140 MHP

This consolidated litigation represents numerous actions filed derivatively against nominal

defendant VeriFone Holdings, Inc. ("VeriFone") and some of VeriFone's current and former officers

and directors by its shareholder, alleging breaches of fiduciary duties and related causes of action.

Now before the court is VeriFone's motion to dismiss plaintiff's second consolidated amended

shareholder derivative complaint under Federal Rules of Civil Procedure 12(b)(6) and 23.1 for

failure to make demand on VeriFone's Board of Directors (the "Board") prior to bringing this action.

Having considered the arguments and submissions of the parties, the court enters the following

memorandum and order.


BACKGROUND

VeriFone is a Delaware corporation with its principal place of business in San Jose,

California.  It engages in the design, marketing and service of transaction automation systems,

including point-of-sale devices that enable secure electronic payments among consumers, merchants

and financial institutions.  Its main customers include global financial institutions, payment processors, large retailers, government organizations and healthcare companies.  On November 1, 2006, VeriFone acquired Lipman Electronic Engineering Ltd. ("Lipman"), an Israeli-based developer, manufacturer and seller of electronic payment systems and software.  At the time of the acquisition, Lipman was the fourth-largest point-of-sale terminal maker in the world.  The acquisition of Lipman made VeriFone the world's largest provider of electronic payment solutions and services.

On December 3, 2007, VeriFone shareholders learned, via a company press release, that the company would restate its quarterly financial statements for the previous three quarters to correct errors that overstated previously reported profits.  VeriFone publicly announced that its consolidated financial statements for the quarters ending January 31, 2007, April 30, 2007 and July 31, 2007 should not be relied upon due to accounting errors related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory, each of which affected VeriFone's reported costs of net revenues.  These accounting errors were caused by manual adjustments made by Paul Periolat, VeriFone's supply chain controller.  The restatement resulted in reductions to net revenue of approximately $7.7 million, $11.5 million and $8.4 million for quarters ending January 31, 2007, April 30, 2007 and July 31, 2007, respectively, and reductions to previously reported income of approximately $11.8 million (to a net loss of $602,000), $10.2 million and $14.7 million for these three quarters, respectively.  Cumulatively, operating income for the three quarters fell from $65.6 million to $28.6 million, or an overstatement of 129%.  On the day of the press release, December 3, 2007, shares of VeriFone dropped from $48.03 to $26.03—a decline of over 45%—with over 49 million shares traded.

VeriFone's public announcement exposed it to litigation on various fronts.  On December 4, 2007, a securities class action was filed in the Northern District of California, asserting securities fraud claims against VeriFone, its Chief Executive Officer Douglas Bergeron and its Chief Financial Officer Barry Zwarenstein.  Several other actions alleging securities violations followed, and the cases were related and thereafter consolidated as *In re VeriFone Holdings Inc. Securities Litigation*,

United States District Court

For the Northern District of California

C 07-6140 MHP.  On December 14, 2007, plaintiff Charles R. King filed a shareholder derivative action on behalf of nominal defendant VeriFone against certain VeriFone officers and Board members.  Docket No. 1 (Complaint).  Three other federal derivative actions followed, brought against similar defendants for breach of fiduciary duty and related causes of action, and all four cases were subsequently related and consolidated as the instant action.  Docket No. 17 (Order Relating Cases); Docket No. 36 (Order Consolidating Actions and Appointing Lead Plaintiff and Lead Counsel).  King, a Florida citizen and a current owner of VeriFone common stock, was appointed lead plaintiff.

On October 31, 2008, plaintiff filed a consolidated amended shareholder derivative complaint against VeriFone.  On May 26, 2009, the consolidated complaint was dismissed with leave to amend.  Thereafter, King attempted to obtain VeriFone's books and records under 8 Delaware Code section 220, but was only partially successful.  Docket No. 106 (Statement of Recent Decision), Exh. A (Opinion) at 10 ("In response to King's demand, VeriFone produced approximately 1,350 pages of documents relating to the Lipman acquisition and the VeriFone Board's audit committee's oversight of the integration of Lipman's inventory system.  But, VeriFone refused to produce the audit committee report and its underlying documents, prepared by VeriFone's counsel, summarizing the audit committee's review of the integration process.").  On December 10, 2009, plaintiff filed a second consolidated amended shareholder derivative complaint ("SAC") against VeriFone, alleging that pre-suit demand on the then ten-director Board was futile because VeriFone directors Bergeron, Leslie G. Denend, Robert B. Henske, Charles R. Rinehart, Collin E. Roche and Alex W. Hart (collectively, "director defendants") were each either personally interested in plaintiff's claims or not independent of VeriFone's management or its other directors.  Docket No. 74 (SAC).

Bergeron was on VeriFone's Board at all relevant times and remains on its Board.  Bergeron is alleged to have been aware of Periolat's adjustments because Bergeron expressed displeasure at an initial gross margin report and thereafter signed VeriFone's Securities and Exchange Commission ("SEC") filings that reflected a sharp increase in inventory.  Between December 11, 2006 and

United States District Court
For the Northern District of California

December 3, 2007, Bergeron sold approximately two million shares of VeriFone stock for proceeds of $79 million. Henske, Denend and Rinehart are current members of VeriFone's Board and served on VeriFone's Audit Committee between December 11, 2006 and December 3, 2007. Roche and Hart were on VeriFone's Board at all relevant times and remain on its Board. No allegations that have not already been dismissed are leveled against the remaining four directors.

LEGAL STANDARD

I.      Rule 12(b)(6) motion to dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A motion to dismiss should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 554, 570 (2007); *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistereri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of their claim that would entitle plaintiff to relief. *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997). Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court need not, however, accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

II.     Rule 23.1 requirements

Pursuant to Federal Rule of Civil Procedure 23.1(b)(3), a shareholder who brings a derivative suit "must first demand action from the corporations' directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999). Demand requirements for a derivative suit, and the circumstances under which demand would be futile, are determined by the law of the state of incorporation which, in this

4

instance, is Delaware. *Id.* at 990; *Rales v. Blasband*, 634 A.2d 927, 931 n.7 (Del. 1993). The demand requirement is a "substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006).

To show futility of demand under Delaware law, a plaintiff must allege particularized facts creating a reasonable doubt that: 1) the directors are disinterested and independent; or 2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The relevant board of directors is the one in place at the time the amended complaint is filed. *Braddock*, 906 A.2d at 786 ("[W]here a complaint is amended with permission following a dismissal without prejudice, even if the act or transaction complained of in the amendment is essentially the same conduct that was challenged in the original dismissed complaint, the Rule 23.1 demand inquiry must be assessed by reference to the board in place at the time when the amended complaint is filed."). "[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent." *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 944 n.69 (Del. Ch. 2003) (citation omitted).

DISCUSSION

There is no dispute that plaintiff did not make a demand on VeriFone's Board before filing his second consolidated amended complaint. Plaintiff does not challenge the exercise of business judgment; consequently, futility of demand is based on whether plaintiff has alleged particularized facts creating a reasonable doubt that the directors are disinterested and independent. Plaintiff must establish such reasonable doubt as to at least five of the ten directors on VeriFone's Board. To the extent plaintiff claims that the Board is not independent, his arguments have already been rejected. *See* Docket No. 64 (Dismissal Order) at 15-17. Consequently, the court focuses on plaintiff's allegations regarding the Board members' interestedness.

5

A director is deemed "interested" where he or she will receive a personal financial benefit from a transaction that is not equally shared by the shareholders or when he or she faces a "substantial likelihood" of personal liability. *Rales*, 634 A.2d. at 936; *Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003) ("Directors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood." (citation omitted)). A substantial likelihood of personal liability can exist for breach of *Caremark* duties to oversee internal controls despite numerous "red flags."

A *Caremark* claim creates director liability for a failure to exercise oversight, based on an underlying lack of good faith. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 970-71 (Del. Ch. 1996). Specifically, a *Caremark* claim exists when directors and officers fail to implement any reporting or information system or controls or, having implemented such controls, consciously fail to oversee their operations, thus disabling themselves from being informed of risks or problems requiring their attention. *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."). However, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Caremark*, 698 A.2d at 971. Therefore, there must be a showing that the directors breached their fiduciary duty by failing to attend to their duties in good faith, or put otherwise, that the directors were conscious of the fact that they were not doing their jobs. *Guttman*, 823 A.2d at 506.

Plaintiff alleges that the director defendants breached their *Caremark* duties by consciously disregarding numerous "red flags," which indicated that VeriFone's accounting function was either deficient or unreliable. Plaintiff advances seven categories of "red flags," each of which allegedly demonstrates the Board's interestedness: 1) the sharp and unprecedented increase in inventory; 2) the huge, last minute, upward revisions to operating income and gross margins which more than

6

1   doubled VeriFone's operating income; 3) the inventory adjustments themselves; 4) the control

2   deficiency over inventory; 5) the control deficiency over the financial statement close process; 6) the

3   inadequate accounting department and strain due to the Lipman merger; and 7) Bergeron, Roche and

4   Zwarenstein's sale of stock.  Each "red flag" is discussed in turn.

5           Firstly, plaintiff's basic argument regarding the magnitude of the jump in inventory has

6   already been rejected by the court:

7               Plaintiffs also argue that the jump in inventory valuation was a 'red flag' and that the
                Board failed to have adequate internal controls, failed to exercise those controls or
8               ignored the obvious increases in aggregate value of inventory before issuing
                inaccurate financial statements.  Again, the director defendants are not required to
9               possess detailed information about all aspects of the business, nor are they expected
                to monitor or otherwise gauge all of the factors affecting inventory valuation.
10              Plaintiffs do not allege with particularity how, when or which of the directors became
                aware of the inventory valuations and how they failed to act upon this knowledge.

11  Docket No. 64 (Dismissal Order) at 10.  Plaintiff attempts, but ultimately fails, to address the

12  deficiencies outlined above.  SAC; Docket No. 97 (Opposition) at 9-10.  Plaintiff alleges that the

13  director defendants were informed of the inventory valuation during Board and Audit Committee

14  meetings in December 2006, March 2007 and September 2007.  The December 2006 meetings were

15  prior to the purported fraud, and plaintiff has not specifically alleged that the fraud was

16  contemplated at that time.  SAC ¶ 65 (referring to a presentation made to the Board which

17  anticipated an increase of $6.8 million in inventory in Q1 FY07).  Inventories were discussed at the

18  remaining meetings, but the associated meeting minutes do not provide any support for plaintiff's

19  allegations regarding knowledge of the incorrect accounting.  Although the minutes demonstrate that

20  the Board knew inventory was expected to increase $6.8 million for the first quarter of 2007, this

21  knowledge does not suggest that the Board was not doing its job when VeriFone thereafter reported

22  an inventory increase of $44.2 million, from $86.6 million to $130.8 million.  Since the Board was

23  aware that an increase was expected due to the acquisition of Lipman, the magnitude of the increase

24  does not suggest that the directors consciously disregarded the risks or problems associated with this

25  increase.  *See* Docket No. 82 (Cullen Dec.), Exh. M (March 2007 Board Minutes) at 3 ("Zwarenstein

26  then updated the Board on accounts receivable and inventory trends, *which were impacted at the*

27

28                                                    7

United States District Court

For the Northern District of California

1   *beginning of the first quarter by the Lipman acquisition.*  The directors discussed the trends over the

2   quarter in detail.  Mr. Bergeron then presented an update of the forecast for the second quarter and

3   directors asked further questions." (emphasis added)).  Similarly, discussion of inventory issues

4   during the September 2007 meeting does not demonstrate knowledge of the errors.  Indeed, even

5   though the Audit Committee specifically discussed "inventory and inventory valuation" with Ernst

6   & Young, VeriFone's outside accountants, in February 2007, May 2007 and September 2007, no

7   "red flags" were raised by the accountants during those meetings.  *Id.*, Exh. F at 2-3, Exh. H at 2-3,

8   Exh. J at 2-3.

9       Plaintiff also claims that the director defendants had knowledge of the inventory valuation

10  through their review of VeriFone's monthly financial reports and SEC filings.  Plaintiff does not

11  specifically allege facts which suggest that knowledge of falsity can be gleaned from the monthly

12  reports.  The SEC filings demonstrate that the director defendants knew of the increase in inventory;

13  however, they also do not suggest that the director defendants had knowledge of the accounting

14  fraud.  According to the court's prior order, "plaintiffs have alleged no cognizable facts that director

15  defendants were involved in issuing any corporate statements with the knowledge (or where they

16  'should have known') that the disseminated information was deceptive or incomplete or that the

17  directors otherwise intentionally failed to observe proper disclosure requirements."  Dismissal Order

18  at 12.  The monthly financial reports and SEC filings touch only the magnitude of the inventory

19  valuation, and do not suggest the director defendants' knowledge of the underlying faulty

20  accounting, nor do they suggest that the director defendants failed to monitor or otherwise gauge

21  factors affecting inventory valuation.  Thus, plaintiff again fails to provide factual allegations

22  regarding knowledge.  Likewise, the mere filing of SEC form 10-Q with incorrect information is

23  also insufficient to suggest the Board's knowledge of the accounting irregularities.

24      Secondly, plaintiff asserts that the magnitude of the revisions was a "red flag."  This

25  argument has also already been rejected by the court:  "Plaintiffs argue that basic accounting rules or

26  principles combined with the sheer amount of overstatement would indicate that there were

27  problems with the inventory valuation, but this is not sufficient to show with particularity that the

28

United States District Court

For the Northern District of California

1  directors knew about such faulty accounting and decided to do nothing to oversee the accounting

2  valuations." Dismissal Order at 10.  Plaintiff now claims that the preliminary reports, which

3  indicated that gross margins were below expectations, were "red flags" because the final report

4  stated that gross margins were closer in line with expectations.  Plaintiff's argument proves too

5  much; it requires that any adjustment to a preliminary report—if the adjustment leads to the meeting

6  of previously publicized expectations—is a "red flag" that demonstrates interestedness on part of the

7  director defendants.  Without particularized allegations regarding interestedness, interestedness

8  cannot be assumed based on adjustments to a draft document that is subject to revisions.  Moreover,

9  the SAC appears to allege that these reports were distributed only to the company's "finance

10  personnel."  SAC ¶ 66.  Again, without particularized allegations regarding receipt of these

11  preliminary reports by the director defendants, Board interestedness cannot be found.

12          Thirdly, plaintiff argues that Periolat's upward amendments were "suspicious."  Plaintiff

13  claims that "senior management" was aware of these adjustments, but other than that bare allegation,

14  does not provide factual support for this conclusion.  SAC ¶ 78 (alleging knowledge with respect to

15  Bergeron and Zwarenstein only).  Plaintiff does not specify which, if any, of the Board members,

16  save Bergeron, were aware of Periolat's manual adjustments.  Plaintiff further claims that Periolat's

17  presentations to the Audit Committee regarding VeriFone's inventory demonstrates interestedness

18  because the Committee failed to sufficiently question Periolat regarding his manual upward

19  adjustments.  However, as already held, "the director defendants are not required to possess detailed

20  information about all aspects of the business, nor are they expected to monitor or otherwise gauge all

21  of the factors affecting inventory valuation."  Dismissal Order at 10.  In any event, even if these

22  allegations were sufficient to demonstrate interestedness, they touch only Bergeron and the Audit

23  Committee, and do not implicate the other six Board members.

24          Fourthly, plaintiff claims the director defendants allowed control deficiencies over inventory

25  to occur despite warnings that "more diligence is necessary in carrying out the inventory count."

26  SAC ¶ 29.[1]  In a March 19, 2007 letter, VeriFone's outside auditor, Ernst & Young, informed

27  VeriFone's Audit Committee and management regarding VeriFone's control deficiency by stating

28
                                                    9

1    that "entire pallets of inventory" were "missed," part numbers were wrong and incomplete boxes

2    were being counted as full.  *Id.*  Although the letter stated these discrepancies were not "material," it

3    asked VeriFone to "add further measures to validate the correctness of the counts performed."  SAC,

4    Exh. C (E&Y Letter) at 5.  This letter, plaintiff claims, demonstrates that VeriFone's control

5    deficiency remained uncorrected for the period in which Periolat was making his fraudulent

6    inventory adjustments.  The letter, however, does not suggest that the director defendants failed to

7    implement any reporting or information system or controls or, having implemented such controls,

8    consciously failed to oversee their operations, thus disabling themselves from being informed of

9    risks or problems requiring their attention.  To the contrary, VeriFone paid attention to the Ernst &

10   Young letter by responding to it, stating that it was enhancing its training materials and also taking

11   additional steps to identify and remove the poor performers.  *Id.*  Even though it is unclear whether

12   the counting issues existed at VeriFone's foreign warehouses, the non-material counting issues

13   discussed in the letter do not implicate the *a*ccounting wrongs at issue here.  VeriFone's response

14   cannot be ignored merely because it was from management, and not from the Board or Audit

15   Committee.  The Board need not separately respond if the company has already implemented

16   corrective measures.  The undisputed fact remains that the Board commissioned an accounting firm

17   to perform an audit and VeriFone responded, or the Board caused a response, to the stated

18   deficiencies.

19        Fifthly, plaintiff claims that VeriFone's financial statement close process was deficient

20   because "[n]either Periolat's supervisor nor another senior management reviewed Periolat's work.

21   Nor were there proper controls in place to prevent the person responsible for forecasting financial

22   results from making adjustments which allowed the company to meet the forecasts."  SAC ¶ 77.  It is

23   undisputed that in a complaint filed by the SEC, it alleged that "VeriFone's internal controls were

24   inadequate and did not detect the adjustments made by a mid-level controller who was able to make

25   multi-million entries which grossly distorted the company's true financial results."  SAC, Exh. A

26   (SEC complaint) ¶ 27.  Plaintiff's tacit assertion that this lack of review amounts to a failure to

27   implement reporting or information controls is misguided.  The mere inadequacy of internal controls

28

United States District Court

For the Northern District of California

1   does not compel a finding of Board interestedness. *See Stone*, 911 A.2d at 370-71 (affirming Court

2   of Chancery, which held that ineffective internal controls that led to a $50 million fine "is not alone

3   enough for a court to conclude that a majority of the corporation's board of directors is disqualified

4   from considering demand . . . ."). Here, the Audit Committee undertook dozens of specific actions

5   during the relevant period which suggest that it did not fail to implement controls, nor did it disable

6   itself from being informed of risks or problems requiring its attention. SAC, Exh. B (Merkl Report).

7       Plaintiff further claims that the March 19, 2007 Ernst & Young letter stated that VeriFone

8   "does not allow adequate time[] prior to the closing of the general ledger . . . for the completion of

9   thorough management reviews and/or necessary changes." SAC ¶ 48. This, Ernst & Young warned,

10  exposed "the Company to an increased financial statement disclosure risk both from an accuracy and

11  timing perspective." E&Y Letter at 4-5. The letter also states that "it is important that the Company

12  re-evaluate this process and consider the need for additional resources. If necessary, the Company

13  may want to consider allowing more time to close the books before reporting financial results." *Id.*

14  Although plaintiff is right that the director defendants may have been on notice regarding process

15  deficiencies, these allegations do not suggest that the director defendants consciously failed to

16  oversee their operations, thus disabling themselves from being informed of risks or problems

17  requiring their attention. VeriFone paid attention to the letter by responding that it had filled certain

18  key positions, was actively recruiting additional personnel, had hired temporary personnel, had

19  streamlined its reporting process by upgrading to a web-based interface, and implemented software

20  tools to speed up the closing process and provide more local responsibility. *Id.*

21      Plaintiff's allegations regarding a presentation made by Sameer Prabhavalkar, VeriFone's

22  Internal Audit Director, to the Audit Committee—that VeriFone's general ledger closing process

23  was an area of "high" concern that posed a "high" overall risk to VeriFone—do not touch the non-

24  Audit Committee directors; consequently, the presentation cannot demonstrate interestedness of five

25  members of the Board. SAC, Exh. D (Prabhavalkar Presentation).

26      Sixthly, plaintiff claims that VeriFone's accounting department was inadequate and that the

27  Lipman merger further strained already stretched resources. This argument has already been

28

11

United States District Court

For the Northern District of California

rejected: "It is conclusory to state that the directors knew about the internal problems in accounting because they were on the Audit Committee, there were high attrition rates in the accounting department and the Lipman acquisition was complex and not going smoothly. These facts suggest at most that there were weaknesses in the accounting division of VeriFone and difficulties with the Lipman acquisition, not that the directors were conscious of the fact that they were not doing their jobs. This is not enough to expose them to 'oversight' liability based on director failure to act in good faith." Dismissal Order at 11. Plaintiff now presents a confidential witness who claims that VeriFone's controller was both weak and ineffective. SAC ¶ 43. Again, this simply suggests weaknesses in the accounting division of VeriFone. The March 19, 2007 Ernst & Young letter—which states that the role of North American Controller was a "key position" and that VeriFone was having trouble with "recent turnover in personnel and current staffing levels"—also does not suggest the director defendants' awareness of fraud. SAC ¶¶ 42, 48, 58. To the contrary, the directors' detailed response to the letter suggests that they were in fact doing their jobs.

Seventhly, plaintiff claims that Bergeron, Roche and Zwarenstein were selling large amounts of VeriFone stock during the relevant period and therefore had a motive to manipulate financial statistics, such as gross margins, that were important to the price of VeriFone stock. Plaintiff's claims against Bergeron, even if true, do not demonstrate that five members of the Board were interested. Plaintiff's claim against Roche is simply that Roche, through GTCR, sold 9.8 million shares of VeriFone stock for proceeds of $358 million. SAC ¶ 147. This sale, though it provides incentive, does not suggest knowledge. Plaintiff's argument again proves too much as it creates director liability anytime there is a large sale by a director prior to a restatement. Delaware courts have declined to formulate a common law rule that makes a director *per se* interested when a derivative plaintiff alleges that the director made large sales of stock at a time when he possessed inside information. *Guttman*, 823 A.2d at 502. The timing of the sales and amount of stocks sold by the director is but one part of showing interest. Since plaintiff has failed to plead particularized facts regarding what Roche knew about the falsity of the financial statements, his sale of stock, by itself, is insufficient. Finally, Zwarenstein was not on the Board at the time plaintiff filed his SAC, nor

1   was he ever on VeriFone's Board; consequently, his stock sales are irrelevant to the present analysis.

2   The fact that the remaining director defendants were aware (or should have been aware) of this

3   allegedly perverse incentive—which always exists with respect to directors that own company

4   stock—does not suggest personal liability for the remaining director defendants.

5       *Ash v. McCall*, No. Civ. A. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000), does not

6   compel a different result. *Ash* found that "[i]f plaintiffs can allege particularized facts that might

7   enable this Court to infer that HBOC directors (or perhaps members of HBOC's audit committee)

8   did possess knowledge of facts suggesting potential accounting improprieties (such as knowledge of

9   the CFRA reports) and took no action to respond to them until they were confronted (three months

10  after the merger) with DeLoitte's audit report, one could argue that the HBOC directors (or the audit

11  committee members) failed to act in good faith." *Id.* at *15. Plaintiff, however, has failed to allege

12  facts suggesting knowledge of potential accounting irregularities. A larger than expected inventory

13  increase, in light of a merger, does not suggest that the Board knew of Periolat's failure to confirm

14  inventory levels or in-transit inventory valuations. *Miller v. Material Sciences Corp.*, 9 F. Supp. 2d

15  925 (N.D. Ill. 1998), is inapposite. There, the company "employed virtually no internal audit

16  procedures" and "no audit or investigation of [the relevant company division] was conducted [during

17  the relevant time period]." *Id.* at 928. In contrast, there exist numerous internal audit procedures

18  here, including an Audit Committee that met regularly with independent outside accountants that

19  failed to provide the Committee with notice of the irregularities.

20      The *Caremark* court recognized that "[m]ost of the decisions that a corporation, acting

21  through its human agents, makes are, of course, not the subject of director attention" and,

22  consequently, a claim that directors are subject to personal liability for employee failures is

23  "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a

24  judgment." 698 A.2d at 967-68. Plaintiff's new allegations do not suggest that the director

25  defendants had actual or constructive notice of the accounting errors that led to VeriFone's

26  restatement. Thus, plaintiff has not alleged particularized facts that create a reasonable doubt as to

27  the disinterestedness of the directors. Because plaintiff has failed to show that demand is futile, the

28

United States District Court

For the Northern District of California

1    consolidated complaint must be dismissed.  As discussed above, plaintiff's insider trading claims

2    also fail for the same reasons.  *See also* Dismissal Order at 13-14.  And plaintiff's arguments

3    regarding the 10b5-1 plan have already been rejected.  *Id.*  The SEC complaint against VeriFone

4    does not compel a different result because it only discusses the interestedness of Bergeron, and not

5    of the remaining Board members.

6          Moreover, even if Bergeron and the Audit Committee directors were found to be interested,

7    the remaining six directors are not interested.  Plaintiff claims Roche should be imputed to have

8    knowledge of these documents because he was the representative of Golder Rauner LLC ("GTCR")

9    on the Board and his mission was to protect GTCR's substantial financial investment in VeriFone.

10   As of December 31, 2006, GTCR and its affiliates owned approximately 25% of VeriFone, and had

11   therefore appointed two of its principals—Roche and Bondy—to VeriFone's Board to monitor its

12   large investment.  SAC ¶¶ 177-82.  The allegations against Roche are based primarily on VeriFone's

13   monthly reports and the Ernst & Young letter.  Plaintiff alleges that Roche received these documents

14   because of an agreement between GTCR and VeriFone that required VeriFone to send these

15   documents to GTCR.  Opposition, Exh. A (Purchase Agreement) ¶¶ 3A(a), (d).  Since plaintiff failed

16   to specify these facts in the SAC, they may not be considered at this stage; however, they could

17   demonstrate that plaintiff should be allowed leave to amend.  Even if Roche should have reviewed

18   these documents, amendment would be futile for the reasons set forth above.  Moreover, plaintiff

19   does not argue that Roche actually reviewed these documents or that he was obligated to review

20   them.  Significantly, it is unclear whether documents Roche received in his capacity as a principal of

21   GTCR affect his interestedness with respect to his Board position at VeriFone.  Finally, the meager

22   allegations against Hart—knowledge of the sharp and unprecedented inventory increase, and

23   knowledge of other individuals' sale of VeriFone stock—are also insufficient, as discussed above.

24   ///

25   ///

26   ///

27   ///

28
                                                        14

///

CONCLUSION

For the foregoing reasons, VeriFone's motion to dismiss is GRANTED with prejudice.

IT IS SO ORDERED.

Dated: August 25, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court

For the Northern District of California

15

1

## **ENDNOTES**

2

1.      The court appreciates defendants' desire for confidentiality; however, it will not redact large
portions of its order.  In this public forum, certain matters must be discussed openly so that can become
part of the public record.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California